Stephen F. Yunker (CSB 110159)
**YUNKER & SCHNEIDER**
655 West Broadway, Suite 1400
San Diego, California 92101
Tel:  (619) 233-5500
Fax:  (619) 233-5535
Email:  sfy@yslaw.com

James M. Pietz (to be admitted *pro hac vice*)
**PIETZ LAW OFFICE**
429 Forbes Avenue, Suite 1710
Allegheny Building
Pittsburgh, PA  15219
Tel:  (412) 288-4333
Fax  1-866-633-1820
Email:  jpietz@pietzlaw.com

Joseph N. Kravec, Jr.
(to be admitted *pro hac vice*)
Wyatt A. Lison (to be admitted *pro hac vice*)
**FEINSTEIN DOYLE**
    **PAYNE & KRAVEC, LLC**
Allegheny Building, 17th Floor
429 Forbes Avenue
Pittsburgh, PA  15219
Tel:     (412) 281-8400
Fax:     (412) 281-1007
Email:  jkravec@fdpklaw.com
Email:  wlison@fdpklaw.com

*ATTORNEYS FOR PLAINTIFFS AND THE PROPOSED CLASS AND SUBCLASSES*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| VICTOR P. GIOTTA and LORALEE GIOTTA, On Behalf Of Themselves And All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>OCWEN FINANCIAL CORPORATION, OCWEN LOAN SERVICING, LLC, ALTISOURCE PORTFOLIO SOLUTIONS S.A., ALTISOURCE SOLUTIONS, INC.; WILLIAM C. ERBEY; and DOEs 1-50.<br><br>                    Defendants. | **Case No.:**<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1) Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962(c) and (d));<br>(2) Violations of the Fair Debt Collection Practices Act (15 U.S.C. §§ 1601, *et seq*.);<br>(3) Violations Of The Rosenthal Fair Debt Collection Practices Act (California Civil Code §§ 1788, *et seq*.);<br>(4) Violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq*.); and<br>(5) Fraud.<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Victor P. Giotta and Loralee Giotta (collectively "Plaintiffs" or the "Giottas") by their attorneys, bring this class action on their own behalf and on behalf of all others similarly situated against: Defendants Ocwen Financial Corporation ("Ocwen Financial") and Ocwen Loan Servicing, LLC ("Ocwen Servicing") (collectively the "Ocwen Entities"); Defendants Altisource Portfolio Solutions, S.A. (the "Altisource Parent") and Altisource Solutions, Inc. ("Altisource Servicing") (collectively the "Altisource Entities"); and Defendant William C. Erbey and other unknown DOEs defendants (collectively all defendants are referred to as "Defendants").  Plaintiffs allege as follows based on the investigation of their counsel:

## I.     INTRODUCTION

1.     This case is about the abusive, predatory and illegal home mortgage loan servicing business Defendant Erbey orchestrated by means of an illegal scheme involving the Ocwen and Altisource Entities.  Until recently, Erbey controlled each of the Ocwen and Altisource Entities either directly or functionally: Erbey was the CEO of Ocwen Financial, the Executive Chairman of Ocwen Servicing and the Chairman of the Board of Directors of the Altisource Parent and three Altisource subsidiaries.  Effective January 16, 2015, Erbey was forced by the New York Department of Financial Services to resign from these positions as part of a consent order entered following the Department's investigation of the very same practices giving rise to the allegations in Plaintiffs' Complaint.  Despite this, Erbey continues to exercise some control over these entities because he remains largest individual shareholder of both the Altisource Parent and Altisource Servicing (which was a subsidiary of Ocwen Financial until, in 2009, it was spun off into an "independent" company under Erbey's direction).  Moreover, the Ocwen and Altisource Entities continue to operate the scheme Erbey set in motion which continues to harm borrowers as described herein.  This illegal scheme is the "OCWEN Enterprise."[1]

2.     As uncovered by the New York Department of Financial Services, the Ocwen Enterprise is described in detail herein and worked like this: under Erbey's direction, Ocwen Financial caused its subsidiary Ocwen Servicing to acquire the servicing rights to subprime

---

[1] The Ocwen Enterprise is more specifically described in the First Cause of Action below.

Class Action Complaint;
Case No.:

1   mortgages that were likely to become "distressed" (meaning the borrower falls behind on their

2   payments and enters default). [2]  When Ocwen Servicing acquired the servicing rights to a mortgage,

3   it also acquired the right to collect from the borrower fees for certain services in the event the

4   mortgage became distressed.  These services are the Distressed Mortgage Services[3] and the fees

5   Ocwen Servicing charged borrowers for them are the Distressed Mortgage Fees.  Ocwen Servicing

6   keeps the Distressed Mortgage Fees and profits from them.  To increase Ocwen Servicing's profits

7   from the Distressed Mortgage Fees, Ocwen Servicing hired Altisource Servicing (which Erbey also

8   controls) to provide the Distressed Mortgage Services at artificially and unreasonably high prices

9   and to pay for Distressed Mortgage Services that were unnecessary and duplicative of one another.

10  Through this scheme, which was concealed from borrowers, the Ocwen Enterprise reaped increased

11  profits they did not earn at the borrowers' expense.

12          3.      This scheme to charge borrowers for marked-up and duplicative Distressed Mortgage

13  Services was never disclosed to borrowers or otherwise made public until being revealed by the New

14  York State Department of Financial Services beginning, in part, in a February 26, 2014 letter

15  released by the Department.

16          4.      Plaintiffs bring this action seeking injunctive relief and damages on behalf of

17  themselves and thousands of homeowners in California and throughout the United States who have

18  been and continue to be victims of Defendants' unfair and unlawful schemes.

19

20

21

_____

22  [2] For instance, Ocwen Financial guaranteed Ocwen Servicing's performance and financed the
23  transaction when Ocwen Financial acquired servicing rights from the lender on at least one occasion.
    *See* June 13, 2013 Ocwen Financial Corp SEC Form 8-K at p.3, item 1.01, attached hereto as Exhibit
24  1.  *See also id.* at 79 (Ocwen Financial makes the guarantee to induce the bank to sell the servicing
25  rights to Ocwen Servicing's subsidiary).

26  [3] As detailed herein, the Distressed Mortgage Services include: property inspections, property
    appraisals, broker price opinions ("BPOs"), property valuation expenses, foreclosure auctions, and
27  title examinations.  Plaintiffs may learn of other Distressed Mortgage Services for which Ocwen
    Servicing charged borrowers fees as part of the Ocwen Enterprise, and reserve their right to amend
28  their complaint to include additional fees for Distressed Mortgage Services so discovered.

Class Action Complaint;
Case No.:

## II.    PARTIES

5.      Plaintiffs Victor P. Giotta and Loralee Giotta are married and citizens of the State of California, residing in San Jose, Santa Clara County, California. The Giottas have an outstanding mortgage loan, serviced by Ocwen, on their San Jose house in which they have resided for over 50 years.

6.      Defendant William C. Erbey controlled the Ocwen Enterprise through either direct or effective control of its participants including the Ocwen and Altisource Entities.  Mr. Erbey is the former CEO of Ocwen Financial, the Executive Chairman of Ocwen Servicing and former Director and Chairman of the Board of four related Altisource companies, including Altisource Portfolio Solutions S.A., Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions, Ltd.  Mr. Erbey is the single largest shareholder of Ocwen Financial and the Altisource Parent.  On January 16, 2015 he stepped down from his positions as Executive Chairman of Ocwen and Director and Chairman of the Board of Altisource as part of a consent order with the New York Department of Financial Services due to his involvement in a multitude of loan servicing violations, including those described herein.  Mr. Erbey, through his control over the Ocwen and Altisource Entities, regularly conducted business within California at least through January 16, 2015.  Through his control of the Ocwen and Altisource Entities, Mr. Erbey orchestrated the Ocwen Enterprise.

7.      Defendant Ocwen Financial Corporation ("Ocwen Financial") is a publically traded corporation organized under the laws of Florida, with its principal place of business in Atlanta, Georgia.  Ocwen Financial regularly conducts business in California, and regularly conducts business within this District.  Ocwen Financial's main role in the Ocwen Enterprise, as described in detail herein, is to help secure mortgage servicing rights for its subsidiary Ocwen Servicing.

8.      Defendant Ocwen Loan Servicing, LLC ("Ocwen Servicing") is a limited liability company organized under the laws of Delaware, and an indirect wholly-owned subsidiary of Ocwen Financial.  Ocwen Servicing maintains operations in this District related to the activities at issue in this case, including operations involving the servicing of mortgage loans at issue in this action. Ocwen Servicing is headquartered in West Palm Beach, Florida, and is currently licensed to service

mortgage loans in all fifty states, including California, the District of Columbia, and two U.S. territories.  Ocwen Servicing's main role in the Ocwen Enterprise, as described in detail herein, is to contract with the Altisource Entities for Distressed Mortgage Services at artificially high prices and charge borrowers for these inflated services as well as for Distressed Mortgage Services that are unnecessary and duplicative.

9.      Defendant Altisource Portfolio Solutions S.A. (the "Altisource Parent") is a publically traded company incorporated in Luxembourg, with a principal place of business in Atlanta, Georgia.  The Altisource Parent is a closely affiliated company with Ocwen, given that: (i) its former Chairman, William Erbey, owns or controls more than 13% of Ocwen Financial's common stock and 26% of Altisource Portfolio Solutions S.A.'s common stock: (ii) 65% of Altisource's revenue is derived from Ocwen Financial and its subsidiaries; and (iii) no other client accounts for more than 10% of Altisource's revenue.  Altisource Portfolio Solutions S.A. maintains offices and regularly conducts business in California, and regularly conducts business within this District.   Altisource Portfolio Solutions S.A. also conducts business through its subsidiaries, including through Altisource Solutions, Inc. who regularly conducted business within this District. The Altisource Parent's main role in the Ocwen Enterprise, as described in detail herein, is to lease back to Ocwen Financial the mortgage servicing software Ocwen Servicing developed then sold to the Altisource Parent.

10.     Defendant Altisource Solutions, Inc. ("Altisource Servicing") is a subsidiary of Altisource Portfolio Solutions S.A. and is a closely affiliated company with the Ocwen Entities. Altisource Solutions, Inc. was incorporated in Delaware in 2009 after being spun off of Ocwen Servicing, and has its principal place of business in West Palm Beach, Florida.  Altisource Solutions, Inc. is registered to conduct business in California, maintains offices and regularly conducts business in California and within this District.  Altisource Servicing's main role in the Ocwen Enterprise, as described in detail herein, is to provide the Distressed Mortgage Services to Ocwen Servicing at artificially inflated prices so that Ocwen Servicing may pass these inflated prices along to the borrower and the Ocwen Enterprise may profit therefrom.

4

1    **III.    JURISDICTION AND VENUE**

2         11.    Jurisdiction is proper under 28 U.S.C. §§ 1331 for Plaintiffs' claims under RICO and

3    the FDCPA, and under 28 U.S.C. § 1367 the Court may exercise supplemental jurisdiction over the

4    state law claims because all of the claims are derived from a common nucleus of operative facts and

5    are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.  Jurisdiction

6    of this Court is also proper under 28 U.S.C. § 1332(d)(2).  The matter in controversy exceeds the

7    sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members

8    of the class of plaintiffs are citizens of states different from Defendants.

9         12.    Venue is proper within this judicial district pursuant to 28 U.S.C. §1391(b) and (c).

10   Defendants transact business and are found within this District, and a substantial portion of the

11   underlying transactions and events complained of by the enterprise occurred in this district, and

12   affected persons, including Plaintiffs, who reside or resided in this judicial district at the material

13   time. Defendants have received substantial compensation from such transactions and business

14   activity in this District, including as the result of servicing mortgage loans for persons residing in

15   this District. Finally, Defendants reside and/or may be found in this District and the interstate trade

16   and commerce described herein is and has been carried out in part within this judicial District.

17   **IV.    INTRA-DISTRICT ASSIGNMENT**

18        13.    Consistent with Northern District of California Civil Local Rule 3-5(b), assignment to

19   the San Jose Division is appropriate under Civil Local Rule 3-2(c) and 3-2(e), because acts giving

20   rise to the claims at issue in this lawsuit occurred, among other places, in this District, in Santa Clara

21   County, California.

22   **V.    FACTUAL ALLEGATIONS**

23        **A.    Home Mortgage Servicing Industry**

24        14.    The single family home mortgage servicing industry consists of three players: (1)

25   borrowers who obtain mortgages for one- to four-family residential properties; (2) the trusts and

26   investors who own borrowers' mortgages and derive income from borrowers' principal and interest

27   payments; and (3) mortgage servicers that collect borrowers' mortgage payments, pass the principal

28   and interest on to the owner and profit from the fees for ancillary services.

5

15. For more than thirty years, mortgages typically have been "pooled" to create an investment vehicle, often denominated as a trust. Interests in the trusts have been sold to investors that own interests in payment streams generated by principal and interest payments by the borrowers. These interests are called mortgage backed securities.

16. A mortgage servicer (such as Ocwen Servicing) is a company to which borrowers pay their mortgage loan payments and which performs other services in connection with mortgages and mortgage-backed securities. Servicers perform services including: collecting payments from borrowers; applying the payments as provided by the mortgage agreement; forwarding principal and interest to the owner; assessing and collecting money for any distressed mortgage services as provided by the mortgage contract for such things as late payments, property inspection fees, appraisal fees, BPOs, foreclosure auctions and title examinations; managing any escrow created for the payment of taxes and/or insurance; and default and delinquency related activities such as pursuing collections or foreclosing on borrowers' homes.

17. Often, the servicer did not originate the loans it services but became the servicer by purchasing the "mortgage servicing rights" or by entering into a contract with a "master servicer" to act on its behalf as a "subservicer." This occurs at various times throughout the life of the mortgage – including when the borrower is delinquent in payments and may be seeking the servicer's assistance to avoid foreclosure.

18. Under these servicing agreements, the servicer collects the borrower's payments for principal and interest and passes them along to the owner. In contrast, the servicer collects the borrower's payments for ancillary costs (such as the Distressed Mortgage Fees) and profits from them. Thus, every dollar a borrower pays in fees (as opposed to principal and interest) is a dollar of revenue for the servicer. Importantly, this creates a perverse incentive for servicers such as Ocwen Servicing, who have little interest in keeping a loan performing and a vastly greater interest in maximizing fees, including fees resulting from distressed mortgages. As a Member of the Board of Governors of the Federal Reserve System explained, "[w]hile an investor's financial interests are tied more or less directly to the performance of a loan, the interest of a third-party servicer are tied to it only indirectly, at best. The servicer makes money, to oversimplify it a bit, by maximizing fees

6

earned and minimizing expenses while performing the actions spelled out in its contract with the investor…. The broad grant of delegated authority that servicers enjoy under pooling and servicing agreements (PSAs), combined with an effective lack of choice on the part of consumers, creates an environment ripe for abuse."[4]

19. For loan servicers like Ocwen Servicing desiring to maximize profit from servicing loans, the right to charge servicing fees is "ripe for abuse." Because the money Ocwen Servicing can generate from servicing fees is not linked to money generated from principal and interest, Ocwen Servicing makes more money on defaulting mortgages supposedly requiring many services than on performing loans requiring few services. In short, Ocwen Servicing is incentivized to grow its profits by finding ways to charge borrowers additional fees, and distressed borrowers are ripe for exactly that.

20. Mortgage contracts between borrowers and lenders, which provide for the terms under which mortgage servicers must perform their jobs, generally consist of two documents, a promissory note and mortgage or deed of trust. These mortgage contracts, including both of their typical documents, are substantially similar for typical borrowers because they must conform to the standard Fannie Mae / Freddie Mac form contracts, and because they are most easily pooled for reinvestment when they are essentially fungible.

**B. Ocwen Servicing Operates its Subprime Mortgage Servicing Business to Profit the Ocwen Enterprise by Generating Fees**

21. Ocwen Servicing is a mortgage servicer of single-family mortgages (*i.e.*, one to four-family homes), including the mortgages of Plaintiffs and members of the putative class and subclasses defined below. Ocwen Financial touts Ocwen Servicing as being the fourth largest mortgage servicer in the United States, and services over $400 billion of mortgage loans. According to Ocwen Financial's 2013 10-K, California has Ocwen Servicing's largest concentration of loans, which make up approximately 15% of Ocwen Servicing's total loans serviced. Ocwen Servicing is

---

[4] Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference, November 12, 2010, available at http://www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited January 22, 2012.

7

one of the nation's largest "subprime" mortgage servicers, managing more than 1/4 of all outstanding subprime loans in the United States.  According to Ocwen Financial's October 31, 2014 Quarterly Report, Ocwen Servicing then serviced nearly 730,000 subprime loans with an unpaid principal balance of over $123 billion.  Ocwen Servicing is also the largest nonbank servicer in the United States.

22.     "Subprime" loans are those offered at a higher interest rate to individuals who do not qualify for traditional "prime" loans.  Such subprime loans are often given by nontraditional lenders to persons with low credit ratings or other factors indicating that they have a higher probability than the typical borrower of defaulting on the debt repayment.  Subprime loans are given to individuals who do not qualify for better loans because of their risk factors, so subprime loans are more likely to become distressed because a borrower falls behind on their payments.  From Ocwen Servicing's perspective, this translates to greater opportunities to collect fees and increase profits from servicing subprime as opposed to prime loans.

23.     Thus, the gist of Ocwen Servicing's business is to acquire the servicing rights for mortgage loans that are in default already before Ocwen Servicing acquired them.  As recently reported in the Atlanta Business Chronicle:

> Ocwen (NYSE: OCN) runs call centers and other tools to rework or force repayment on mortgages that have gone sour. The idea, [Paul] Koches[5] said, is that it's better to keep a person in their house, paying something, than to kick them out and get nothing at all. Ocwen takes over the distressed loans of other banks and then calls the borrowers to renegotiate.[6]

24.     To put a good face on this, Ocwen Servicing presents itself as committed to helping borrowers whose mortgage loans it services, that it has technology allowing it to lower loan re-default rates, and that it has the ability to keep people from defaulting on loans.  Ocwen Servicing thus spins its business as goodwill using the slogan "Helping Homeowners is What We Do!" rather than what it truly is – selectively profiting directly from borrowers' financial distress.  Yet, despite

---

[5] Paul Koches is the Executive Vice President and General Counsel of Ocwen Financial Corp.

[6] "Ocwen Financial Spends $306M On Bad Loans", Atlanta Business Chronicle (Nov. 11, 2011) which can be found at:  http://www.bizjournals.com/atlanta/print-edition/2011/11/11/ocwen-financial-spends-306m-on-bad.html?page=all.

Class Action Complaint;
Case No.:

its facade, Ocwen Servicing moves subprime loans through foreclosure faster than other subprime servicers.[7]

25.     Under the mortgage servicing rights that Ocwen Servicing acquires, Ocwen Servicing has the unilateral right to assess late fees and other default or delinquency charges provided for in the mortgage agreement.  Ocwen Servicing exercises full discretion to charge late fees and other default and delinquency charges, and collect such charges and fees from borrowers pursuant to the terms of borrowers' mortgage contracts.

26.     When Ocwen Servicing exercises its discretion to assess late fees, default or delinquency charges, Ocwen Servicing advances the money to pay said fees, charges or premiums, and retains the right to recover the amounts advanced from borrowers.  Ocwen Servicing then adds these amounts to borrowers' loans to collect the amounts advanced.  In other words, when Ocwen Servicing performs a Distressed Loan Service such as a property inspection, Ocwen Servicing pays a third party for the service then adds the cost on to the borrower's bill.

27.     As reported by state and federal regulators and made the subject of consent decrees entered with the Ocwen Entities, described herein, Ocwen Servicing, contrary to its commitment to homeowners, routinely, amongst other things: (i) fails to timely and accurately apply payments made by borrowers; (ii) fails to maintain accurate account statements; (iii) charges unauthorized inflated fees for Distressed Mortgage Services; (iv) charges fees for authorized but unnecessary Distressed Mortgage Services; (v) provides false and misleading information to borrowers regarding their loans; and (vi) provides false or misleading information to borrowers about their ability to modify their mortgages.[8]

28.     Using these unfair and fraudulent practices, Ocwen Servicing has made it its business to maximize revenue by, among other things, assessing improper fees and charges to mortgage

---

[7] SEC Form 10-K for Ocwen Financial Corp. for the fiscal year ended December 31, 2013, filed on March            3,            2014            available            at http://www.sec.gov/Archives/edgar/data/873860/000144530514000799/a2013123110k.htm.

[8] *See* Complaint filed by the Consumer Finance Protection Bureau and 49 states attorneys general at www.consumerfinance.gov/f/201312_cfpb_complaint_ocwen.pdf, pp. 12-13 (last visited January 22, 2015).

Class Action Complaint;
Case No.:

loans, and making it difficult for borrowers to modify their existing mortgages to have more favorable terms.  Ocwen Servicing charges borrowers for these needless, unfair, and unlawful charges in order to maximize its revenue and profits from its servicing operations.  However, Ocwen Servicing did not act or profit alone in these practices.

**C.     Ocwen Servicing is Part of Defendant Erbey's Larger Scheme to Overcharge Distressed Borrowers in Conjunction With the Other Defendants**

29.     Since the Ocwen Enterprise's inception in or about August of 2009 and continuing as of the date of the filing of this Complaint, Defendants Erbey and the Ocwen and Altisource Entities conspired to increase their financial revenue and profits by overcharging homeowners for services including, property inspections, broker price opinions ("BPOs"), property appraisals, foreclosure auction services and title examinations (collectively "Distressed Mortgage Services," the fees for which are the "Distressed Mortgage Fees").  Ocwen Servicing accomplishes this by using Altisource Servicing and other subsidiaries of the Altisource Parent to procure these Distressed Mortgage Services, which is facilitated through the use of mortgage servicing software leased from Altisource Servicing that Ocwen Servicing itself originally designed to manage homeowners' loan accounts and assess fees.

30.     Prior to August 2009, Ocwen Servicing's mortgage servicing systems were provided by a subsidiary of Ocwen Financial called Ocwen Solutions.  Ocwen Solutions' mortgage servicing systems provided technological services throughout the lifecycle of the mortgages serviced by Ocwen Servicing – including triggering the Distressed Mortgage Services and the resulting fees at issue in this case – and also including collections and customer relationship management.  Ocwen Financial developed these mortgage servicing systems over a period of more than 20 years at a cost of more than $150 million.

31.     On August 10, 2009, Ocwen Financial, under the direction of Erbey, spun off Ocwen Solutions to create a new, independent company called the Altisource Parent.  It was at or about that time that the Ocwen Entities began using Altisource and the software Ocwen Servicing developed, but was now owned by Altisource, for the Distressed Mortgage Fees described throughout this Complaint.  Ocwen Servicing purportedly spun off Ocwen Solutions in order to focus more on

10

Ocwen Servicing's core servicing business, and to remove any conflicts of interest between Ocwen Servicing and other servicers which were customers of Ocwen Solutions competing with Ocwen Servicing in servicing mortgage loans.  As part of the Altisource spin-off, William C. Erbey, Ocwen Financial's Chairman of the Board and largest individual shareholder owning of 13% of Ocwen Financial's common stock, also became the Chairman of the Board for Altisource.[9]

32.     At the time of Altisource's spin-off from Ocwen Servicing, Ocwen Servicing immediately became Altisource's single largest customer.  Ocwen Servicing remained contractually obligated to purchase mortgage servicing system services from Altisource for eight years after the spinoff.  That obligation was later extended three more years through 2020.[10]  Also at the time of the spin-off, Mr. Erbey became the largest shareholder of the Altisource Parent, holding 27.1% of common stock.[11]

33.     As part of Ocwen Servicing's contractual obligation to purchase services from Altisource Servicing, Ocwen Servicing has agreed to lease the identical mortgage servicing technology services from the Altisource Parent that Ocwen Servicing developed through Ocwen Solutions.  As the Altisource Parent explains its mortgage servicing software, its "Technology

---

[9]  The Altisource Parent was incorporated on November 4, 1999 in Luxembourg as Ocwen Luxembourg S.à r.l.  Altisource Portfolio Solutions S.A..  *See* SEC Form 10-K for the period ended Dec.         31,          2012,          available           at http://www.sec.gov/Archives/edgar/data/1462418/000110465913009969/a13-2839_110k.htm.  The company was renamed Altisource Portfolio Solutions S.à r.l. on May 12, 2009, and converted into the Altisource Parent on June 5, 2009. *Id*. Prior to August 10, 2009, the Altisource Parent was a wholly-owned subsidiary of Ocwen Financial. *Id*.

[10]  The Altisource Parent SEC Form 10-K for the period ended Dec. 31, 2012, available at http://www.sec.gov/Archives/edgar/data/1462418/000110465913009969/a13-2839_110k.htm ("Ocwen, including its wholly owned subsidiary, Ocwen Mortgage Servicing Inc. ('OMS'), are contractually obligated to purchase certain mortgage services and technology services from us under service agreements.  In October 2012, the Ocwen agreement was extended by three years through 2020.  Separately, we signed a similar agreement in October 2012 with OMS effective through 2020.)

[11]  Mr. Erbey was the Chairman of the Altisource Parent and several other related companies, including Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd., and held more than $1 billion in stock in Ocwen and Altisource and their affiliated companies.  *See* Consent Order Pursuant to New York Banking Law § 44, at page 8, available at http://www.dfs.ny.gov/about/ea/ea141222.pdf (last visited January 30, 2015).

Class Action Complaint;
Case No.:

Services" are comprised of: (i) REALSuite software applications, including REALServicing that provides automated workflows and reporting through the entire life of a mortgage loan; (ii) REALTrans which automates the ordering, tracking and fulfilling of services related to mortgage servicing; (iii) REALRemit which allows service providers to submit invoices for payment electronically; and (iv) REALDoc that generates correspondence associated with mortgage loan servicing.[12]

34.     The Altisource Parent's REALSuite platform manages Ocwen Servicing's mortgage loan servicing automatically based on parameters determined by Ocwen Servicing.  This includes ordering, managing and paying for Distressed Mortgage Services including property inspections, BPOs and appraisals provided by local third-party vendors convenient to the home with a mortgage in default.  Ocwen Servicing also assesses fees for these services through the REALSuite platform.

35.     Ocwen Servicing also pays Altisource Servicing to perform services on delinquent loans that Ocwen Servicing could easily do itself, and which formerly were provided "in-house" by Ocwen Servicing or an affiliated company.  Altisource Servicing charges additional fees for these services that are passed along to borrowers by Ocwen Servicing.  These services provided by Altisource Servicing to Ocwen Servicing include services such as property inspections, property appraisals, BPOs, title services and auction services.  By using Altisource Servicing to source these services, Ocwen Servicing passes along higher charges for the services to homeowners than the services would cost if Ocwen Servicing or one of its affiliated companies provided these services.

36.     In its SEC filings, Ocwen Financial acknowledged the potential conflicts of interest created by the close relationship between Erbey and the Ocwen and Altisource Entities.[13]  Among other risks, Ocwen Financial acknowledged that Mr. Erbey and other Ocwen Financial officers and directors had potential conflicts of interests due to the ongoing business relationships between the

---

[12] SEC Form 10-for Altisource Portfolio Solutions S.A., for the period ended December 31, 2013, available at http://www.sec.gov/Archives/edgar/data/1462418/000110465913009969/a13-2839_110k.htm.

[13] Ocwen's     SEC     Form     8-K     filed     July     20,     2009     located     at http://www.sec.gov/Archives/edgar/data/873860/000101905609000723/ocn_8k.htm.

Class Action Complaint;
Case No.:

companies, and due to Mr. Erbey's role as CEO and Chairman of the Board of Ocwen Financial, while also becoming such a substantial stockholder in the Altisource Parent and its Chairman of the Board as well.

37.     The conflicts of interests due to the ongoing relationship between the Ocwen Entities and Altisource Entities were identified by Benjamin Lawsky, Superintendent of the New York State Department of Financial Services in a public letter to Ocwen dated February 26, 2014.[14]  In that letter, Mr. Lawsky noted that Mr. Erbey was not only the Executive Chairman of Ocwen Financial, but was also the largest shareholder of each of several Altisource companies with business ties to the Ocwen Entities, including Altisource Portfolio Solutions, S.A., Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd.  Moreover, Mr. Lawsky noted that Altisource Portfolio Solutions, S.A.'s Chief Risk Officer was also Ocwen Financial's Chief Risk Officer, reported directly to Mr. Erbey in both capacities, and had his salary paid entirely by Ocwen.

### D.     State and Federal Investigations of the Ocwen Enterprise

38.     As part of New York's continued investigation into the Ocwen Enterprise, it was revealed that Ocwen Servicing used an Altisource subsidiary, namely Hubzu, for online auctions of homes of borrowers who were facing foreclosure.[15]  Hubzu charged Ocwen Servicing up to three times the fees it charged non-Ocwen customers, which were passed along to the borrowers facing foreclosure.  Mr. Lawsky noted his concerns about the Ocwen Enterprise's self-dealing, in that it appeared the companies were charging struggling borrowers for inflated mortgage servicing-related fees.

39.     On August 4, 2014, Mr. Lawsky sent another letter raising further concerns about Ocwen Servicing's use of related companies to provide fee-based mortgage servicing, specifically

---

[14] *See* February 26, 2014 letter from Benjamin M. Lawsky to Timothy Hayes, General Counsel for Ocwen Financial Corporation attached as Exhibit 2.

[15] *See* April 21, 2014 letter from Benjamin M. Lawsky to Timothy Hayes, General Counsel for Ocwen Financial Corporation attached as Exhibit 3.

13

Class Action Complaint;
Case No.:

Altisource Servicing.[16]   Mr. Lawsky stated that Ocwen Servicing had funneled as much as $65 million in fees from distressed homeowners to Altisource Servicing "for minimal work."   Ocwen Servicing's use of related companies to provide fee-based services also raised concerns regarding whether the services were priced fairly based on arms-length negotiations, or whether they were simply unlawful up-charges.

40.   On October 21, 2014, Mr. Lawsky sent yet another letter to Ocwen Servicing regarding its mortgage servicing practices related to the company's back-dating of critical letters sent to mortgage borrowers in default.[17]   Mr. Lawsky cited several examples of Ocwen Servicing telling mortgage borrowers that they were in danger of foreclosure if they did not respond by a date prior to the letter actually being sent to the borrower.   Other time-sensitive, backdated letters notified financially stressed borrowers that their request for loan modifications were denied, and that they had to appeal such denial by an imminent and unrealistic date or they would not be able to modify their mortgage loans.   Ocwen Financial's CEO, Ron Faris, wrote an open letter apologizing for the misdating of borrower letters, admitting that in some instances, "there was a significant gap between the date on the face of the letter and the date it was actually generated."[18]

41.   The New York Department of Financial Services is not the only regulator who has taken notice of Ocwen Servicing's improper use of the affiliated Altisource Entities.   On December 19, 2013, the Federal Consumer Finance Protection Bureau ("CFPB") and the attorneys general for 49 states filed a complaint against Ocwen for their mortgage servicing practices.[19]   Among other things, the CFPB and attorneys general alleged that Ocwen unlawfully and unfairly charged unauthorized fees for Distressed Mortgage Services, failed to timely or accurately apply payments

---

[16] *See* August 4, 2014 letter from Benjamin M. Lawsky to Timothy Hayes, General Counsel for Ocwen Financial Corporation attached as Exhibit 4.

[17] *See* October 21, 2014 letter from Benjamin M. Lawsky to Timothy Hayes, General Counsel for Ocwen Financial Corporation attached as Exhibit 5.

[18] See October 24, 2014 Open Letter to Homeowners Concerning Letter Dating Issues at http://shareholders.ocwen.com/releasedetail.cfm?ReleaseID=878151 (last visited January 22, 2015).

[19] Available at www.consumerfinance.gov/f/201312_cfpb_complaint_ocwen.pdf (last visited January 22, 2015).

14

Class Action Complaint;
Case No.:

made by borrowers, and provided false and misleading information to borrowers concerning the status of loan modification requests and foreclosure efforts.  The Ocwen Enterprise's participants and their conspiratorial conduct described herein were not mentioned or otherwise revealed in the CFPB's complaint.

42.     The result of the CFPB action was a federal Consent Judgment affecting 49 states entered on February 26, 2014 which required Ocwen to provide $2 billion in loan modifications to struggling borrowers, but which did not provide any direct cash relief to borrowers for the charges and fees assessed from Ocwen's improper Distressed Mortgage Services.[20]  Again, Altisource, Erbey and their conspiratorial conduct described herein were not mentioned or otherwise revealed in the Consent Judgment.

43.     It was not until Mr. Lawsky, Superintendent of the New York State Department of Financial Services, sent his letter dated February 26, 2014 that the Ocwen Enterprise's conspiratorial conduct described herein was first (and only partially) revealed publically.  On December 22, 2014, the New York State Department of Financial Services entered its own Consent Order Pursuant to New York Banking Law § 44 with the Ocwen Entities, Altisource Entities and Erbey  under which the Ocwen Entities, among other things, committed to make cash payments only to borrowers in New York it serviced who had entered or completed foreclosure proceedings.  The New York Consent Order did not provide any direct cash relief for the charges and fees assessed from the Ocwen Entities' improper Distressed Mortgage Services that are at issue in this Complaint.[21]

44.     The New York Consent Order also included Mr. Erbey's agreement that by January 16, 2015 he would resign and have no directorial, management, oversight, consulting, or any other role at Ocwen Financial or any related party, or at any of Ocwen Financial's or the related parties' affiliates or subsidiaries, and to resign as Chairman of the Board of Directors of each of four related the Altisource Parent companies: Altisource Portfolio Solutions S.A., Altisource Residential

---

[20]     *See* Exhibit 6, Consent Judgment.

[21]     *See* Consent Order Pursuant to New York Banking Law § 44, available at http://www.dfs.ny.gov/about/ea/ea141222.pdf (last visited January 30, 2015).

Class Action Complaint;
Case No.:

Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions, Ltd. According to Ocwen's 8-K filed with the SEC on January 20, 2015, Erbey "retired" from Ocwen's Board and as an officer of the company on January 16, 2015.[22]

45.     As further fallout from the regulators' scrutiny over Ocwen Financial, Ocwen Financial's current CEO, Ronald Faris, announced the company would withdraw from the business of servicing mortgages backed by the U.S. government, and intended to sell such servicing rights for approximately $1.7 billion.  Ocwen Servicing intends to continue to service non-government backed mortgages going forward.

46.     Despite Erbey's involuntary "retirement" at the hands of the New York State Department of Financial Services, the Ocwen Enterprise he set in motion continues to operate. Moreover, Erbey still retains a degree of control over the Ocwen Enterprise, including by virtue of remaining the largest individual shareholder of both the Altisource Parent and Altisource Servicing. Thus, despite Erbey's "retirement," the Ocwen Enterprise's conduct is ongoing and continues to harm borrowers.  As a result of the unlawful Ocwen Enterprise, many thousands of borrowers were cheated out of millions of dollars, none of which has yet been repaid or otherwise compensated.

> **D.     Harm to Borrowers Resulting from Ocwen, Altisource and Erbey's Actions**
>
> > **1.     *Excessive Distressed Mortgage Fees*.**

47.     When a borrower misses a payment and goes into "default," Ocwen Servicing assesses various fees for Distressed Mortgage Services, and adds them to the borrower's outstanding principal and interest on the loan.  These fees are the Distressed Mortgage Fees.  As detailed herein, the Distressed Mortgage Services for which Ocwen Servicing overcharges borrowers include: property inspections, property appraisals, broker price opinions ("BPOs"), property valuation expenses, foreclosure auctions, and title examinations.  Plaintiffs may learn of other Distressed Mortgage Services for which Ocwen Servicing overcharged borrowers fees as part of the Ocwen Enterprise, and reserve their right to amend their complaint accordingly.

---

[22] *See* Ocwen Financial SEC Form 8-K filed January 16, 2015 available at http://google.brand.edgar-online.com/displayfilinginfo.aspx?FilingID=10415213-1084-12051&type=sect&TabIndex=2&companyid=10413&ppu=%252fdefault.aspx%253fsym%253docn

Class Action Complaint;
Case No.:

48.     According to the standardized mortgage agreements applicable here, payments made after a missed payment must **first** go to pay the Distressed Mortgage Fees **before** being applied to the outstanding principal, interest or escrow account.   Thus, if a person pays only the normal mortgage payment amount owed on a month following a "default," there will not be sufficient funds in the payment to cover the principal and interest due after paying the Distressed Mortgage Fees. This obvious and foreseeable shortfall leads to another default, and additional charges and fees, and will continue to do so each month as the payment to cover the principal and interest falls ever more short.

49.     This cascade of fees added monthly to a "default" loan consequently will often put borrowers further and further behind in their payments, keeping them delinquent and unable to catch up on their mortgage payments without going through a loan modification.   This cascade of fees therefore can drive borrowers further into default, and further towards foreclosure, leading to even more Distressed Mortgage Services and Distressed Mortgage Fees imposed by Ocwen Servicing. The assessment of inflated Distressed Mortgage Fees not only harms borrowers by charging them for fees they should not have to pay, but also further harms borrowers by making it difficult, if not impossible, for mortgage borrowers to keep current on their loans after even one missed monthly payment.   Additionally, borrowers who fall further and further behind in their payments due to Ocwen Servicing's assessment of illegal and unfair Distressed Mortgage Fees have their credit scores damaged.   Ocwen Servicing reports mortgage payment history, including delinquencies, to credit reporting companies.   Borrowers kept in default by Ocwen Servicing's conduct therefore can lose their ability to get other loans – including loans to refinance their Ocwen Servicing-serviced loans – and can face higher rates on any loans they are able to obtain.

50.     Plaintiffs have identified the specific Distressed Mortgage Fees Ocwen Servicing charges borrowers that have already been found to be inflated by virtue of the Ocwen Enterprise's scheme, including the following:

a.   Prior to spinning-off its internal Distressed Mortgage Service function to Altisource Servicing, Ocwen Servicing paid real estate agents $45-$50 to perform

17

a BPO.[23]   Since the spin-off to Altisource Servicing, Ocwen Servicing charges struggling homeowners approximately $100 for each BPO.

    b.   Ocwen Servicing uses another Altisource subsidiary, Hubzu, for its foreclosure auctions, that is retained through Altisource Servicing.  According to Mr. Lawsky, Hubzu charges Ocwen Servicing up to three times the fees it charges non-Ocwen customers for the same services.   These inflated fees are passed onto those borrowers who are able to stop the foreclosure auction from going through.

    c.   Ocwen Servicing hires title examiners through Alitisource Servicing or through the use of the Altisource Parent's software.  Upon information and belief, Ocwen Servicing charges borrowers artificially inflated and unreasonable fees for title examinations as part of the Ocwen Enterprise.

    d.   The Distressed Mortgage Fees described above are artificially marked-up due to Ocwen's use of Altisource and through Ocwen Financial's lease of Altisource's software.   These artificially inflated costs are passed along to borrowers by assessing the inflated amounts on borrowers' loans, and misclassifying them as necessary Distressed Mortgage Fees.

51.    Plaintiffs have detailed the publically available details of how Ocwen Servicing and the other members of the Ocwen Enterprise up-charge the Distressed Mortgage Fees.  Plaintiffs reserve the right to amend their complaint to add additional detail regarding these and other up-charged Distressed Mortgage Fees.

        *ii.*    *Duplicative Distressed Mortgage Services*

52.    In addition to charging borrowers artificially inflated Distressed Mortgage Fees, Ocwen Servicing also charges borrowers fees for Distressed Mortgage Services that should never have been performed at all.  This is because Ocwen Servicing orders and charges borrowers for different Distressed Mortgage Services that accomplish the same thing.

---

[23] *See Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, 249 F. App'x 63, 72 n.9 (10th Cir. 2007) (summarizing testimony of William C. Erbey that Ocwen would pay an agent or broker approximately $45 to $50 to do a BPO).

Class Action Complaint;
Case No.:

53.     Ocwen Servicing is required by the Federal National Mortgage Association ("Fannie Mae") to inspect homes of borrowers in default on Fannie Mae loans monthly.  Thus,  Ocwen Servicing charges distressed borrowers a "property inspection fee" that Ocwen Servicing defines as being "for an inspection of the property to make sure that it is still in good condition."[24]

54.     Ocwen Servicing is also required by Fannie Mae to obtain a BPO when a borrower expresses interest in a "short sale" or in advance of a foreclosure sale.  A BPO is the process a hired sales agent utilizes to determine an estimated selling price of a real estate property.  Ocwen defines its BPOs to be "determining the value and condition of the property, using a certified Real Estate Agent."[25]   Upon information and belief, Ocwen Servicing sometimes calls its BPOs "property valuation expenses" on borrowers' statements.  Because Ocwen Servicing conceals BPO services under the undefined moniker "property valuation expenses", Ocwen Servicing conceals that the company assesses, charges and collects fees from borrowers for a service that includes determining the condition of the homeowner's property, which makes any property inspection performed and charged to the borrower at or around the same time as the service for the "property valuation expense" entirely unnecessary.

55.     Ocwen Financial also charges borrowers for appraisals.  An appraisal is the process of developing an opinion of the value of a home.  In order to perform a home appraisal, an appraiser must determine the condition of the home.  Ocwen Servicing orders appraisals through Springhouse LLC, an appraisal management company and subsidiary of the Altisource Parent, through the use of Altisource's mortgage servicing software.

56.     In the case of a BPO or appraisal, the broker or appraiser providing the opinion of value must determine the condition of the subject property.  Any inspection performed around the same time as a BPO or appraisal would be unnecessary because the broker or appraiser would have already determined the condition of the property as part of their valuation.  Thus, any charge to a

---

[24] *See* Ocwen Servicing's definitions of various charges provided to Plaintffs, attached hereto as Exhibit 7, p. 5.

[25] *See* Exhibit 7, p. 5.

Class Action Complaint;
Case No.:

borrower for an inspection done around the same time they as a BPO or appraisal would be unnecessary and another way Ocwen Servicing up-charges struggling borrowers.   This also happened to Plaintiffs on several occasions.   Ocwen Servicing's only purpose in ordering and charging for such unnecessary inspections is to generate Distressed Mortgage Fees assessed to and collected from mortgage borrowers.

**F.      Plaintiffs' Claims against Defendants**

57.      Plaintiffs Victor Giotta and Loralee Giotta entered into a mortgage agreement with BankUnited, FSB on or around January 19, 2007 that is now being serviced by Ocwen Servicing.[26]

58.      The Giottas' deed of trust contains uniform provisions materially similar to other mortgage loans serviced by Ocwen Servicing.

59.      The Giottas' deed of trust allows the lender, or a servicer acting on behalf of the lender, to assess reasonable fees if the loan goes into default, including fees for property inspections, BPOs and other Distressed Mortgage Services when necessary to protect the lender's interest.   The Giottas' deed of trust does not contain any provision that allows the lender, or a servicer acting on behalf of the lender, to assess unreasonable or excessive fees for property inspections, BPOs or other Distressed Mortgage Services.   Indeed, such a provision would be patently unconscionable as are Ocwen Servicing's charges for unreasonable and excessive Distressed Mortgage Fees described throughout this Complaint.

60.      The Giottas' deed of trust requires mortgage payments to be applied to interest due under the note, then to principal due under the note, and then to any escrow account used to pay insurance or taxes.[27]   However, if there are any delinquencies or late charges owed, the lender may apply the mortgage payments to these charges first.

61.      On or about February 16, 2013, the servicing rights of Plaintiffs' mortgage loan were transferred to Ocwen Servicing, and Ocwen Servicing continues to service the Giottas' mortgage

---

[26] *See* Deed of Trust for Victor P. Giotta and Loralee Giotta, dated January 9, 2007 attached hereto as Exhibit 8.

[27] *See* Exhibit 8, p. 3.

20

Class Action Complaint;
Case No.:

loan to this date.  While servicing the Giottas' mortgage loan, Ocwen Servicing has assessed and charged the Giottas for numerous marked-up Distressed Mortgage Fees.  On June 27, 2014, Ocwen Servicing charged the Giottas for eight separate property inspections procured through Altisource Servicing or through the Altisource Parent's software, six costing $10.50, and two costing $15.00.[28] The fees for the property inspections charged to the Giottas were excessive.  They were unnecessarily and unreasonably inflated due to Ocwen's use of Altisource Servicing or the Altisource Parent's software to procure the property inspection services.

62.     On August 26, 2013, Ocwen Servicing charged the Giottas a $10.50 "Property Inspection Fee," followed closely on September 4, 2013 by a $100.00 "Property Valuation Expense."[29]  Both the property inspection and property valuation were procured through Altisource Servicing, or through the use of the Altisource Parent's software.  Although Ocwen Servicing never defines what a "Property Valuation Expense" is, based on the name and amount charged it appears to be another name for a BPO.  Both services cannot be necessary since Ocwen Servicing defines a BPO as including a determination of the condition of the home, which is what Ocwen Servicing defines a property inspection to be.  Even if necessary, the fees for both the property inspection and BPO were unnecessarily and unreasonably inflated due to Ocwen Servicing's use of Altisource Servicing or the Altisource Parent's software to procure the property inspection and BPO services.

63.     Ocwen Servicing similarly charged $13.25 for a "Property Inspection" on November 28, 2014, and six days later on December 4, 2014 charged $100 for a "Property Valuation Expense."[30]  Both the property inspection and the BPO were procured by Altisource Servicing, or through the use of the Altisource Parent's software.  Both services cannot be necessary since Ocwen Servicing defines a BPO as including a determination of the condition of the home, which is what

---

[28] See Mortgage Account Statement for Victor P. Giotta and Loralee Giotta dated June 30, 2014 attached hereto as Exhibit 9.

[29] See Account Statement for Victor P. Giotta and Loralee Giotta dated September 5, 2013 attached hereto as Exhibit 10.

[30] See Mortgage Account Statement for Victor P. Giotta and Loralee Giotta dated December 16, 2014 attached hereto as Exhibit 11.

Class Action Complaint;
Case No.:

Ocwen Servicing defines a property inspection to be.  To the extent both the property inspection and BPO were necessary, both the property inspection and the BPO were unnecessarily and unreasonably inflated due to Ocwen Servicing's use of Altisource Servicing or the Altisource Parent's software to procure the property inspection and BPO services.

64.    The Giottas were charged additional inflated Distressed Mortgage Fees for other default related services procured by Ocwen Servicing through Altisource Servicing or through the use of the Altisource Parent's software, including for services for property inspections, BPOs and other Distressed Mortgage Services as displayed by the Giottas' monthly billing statements attached to this Complaint.[31]

65.    As of the date of this Complaint, the Giottas have been unable to locate all of their billing statements from Ocwen Servicing.  Accordingly, the Giottas may have been charged additional excessive Distressed Mortgage Fees for default related services procured by Ocwen Servicing through Altisource Servicing or through the use of the Altisource Parent's software, the proof of which are shown in records currently in Ocwen Servicing's and/or other Defendants' possession.  To the extent Ocwen charged the Giottas any such additional excessive Distressed Mortgage Fees, they are part of the claims asserted in this action.

### G.    Plaintiffs' and the Classes' Claims are Tolled by Operation of the Discovery Rule and Doctrine of Concealment

66.    Plaintiffs and members of the classes alleged herein did not know, and had no reason to suspect, that the Ocwen Enterprise had charged and was charging excessive rates for Distressed Mortgage Services until, at the very earliest, the New York State Department of Financial Services published its letters regarding its investigation of the Ocwen Entities, the first of which is dated February 26, 2014 as described in this Complaint.

67.    Ocwen Servicing, as a servicer of Plaintiffs' and class members' loans, had a continuing duty to disclose to Plaintiffs and other borrowers the true costs of fees assessed for services provided for their mortgage loans.  As explained above, Ocwen Servicing misrepresented

---

[31] *See* Mortgage Account Statements of Victor P. Giotta and Loralee Giotta, attached hereto collectively as Exhibit 12.

and actively concealed that its Distressed Mortgage Fees were improperly inflated through the use of Altisource Servicing and the Altisource Parent's mortgage servicing software.  Moreover, there was no public information disclosing Ocwen Servicing's up-charging of fees through the use of Altisource Servicing and the Altisource Parent's mortgage servicing software prior to the New York State Department of Financial Services' letters.

68.     Plaintiffs, like all other borrowers whose loans are being serviced by Ocwen Servicing, did not know, nor did they have reason to know, that Ocwen Servicing was not entitled to collect the amounts Ocwen Servicing charged to borrowers for Distressed Mortgage Services. Neither Ocwen Servicing, any other member of the Ocwen Enterprise nor the holder of Plaintiffs' and other class members' loans disclosed to Plaintiffs, borrowers or the general public that Ocwen Servicing was up-charging for Distressed Mortgage Services.  Nor did Plaintiffs or other borrowers with loans being serviced by Ocwen Servicing have reason to suspect that they were being charged excessive Distressed Mortgage Fees.

69.     Similarly, Plaintiffs, like all other borrowers whose loans are being serviced by Ocwen Servicing, had no reason to suspect that Ocwen Servicing charged them and other borrowers fees for Distressed Mortgage Services that were unreasonable and unnecessary because they were duplicative of each other.  Neither Ocwen Servicing, any other member of the Ocwen Enterprise nor the holder of Plaintiffs' and other class members' loans disclosed to Plaintiffs, borrowers or the general public that Ocwen Servicing was charging for unnecessary and duplicative Distressed Mortgage Services.  Nor did Plaintiffs or other borrowers with loans being serviced by Ocwen Servicing have reason to suspect that they were being charged fees for unnecessary and duplicative Distressed Mortgage Services.

70.     Defendants' acts and omissions described herein – including assessing, charging and collecting up-charged Distressed Mortgage Fees, and holding out such fees as being the actual costs for such services chargeable to borrowers – actually deceived or were likely to deceive borrowers into thinking that Ocwen Servicing could lawfully collect the amounts it charged for Distressed Mortgage Services.

Class Action Complaint;
Case No.:

71.     Plaintiffs and Class Members relied on Defendants' omissions and concealment in paying the Distressed Mortgage Fees as described herein that had the effect of misrepresenting and portraying the Default-Related Services Fees charges memorialized in Ocwen Servicing's uniform billing statements as lawful, reasonable and necessary, which they were not.  Class Members' reliance may also be presumed or inferred from the very nature of the omissions, concealment, misrepresentations and conduct of the Defendants presented in this action.

72.     By virtue of Ocwen Servicing's misrepresentations and active concealment, any otherwise applicable statutes of limitations for Plaintiffs and class members are tolled by the discovery rule, concealment doctrine and/or other equitable tolling from the first unlawful charging of Distressed Mortgage Fees until – at the earliest – the publication of the New York State Department of Financial Services' letters concerning its investigation of the Ocwen Enterprise's practices described herein on February 26, 2014.

## VII.   CLASS ACTION ALLEGATIONS

73.     This action asserts claims on behalf of a nationwide class, a nationwide subclass, and a California subclass pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and (c)(4), which class and subclasses consist of persons who paid for excessive, unlawfully inflated Distressed Mortgage Fees as follows:

> All persons in the United States who had or have a mortgage loan serviced by Ocwen Servicing on or after August 10, 2009, and were assessed one or more of the Distressed Mortgage Fees by Ocwen Servicing (the "National Distressed Mortgage Fee Class").

> All persons in the United States who had or have a mortgage loan serviced by Ocwen Servicing on or after August 10, 2009, for which the servicing rights were transferred to Ocwen Servicing when the loan was already in default, and were assessed one or more of the Distressed Mortgage Fees  (the "National FDCPA Distressed Mortgage Fee Subclass").

> All persons who have or had a mortgage loan on a property located in California serviced by Ocwen Servicing on or after August 10, 2009, and were assessed one or more of the Distressed Mortgage Fees  (the "California Distressed Mortgage Fee Subclass").

74.     Excluded from each of the class and  subclasses are: (i) Ocwen Financial Corporation, Ocwen Loan Servicing, LLC, Altisource Portfolio Solutions, S.A., and Altisource Solutions, Inc. and their employees, principals, affiliated entities, legal representatives, successors and assigns; (ii)

Class Action Complaint;
Case No.:

William C. Erbey; (iii) the judges to whom this action is assigned and any members of their immediate families.

75.     There are thousands of members in each of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass, and California Distressed Mortgage Fee Subclass who are geographically dispersed throughout California and the United States.  Therefore, individual joinder of the members of any of the classes defined above would be impracticable.

76.     Common questions of law or fact exist as to all members of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass and California Distressed Mortgage Fee Subclass.  These common legal or factual questions include:

    a.   Whether Ocwen Servicing's Distressed Mortgage Fees as described herein were lawful.

    b.   Whether Ocwen Servicing's Distressed Mortgage Fees as described herein were unfair.

    c.   Whether Ocwen Servicing's effort to collect inflated or duplicative Distressed Mortgage Fees were unfair attempts to collect a debt.

    d.   Whether the Ocwen Entities, the Altisource Entities and Erbey were members of, or participants in, the conspiracy alleged herein.

    e.   Whether the Ocwen Entities, the Altisource Entities and Erbey engaged in a pattern or practice of racketeering, as alleged herein.

    f.   Whether Ocwen Servicing charged unreasonable or excessive Distressed Mortgage Fees.

    g.   Whether the Distressed Mortgage Fees Ocwen Servicing charged were unreasonable or excessive as a result of the Ocwen Enterprise.

    h.   Whether Ocwen Servicing's Distressed Mortgage Fees were unconscionable;

    i.   Whether Ocwen Servicing's use of Altisource Servicing and/or the Altisource Parent's software resulted in unreasonable or excessive Distressed Mortgage Fees.

    j.   Whether Ocwen Servicing is a "debt collector" as defined by the FDCPA.

Class Action Complaint;
Case No.:

k.   Whether the Distressed Mortgage Fees added to Plaintiffs loan balances as described herein constitute "debt" within the meaning of the FDCPA.

l.   Whether Ocwen Servicing up-charged borrowers by charging them for Distressed Mortgage Services that duplicate services already provided and charged for.

m.   Whether Ocwen Servicing charged borrowers for Distressed Mortgage Services that were unnecessary because they were duplicative of other Distressed Mortgage Services Ocwen Servicing already charged for.

77.   Plaintiffs' claims are typical of the claims of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass and California Distressed Mortgage Fee Subclass. Ocwen Servicing charged Plaintiffs excessive fees for property inspections, BPOs and other Distressed Mortgage Services procured from Altisource Servicing or through the use of the Altisource Parent's software than were unlawful, up-charged, excessive, unnecessary and/or duplicative. Plaintiffs' loan was also in default at the time Ocwen Servicing obtained its servicing rights. Plaintiffs are also California residents. Therefore, Plaintiffs are no different in any material respect from any other members of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass, or California Distressed Mortgage Fee Subclass, and the relief sought by Plaintiffs is common to the relief sought by the class and subclasses.

78.   Plaintiffs are adequate representatives of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass, and California Distressed Mortgage Fee Subclass because their interests do not conflict with the interests of the class or subclasses members they seek to represent, and they have retained counsel competent and experienced in conducting complex lending and class action litigation. Plaintiffs and their counsel will adequately protect the interests of the class and subclasses.

79.   A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual member of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass, and California Distressed Mortgage Fee Subclass are relatively small, while the burden and monetary expense needed to individually prosecute this case against Defendants is substantial. Thus, it would be

Class Action Complaint;
Case No.:

virtually impossible for class and subclass members individually to redress effectively the wrongs done to them. Moreover, even if members of the class and subclasses defined herein could afford individual actions, a multitude of such individual actions still would not be preferable to class wide litigation. Individual actions also present the potential for inconsistent or contradictory judgments, which would be dispositive of at least some of the issues and hence interests of the other members not party to the individual actions, would substantially impair or impede their ability to protect their interests, and would establish incompatible standards of conduct for the party opposing the class.

80.     By contrast, a class action presents far fewer litigation management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Also, or in the alternative, the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass, and California Distressed Mortgage Fee Subclass may be certified because Defendants have acted or refused to act on grounds generally applicable to each of the respective class and subclasses, thereby making preliminary and final declaratory relief appropriate.

81.     Further, in the alternative, the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass and California Distressed Mortgage Fee Subclass may be maintained as class actions with respect to particular issues, pursuant to Fed.R.Civ.P. 23(c)(4).

82.     All records concerning each of the loans Ocwen Servicing services, including records showing Distressed Mortgage Fees charged to borrowers are in the possession and control of Ocwen Servicing and its agents and are available through discovery.

## VII.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violations of the Racketeer Influenced and Corrupt Organizations Act (18  U.S.C. § 1962(c))
(on Behalf of the National Distressed Mortgage Fees Class against all Defendants)**

83.     Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

84.     Plaintiffs bring this cause of action on behalf of themselves and the members of the National Distressed Mortgage Fees Class.

85.     Each Defendant is a person within the meaning of 18 U.S.C. § 1961(3).

27

86.     The Ocwen Entities, through their directors, employees and agents, the Altisource Entities through their directors, employees and agents, and William C. Erbey conducted the affairs of an associated-in-fact enterprise as defined in 18 U.S.C. § 1961(4) (the "Enterprise").  The affairs of the Enterprise affected interstate commerce through a pattern of racketeering activity.

87.     The Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of charging, assessing, and collecting excessive, unlawfully and unnecessarily inflated and duplicative Distressed Mortgage Fees.

88.     While the members of the Enterprise participate in and are part of the Enterprise, they also have an existence separate and distinct from the Enterprise.  The Enterprise has a systematic linkage due to contractual relationships, agreements, financial ties and coordinated activities between the Ocwen and Altisource Entities and Erbey.

89.     Ocwen Financial controls and directs the affairs of the Enterprise according to policies and procedures developed and established by Ocwen Financial's executives – formerly (and until January 16, 2015) including Mr. Erbey.

90.     As described throughout this Complaint, the policies and procedures established by Ocwen Servicing at the direction of Erbey through his control of Ocwen Financial and the Altisource Entities and in furtherance of the Enterprise include:  (i) procuring Distressed Mortgage Services through Altisource Servicing; (ii) leasing from the Altisource Parent software Ocwen Financial the Altisource Parent had developed to program and which did program Ocwen Servicing's loan servicing systems to order, assess, charge and collect for up-charged Distressed Mortgage Services when borrowers are not current on their mortgage loan; (iii) charging borrowers more for Distressed Mortgage Services than what Ocwen Servicing or Altisource Servicing actually pays the service providers, and, at the very least, more than what is reasonable in the marketplace; (iv) charging borrowers for Distressed Mortgage Services that duplicate services already provided and charged for;  and (v) providing statements to borrowers that conceal the nature of the Distressed Mortgage Services or the true cost thereof.

28

Class Action Complaint;
Case No.:

91.     The process of ordering, assessing and charging for Distressed Mortgage Services is done automatically by Ocwen Servicing's loan servicing systems based on the programming and parameters established by Ocwen Servicing and other members of the Enterprise.

92.     Uniform mortgage agreements executed by borrowers do not permit up-charging for Distressed Mortgage Services, nor do they permit charging for unnecessary and duplicative Distressed Mortgage Services.   Nevertheless, Ocwen Servicing, through its uniform computer mortgage servicing system, routinely orders, assesses, charges and collects for up-charged and duplicative Distressed Mortgage Services.

93.     By developing and implementing policies and procedures leading to up-charged Distressed Mortgage Services, the Ocwen and Altisource Entities and Erbey engaged in the conduct of the Enterprise distinct from any of their own affairs in their other business arrangements and inconsistent with their normal business or the guidelines under which each is obligated to operate.

94.     The Enterprise's systematic scheme of ordering, assessing and charging for up-charged Distressed Mortgage Services, as described throughout this Complaint, was facilitated by the use of the United States Mail and wire.   The Enterprise's scheme constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(l), as acts of mail and wire fraud, under 18 U.S.C. §§ 1341 and 1343.

95.     In violation of 18 U.S.C. §§ 1341 and 1343, the Enterprise utilized the mail and wire in furtherance of their scheme to defraud borrowers whose loans are serviced by Ocwen Servicing by obtaining money from borrowers using false or fraudulent pretenses.

96.     Through the mail and wire, the Enterprise provided invoices, statements, payoff demands, or proofs of claims to borrowers, and demanded that borrowers pay fees for up-charged and/or duplicative Distressed Mortgage Services.   The Enterprise also used the mail and wire to accept payments and engage in other correspondence in furtherance of its scheme.

97.     The Enterprise fraudulently and unlawfully assessed Distressed Mortgage Fees in violation of borrowers' mortgage agreements because the servicers were up-charged, unnecessary and/or duplicative and, therefore, they were contrary to the disclosures made to borrowers.

Class Action Complaint;
Case No.:

98.     The invoices, statements, or proofs of claims provided by Ocwen Servicing to borrowers disguised the fact that the Distressed Mortgage Fees – such as BPO fees, property inspection fees, auction fees and title fees assessed on borrowers' accounts – were up-charged, unnecessary and/or duplicative. By disguising the true nature and basis of the fees purportedly owed in communications to borrowers, the Enterprise made false statements using the Internet, telephone, facsimile, United States Mail, and other interstate commercial carriers.  These false statements were uniform and consistent in that they failed to disclose the Ocwen Enterprise's unlawful conspiracy, or that the Distressed Mortgage Services or Distressed Mortgage Fees were up-charged, unnecessary and/or duplicative.

99.     These omissions were material to Plaintiffs and the members of the National Distressed Mortgage Fee Class.  Had the Enterprise disclosed the true unnecessary nature of the up-charged, unnecessary and/or duplicative Distressed Mortgage Fees, or other unlawful activities described herein, Plaintiffs would have been aware and would have challenged Ocwen Servicing's unlawful practices or they would not have paid the unlawful, duplicative and/or up-charged fees.

100.     Each of these acts constituted an act of mail fraud for purposes of 18 U.S.C. § 1341.

101.     Additionally, using the Internet, telephone, and facsimile transmissions to fraudulently communicate false information to borrowers, to pursue and achieve their fraudulent scheme, the Enterprise engaged in repeated acts of wire fraud in violation of 18 U.S.C. § 1343.

102.     The Enterprise's knowledge that its activities were fraudulent and unlawful is evidenced by, among other things, the fact that they did not disclose the nature of the fees or their actions in their communications to borrowers.

103.     The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) in which the Enterprise has engaged under 18 U.S.C. § 1962(c).

104.     All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Defendant's racketeering Enterprise. The racketeering acts committed by the Enterprise employed a similar method, were related, with a similar purpose, and involved similar participants, with a similar impact on the members of the National Distressed

Class Action Complaint;
Case No.:

1   Mortgage Fees Class.  Because this case is brought on behalf of a class of similarly situated

2   borrowers described above, and there are numerous acts of mail and wire fraud that were used to

3   carry out the scheme, it would be impracticable for Plaintiffs to plead all of the details of the scheme

4   with particularity. Plaintiffs cannot plead the precise dates of all of the Enterprise's uses of the mail

5   and wire because this information cannot be alleged without access to Defendants' records.

6   105.   The pattern of racketeering activity is currently ongoing and open-ended, and

7   threatens to continue indefinitely unless this Court enjoins the racketeering activity.

8   106.   Numerous schemes have been completed involving repeated unlawful conduct that by

9   its nature, projects into the future with a threat of repetition.

10   107.   As a direct and proximate result of these violations of 18 U.S.C. §§ 1962(c) and (d),

11   Plaintiffs and members of the National Distressed Mortgage Fees Class have suffered substantial

12   damages. Members of the Enterprise are liable to Plaintiffs and the Class for treble damages,

13   together with all costs of this action, plus reasonable attorney's fees, as provided under 18 U.S.C. §

14   1964(c).

15   **SECOND CAUSE OF ACTION**
   **Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(d))**

16   **(on Behalf of the National Distressed Mortgage Fees Class against all Defendants)**

17   108.   Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate

18   them as if they were fully written herein.

19   109.   Plaintiffs bring this cause of action on behalf of themselves and the members of the

20   National Distressed Mortgage Fees Class.

21   110.   As set forth above, in violation of 18 U.S.C. § 1962(d), Defendants conspired to

22   violate the provisions of 18 U.S.C. § 1962(c).

23   111.   As set forth above, Defendants were aware of the nature and scope of the Enterprise's

24   unlawful scheme, and they agreed to participate in it.

25   112.   As a direct and proximate result, Plaintiffs and members of the National Distressed

26   Mortgage Fee Class have been injured in their business or property by the predicate acts which make

27   up the Enterprise's patterns of racketeering activity in that up-charged, unnecessary, duplicative and

28   excessive fees for Distressed Mortgage Services were assessed on their mortgage accounts.

31

113.    As a direct and proximate result of these violations of 18 U.S.C. §§ 1962(c) and (d), Plaintiffs and members of the National Distressed Mortgage Fees Class have suffered substantial damages. Members of the Enterprise are liable to Plaintiffs and the Class for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under 18 U.S.C. § 1964(c).

### THIRD CAUSE OF ACTION
**Violation of the Federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, *et seq*. (on behalf of Plaintiffs and the FDCPA Distressed Mortgage Fees Subclass against Ocwen Servicing)**

114.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

115.    Plaintiffs bring this cause of action on behalf of themselves and the members of the FDPCA Distressed Mortgage Fee Subclass.

116.    The FDCPA defines "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or service which are the subject of the transaction or primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."

117.    The FDCPA defines "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).

118.    Ocwen Servicing is a "debt collector" under the FDCPA for all loans it services for which it obtained the servicing rights when the loan was in default, as it uses interstate commerce and the mails to regularly collect debts owed or due or asserted to be owed or due by mortgage borrowers.

119.    A borrower's obligation to pay the charges, fees, principal and interest on a mortgage loan is a "debt" as defined by the FDCPA because it arises out of the agreement between homeowners and their lenders and obliges the homeowners to pay money arising out of the loan given to purchase their home.

120.    The FDCPA prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt" (15 U.S.C. § 1692e).

121.    In violation of 15 U.S.C. § 1692e(10), Ocwen Servicing uses false misrepresentations and deceptive means to collect or attempt to collect a debt by charging borrowers up-charged, unnecessary, duplicative and excessive Distressed Mortgage Fees because Ocwen Servicing knowingly, affirmatively, and actively concealed and suppressed material facts, namely the fact that Ocwen Servicing up-charged for its Distressed Mortgage Services, and that its Distressed Mortgage Services were unnecessary, duplicative and excessive, in violation of the law and the servicing guidelines which Ocwen Servicing is obligated to follow.    Contrary to Ocwen Servicing's communications, it was not legally authorized to asses, charge or collect up-charged and/or duplicative Distressed Mortgage Fees.

122.    As a result of Ocwen Servicing's violations of the FDCPA, Plaintiffs and the FDPCA Distressed Mortgage Fee Subclass members are entitled to their actual damages pursuant to 15 U.S.C. § 1692k(a)(1); statutory damages for Plaintiffs in an amount up to $1,000.00 pursuant to 15 U.S.C. § 1692k(a)(2)(A); class damages for FDPCA Distressed Mortgage Fee Subclass members that are not entitled to actual damages up to the lesser of $500,000 or 1 per centum of the net worth of Ocwen Servicing pursuant to 15 U.S.C. § 1692k(a)(2)(B)(ii); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. 1692k(a)(3) from Ocwen Servicing.

**FOURTH CAUSE OF ACTION**
**Violations of the Rosenthal Fair Debt Collection Practices Act, California Civil Code §§ 1788, *et seq*. (on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against Ocwen Servicing)**

123.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

124.    Plaintiffs bring this cause of action on behalf of themselves and the members of the California Distressed Mortgage Fee Subclass.

125.    As alleged above, Ocwen Servicing committed violations of the Rosenthal Fair Debt Collection Practices Act, California Civil Code §§ 1788, *et seq*. ("RFDCPA"), which incorporates by reference, and requires compliance with, the provisions of the federal FDCPA, 15 U.S.C. § 1692.

33

126.    Ocwen Servicing is a "debt collector" within the meaning of California Civil Code § 1788.2(c) because Ocwen Servicing sent mortgage bills to Plaintiffs and members of the California Distressed Mortgage Fee Subclass, and Plaintiffs and members of the California Distressed Mortgage Fee Subclass made their mortgage payments to Ocwen Servicing, Ocwen Servicing accepted those payments, and Ocwen Servicing made demands for payment which included payments for up-charged, unnecessary, excessive and duplicative Distressed Mortgage Services. Ocwen Servicing made demand for such payment by sending letters, making telephone calls, and through other attempts to collect mortgage payments and fees.

127.    The up-charged, unnecessary, excessive and duplicative and/or duplicative Distressed Mortgage Fees purportedly owed by Plaintiffs and members of the California Distressed Mortgage Fee Subclass are a "debt" within the meaning of California Civil Code § 1788.2(d), because they are "money, property or their equivalent which [are] due or owing or alleged to be due or owing from a natural person to another person."

128.    The FDCPA and RFDCPA prohibit a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt.  15 U.S.C. § 1692e.

129.    Ocwen Servicing knowingly, affirmatively, and actively concealed and suppressed material facts, namely the fact that Ocwen Servicing up-charged, unnecessary, excessive and duplicative Distressed Mortgage Fees and charged fees for Distressed Mortgage Services that were duplicative, in violation of the law and the servicing guidelines which Ocwen Servicing is obligated to follow.  Contrary to Ocwen Servicing's communications, it was not permitted to asses, charge or collect up-charged, unnecessary, excessive and duplicative Distressed Mortgage Fees.

130.    Pursuant to California Civil Code §§ 1788.17 and 1788.30, Plaintiffs and members of the California Distressed Mortgage Fee Subclass are entitled to recover actual damages sustained as a result of Ocwen Servicing's violations of the RFDCPA. Such damages include, without limitation, monetary losses and damages. Additionally, because Ocwen Servicing's violations of the RFDCPA were committed willingly and knowingly, Plaintiffs and members of the California Distressed

Class Action Complaint;
Case No.:

1   Mortgage Fee Subclass are entitled to recover penalties of up to $1,000 per violation as provided for

2   in the RFDCPA, as well as attorneys' fees, costs, and expenses incurred in bringing this action.

3   

**FIFTH CAUSE OF ACTION**
**Violation of The "Unlawful" prong of the Unfair Competition Law, Bus. & Prof. Code §§**

4   **17200, *et seq*. (on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass**
**against all Defendants)**

5   

6   131.   Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate

7   them as if they were fully written herein.

8   132.   Plaintiffs bring this cause of action on behalf of themselves and the members of the

9   California Distressed Mortgage Fee Subclass.

10   133.   The Unfair Competition Law ("UCL"), California Business and Professions Code §§

11   17200, *et seq*., defines unfair business competition to include any "unlawful, unfair or fraudulent"

12   act or practice.

13   134.   A business act or practice is "unlawful" if it violates any established state or federal

14   law.

15   135.   Defendants have and continue to violate the "unlawful" prong of the UCL by

16   engaging in the conspiratorial conduct described above to charge borrowers for up-charged,

17   unnecessary, excessive and duplicative Distressed Mortgage Fees, and thereby attempting to collect

18   a debt not owed, in violation of Title 18 U.S.C. §§ 1341, 1343, and 1962, 15 U.S.C. §§ 1601 *et seq*.,

19   and California's Rosenthal Fair Debt Collection Practices Act.

20   136.   Through their unlawful acts and practices, Defendants have obtained, and continue to

21   unfairly obtain, money from Plaintiffs and members of the California Distressed Mortgage Fee

22   Subclass.  As such, Plaintiffs request on behalf of themselves and all California Distressed Mortgage

23   Fee Subclass members the relief set forth in the Prayer, including that this Court enjoin Defendants

24   from continuing to violate the Unfair Competition Law as discussed herein.   Otherwise, the

25   California Distressed Mortgage Fee Subclass may be irreparably harmed and/or denied an effective

26   and complete remedy if such an order is not granted.

27

28

35

Class Action Complaint;
Case No.:

## SIXTH CAUSE OF ACTION

**Violation of The "Unfair" prong of the Unfair Competition Law, Bus. & Prof. Code §§ 17200,
*et seq*. (on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against All
Defendants)**

137.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

138.    Plaintiffs bring this cause of action on behalf of themselves and the members of the California Distressed Mortgage Fee Subclass.

139.    The Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200, *et seq*., defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice.

140.    A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

141.    Defendants' acts and practices of assessing, charging and collecting fees for up-charged, unnecessary, excessive and duplicative Distressed Mortgage Services was "unfair" under the UCL.

142.    The gravity of the harm to Plaintiffs and members of the California Distressed Mortgage Fee Subclass resulting from Defendants' unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of Defendants' conduct.  By committing the acts and practices alleged above, Defendants have engaged, and continue to be engaged, in unfair business practices within the meaning of California Business and Professions Code 17200, *et seq*.

143.    As a result of the conduct described above, Defendants have been, and will continue to be, unjustly enriched at the expense of Plaintiffs and members of the proposed California Distressed Mortgage Fee Subclass.  Specifically, Defendants have been unjustly enriched by the profits they have obtained from Plaintiffs and members of the California Distressed Mortgage Fee Subclass for the up-charged Distressed Mortgage Services.

144.    Through their unfair acts and practices, Defendants have improperly obtained, and continue to improperly obtain, money from members of the California Distressed Mortgage Fee Subclass.  As such, Plaintiffs request that this Court cause Defendants to restore this money to

36

1    Plaintiffs and the California Distressed Mortgage Fee Subclass, to disgorge the profits Defendants

2    have made on Distressed Mortgage Fees, and to enjoin Defendants from continuing to violate the

3    Unfair Competition Law or violating it in the same fashion in the future as discussed herein.

4    Otherwise, members of the California Distressed Mortgage Fee Subclass may be irreparably harmed

5    and/or denied an effective and complete remedy if such an Order is not granted.

6

7    **SEVENTH CAUSE OF ACTION**
     **Violation of The "Fraudulent" prong of the Unfair Competition Law, Bus. & Prof. Code §§**
8    **17200, *et seq*. (on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass All**
     **Defendants)**

9        145.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate

10   them as if they were fully written herein.

11       146.    Plaintiffs bring this cause of action on behalf of themselves and the members of the

12   California Distressed Mortgage Fee Subclass.

13       147.    The Unfair Competition Law ("UCL"), California Business and Professions Code §§

14   17200, *et seq*., defines unfair business competition to include any "unlawful, unfair or fraudulent"

15   act or practice.

16       148.    A business act or practice is "fraudulent" under the UCL if it actually deceives or is

17   likely to deceive members of the consuming public.

18       149.    In the course and conduct of Ocwen Servicing's loan servicing and collection,

19   Defendants fail to disclose the nature of the Distressed Mortgage Fees Ocwen Servicing assesses to

20   and collects from borrowers.  Defendants also failed to disclose the nature of the relationship

21   between and among the Ocwen Enterprise, and that all of the Distressed Mortgage Services were

22   being up-charged as a result of their relationships and the manner by which the up-charges were

23   accomplished.

24       150.    Plaintiffs and members of the California Distressed Mortgage Fee Subclass believed

25   they were obligated to pay the amounts specified in Ocwen Servicing's communications for the

26   Distressed Mortgage Services it charged to Plaintiffs and California Distressed Mortgage Fee

27   Subclass members. Plaintiffs and members of the California Distressed Mortgage Fee Subclass

28   relied on Defendants' omissions and concealment in paying the Distressed Mortgage Fees as

37

described herein that had the effect of misrepresenting and portraying the Default-Related Services Fees charges memorialized in Ocwen Servicing's uniform billing statements as lawful, reasonable and necessary, which they were not.  While proof of reliance for the members of the California Distressed Mortgage Fee Subclass is not necessary under the UCL, it may also be presumed or inferred from the very nature of the omissions, concealment, misrepresentations and conduct of the Defendants presented in this action.

151.   Borrowers, however, are not obligated to pay the amounts Ocwen Servicing specified in its communications concerning Distressed Mortgage Services. Ocwen Servicing disguises the fact that the Distressed Mortgage Fees they represent as being owed relate to services that were up-charged, unnecessary, excessive and duplicative through the use of Altisource Servicing and the Altisource Parent's mortgage servicing technology software, and in violation of disclosures required by borrowers' mortgage contracts and servicing guidelines Ocwen Servicing is required to follow. Contrary to Ocwen Servicing's attempts to collect for the Distressed Mortgage Fees charged to borrowers, Ocwen Servicing is not legally authorized to indiscriminately assess and collect up-charged, unnecessary, excessive and duplicative Distressed Mortgage Fees.

152.   Ocwen Servicing's concealment of material facts, as set forth above, was misleading or likely to deceive the general public within the meaning of the UCL.

153.   As a result of the conduct described above, Defendants have been, and will continue to be, unjustly enriched at the expense of Plaintiffs and members of the California Distressed Mortgage Fee Subclass.  Specifically, Defendants have been unjustly enriched by the revenue and profits they have obtained from Plaintiffs and the California Distressed Mortgage Fee Subclass.

154.   Through their fraudulent acts and practices, Defendants have improperly obtained, and continue to improperly obtain, money from members of the California Distressed Mortgage Fee Subclass.  As such, Plaintiffs request that this Court cause Defendants to restore this money to Plaintiffs and the California Distressed Mortgage Fee Subclass, to disgorge the profits Defendants have made on Distressed Mortgage Fees, and to enjoin Defendants from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future as discussed herein.

Class Action Complaint;
Case No.:

1   Otherwise, members of the California Distressed Mortgage Fee Subclass may be irreparably harmed

2   and/or denied an effective and complete remedy if such an Order is not granted.

3                              **EIGHTH CAUSE OF ACTION**
       **Fraud (on behalf of Plaintiffs and the National Distressed Mortgage Fees Class and against All**
4                                    **Defendants)**

5          155.   Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate

6   them as if they were fully written herein.

7          156.   Plaintiffs bring this cause of action on behalf of themselves and the members of the

8   nationwide Default-related Fees Class.

9          157.   Plaintiffs reasonably expected that Ocwen Servicing would comply with the mortgage

10  agreement, Notes, Security Instruments regarding the ability to charge only for necessary Distressed

11  Mortgage Services, and not up-charged for Distressed Mortgage Services, or for excessive,

12  unnecessary or duplicative Distressed Mortgage Services.  As a result, Plaintiffs relied on Ocwen

13  Servicing's disclosures through its bill statements and other written communications that uniformly

14  and consistently failed to disclose the Ocwen Enterprise conspiracy, or that the Distressed Mortgage

15  Services or Distressed Mortgage Fees were up-charged, unnecessary, excessive and/or duplicative,

16  which lead Plaintiffs and the National Distressed Mortgage Fee Class reasonably believed were valid

17  lawful charges.

18         158.   Had the true nature of the up-charged, unnecessary, excessive and/or duplicative

19  Distressed Mortgage Fees been disclosed to Plaintiffs and members of the National Distressed

20  Mortgage Fees Class, they would have been aware of the unlawful nature of the fees, and Plaintiffs

21  would have disputed the charges and not paid them.

22         159.   As a result of Ocwen Servicing's disclosures, omissions and failures to disclose,

23  Plaintiffs and National Distressed Mortgage Fee Class members have been injured and suffered a

24  loss of money or property. Plaintiffs and members of the National Distressed Mortgage Fee Class

25  would have challenged Ocwen Servicing's attempt to assess the up-charged, unnecessary, excessive

26  and duplicative Distressed Mortgage Fees on their accounts had it not been for Ocwen Servicing's

27  concealment of material facts.

28

Class Action Complaint;
Case No.:

160.   Ocwen Servicing omitted and concealed material facts, as discussed above, with knowledge of the effect of concealing of these material facts. Ocwen Servicing knew that by misleading consumers, they would generate higher revenue and profits for itself, Ocwen Financial, Erbey and the Altisource Entities.

161.   Plaintiffs and members of the National Distressed Mortgage Fee Class justifiably relied upon Ocwen Servicing's knowing, affirmative, and active concealment. Class Members' justifiable reliance may also be presumed or inferred from the very nature of the omissions, concealment, misrepresentations and conduct of the Defendants presented in this action. By concealing material information about their scheme to assess excessive, unnecessary, duplicative and up-charged fees on borrowers' accounts, Ocwen Servicing intended to induce Plaintiffs and members of the National Distressed Mortgage Fee Class into believing that they owed Ocwen Servicing more money that it was entitled to.

162.   Ocwen Servicing acted with malice, oppression, or fraud.

163.   As a direct and proximate result of Ocwen Servicing's omissions and active concealment of material facts, Plaintiffs and each member of the National Distressed Mortgage Fee Class has been damaged in an amount to be proved at trial.

## VIII.   PRAYER

WHEREFORE, Plaintiffs, on behalf of themselves and all class members and subclass members, request award and relief as follows:

A.      An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiffs Victor P. Giotta and Loralee Giotta be appointed a Class Representatives for the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass and California Distressed Mortgage Fee Subclass, and that Plaintiffs' counsel be appointed Counsel for the Class and Subclasses.

B.      Order that Defendants are financially responsible for notifying all members of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass and California Distressed Mortgage Fee Subclass of the alleged omissions, concealments,

Class Action Complaint;
Case No.:

misrepresentations, conduct, up-charges and duplicative, unnecessary or excessive Distressed Mortgage Services described herein, as well as any finding by the Court with respect thereto.

C.      Awarding compensatory damages in an amount determined at trial for each Cause of Action asserted herein for which these damages are available.

D.      Awarding restitution in such amount that were overpaid or overcharged for Distressed Mortgage Services, or restitutionary disgorgement of the profits Defendants obtained from those transactions for each Cause of Action asserted herein for which this relief is available.

E.      Awarding treble and punitive damages as provided by law in an amount determined at trial for each Cause of Action asserted herein for which these damages are available.

F.      Awarding statutory damages as provided by law for each Cause of Action asserted herein for which these damages are available.

G.      An order enjoining Defendants from continuing the unlawful, unfair and fraudulent practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of their conduct and pay them restitution and disgorgement of all moneys acquired by Defendants by means of any act or practice to be declared by this Court to be wrongful.

H.      An order awarding Plaintiffs their costs of suit, including reasonable attorneys' fees and pre and post-judgment interest.

I.      An order requiring an accounting for, and imposition of, a constructive trust upon, all monies received by Defendants as a result of the unlawful, unfair, and fraudulent conduct alleged herein.

J.      Such other and further relief as may be available as part of the statutory claims asserted herein, or otherwise as may be deemed necessary or appropriate for any of the claims asserted.

41

Class Action Complaint;
Case No.:

1   **IX.     DEMAND FOR JURY TRIAL**

2           Plaintiffs hereby demand a trial by jury on all claims and/or issues so triable.

3   DATED:  February 9, 2015                          Respectfully Submitted,

4

5                                                          s/Stephen F. Yunker

6                                                     Stephen F. Yunker (CSB 110159)

7                                                     **YUNKER & SCHNEIDER**
                                                      655 West Broadway, Suite 1400
8                                                     San Diego, California 92101
                                                      Tel:  (619) 233-5500
9                                                     Fax:  (619) 233-5535
                                                      Email: sfy@yslaw.com
10
                                                      Joseph N. Kravec, Jr.
11                                                    Wyatt A. Lison
                                                      **FEINSTEIN DOYLE**
12                                                        **PAYNE & KRAVEC, LLC**
                                                      Allegheny Building, 17th Floor
13                                                    429 Forbes Avenue
                                                      Pittsburgh, PA  15219
14                                                    Tel:     (412) 281-8400
                                                      Fax:     (412) 281-1007
15                                                    Email:  jkravec@fdpklaw.com
                                                      Email:  wlison@fdpklaw.com
16
                                                      James M. Pietz
17                                                    **PIETZ LAW OFFICE**
                                                      429 Forbes Avenue, Suite 1710
18                                                    Allegheny Building
                                                      Pittsburgh, PA  15219
19                                                    Tel:  (412) 288-4333
                                                      Fax  1-866-633-1820
20                                                    Email:  jpietz@pietzlaw.com

21                                                    *ATTORNEYS FOR PLAINTIFFS AND THE*
                                                      *PROPOSED CLASS AND SUBCLASSES*
22

23

24

25

26

27

28

Class Action Complaint;
Case No.: