Stephen F. Yunker (CSB 110159)
**YUNKER & SCHNEIDER**
655 West Broadway, Suite 1400
San Diego, California 92101
Tel:  (619) 233-5500
Fax:  (619) 233-5535
Email:  sfy@yslaw.com

Gretchen Freeman Cappio (to be admitted
*pro hac vice*)
Dean N. Kawamoto (CSB 232032)
Gretchen S. Obrist (to be admitted *pro hac vice*)
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax: (206) 623-3384
E-mail: gcappio@kellerrohrback.com
      dkawamoto@kellerrohrback.com
      gobrist@kellerrohrback.com

Joseph N. Kravec, Jr.
(admitted *pro hac vice*)
Wyatt A. Lison (admitted *pro hac vice*)
McKean J. Evans (to be admitted *pro hac vice*)
**FEINSTEIN DOYLE**
   **PAYNE & KRAVEC, LLC**
Allegheny Building, 17th Floor
429 Forbes Avenue
Pittsburgh, PA  15219
Tel:    (412) 281-8400
Fax:    (412) 281-1007
Email:  jkravec@fdpklaw.com
Email:  wlison@fdpklaw.com
Email:  mevans@fdpklaw.com

James M. Pietz (admitted *pro hac vice*)
**PIETZ LAW OFFICE**
429 Forbes Avenue, Suite 1710
Allegheny Building
Pittsburgh, PA  15219
Tel: (412) 288-4333
Fax  1-866-633-1820
Email:  jpietz@pietzlaw.com

***ATTORNEYS FOR PLAINTIFFS AND THE PROPOSED CLASS AND SUBCLASSES***

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| VICTOR P. GIOTTA and LORALEE GIOTTA, On Behalf Of Themselves And All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>OCWEN FINANCIAL CORPORATION, OCWEN LOAN SERVICING, LLC, ALTISOURCE SOLUTIONS, INC.; WILLIAM C. ERBEY; and DOEs 1-50.<br><br>Defendants. | **Case No.: 5-15-cv-00620-BLF**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br>(1) Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962(c) and (d));<br>(2) Violations of the Fair Debt Collection Practices Act (15 U.S.C. §§ 1601, *et seq.*);<br>(3) Violations Of The Rosenthal Fair Debt Collection Practices Act (California Civil Code §§ 1788, *et seq.*);<br>(4) Violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*); and<br>(5) Fraud.<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     PARTIES ...............................................................................................................3

III.    JURISDICTION AND VENUE ............................................................................9

IV.     INTRA-DISTRICT ASSIGNMENT ...................................................................12

V.      FACTUAL ALLEGATIONS ...............................................................................12

        A.      Home Mortgage Servicing Industry........................................................12

        B.      Ocwen Servicing Operates its Subprime Mortgage Servicing Business to Generate Fees ........................................................................................................................14

        C.      Ocwen Servicing is Part of Defendant Erbey's Larger Scheme to Overcharge Distressed Borrowers in Conjunction with the Other Defendants...............................18

        D.      State and Federal Investigations of the Ocwen Enterprise ......................23

        E.      Harm to Borrowers Resulting from Ocwen, Altisource and Erbey's Actions............28

                1.      Inflated Distressed Mortgage Fees.................................................28

                2.      Duplicative Distressed Mortgage Services ....................................31

        F.      Plaintiffs' Claims against Defendants......................................................32

        G.      Plaintiffs' and the Classes' Claims are Tolled by Operation of the Discovery Rule and Doctrine of Concealment ........................................................................................35

VI.     CIVIL CONSPIRCY AND AIDING AND ABETTING ....................................37

VII.    CLASS ACTION ALLEGATIONS .....................................................................38

VIII.   CLAIMS FOR RELIEF .......................................................................................42

FIRST CAUSE OF ACTION Violations of RICO (18  U.S.C. §§ 1962(c) and (d)) (on Behalf of the National Distressed Mortgage Fees Class against All Defendants).....................................42

        A.  Violation of 18 U.S.C. § 1962(c) ...............................................................44

        B.  Violation of 18 U.S.C. § 1962(d) ...............................................................46

SECOND CAUSE OF ACTION Violation of the FDCPA (15 U.S.C. §§ 1692, *et seq*) (on behalf of Plaintiffs and the FDCPA Distressed Mortgage Fees Subclass against All Defendants)...................47

THIRD CAUSE OF ACTION Violations of the Rosenthal Fair Debt Collection Practices Act (RFDCPA) (Cal. Civ. Code §§ 1788, *et seq* (on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against All Defendants) ...................................................................49

FOURTH CAUSE OF ACTION Violation of the "Unlawful" prong of the UCL (Bus. & Prof. Code §§ 17200, *et seq.*)(on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against All Defendants)..................................................................................................................50

FIFTH CAUSE OF ACTION Violation of the "Unfair" prong of the UCL (Bus. & Prof. Code §§ 17200, *et seq.*) (on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against All Defendants)..................................................................................................................52

SIXTH CAUSE OF ACTION Violation of the "Fraudulent" Prong of the UCL (Bus. & Prof. Code §§ 17200, *et seq.*) (on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against All Defendants)..................................................................................................................54

SEVENTH CAUSE OF ACTION Fraud (on behalf of Plaintiffs and the National Distressed Mortgage Fees Class and against All Defendants) ......................................................................56

IX.      PRAYER..................................................................................................................58

X.       DEMAND FOR JURY TRIAL ...............................................................................59

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

Plaintiffs Victor P. Giotta and Loralee Giotta (collectively "Plaintiffs" or the "Giottas") by their attorneys, bring this class action on their own behalf and on behalf of all others similarly situated against: Defendants Ocwen Financial Corporation ("Ocwen Financial") and Ocwen Loan Servicing, LLC ("Ocwen Servicing") (collectively the "Ocwen Entities"); Defendant Altisource Solutions, Inc. (which, collectively with its parent Altisource Portfolio Solutions, S.A. (the "Altisource Parent")[1] constitutes the "Altisource Entities"); and Defendant William C. Erbey and other unknown DOEs defendants (collectively all defendants are referred to as "Defendants").  Plaintiffs allege as follows based on the investigation of their counsel:

## I.    INTRODUCTION

1.    This case is about the abusive, predatory and illegal home mortgage loan servicing business Defendant Erbey orchestrated by means of an illegal scheme involving the Ocwen and Altisource Entities.  Until recently, Erbey controlled each of the Ocwen and Altisource Entities either directly or functionally: Erbey was the CEO of Ocwen Financial, the Executive Chairman of Ocwen Servicing and the Chairman of the Board of Directors of the Altisource Parent and three Altisource subsidiaries.  Erbey's control over these entities has been called a "complex mortgage servicing empire."[2]  Effective January 16, 2015, , Erbey was forced by the New York Department of Financial Services to resign from these positions as part of a consent order entered following the Department's investigation of the very same practices giving rise to the allegations in Plaintiffs' Complaint.  Despite this, Erbey continues to exercise some control over these entities because he was and still remains largest individual shareholder of both the Altisource Parent and Altisource Servicing (which was a subsidiary of Ocwen Financial until, in 2009, it was spun off into an "independent" company under

---

[1] Plaintiffs named the Altisource Parent as a defendant in their original Complaint (Dkt. No. 1) but subsequently dismissed the Altisource Parent's without prejudice after entering into a tolling agreement with the company. Dkt. No. 25.  Although Plaintiffs' First Amended Complaint does not name the Altisource Parent as a defendant, the Altisource Parent is a key entity in the Ocwen Enterprise described herein.

[2] *Altisource Portfolio – Fall of Erbey's Empire*, Seeking Alpha, March 23, 2015, available at http://seekingalpha.com/article/3020316-altisource-portfolio-fall-of-erbeys-empire (last visited April 1, 2015).

Erbey's direction), and has and still owns 16.9% (over 5 million shares) of stock in Ocwen Financial. Moreover, the Ocwen and Altisource Entities continue to operate the scheme Erbey set in motion which continues to harm borrowers as described herein. This illegal scheme is the "Ocwen Enterprise."[3]

2.     Ocwen Financial and Ocwen Servicing entered into a consent order with the New York State Department of Financial Services, in which the companies stipulated that they overcharged borrowers for Distressed Mortgage Services, and did so through its association with Altisource. Simply put, the Ocwen Enterprise was premised on undisclosed self-dealing. It worked like this: Ocwen Financial caused its subsidiary Ocwen Servicing to acquire the servicing rights to subprime mortgages that were likely to become "distressed" (meaning the borrower falls behind on his or her payments and enters default).[4] When Ocwen Servicing acquired the servicing rights to a mortgage, it also acquired the right to collect from the borrower fees for certain services in the event the mortgage became distressed. These services are the Distressed Mortgage Services[5] and the fees Ocwen Servicing charged borrowers for them are the Distressed Mortgage Fees. Ocwen Servicing keeps the Distressed Mortgage Fees and reaps increased revenue and profits therefrom.

3.     Under Erbey's direction, Ocwen also split off Altisource into its own "independent" company, effectively allowing Erbey and other joint managers, directors and shareholders to double-dip salaries, benefits and profits by receiving money from the operations of Ocwen and the newly-separated Altisource. To increase their own salaries, benefits, revenue and profits derived from the

---

[3] The Ocwen Enterprise is more specifically described in the First Cause of Action below.

[4] For instance, Ocwen Financial guaranteed Ocwen Servicing's performance and financed the transaction when Ocwen Financial acquired servicing rights from the lender on at least one occasion. *See* June 13, 2013 Ocwen Financial Corp SEC Form 8-K at p.3, item 1.01, attached hereto as Exhibit 1. *See also id.* at Exhibit 10.1 ("Guarantee") (Ocwen Financial makes the guarantee to induce the bank to sell the servicing rights to Ocwen Servicing's subsidiary).

[5] As detailed herein, the Distressed Mortgage Services include: property inspections, property appraisals, broker price opinions ("BPOs"), property valuation expenses, foreclosure auctions, and title examinations. Plaintiffs may learn of other Distressed Mortgage Services for which Ocwen Servicing charged borrowers fees as part of the Ocwen Enterprise, and reserve their right to amend their complaint to include additional fees for Distressed Mortgage Services so discovered.

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

Distressed Mortgage Fees, Ocwen Servicing then hired Altisource and its subsidiaries (which Erbey also controls) to provide the Distressed Mortgage Services for Ocwen, which it previously did for itself in-house, at artificially and unfairly high prices for the Distressed Mortgage Services, and to charge for Distressed Mortgage Services that were duplicative of other services.  Through this scheme, which was concealed from borrowers, the self-dealing Ocwen Enterprise reaped increased salary, benefits, revenue and profits they did not earn at the borrowers' expense.  Moreover, given that Altisource was not a mortgage servicer, it could operate outside of the purview of bank regulators such as the Consumer Financial Protection Bureau that was created to rein-in mortgage servicing abuses.

4.     The Ocwen Enterprise's self-dealing scheme to charge borrowers for marked-up and duplicative Distressed Mortgage Services was never disclosed to borrowers or otherwise made public until being revealed by the New York State Department of Financial Services beginning, in part, in a February 26, 2014 letter released by the Department.

5.     Plaintiffs bring this action seeking injunctive relief and damages on behalf of themselves and thousands of homeowners in California and throughout the United States who have been and continue to be victims of Defendants' unfair and unlawful schemes.

## II.     PARTIES

6.     Plaintiffs Victor P. Giotta and Loralee Giotta are married and citizens of the State of California, residing in San Jose, Santa Clara County, California. The Giottas have an outstanding mortgage loan, serviced by Ocwen Servicing, on their San Jose house in which they have resided for over 50 years.  The Giottas' mortgage loan was in default at the time Ocwen Servicing acquired the right to service their mortgage loan in or about February 2013.

7.     Defendant William C. Erbey controlled the Ocwen Enterprise through either direct or effective control of its participants including the Ocwen and Altisource Entities.  Mr. Erbey is the former CEO of Ocwen Financial, the Executive Chairman of Ocwen Servicing and former Director and Chairman of the Board of four related Altisource companies, including Altisource Portfolio Solutions S.A., Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions, Ltd.  Mr. Erbey is the single largest shareholder of Ocwen Financial and the Altisource Parent.  On January 16, 2015 he stepped down from his positions as Executive

3

1    Chairman of Ocwen and Director and Chairman of the Board of Altisource as part of a consent order

2    with the New York Department of Financial Services due to his involvement in a multitude of loan

3    servicing violations, including those described herein.   Through his control of the Ocwen and

4    Altisource Entities, Mr. Erbey orchestrated the Ocwen Enterprise.   Mr. Erbey's control over these

5    entities has been called a "complex mortgage servicing empire."[6]  As of December 31, 2014, Erbey

6    owned or controlled approximately 29% of the common stock of the Altisource Parent, and currently

7    owns approximately 16.9% of the common stock of Ocwen Financial.[7]

8         8.      Defendant Ocwen Financial Corporation ("Ocwen Financial") is a publicly traded

9    corporation organized under the laws of Florida, with its principal place of business in Atlanta,

10   Georgia.  Ocwen Financial regularly conducts business in California, and regularly conducts business

11   within this District.  Ocwen Financial's main role in the Ocwen Enterprise is to help secure mortgage

12   servicing rights for its subsidiary, Ocwen Servicing.  Ocwen Financial's close affiliation with the other

13   members of the Ocwen Enterprise is reinforced by the following:

14        a.      Ocwen Financial admits its business is "dependent on many of the services and

15                products provided by Altisource."[8]  These services include "various business process

16                outsourcing services" (which includes the Distressed Mortgage Services) and

17                technology products and support services (which includes the mortgage servicing

18                software Ocwen Servicing developed then sold to the Altisource Parent). *Id.*

19        b.      Ocwen Financial and the Altisource Parent also share administrative and corporate

20                services as well as sharing access to borrower data.  *Id.*

---

23   [6] *Altisource Portfolio – Fall of Erbey's Empire*, Seeking Alpha, March 23, 2015, available at

24   http://seekingalpha.com/article/3020316-altisource-portfolio-fall-of-erbeys-empire (last visited April 1, 2015).

25   [7] Altisource Parent March 2, 2015 SEC Form 10-k, p. 16, available at

26   http://www.sec.gov/Archives/edgar/data/1462418/000162828015001367/asps-12312014x10k.htm.

27   [8] Ocwen Financial September 30, 2014 SEC Form 10-Q, p. 44-45, available at

28   http://www.sec.gov/Archives/edgar/data/873860/000087386014000020/a2014093010q.htm   (last visited April 3, 2015).

4

c.      Although Ocwen Financial pays the Altisource Parent for the Distressed Mortgage Fees, Ocwen Financial does not report the Distressed Mortgage Fees as expenses because "[s]ervices provided by Altisource under the Services Agreements with Ocwen are generally charged to the borrower and/or loan investor." *Id.*

d.      In 2013, Ocwen Financial purchased two competing home loan servicing entities, Homeward and ResCap, then promptly sold these entities' fee-based businesses to Altisource. *Id.* at 42.  Ocwen Financial financed these transactions in part using a $75 million loan from the Altisource Parent. *Id.* at 55.

e.      Ocwen Financial has automatically-renewing agreements with the Altisource Parent pursuant to which the Ocwen and Altisource Entities share services including human resources, vendor management, corporate services, six sigma, quality assurance, quantitative analytics, treasury, accounting, tax matters, risk management, strategic planning and compliance. *Id.* at F-59-60.

f.      Defendant Erbey was Ocwen Financial's Executive Chairman in addition to serving as the Chairman of Altisource, and many of Ocwen Financial's officers and directors own interests in the Altisource Parent and/or Altisource Servicing.[9]

g.      Its former Chairman, William Erbey, owns or controls more than 13% of Ocwen Financial's common stock and 26% of Altisource Portfolio Solutions S.A.'s common stock.

h.      In 2012, Ocwen purchased Erbey's home for $6.5 million. *Id.* at F-59.

i.      Until recently, Ocwen Financial's Chief Risk Officer concurrently served as the Altisource Parent's Chief Risk Officer, while reporting directly to Erbey in both capacities.  Consent Order ¶ 23.  NYDFS observed "This individual seemed not to

---

[9]    Ocwen    Financial    2013    SEC    Form    10-k,    p.    18,    available    at http://www.sec.gov/Archives/edgar/data/873860/000144530514000799/a2013123110k.htm    (last visited April 3, 2015).

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

1    appreciate the potential conflicts of interest posed by this dual role, which was of

2    particular concern given his role as Chief Risk Officer."  *Id.*

3    j.    According to the Altisource Parent's most recent SEC Annual Report, "Ocwen is our

4          largest customer and the loss of Ocwen as a customer or a reduction in the size of

5          Ocwen could adversely affect our business and results of operations."[10]  "The Service

6          Agreements also prohibit Ocwen from establishing fee-based businesses that would

7          directly or indirectly compete with Altisource's services with respect to the Homeward

8          Residential, Inc. and Residential Capital, LLC portfolios."  April 23, 2015 SEC form

9          10-Q at 9.

10   k.    Unsurprisingly given its origin, the Altisource Parent provides mortgage services

11         "primarily for loan portfolios serviced by Ocwen."[11]

12   l.    In 2014, 60% of the Altisource Parent's total revenue was derived from Ocwen

13         Financial and its subsidiaries.[12] No other client accounts for more than 10% of

14         Altisource's revenue.

15   m.    As one investor report described, "[o]ne key aspect of the spinoff is that Ocwen has to

16         use Altisource's services.  This means that whenever Ocwen sells shares or raises debt

17         to buy mortgage servicing portfolios, it brings business to Altisource.  Altisource does

18         not have to spend money on attracting this new business.  And of course it grows when

19         Ocwen grows."[13]

20

---

21   [10]    March   2,   2015   SEC   Form   10-k,   p.   9,   available   at
22   http://www.sec.gov/Archives/edgar/data/1462418/000162828015001367/asps-12312014x10k.htm.

23   [11]    March   2,   2015   SEC   Form   10-k,   available   at
24   http://www.sec.gov/Archives/edgar/data/1462418/000162828015001367/asps-12312014x10k.htm.

25   [12]    March   2,   2015   SEC   Form   10-k,   p.   6,   available   at
     http://www.sec.gov/Archives/edgar/data/1462418/000162828015001367/asps-12312014x10k.htm.

26   [13] *Investment Thesis on Altisource Portfolio Solutions (ASPS)*, MarketFolly, July 8, 2013, available at
27   http://www.marketfolly.com/2013/07/altisource-portfolio-solutions-asps.html (last visited April 1,
     2015).

28

6

n.      Since the Ocwen Enterprise has come under fire from regulators and consumer lawsuits, investors are seriously questioning the Altisource Parent's continued performance since it depends directly on the Ocwen Enterprise and is therefore directly threatened by the exposure of the Ocwen Enterprise's wrongdoing.[14]  Reportedly, the Altisource Parent's "whole business model" "is now threatened" by the exposure of the Ocwen Enterprise's conduct.  *Id.*  "[A]s the bulk of Altisource's revenue is created in connection with [Ocwen Financial], a failure of [Ocwen Financial] to restore its operations in time would definitely endanger the whole core business of [the Altisource Parent]."  *Id.*

o.      The Altisource Parent's March 2, 2015 SEC filing reported a decline in earnings growth as a result of expenses incurred "for people and infrastructure to support a larger Ocwen[.]"[15]

9.      Defendant Ocwen Loan Servicing, LLC ("Ocwen Servicing") is a limited liability company organized under the laws of Delaware, and an indirect wholly-owned subsidiary of Ocwen Financial.[16]  Ocwen Servicing maintains operations in this District related to the activities at issue in this case, including operations involving the servicing of mortgage loans at issue in this action. Ocwen Servicing is headquartered in West Palm Beach, Florida, and is currently licensed to service mortgage loans in all fifty states, including California, the District of Columbia, and two U.S. territories.  Ocwen Servicing's main role in the Ocwen Enterprise, is to contract with the Altisource Entities for Distressed

---

[14] *Altisource Portfolio – Fall of Erbey's Empire*, Seeking Alpha, March 23, 2015, available at http://seekingalpha.com/article/3020316-altisource-portfolio-fall-of-erbeys-empire (last visited April 1, 2015).

[15] See exhibit to March 2, 2015 SEC Form 8-k, available at http://www.sec.gov/Archives/edgar/data/1462418/000110465915015799/a15-5701_1ex99d1.htm (last visited April 1, 2015).

[16] Ocwen Financial September 30, 2014 SEC Form 10-Q, p. 8, available at http://www.sec.gov/Archives/edgar/data/873860/000087386014000020/a2014093010q.htm (last visited April 3, 2015).

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

Mortgage Services at artificially high prices and charge borrowers for these inflated services as well as for Distressed Mortgage Services that are duplicative of other services.  On January 23, 2015, the California Department of Business Oversight ("DBO") announced a $2.5 million settlement with Ocwen Servicing for failing to provide the DBO with reports on its compliance with California mortgage lending laws.[17]  The settlement provides Ocwen Servicing will pay $2.5 million in penalties to the DBO, pay for an independent audit of its mortgage servicing practices and take on no new California customers pending the DBO's approval, in exchange for the DBO's agreement to drop its efforts to suspend Ocwen Servicing's license to operate in California.  *Id.*

10.    Altisource Portfolio Solutions S.A. (the "Altisource Parent") is not a named defendant in this lawsuit, but is an integral element of the Ocwen Enterprise.  The Altisource Parent is a publicly traded company incorporated in Luxembourg, with a principal place of business in Atlanta, Georgia. The Altisource Parent consists of Ocwen Financial's former "Ocwen Solutions" line of business that Ocwen Financial spun off in 2009.[18]  Ocwen Financial admits the Altisource Parent is really nothing more than "[Ocwen Financial's] former unsecured collections business, residential fee-based loan processing business and technology platforms" that continues to provide these services to Ocwen Financial in furtherance of the Ocwen Enterprise.  *Id.*  The Altisource Parent's main role in the Ocwen Enterprise is to lease back to Ocwen Financial the mortgage servicing software Ocwen Servicing developed then sold to the Altisource Parent.  Ocwen Financial's 2013 Annual Report makes clear

---

[17] *Ocwen Agrees to $2.5 Million Settlement for Failing to Provide Loan Information*, California Department of Business Oversight, January 23, 2015, available at http://www.dbo.ca.gov/Press/press_releases/2015/Ocwen%20Settlement%20Announcement%2001-23-15.pdf (last visited April 1, 2015).

[18] Ocwen Financial 2013 SEC Form 10-k, p. 9, available at http://www.sec.gov/Archives/edgar/data/873860/000144530514000799/a2013123110k.htm (last visited April 3, 2015).

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

Ocwen Financial depends completely on this technology it used to own that it now leases back from the Altisource Parent.[19]

11.     Defendant Altisource Solutions, Inc. ("Altisource Servicing") is a subsidiary of Altisource Portfolio Solutions S.A. and is a closely affiliated company with the Ocwen Entities. Altisource Solutions, Inc. was incorporated in Delaware in 2009 after being spun off of Ocwen Servicing, and has its principal place of business in West Palm Beach, Florida.  Altisource Solutions, Inc. is registered to conduct business in California, maintains offices and regularly conducts business in California and within this District.  Altisource Servicing's main role in the Ocwen Enterprise, as described in detail herein, is to provide the inflated and/or duplicative Distressed Mortgage Services to Ocwen Servicing so that Ocwen Servicing may pass these inflated prices along to the borrower and the Ocwen Enterprise may generate higher revenue and profit therefrom.

12.     Defendants DOES 1-10 are individuals or entities who participated in the conduct alleged in this First Amended Complaint but whose identities are as yet unknown to Plaintiffs.  The DOE Defendants may include the officers or directors of the Ocwen and/or Altisource Entities, who may be obligated to indemnify the Ocwen and/or Altisource Entities for liability stemming from the allegations of this First Amended Complaint.[20]   Plaintiffs reserve the right to amend this First Amended Complaint to identify these individuals or entities once their identities are ascertained.

## III.     JURISDICTION AND VENUE

13.     Jurisdiction is proper under 28 U.S.C. §§ 1331 for Plaintiffs' claims under RICO and the FDCPA, and under 28 U.S.C. § 1367 the Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and

---

[19]    Ocwen   Financial   2013   SEC   Form   10-k,   p.   18,   available   at http://www.sec.gov/Archives/edgar/data/873860/000144530514000799/a2013123110k.htm   (last visited April 3, 2014).

[20] For example, on March 21, 2015, Ocwen Financial began entering into undertakings with directors and executive officers whereby the director or executive officer agreed to repay any amounts paid, advanced or reimbursed by Ocwen Financial in connection with a claim for which the director or executive officer as adjudged to be liable.  *See* Ocwen Financial March 26, 2015 SEC Form 8-k exhibit 10.2.

9

are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.  Jurisdiction of this Court is also proper under 28 U.S.C. § 1332(d)(2).  The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members of the class of plaintiffs are citizens of states different from Defendants.

14.     Venue is proper within this judicial district pursuant to 28 U.S.C. §1391(b) and (c). Defendants transact business and are found within this District, and a substantial portion of the underlying transactions and events complained of by the enterprise occurred in this district, and affected persons, including Plaintiffs, who reside or resided in this judicial district at the material time. Defendants have received substantial compensation from such transactions and business activity in this District, including as the result of servicing mortgage loans for persons residing in this District. Finally, Defendants reside and/or may be found in this District and the interstate trade and commerce described herein is and has been carried out in part within this judicial District.

15.     The Court has general personal jurisdiction over the Ocwen and Altisource Entities because they have continuous and systemic business contacts within California by virtue of the conduct described throughout this First Amended Complaint.  Alternatively, if the Ocwen and Altisource Entities' conduct described throughout this First Amended Complaint does not rise to the level of "continuous and systemic" activity within California, the Court has specific personal jurisdiction over Ocwen and the Altisource Entities because Ocwen's and the Altisource Entities' conduct described throughout this First Amended Complaint and out of which Plaintiffs' claims arise was purposefully directed at California residents, invoked the benefits and protections of California law, and causes jurisdiction over the Ocwen and Altisource Entities to be Reasonable.

16.     The Court also has specific personal jurisdiction over Defendant Erbey by virtue of his role as the mastermind of the Ocwen Enterprise.  Erbey created, oversaw and implemented the Ocwen Enterprise's unlawful practices that were directed at and harmed California residents under the protection of California's laws and to the benefit of Erbey and the Ocwen Enterprise's other participants.   Erbey personally and directly controlled, directed, authorized, encouraged and participated in, and received a direct financial interest and benefit from, the Ocwen Enterprise as described throughout this First Amended Complaint, including:

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

10

a. Erbey controlled the Ocwen Enterprise through direct and/or effective control of its participants, including the Ocwen and Altisource Entities, who constitute "Erbey's Empire."[21]  Erbey is the former CEO of Ocwen Financial, the Executive Chairman of Ocwen Servicing and former Director and Chairman of the Board of four related Altisource companies, including Altisource Portfolio Solutions S.A., Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions, Ltd.  Erbey is the single largest shareholder of Ocwen Financial and the Altisource Parent.

b. Under Erbey's direction, Ocwen Financial's former loan servicing arm, Ocwen Solutions, was spun off to create the Altisource Parent.  Erbey retained effective control over the Altisource Parent as part of the spin-off.  Ocwen Financial's SEC filings acknowledged the potential conflicts of interest created by the close relationship between Erbey and the Ocwen and Altisource Entities.[22]

c. The Chief Risk Officer of both Ocwen Financial and the Altisource Parent reporting directly to Erbey.  Consent Order ¶ 23.

d. In 2012, Ocwen purchased Erbey's personal residence for $6.5 million – 50% more than Erbey paid to purchase it in 2006.[23]

e. The New York Department of Financial Services ordered Erbey to resign from his control positions within the Ocwen and Altisource Entities.  NYDFS specifically found (and the Ocwen Entities stipulated and agreed) that "Mr. Erbey…***has participated in*** the approval of a number of transactions between [Ocwen Financial and the Altisource Parent] or from which Altisource received some benefit[.]"  Consent Order ¶ 21 (emphasis added).  NYDFS' consent order also found extensive conflicts of interest among the Ocwen and Altisource Entities by virtue of Erbey's control positions within these entities.  NYDFS Consent Order ¶¶ 20-21.

f. Despite this, Erbey continues to exercise some control over these entities because he remains largest individual shareholder of both the Altisource Parent and Altisource Servicing, and Ocwen Financial.

17.    Erbey also has extensive direct contact with California in an individual capacity.  In support of his motion to dismiss asserting the Court lacks personal jurisdiction over him, Erbey

---

[21] *Altisource Portfolio – Fall of Erbey's Empire*, Seeking Alpha, March 23, 2015, available at http://seekingalpha.com/article/3020316-altisource-portfolio-fall-of-erbeys-empire (last visited April 1, 2015).

[22]    Ocwen's    SEC    Form    8-K    filed    July    20,    2009    located    at http://www.sec.gov/Archives/edgar/data/873860/000101905609000723/ocn_8k.htm.

[23] Ocwen Financial 2013 SEC Form 10-k, p. F-059, available at *http://www.sec.gov/Archives/edgar/data/873860/000144530514000799/a2013123110k.htm (last visited April 3, 2015)*; *Ocwen's Rapid Growth Puts Spotlight on Its Practices,* Wall Street Journal, December 7, 2012, available at http://www.wsj.com/articles/SB10001424127887324640104578163461378035442.

11

declared, "I have not been a partner, member, shareholder, director, or officer in a partnership, LLC, or corporation that was formed or had a principal place of business in California for over 25 years." Dkt. No. 39-01 at ¶ 3. This statement is demonstrably false. As of 2013, Erbey was a director of at least two active California corporations, including "NHPAHP Affordable Housing Corporation CA 14" and "NHPAHP Affordable Housing Corporation CA5."

## IV.    INTRA-DISTRICT ASSIGNMENT

18.    Consistent with Northern District of California Civil Local Rule 3-5(b), assignment to the San Jose Division is appropriate under Civil Local Rule 3-2(c) and 3-2(e), because acts giving rise to the claims at issue in this lawsuit occurred, among other places, in this District, in Santa Clara County, California.

## V.    FACTUAL ALLEGATIONS

### A.    Home Mortgage Servicing Industry

19.    The single family home mortgage servicing industry consists of three players: (1) borrowers who obtain mortgages for one- to four-family residential properties; (2) the trusts and investors who own borrowers' mortgages and derive income from borrowers' principal and interest payments; and (3) mortgage servicers that collect borrowers' mortgage payments, pass the principal and interest on to the owner and profit from the fees for ancillary services.

20.    For more than thirty years, mortgages typically have been "pooled" to create an investment vehicle, often denominated as a trust. This practice exploded during the financial crisis along with a significant loosening of lending standards. Interests in the trusts have been sold to investors that own interests in payment streams generated by principal and interest payments by the borrowers. These interests are called mortgage backed securities.

21.    A mortgage servicer (such as Ocwen Servicing) is a company to which borrowers pay their mortgage loan payments and which performs other services in connection with mortgages and mortgage-backed securities. Servicers perform services including: collecting payments from borrowers; applying the payments as provided by the mortgage agreement; forwarding principal and interest to the owner; assessing and collecting money for any distressed mortgage services as provided by the mortgage contract for such things as late payments, property inspection fees, appraisal fees,

12

BPOs, foreclosure auctions and title examinations; managing any escrow created for the payment of taxes and/or insurance; and default and delinquency related activities such as pursuing collections or foreclosing on borrowers' homes.

22.     Often, as is the case with Ocwen Servicing, the servicer did not originate the loans it services but became the servicer by purchasing the "mortgage servicing rights" or by entering into a contract with a "master servicer" to act on its behalf as a "subservicer." This occurs at various times throughout the life of the mortgage – including when the borrower is delinquent in payments and may need the servicer's assistance to avoid foreclosure.

23.     Under these servicing agreements, the servicer collects the borrower's payments for principal and interest and passes them along to the owner. In contrast, the servicer collects the borrower's payments for ancillary costs (such as the Distressed Mortgage Fees) and profits from them. Thus, every dollar a borrower pays in fees (as opposed to principal and interest) is a dollar of revenue for the servicer. Importantly, this creates a perverse incentive for servicers such as Ocwen Servicing, who have little interest in keeping a loan performing and a vastly greater interest in maximizing fees, including fees resulting from distressed mortgages. As a Member of the Board of Governors of the Federal Reserve System explained, "[w]hile an investor's financial interests are tied more or less directly to the performance of a loan, the interest of a third-party servicer are tied to it only indirectly, at best. The servicer makes money, to oversimplify it a bit, by maximizing fees earned and minimizing expenses while performing the actions spelled out in its contract with the investor…. The broad grant of delegated authority that servicers enjoy under pooling and servicing agreements (PSAs), combined with an effective lack of choice on the part of consumers, creates an environment ripe for abuse."[24]

24.     For loan servicers like Ocwen Servicing desiring to maximize revenue and profit from servicing loans, the right to charge servicing fees is "ripe for abuse." Because the money Ocwen Servicing can generate from servicing fees is not linked to money generated from principal and

---

[24] Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference, November 12, 2010, available at http://www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited January 22, 2012.

13

interest, Ocwen Servicing makes more money on defaulting mortgages supposedly requiring many services than on performing loans requiring few services.  In short, Ocwen Servicing is incentivized to grow its revenue and profits by finding ways to charge borrowers additional fees, and distressed borrowers are ripe for exactly that.

25.     Mortgage contracts between borrowers and lenders, which provide for the terms under which mortgage servicers must perform their jobs, generally consist of two documents, a promissory note and mortgage or deed of trust.  These mortgage contracts, including both of their typical documents, are substantially similar for typical borrowers because they must conform to the standard Fannie Mae / Freddie Mac form contracts, and because they are most easily pooled for reinvestment when they are essentially fungible.

**B.      Ocwen Servicing Operates its Subprime Mortgage Servicing Business to Generate Fees**

26.     Ocwen Servicing is a mortgage servicer of single-family mortgages (*i.e.*, one to four-family homes), including the mortgages of Plaintiffs and members of the putative class and subclasses defined below.  Ocwen Financial touts Ocwen Servicing as being the fourth largest mortgage servicer in the United States, and services over $400 billion of mortgage loans.  According to Ocwen Financial's 2013 10-K, California has Ocwen Servicing's largest concentration of loans, which make up approximately 15% of Ocwen Servicing's total loans serviced. Ocwen Servicing is one of the nation's largest "subprime" mortgage servicers, managing more than 1/4 of all outstanding subprime loans in the United States.  According to Ocwen Financial's October 31, 2014 Quarterly Report, Ocwen Servicing then serviced nearly 730,000 subprime loans with an unpaid principal balance of over $123 billion.  Ocwen Servicing is also the largest nonbank servicer in the United States. "Subprime" loans are those offered at a higher interest rate to individuals who do not qualify for traditional "prime" loans.  Such subprime loans are often given by nontraditional lenders to persons with lower credit ratings or fewer assets, who may have greater problems making their mortgage payments.  These are also the borrowers that are the most likely be to be subject to predatory lending practices.  Generally speaking, subprime borrowers are of modest economic means, and are the most vulnerable to falling behind on their mortgage payments, and hence the most likely to need help from

14

their servicer.  From Ocwen Servicing's perspective, this translates to greater opportunities to collect fees and increase revenue and profits from servicing subprime as opposed to prime loans.

27.    Thus, the gist of Ocwen Servicing's business is to acquire the servicing rights for mortgage loans that are in default already before Ocwen Servicing acquired them.  As recently reported in the Atlanta Business Chronicle:

> Ocwen (NYSE: OCN) runs call centers and other tools to rework or force repayment on mortgages that have gone sour. The idea, [Paul] Koches[25] said, is that it's better to keep a person in their house, paying something, than to kick them out and get nothing at all. Ocwen takes over the distressed loans of other banks and then calls the borrowers to renegotiate.[26]

28.    To put a good face on this, Ocwen Servicing presents itself as committed to helping borrowers whose mortgage loans it services, that it has technology allowing it to lower loan re-default rates, and that it has the ability to keep people from defaulting on loans.  Ocwen Servicing thus spins its business as goodwill using the slogan "Helping Homeowners is What We Do!" rather than what it truly is – selectively profiting directly from borrowers' financial distress.

29.    Under the mortgage servicing rights that Ocwen Servicing acquires, Ocwen Servicing is authorized to assess reasonable and appropriate fees and charges as provided for in the mortgage agreement.  Whether or not they are contractually authorized to assess any or all of the fees at issue in this action, they cannot charge or collect fees that are unlawful, unfair or the product of a self-dealing fraudulent conspiracy under federal or state laws.

30.    Ocwen Servicing advances the money to pay fees, charges or premiums, and retains the right to recover the amounts advanced from borrowers.  Ocwen Servicing then adds these amounts to borrowers' loans to collect the amounts advanced.  In other words, when Ocwen Servicing performs a Distressed Loan Service such as a property inspection, Ocwen Servicing pays a third party for the service then adds the cost on to the borrower's bill.

---

[25] Paul Koches is the Executive Vice President and General Counsel of Ocwen Financial Corp.

[26] "Ocwen Financial Spends $306M On Bad Loans", Atlanta Business Chronicle (Nov. 11, 2011) which can be found at:  http://www.bizjournals.com/atlanta/print-edition/2011/11/11/ocwen-financial-spends-306m-on-bad.html?page=all.

15

31.     As reported by state and federal regulators and made the subject of consent decrees entered with the Ocwen Entities, described herein, Ocwen Servicing, contrary to its commitment to homeowners, routinely, amongst other things: (i) fails to timely and accurately apply payments made by borrowers; (ii) fails to maintain accurate account statements; (iii) charges unauthorized inflated fees for Distressed Mortgage Services; (iv) charges fees for authorized but unnecessary Distressed Mortgage Services, such as force-place insurance; (v) provides false and misleading information to borrowers regarding their loans; and (vi) provides false or misleading information to borrowers about their ability to modify their mortgages.[27]

32.     Using these unfair and fraudulent practices, Ocwen Servicing has made it its business to maximize revenue by, among other things, assessing improper fees and charges to mortgage loans, and making it difficult for borrowers to modify their existing mortgages to have more favorable terms. Ocwen Servicing charges borrowers for these needless, unfair, and unlawful charges in order to maximize its revenue and profits from its servicing operations.  However, Ocwen Servicing did not act or profit alone in these practices.

33.     As described herein, Ocwen Servicing's conduct was part of the Ocwen Enterprise's scheme of undisclosed self-dealing and violates federal laws and regulations.

34.     Indeed, as a result of the financial crisis that resulted, in part, from subprime lending practices, Congress created the Consumer Financial Protection Bureau, authorized by the Dodd-Frank Wall Street Reform and Consumer Protection Act, for the purpose of, amongst other things, overseeing mortgage-servicing operations.  The CFPB is responsible for promoting fairness and transparency in mortgages and other financial products and services.

35.     As part of this mandate, the Consumer Financial Protection Bureau has authority to enforce the federal consumer protection laws, under which Defendants' conduct is prohibited and may declare practices to be unlawful because it is "unfair" and "abusive" if certain circumstances are met.

---

[27] *See* Complaint filed by the Consumer Finance Protection Bureau and 49 states attorneys general at www.consumerfinance.gov/f/201312_cfpb_complaint_ocwen.pdf, pp. 12-13 (last visited January 22, 2015).

*See* 12 U.S.C. § 5531(c) (unfairness), (d) (abusive). *See also* 12 U.S.C. 5536 (prohibited acts). An "unfair" practice under the Dodd-Frank Act is one where "the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers" and "such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c). An "abusive" practice is one where the conduct, among other things, "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service" or "takes unreasonable advantage of" a consumer's "lack of understanding . . . of the material risks, costs, or conditions of the product or service" or "the inability of the consumer to protect" his or her interests "in selecting or using a consumer financial product or service." *Id.* § 5331(d).  The conduct described herein meets these definitions of federally prohibited conduct, and, as set forth more fully below, also supports Plaintiffs' causes of action asserted here.

36.     Similarly, the CFPB has published regulatory guidance for the purpose of identifying and eliminating "risks to consumers," such as "potentially unfair, deceptive, or abusive acts or practices (UDAAPs) with respect to servicers' interactions with consumers."[28] The CFPB's examination guidelines prohibit the following conduct:

- A representation, omission, act, or practice is deceptive when:

    (1) the representation, omission, act, or practice misleads or is likely to mislead the consumer;

    (2) the consumer's interpretation of the representation, omission, act, or practice is reasonable under the circumstances; and

    (3) the misleading representation, omission, act, or practice is material.

- An act or practice is unfair when:

    (1) it causes or is likely to cause substantial injury to consumers;

    (2) the injury is not reasonably avoidable by consumers; and

    (3) the injury is not outweighed by countervailing benefits to consumers or to competition.

- An abusive act or practice:

---

[28] CFPB Examination Procedures—Mortgage Servicing (January 2014), at 3, *available at* http://files.consumerfinance.gov/f/201401_cfpb_mortgage-servicing-exam-procedures.pdf.

17

(1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service or

(2) takes unreasonable advantage of –

- a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

- the inability of the consumer to protect its interests in selecting or using a consumer financial product or service; or

- the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.[29]

37.     Further, Ocwen's conduct violates the guidelines of the federal government-sponsored enterprise Fannie Mae, which issues the standard form uniform security instruments used for residential mortgages in the United States, including the Giottas' mortgage. Fannie Mae requires servicers, including Ocwen Servicing, to have clear written policies regarding fees that "will ensure that fees comply with applicable laws and regulations." Specifically, Fannie Mae requires servicers, including Ocwen Servicing, to have policies in place regarding property inspections, as follows:

fees may be charged on a repetitive basis only when required or permitted by Fannie Mae's Guides or otherwise clearly supported by the circumstances relating to a particular loan (e.g., charging a delinquent borrower's account for monthly property inspections generally would not be a permissible practice unless the servicer determines that the circumstances *warrant multiple inspections.*[30]

**C. Ocwen Servicing is Part of Defendant Erbey's Larger Scheme to Overcharge Distressed Borrowers in Conjunction with the Other Defendants**

38.     Since the Ocwen Enterprise's inception in or about August of 2009 and continuing as of the date of the filing of this Complaint, Defendants Erbey and the Ocwen and Altisource Entities conspired to increase their financial revenue and profits by overcharging homeowners for services including, property inspections, broker price opinions ("BPOs"), property appraisals, foreclosure auction services and title examinations (collectively "Distressed Mortgage Services," the fees for which are the "Distressed Mortgage Fees"). Ocwen Servicing accomplishes this by using Altisource

---

[29] *Id.* at 3-4.

[30] Fannie     Mae     Single     Family     2011     Servicing     Guide,     *available     at* https://www.fanniemae.com/content/guide/svc061011.pdf.

18

Servicing and other subsidiaries of the Altisource Parent to procure these Distressed Mortgage Services, which is facilitated through the use of mortgage servicing software leased from Altisource Servicing that Ocwen Servicing itself originally designed to manage homeowners' loan accounts and assess fees. The undisclosed self-dealing Ocwen Enterprise was formed and operated as described below.

39.     Prior to August 2009, Altisource was a subsidiary of Ocwen, then called Ocwen Solutions, that created and maintained Ocwen's mortgage servicing software. Ocwen Solutions' mortgage servicing systems provided technological services throughout the lifecycle of the mortgages serviced by Ocwen Servicing – including triggering the Distressed Mortgage Services and the resulting fees at issue in this case – and also including collections and customer relationship management. Ocwen Financial developed these mortgage servicing systems over a period of more than 20 years at a cost of more than $150 million.

40.     On August 10, 2009, Ocwen Financial, under the direction of Erbey and other Ocwen officers, spun off Ocwen Solutions to create a new, independent company called the Altisource Parent. Erbey and other of Ocwen's officers took a large controlling share of the newly-formed Altisource corporation, and would be able to financially profit from the revenues generated by both Ocwen and Altisource.

41.     When the companies split, Ocwen gave Altisource control of the mortgage servicing software that, up to that point, was used by Owen to run its entire mortgage servicing operations. Given that the software was essential to Ocwen's business, Ocwen "leased" the software from Altisource so that it could continue to service mortgages, essentially creating a cost to Ocwen that did not exist previously, and a revenue source to Altisource from which Erbey and other shareholders could financially benefit. Moreover, Erbey and other officers holding shares in both Ocwen and Altisource were then able to be paid salaries, bonuses, revenue and profits from both companies for the same mortgage services that had been provided exclusively from Ocwen prior to the Altisource split. As part of the Altisource spin-off, Defendant Erbey, Ocwen Financial's Chairman of the Board

19

and largest individual shareholder owning of 13% of Ocwen Financial's common stock, also became the Chairman of the Board for Altisource.[31]

42.    At the time of Altisource's spin-off from Ocwen Servicing, Ocwen Servicing immediately became Altisource's single largest customer.  Ocwen Servicing remained contractually obligated to purchase mortgage servicing system services from Altisource for eight years after the spinoff.  That obligation was later extended three more years through 2020.[32]  Also at the time of the spin-off, Mr. Erbey became the largest shareholder of the Altisource Parent, holding 27.1% of common stock.[33]

43.    As the Altisource Parent explains its mortgage servicing software, its "Technology Services" are comprised of: (i) REALSuite software applications, including REALServicing that provides automated workflows and reporting through the entire life of a mortgage loan; (ii) REALTrans which automates the ordering, tracking and fulfilling of services related to mortgage servicing; (iii) REALRemit which allows service providers to submit invoices for payment

---

[31] The Altisource Parent was incorporated on November 4, 1999 in Luxembourg as Ocwen Luxembourg S.à r.l.  Altisource Portfolio Solutions S.A..  *See* SEC Form 10-K for the period ended Dec. 31, 2012, available at http://www.sec.gov/Archives/edgar/data/1462418/000110465913009969/a13-2839_110k.htm.  The company was renamed Altisource Portfolio Solutions S.à r.l. on May 12, 2009, and converted into the Altisource Parent on June 5, 2009. *Id.* Prior to August 10, 2009, the Altisource Parent was a wholly-owned subsidiary of Ocwen Financial. *Id.*

[32] The Altisource Parent SEC Form 10-K for the period ended Dec. 31, 2012, available at http://www.sec.gov/Archives/edgar/data/1462418/000110465913009969/a13-2839_110k.htm ("Ocwen, including its wholly owned subsidiary, Ocwen Mortgage Servicing Inc. ('OMS'), are contractually obligated to purchase certain mortgage services and technology services from us under service agreements.  In October 2012, the Ocwen agreement was extended by three years through 2020.  Separately, we signed a similar agreement in October 2012 with OMS effective through 2020.)

[33] Mr. Erbey was the Chairman of the Altisource Parent and several other related companies, including Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd., and held more than $1 billion in stock in Ocwen and Altisource and their affiliated companies. *See* Consent Order Pursuant to New York Banking Law § 44, at page 8, available at http://www.dfs.ny.gov/about/ea/ea141222.pdf (last visited January 30, 2015).

1   electronically; and (iv) REALDoc that generates correspondence associated with mortgage loan

2   servicing.[34]

3        44.     The Altisource Parent's REALSuite platform manages Ocwen Servicing's mortgage

4   loan servicing automatically based on parameters determined by Ocwen Servicing.  This includes

5   ordering, managing and paying for Distressed Mortgage Services including property inspections,

6   BPOs and appraisals provided by local third-party vendors convenient to the home with a mortgage in

7   default.  Ocwen Servicing also assesses fees for these services through the REALSuite platform.

8        45.     This mortgage servicing software that that Ocwen gave to Altisource was used by the

9   Ocwen Enterprise to automatically facilitate the ordering, charging, and payment of the Distressed

10  Mortgage Services described throughout this Complaint.  Those communications, which included

11  charging for the Inflated and Duplicative Distressed Mortgage Services, were done electronically over

12  the wires.  The communications to borrowers were also created by the same mortgage servicing

13  software, and communicated via the mail or wires to borrowers.  These communications were and are

14  essential to the Ocwen Enterprise's operation because they facilitate the very charges at issue in this

15  First Amended Complaint.  For the same reason, these communications had/have similar purposes,

16  results, victims and methods of commission, and each is/was connected to the Ocwen Enterprise's

17  operation.   These communications occurred continuously since the Ocwen Enterprise's inception

18  (and continue to occur as the Ocwen Enterprise continues to operate) because the Ocwen Enterprise's

19  goal was not to derive inflated revenue from one transaction or several unrelated transactions, but

20  rather to derive inflated revenue from the entire class of Distressed Mortgage Fees alleged throughout

21  this Complaint.   Because Ocwen Servicing services mortgages for millions of homeowners

22  nationwide, these communications were transmitted over the mail and/or wires at least twice and likely

23  millions of times throughout the life of the Ocwen Enterprise.

24

25

26

27  [34] SEC Form 10-for Altisource Portfolio Solutions S.A., for the period ended December 31, 2013,
    available        at       http://www.sec.gov/Archives/edgar/data/1462418/000110465913009969/a13-
28  2839_110k.htm.

21

46.     The charges for the Distressed Mortgage Services ordered and facilitated by Altisource's mortgage servicing software were passed from Ocwen to Altisource, allowing Erbey and Altisource's other officers to profit from services that had previously been provided by Ocwen internally.  Altisource Servicing charges additional fees for these Distressed Mortgage Services that are passed along to borrowers by Ocwen Servicing.  Shifting the costs, revenue and profits from Ocwen to Altisource for the Distressed Mortgage Services also allowed them to evade regulatory scrutiny since they were being provided by what was held out as an independent third-party company, with charges negotiated at arms-length.

47.     In reality, Altisource was anything but an independent company.  Erbey and other Ocwen officers maintained a large controlling stake in both Ocwen and Altisource by virtue of the amount of stock they owned in both companies, and by virtue of their positions in the companies as directors and/or officers.  Further, to avoid any internal criticism to the obvious undisclosed self-dealing and conflicts of interest between Ocwen and Altisource, Erbey placed Ocwen's chief risk officer in a duel role within Altisource as its chief risk officer to ensure compliance with the Ocwen Enterprise, not the law.

48.     In its SEC filings, Ocwen Financial acknowledged the potential conflicts of interest created by the close relationship between Erbey and the Ocwen and Altisource Entities.[35]  Among other risks, Ocwen Financial acknowledged that Mr. Erbey and other Ocwen Financial officers and directors had potential conflicts of interests due to the ongoing business relationships between the companies, and due to Mr. Erbey's role as CEO and Chairman of the Board of Ocwen Financial, while also becoming such a substantial stockholder in the Altisource Parent and its Chairman of the Board as well.

49.     The conflicts of interests due to the ongoing relationship between the Ocwen Entities and Altisource Entities were identified by Benjamin Lawsky, Superintendent of the New York State

---

[35]     Ocwen's   SEC   Form   8-K   filed   July   20,   2009   located   at http://www.sec.gov/Archives/edgar/data/873860/000101905609000723/ocn_8k.htm.

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

Department of Financial Services in a public letter to Ocwen dated February 26, 2014.[36]  In that letter, Mr. Lawsky noted that Mr. Erbey was not only the Executive Chairman of Ocwen Financial, but was also the largest shareholder of each of several Altisource companies with business ties to the Ocwen Entities, including Altisource Portfolio Solutions, S.A., Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd.  Moreover, Mr. Lawsky noted that Altisource Portfolio Solutions, S.A.'s Chief Risk Officer was also Ocwen Financial's Chief Risk Officer, reported directly to Mr. Erbey in both capacities, and had his salary paid entirely by Ocwen.  The result of the cozy relationship between Ocwen and Altisource, both being controlled by Erbey, was that borrowers were overcharged for Distressed Mortgage Services, including by virtue of extra costs built into all Distressed Mortgage Services charged through Altisource, and by the charging of duplicative Distressed Mortgage Services.

50.    Indeed, after investigating the very conflicts of interest inherent in the Ocwen-Altisource corporate relations complained about herein, Ocwen stipulated and agreed with New York's Department of Financial Services that Ocwen's conduct resulted in borrowers being overcharged for Distressed Mortgage Services, and Erbey agreed to resign as an officer and director from all Ocwen and Altisource-related companies as described below.  However, despite his removal as a director and officer in Ocwen and Altisource companies, Erbey still maintains 16.9% of the common stock in Ocwen, and 26% of Altisource's stock.

**D.    State and Federal Investigations of the Ocwen Enterprise**

51.    Ocwen stipulated with the NYDFS that the Ocwen Enterprise overcharged borrowers for mortgage services.  As part of New York's continued investigation into the Ocwen Enterprise, it was revealed that Ocwen Servicing used an Altisource subsidiary, namely Hubzu, for online auctions of homes of borrowers who were facing foreclosure.[37]  Hubzu charged Ocwen Servicing up to three

---

[36] *See* February 26, 2014 letter from Benjamin M. Lawsky to Timothy Hayes, General Counsel for Ocwen Financial Corporation attached hereto as Exhibit 2.

[37] *See* April 21, 2014 letter from Benjamin M. Lawsky to Timothy Hayes, General Counsel for Ocwen Financial Corporation attached hereto as Exhibit 3.

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

times the fees it charged non-Ocwen customers, which were passed along to the borrowers facing foreclosure.  Mr. Lawsky noted his concerns about the Ocwen Enterprise's self-dealing, in that it appeared the companies were charging struggling borrowers for inflated mortgage servicing-related fees.

52.     On August 4, 2014, Mr. Lawsky sent another letter raising further concerns about Ocwen Servicing's use of related companies to provide fee-based mortgage servicing, specifically Altisource Servicing.[38]  Mr. Lawsky stated that Ocwen Servicing had funneled as much as $65 million in fees from distressed homeowners to Altisource Servicing "for minimal work."  Ocwen Servicing's use of related companies to provide fee-based services also raised concerns regarding whether the services were priced fairly based on arms-length negotiations, or whether they were simply unlawful up-charges.

53.     On October 21, 2014, Mr. Lawsky sent yet another letter to Ocwen Servicing regarding its mortgage servicing practices related to the company's back-dating of critical letters sent to mortgage borrowers in default.[39]  Mr. Lawsky cited several examples of Ocwen Servicing telling mortgage borrowers that they were in danger of foreclosure if they did not respond by a date prior to the letter actually being sent to the borrower.  Other time-sensitive, backdated letters notified financially stressed borrowers that their request for loan modifications were denied, and that they had to appeal such denial by an imminent and unrealistic date or they would not be able to modify their mortgage loans.  Ocwen Financial's CEO, Ron Faris, wrote an open letter apologizing for the misdating of borrower letters, admitting that in some instances, "there was a significant gap between the date on the face of the letter and the date it was actually generated."[40]

---

[38] See August 4, 2014 letter from Benjamin M. Lawsky to Timothy Hayes, General Counsel for Ocwen Financial Corporation attached hereto as Exhibit 4.

[39] See October 21, 2014 letter from Benjamin M. Lawsky to Timothy Hayes, General Counsel for Ocwen Financial Corporation attached hereto as Exhibit 5.

[40] See October 24, 2014 Open Letter to Homeowners Concerning Letter Dating Issues at http://shareholders.ocwen.com/releasedetail.cfm?ReleaseID=878151 (last visited January 22, 2015).

54.     NYDFS and the Ocwen Entities entered into a Consent Order dated December 19, 2014.[41]  Pursuant to the Consent Order, the Ocwen Entities stipulated and agreed they engaged in certain wrongdoing, including amongst other things the wrongdoing described above.  Unlike many settlements of legal claims, the Ocwen Entities neither denied nor contested that they engaged in this wrongdoing described in the Consent Order.

55.     The Ocwen Entities' stipulation to wrongdoing in the Consent Order supports Plaintiffs' allegations that Defendants engaged in the practices described herein.  With respect to the Overcharged Distressed Mortgage Fees, the Ocwen Entities agreed that through Ocwen's relationship with the Altisource Parent, the Ocwen Entities overcharged borrowers for fee-based services.  Consent Order ¶ 22.  With respect to the Duplicative Distressed Mortgage Services, the Ocwen Entities agreed their computer systems contained duplicate process codes initiating the same servicing functions.  Consent Order ¶ 17.

56.     Pursuant to the Consent Order, the Ocwen Entities committed to report to NYDFS on a semi-annual basis all fees charged to New York borrowers by the Ocwen Enterprise.  Consent Order ¶ 53.  The purpose of these reports is to evaluate whether the fees "are commensurate with market rates" or "reasonably related to actual expenses incurred."  *Id*.  The Ocwen Entities also agreed that the "[m]aximum rates for services that are established by government-sponsored enterprises or other investors may not be presumed to be the market rate and may not substitute for actual assessment of market rates."  *Id*.

57.     While the Ocwen Entities also committed to provide some cash relief to New York borrowers exclusively as part of the Consent Order, the New York Consent Order did not provide any direct cash relief for the charges and fees assessed from the Ocwen Entities' specific wrongdoing alleged throughout this Complaint.  Consent Order ¶¶ 24-25.  Furthermore, the Consent Order expressly provides this relief does not limit borrowers' rights to hold the Ocwen Entities accountable for their unlawful conduct.  *Id*. at ¶¶ 64-65.

---

[41] The Consent Order is attached hereto as Exhibit 6.

25

58.     It was not until Mr. Lawsky, Superintendent of the New York State Department of Financial Services, sent his letter dated February 26, 2014 that the Ocwen Enterprise's undisclosed self-dealing and conspiratorial conduct described herein was first (and only partially) revealed publicly.

59.     The Consent Order also included Mr. Erbey's agreement that, by January 16, 2015, Mr. Erbey would resign and have no directorial, management, oversight, consulting, or any other role at Ocwen Financial or any related party, or at any of Ocwen Financial's or the related parties' affiliates or subsidiaries, and to resign as Chairman of the Board of Directors of each of four related the Altisource Parent companies: Altisource Portfolio Solutions S.A., Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions, Ltd.  According to Ocwen's 8-K filed with the SEC on January 20, 2015, Erbey "retired" from Ocwen's Board and as an officer of the company on January 16, 2015.[42]

60.     The New York Department of Financial Services is not the only regulator who has taken notice of Ocwen Servicing's improper use of the affiliated Altisource Entities.  On December 19, 2013, the Federal Consumer Financial Protection Bureau ("CFPB") and the attorneys general for 49 states filed a complaint against Ocwen for their mortgage servicing practices.[43]  Among other things, the CFPB and attorneys general alleged that Ocwen unlawfully and unfairly charged unauthorized fees for Distressed Mortgage Services, failed to timely or accurately apply payments made by borrowers, and provided false and misleading information to borrowers concerning the status of loan modification requests and foreclosure efforts.  The Ocwen Enterprise's participants and their conspiratorial conduct described herein were not mentioned or otherwise revealed in the CFPB's complaint.

---

[42] *See* Ocwen Financial SEC Form 8-K filed January 16, 2015 available at http://google.brand.edgar-online.com/displayfilinginfo.aspx?FilingID=10415213-1084-12051&type=sect&TabIndex=2&companyid=10413&ppu=%252fdefault.aspx%253fsym%253docn

[43] Available at www.consumerfinance.gov/f/201312_cfpb_complaint_ocwen.pdf (last visited January 22, 2015).

61.     The result of the CFPB action was a federal Consent Judgment affecting 49 states entered on February 26, 2014 which required Ocwen to provide $2 billion in loan modifications to struggling borrowers, but which did not provide any direct cash relief to borrowers for the charges and fees assessed from Ocwen's improper Distressed Mortgage Services.[44]   Again, Altisource, Erbey and their conspiratorial conduct described herein were not mentioned or otherwise revealed in the Consent Judgment.

62.     The California Department of Business Oversight ("CADBO") also investigated and pursued Ocwen.  In early 2013, CADBO commenced a regulatory examination of Ocwen to evaluate its compliance with California law, specifically the California Residential Mortgage Lending Act and California's Homeowner Bill of Rights.  As part of this examination, CADBO made repeated requests for information, including requests for loan files.  Despite multiple requests, an order from the commissioner, and an order from an administrative law judge, Ocwen repeatedly refused to provide the necessary information.  California thus had not choice put to commence a proceeding to suspend Ocwen's business license, thereby prohibiting them from servicing mortgages in California.

63.     In January 2015, Ocwen and CADBO entered into a Consent Order.  Pursuant to this order, Ocwen agreed:  (1) not to acquire mortgage servicing rights for loans secured by properties in California without CADBO's approval; (2) to pay a $2.5 million civil penalty; and (3) to pay a third party auditor to conduct a compliance and servicing review of Ocwen.  As a department spokesman explained, "[O]cwen failed to comply with requests for information.  They failed to comply with a subpoena for information.  They violated a lawful order from the commissioner.  And they failed to comply with an order from an administrative judge.  We can't countenance that kind of behavior."[45]

64.     As further fallout from the regulators' scrutiny over Ocwen Financial, Ocwen Financial's current CEO, Ronald Faris, announced the company would withdraw from the business of servicing mortgages backed by the U.S. government, and intended to sell such servicing rights for

---

[44]   *See* Exhibit 7 attached hereto ("Consent Judgment").

[45]   *See* E. Scott Reckard, California Seeking to suspend Ocwen Financial's mortgage license, L.A. Times, January 12, 2015.

approximately $1.7 billion.  Ocwen Servicing intends to continue to service non-government backed mortgages going forward.

65.     Despite Erbey's involuntary "retirement" at the hands of the New York State Department of Financial Services, the undisclosed self-dealing Ocwen Enterprise he set in motion continues to operate.  Moreover, Erbey still retains a degree of control over the Ocwen Enterprise, including by virtue of remaining the largest individual shareholder of both the Altisource Parent and Altisource Servicing.  Thus, despite Erbey's "retirement," the Ocwen Enterprise's conduct is ongoing and continues to harm borrowers.  As a result of the unlawful Ocwen Enterprise, many thousands of borrowers were cheated out of millions of dollars, none of which has yet been repaid or otherwise compensated.

### E.     Harm to Borrowers Resulting from Ocwen, Altisource and Erbey's Actions

#### 1.     Inflated Distressed Mortgage Fees.

66.     When a borrower misses a payment and goes into "default," Ocwen Servicing assesses various fees for Distressed Mortgage Services, and adds them to the borrower's outstanding principal and interest on the loan.  These fees are the Distressed Mortgage Fees.  As detailed herein, the Distressed Mortgage Services for which Ocwen Servicing overcharges borrowers include: property inspections, property appraisals, broker price opinions ("BPOs"), property valuation expenses, foreclosure auctions, and title examinations.  Plaintiffs may learn of other Distressed Mortgage Services for which Ocwen Servicing overcharged borrowers fees as part of the Ocwen Enterprise, and reserve their right to amend their complaint accordingly.

67.     Ocwen's practice and procedures are that payments made after a missed payment must **first** go to pay the Distressed Mortgage Fees **before** being applied to the outstanding principal, interest or escrow account.  Thus, if a person pays only the normal mortgage payment amount owed on a month following a "default," there will not be sufficient funds in the payment to cover the principal and interest due after paying the Distressed Mortgage Fees.  This obvious and foreseeable shortfall leads to another default, and additional charges and fees, and will continue to do so each month as the payment to cover the principal and interest falls ever more short.

28

68.     This cascade of fees added monthly to a "default" loan consequently will often put borrowers further and further behind in their payments, keeping them delinquent and unable to catch up on their mortgage payments without going through a loan modification.  This cascade of fees therefore can drive borrowers further into default, and further towards foreclosure, leading to even more Distressed Mortgage Services and Distressed Mortgage Fees imposed by Ocwen Servicing.  This is true even if the default is manufactured, for example as a result of the misapplication of borrower payments.  The assessment of inflated Distressed Mortgage Fees not only harms borrowers by charging them for fees they should not have to pay, but also further harms borrowers by making it difficult, if not impossible, for mortgage borrowers to keep current on their loans after even one missed monthly payment.  Additionally, borrowers who fall further and further behind in their payments due to Ocwen Servicing's assessment of illegal and unfair Distressed Mortgage Fees have their credit scores damaged.  Ocwen Servicing reports mortgage payment history, including delinquencies, to credit reporting companies.  Borrowers kept in default by Ocwen Servicing's conduct therefore can lose their ability to get other loans – including loans to refinance their Ocwen Servicing-serviced loans – and can face higher rates on any loans they are able to obtain.

69.     The Ocwen Entities stipulated to the fact that they, through their close relationship with related companies including, in particular, the Altisource Parent, overcharged borrowers for Distressed Mortgage Fees such as fees related to auctions and short sales.  Consent Order, ¶ 22.

70.     Indeed, as a result of the financial crisis that resulted, in part, from subprime lending practices, Congress created the Consumer Financial Protection Bureau, authorized by the Dodd-Frank Wall Street Reform and Consumer Protection Act, for the purpose of, amongst other things, overseeing mortgage-servicing operations.  The CFPB is responsible for promoting fairness and transparency in mortgages and other financial products and services.

71.     By splitting off its internal Distressed Mortgage Service function to Altisource Servicing, a purported "third party" non-mortgage-servicing company, the Ocwen Enterprise was able to hide high revenue and profits made from Distressed Mortgage Fees.  The Ocwen Enterprise did this by, amongst other things, having Altisource negotiate lower servicing charges from service providers such as brokers, inspectors and appraisers, with a promise of higher work volume and under the guise

29

of being a third-party that had to charge the ultimate purchaser, Ocwen, a higher amount.  Thus, the costs passed onto Ocwen's borrowers included revenue and profits built in for the Ocwen Entities as well as the Altisource Entities, and Erbey earned a salary, bonus, benefits and increased stock options and value by being on both ends of the deal.  However, because Altisource was not a mortgage servicer its operations were not subject to the same regulatory oversight as Ocwen.

72.    The Ocwen Enterprise also overcharged borrowers for Distressed Mortgage Fees by virtue of its "leasing" the computer software it created and gave to Altisource when it split Altisource into its own company, a cost of which would have been added to Distressed Mortgage Fees.

73.    Plaintiffs have also identified several of the specific Distressed Mortgage Fees Ocwen Servicing charges borrowers that have already been found to be inflated by virtue of the Ocwen Enterprise's scheme (the "Inflated Distressed Mortgage Fees"), including the following:

    a.  Prior to spinning-off its internal Distressed Mortgage Service function to Altisource Servicing, Ocwen Servicing paid real estate agents $45-$50 to perform a BPO.[46]  Since the spin-off to Altisource Servicing, Ocwen Servicing charges struggling homeowners approximately $100 for each BPO.

    b.  Ocwen Servicing uses another Altisource subsidiary, Hubzu, for its foreclosure auctions, that is retained through Altisource Servicing.  According to Mr. Lawsky, Hubzu charges Ocwen Servicing up to three times the fees it charges non-Ocwen customers for the same services.  These inflated fees are passed onto those borrowers who are able to stop the foreclosure auction from going through.

    c.  Ocwen Servicing hires title examiners through Altisource Servicing or through the use of the Altisource Parent's software.  Upon information and belief, Ocwen Servicing charges borrowers artificially inflated fees for title examinations as part of the Ocwen Enterprise.

    d.  The Distressed Mortgage Fees described above are artificially marked-up due to Ocwen's use of Altisource and through Ocwen Financial's lease of Altisource's software.  These artificially inflated costs are passed along to borrowers by assessing the inflated amounts on borrowers' loans, and misclassifying them as necessary Distressed Mortgage Fees.

74.    Plaintiffs have detailed the publicly available details of how Ocwen Servicing and the other members of the Ocwen Enterprise overcharged for Distressed Mortgage Fees, all of which was

---

[46] *See Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, 249 F. App'x 63, 72 n.9 (10th Cir. 2007) (summarizing testimony of William C. Erbey that Ocwen would pay an agent or broker approximately $45 to $50 to do a BPO).

30

done to increase the overall revenue and profits of the Ocwen Enterprise.  Plaintiffs reserve the right to amend their complaint to add additional detail regarding these and other up-charged Distressed Mortgage Fees, or to add additional detail regarding other as-yet undisclosed methods by which the Ocwen Enterprise charged borrowers for up-charged and inflated Distressed Mortgage Fees.

### 2. Duplicative Distressed Mortgage Services

75.    In addition to charging borrowers artificially inflated Distressed Mortgage Fees, Ocwen Servicing also charges borrowers fees for Distressed Mortgage Services that should never have been performed at all (the "Duplicative Distressed Mortgage Services").  This is because Ocwen Servicing orders and charges borrowers for different Distressed Mortgage Services performed contemporaneously that accomplish the same thing, or imposes sequential and repetitive charges for services that provide no benefit to the borrower or the lender.  Ocwen unilaterally adds charges and fees to borrower statements without giving the borrower any meaningful way of disputing them.  Moreover, these charges serve no meaningful purpose but to increase Ocwen's revenue profits at the expense of borrowers and lenders.[47]

76.    Ocwen Servicing charges distressed borrowers a "property inspection fee" that Ocwen Servicing defines as being "for an inspection of the property to make sure that it is still in good condition."[48]

77.    Ocwen Servicing obtains a BPO when a borrower expresses interest in a "short sale" or in advance of a foreclosure sale.  A BPO is the process a hired sales agent utilizes to determine an

---

[47] In fact, the "lenders" (the investors in the securities backed by the pooled mortgages) for the loans Ocwen services have themselves complained that Ocwen has improperly serviced the mortgages at issue in this lawsuit for many of the same reasons that form the basis for Plaintiffs' claims.  *See, e.*g., "Notice of Non-Performance to Ocwen Financial Corporation as servicer or master servicer...," located online at  http://www.gibbsbruns.com/certificateholders-issue-notice-of-non-performance-identifying-alleged-failures-by-ocwen-financial-corporation-as-servicer-or-master-servicer-to-perform-covenants-and-servicing-agreements-in-119-residential-mortgage-backed-securities-trusts-01-23-2015/; and "Hedge fund claims Ocwen breached bond covenants," located online at http://www.housingwire.com/articles/32700-hedge-fund-claims-ocwen-breached-bond-covenants.

[48] *See* Ocwen Servicing's definitions of various charges provided to Plaintiffs, attached hereto as Exhibit 8, p. 5.

estimated selling price of a real estate property.  Ocwen defines its BPOs to be "determining the value and condition of the property, using a certified Real Estate Agent."[49]  Upon information and belief, Ocwen Servicing sometimes calls its BPOs "property valuation expenses" on borrowers' statements. Because Ocwen Servicing conceals BPO services under the undefined moniker "property valuation expenses," Ocwen Servicing conceals that the company assesses, charges and collects fees from borrowers for a service that includes determining the condition of the homeowner's property, which makes any property inspection performed and charged to the borrower at or around the same time as the service for the "property valuation expense" entirely duplicative.

78.    Ocwen Financial also charges borrowers for appraisals.  An appraisal is the process of developing an opinion of the value of a home.  In order to perform a home appraisal, an appraiser must determine the condition of the home.  Ocwen Servicing orders appraisals through Springhouse LLC, an appraisal management company and subsidiary of the Altisource Parent, through the use of Altisource's mortgage servicing software.

79.    In the case of a BPO or appraisal, the broker or appraiser providing the opinion of value must determine the condition of the subject property.  Any inspection performed around the same time as a BPO or appraisal would be duplicative because the broker or appraiser would have already determined the condition of the property as part of their valuation.  Thus, any charge to a borrower for an inspection done around the same time they as a BPO or appraisal would be duplicative and another way Ocwen Servicing up-charges struggling borrowers.  This also happened to Plaintiffs on several occasions.  Ocwen Servicing's only purpose in ordering and charging for such duplicative inspections is to generate Distressed Mortgage Fees assessed to and collected from mortgage borrowers.

**F.    Plaintiffs' Claims against Defendants**

80.    Plaintiffs Victor Giotta and Loralee Giotta entered into a mortgage agreement with BankUnited, FSB on or around January 19, 2007 that is now being serviced by Ocwen Servicing.[50]

---

[49] *See* Exhibit 8, p. 5.

[50] *See* Deed of Trust for Victor P. Giotta and Loralee Giotta, dated January 9, 2007 attached hereto as Exhibit 9.

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

81.     On or about February 16, 2013 when the Giottas were in default, the servicing rights of Plaintiffs' mortgage loan were transferred to Ocwen Servicing, and Ocwen Servicing continues to service the Giottas' mortgage loan to this date.  While servicing the Giottas' mortgage loan, Ocwen Servicing has assessed and charged the Giottas for numerous marked-up Distressed Mortgage Fees.  On June 27, 2014, Ocwen Servicing charged the Giottas for eight separate property inspections procured through Altisource Servicing or through the Altisource Parent's software, six costing $10.50, and two costing $15.00.[51]   The fees for the property inspections charged to the Giottas were excessive.  They were unnecessarily and unreasonably inflated due to Ocwen's use of Altisource Servicing or the Altisource Parent's software to procure the property inspection services.

82.     On August 26, 2013, Ocwen Servicing charged the Giottas a $10.50 "Property Inspection Fee," followed closely on September 4, 2013 by a $100.00 "Property Valuation Expense."[52] Both the property inspection and property valuation were procured through Altisource Servicing, or through the use of the Altisource Parent's software.  Although Ocwen Servicing never defines what a "Property Valuation Expense" is, based on the name and amount charged it appears to be another name for a BPO.  Both services cannot be necessary since Ocwen Servicing defines a BPO as including a determination of the condition of the home, which is what Ocwen Servicing defines a property inspection to be.  Even if necessary, the fees for both the property inspection and BPO were unnecessarily and unreasonably inflated due to Ocwen Servicing's use of Altisource Servicing or the Altisource Parent's software to procure the property inspection and BPO services.

83.     Ocwen Servicing similarly charged $13.25 for a "Property Inspection" on November 28, 2014, and six days later on December 4, 2014 charged $100 for a "Property Valuation Expense."[53] Both the property inspection and the BPO were procured by Altisource Servicing, or through the use

---

[51] *See* Mortgage Account Statement for Victor P. Giotta and Loralee Giotta dated June 30, 2014 attached hereto as Exhibit 10.

[52] *See* Account Statement for Victor P. Giotta and Loralee Giotta dated September 5, 2013 attached hereto as Exhibit 11.

[53] *See* Mortgage Account Statement for Victor P. Giotta and Loralee Giotta dated December 16, 2014 attached hereto as Exhibit 12.

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

of the Altisource Parent's software.  Both services cannot be necessary since Ocwen Servicing defines a BPO as including a determination of the condition of the home, which is what Ocwen Servicing defines a property inspection to be.  To the extent both the property inspection and BPO were necessary, both the property inspection and the BPO were unnecessarily and unreasonably inflated due to Ocwen Servicing's use of Altisource Servicing or the Altisource Parent's software to procure the property inspection and BPO services.

84.     The Giottas were charged additional inflated Distressed Mortgage Fees for other default related services procured by Ocwen Servicing through Altisource Servicing or through the use of the Altisource Parent's software, including for services for property inspections, BPOs and other Distressed Mortgage Services as displayed by the Giottas' monthly billing statements attached to this Complaint.[54]

85.     As of the date of this Complaint, the Giottas have been unable to locate all of their billing statements from Ocwen Servicing.  Accordingly, the Giottas may have been charged additional excessive Distressed Mortgage Fees for default related services procured by Ocwen Servicing through Altisource Servicing or through the use of the Altisource Parent's software, the proof of which are shown in records currently in Ocwen Servicing's and/or other Defendants' possession.  To the extent Ocwen charged the Giottas any such additional excessive Distressed Mortgage Fees, they are part of the claims asserted in this action.

86.     Plaintiffs are not asserting any breach of contract claims.  Plaintiffs are not required to allege a contractual breach in order to assert claims under RICO, California's UCL, for fraud, or for violation of federal and state debt collection acts.  In this amended complaint, Plaintiffs allege that Defendants breached various statutory and common law duties, and that these duties exist independently of Defendants' contractual obligations.

---

[54] *See* Mortgage Account Statements of Victor P. Giotta and Loralee Giotta, attached hereto collectively as Exhibit 13.

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

G.     **Plaintiffs' and the Classes' Claims are Tolled by Operation of the Discovery Rule and Doctrine of Concealment**

87.     Plaintiffs and members of the classes alleged herein did not know, and had no reason to suspect, that the Ocwen Enterprise had charged and was charging excessive rates for Distressed Mortgage Services until, at the very earliest, the New York State Department of Financial Services published its letters regarding its investigation of the Ocwen Entities, the first of which is dated February 26, 2014 as described in this Complaint.

88.     Ocwen Servicing, as a servicer of Plaintiffs' and class members' loans, had a continuing duty to disclose to Plaintiffs and other borrowers the true costs and nature of the fees assessed for services provided for their mortgage loans.  As explained above, Ocwen Servicing misrepresented and actively concealed that its Distressed Mortgage Fees were improperly inflated through the use of Altisource Servicing and the Altisource Parent's mortgage servicing software. Moreover, there was no public information disclosing Ocwen Servicing's up-charging of fees through the use of Altisource Servicing and the Altisource Parent's mortgage servicing software prior to the New York State Department of Financial Services' letters.

89.     Plaintiffs, like all other borrowers whose loans are being serviced by Ocwen Servicing, did not know, nor did they have reason to know, that Ocwen Servicing was not entitled to collect the amounts Ocwen Servicing charged to borrowers for Distressed Mortgage Services.  Neither Ocwen Servicing, any other member of the Ocwen Enterprise nor the holder of Plaintiffs' and other class members' loans disclosed to Plaintiffs, borrowers or the general public that Ocwen Servicing was up-charging for Distressed Mortgage Services.  Nor did Plaintiffs or other borrowers with loans being serviced by Ocwen Servicing have reason to suspect that they were being charged excessive Distressed Mortgage Fees.

90.     Similarly, Plaintiffs, like all other borrowers whose loans are being serviced by Ocwen Servicing, had no reason to suspect that Ocwen Servicing charged them and other borrowers fees for Distressed Mortgage Services that were duplicative of each other.  Neither Ocwen Servicing, any other member of the Ocwen Enterprise nor the holder of Plaintiffs' and other class members' loans disclosed to Plaintiffs, borrowers or the general public that Ocwen Servicing was charging for duplicative

Distressed Mortgage Services.  Nor did Plaintiffs or other borrowers with loans being serviced by Ocwen Servicing have reason to suspect that they were being charged fees for duplicative Distressed Mortgage Services.

91.   Ocwen Servicing misrepresented that the Distressed Mortgage Services being charged to Plaintiffs, Ocwen borrowers and the general public were being provided by a disinterested third-party, and that the charges for said Distressed Mortgage Services were negotiated at arms-length. Ocwen's letters, notices and statements to Plaintiffs and other persons with mortgages serviced by Ocwen portrayed, and therefore represented to them, that Ocwen is permitted to charge fees for certain expenses, and that such charges are lawful.[55]  Neither Ocwen Servicing, nor any other member of the Ocwen Enterprise, disclosed that Altisource was not a disinterested third-party, or that its charges for Distressed Mortgage Services were not negotiated with Ocwen at arms-length.  Nor did Plaintiffs or other borrowers with loans being serviced by Ocwen Servicing have reason to suspect that they were being charged for fees for services provided by a non-disinterested third-party, and that the charges assessed were not negotiated at arms-length.

92.   Similarly, Ocwen's fee statements constitute affirmative misrepresentations that the fees being charged are reasonable and for legitimate services.  In fact, the borrower is being charged fees that (1) are inflated, and (2) are for redundant and duplicative services.

93.   Defendants' misrepresentations, acts and omissions described herein – including assessing, charging and collecting up-charged Distressed Mortgage Fees, holding out such fees as being the actual costs for such services chargeable to borrowers, or representing that such fees were for legitimate services – actually deceived or were likely to deceive borrowers into thinking that Ocwen Servicing could lawfully collect the amounts it charged for Distressed Mortgage Services.  For example, when Ocwen Servicing first acquired the servicing right to Plaintiffs' mortgage it provided them with a "Welcome to Ocwen Loan Servicing, LLC" letter describing the legal basis for their acquisition of the servicing rights of Plaintiffs' loan, and a schedule of the types of fees (and their

---

[55] *See, e.g.*, Exhibit 8.

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

costs) for certain services, including some Distressed Mortgage Services.[56] This statement and others suggests to borrowers that the services and any associated fees charged by Ocwen Servicing would be lawful.

94. Plaintiffs and Class Members relied on Defendants' misrepresentations, omissions and concealment in paying the Distressed Mortgage Fees as described herein that had the effect of misrepresenting and portraying the Default-Related Services Fees charges memorialized in Ocwen Servicing's uniform billing statements as lawful, reasonable and necessary, which they were not. Class Members' reliance may also be presumed or inferred from the very nature of the omissions, concealment, misrepresentations and conduct of the Defendants presented in this action.

95. By virtue of Ocwen Servicing's misrepresentations and active concealment, any otherwise applicable statutes of limitations for Plaintiffs and class members are tolled by the discovery rule, concealment doctrine and/or other equitable tolling from the first unlawful charging of Distressed Mortgage Fees until – at the earliest – the publication of the New York State Department of Financial Services' letters concerning its investigation of the Ocwen Enterprise's practices described herein on February 26, 2014.

## VI. CIVIL CONSPIRACY AND AIDING AND ABETTING

96. Members of the Ocwen Enterprise entered into a civil conspiracy, and each is jointly and severally liable for the actions of the other co-conspirators as if they committed the acts themselves as described in detail in paragraphs 39-51, *supra*.

97. As alleged herein and described above, members of the Ocwen Enterprise formed and operated a conspiracy to charge Plaintiffs and borrowers with mortgages serviced by Ocwen Servicing for inflated and duplicative Distressed Mortgage Fees. *See* paragraphs 67-80, *supra*.

98. Plaintiffs and borrowers with loans serviced by Ocwen Servicing were charged and paid inflated and duplicative Distressed Mortgage Fees. The Ocwen Enterprise's charging Plaintiffs and borrowers for Inflated and Duplicative Distressed Mortgage Fees was intended to affect Plaintiffs and other borrowers whose loans were serviced by Ocwen Servicing.

---

[56] *See* Exhibit 14.

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

99.    Plaintiffs and borrowers with loans serviced by Ocwen Servicing were damaged by paying for inflated and duplicative Distressed Mortgage Fees which were charged by the acts of the Ocwen Enterprise.  Defendants could foresee that any harm caused by charging for inflated or duplicative services would harm Plaintiffs and borrowers with loans serviced by Ocwen Servicing, and they had a duty to disclose this information to Plaintiffs and other borrowers whose loans were serviced by Ocwen Servicing.

100.    Plaintiffs' and other borrowers' damages from being charged and paying for Inflated and Duplicative Distressed Mortgage Fees was proximately caused by each member of the undisclosed self-dealing Ocwen Enterprise, and their conduct in forming the conspiratorial enterprise alleged herein, misrepresenting the nature of the Distressed Mortgage Fees, and failing to disclose that the Distressed Mortgage Fees at issue were inflated or duplicative of other services.

101.    Members of the Ocwen Enterprise that did not charge Plaintiffs and class members for their Distressed Mortgage Fees aided and abetted Ocwen Servicing, the company that directly charged for inflated and duplicative Distressed Mortgage Fees, and collected money from Plaintiffs and class members for inflated and duplicative Distressed Mortgage Fees by their collective conduct described herein.

102.    Each member of the Ocwen Enterprise knew that Ocwen Servicing had a duty to Plaintiffs, class and subclass members not to charge inflated or duplicative Distressed Mortgage Fees.

103.    Each member of the Ocwen Enterprise gave substantial assistance and encouragement to Ocwen Servicing to charge Plaintiffs and class members for inflated and duplicative Distressed Mortgage Fees in their collective actions as described throughout this First Amended Complaint.

104.    Each member of the Ocwen Enterprise assisted and encouraged Ocwen Servicing for their own financial advantage, and each member of the Ocwen Enterprise benefitted from borrowers paying for inflated and duplicative Distressed Mortgage Fees.

## VII.    CLASS ACTION ALLEGATIONS

105.    This action asserts claims on behalf of a nationwide class, a nationwide subclass, and a California subclass pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and

(c)(4), which class and subclasses consist of persons who paid for unlawfully inflated (including duplicative) Distressed Mortgage Fees, as follows:

> All persons in the United States who had or have a mortgage loan serviced by Ocwen Servicing on or after August 10, 2009, and were assessed one or more of the Distressed Mortgage Fees by Ocwen Servicing (the "National Distressed Mortgage Fee Class").

> All persons in the United States who had or have a mortgage loan serviced by Ocwen Servicing on or after August 10, 2009, for which the servicing rights were transferred to Ocwen Servicing when the loan was already in default, and were assessed one or more of the Distressed Mortgage Fees (the "National FDCPA Distressed Mortgage Fee Subclass").

> All persons who have or had a mortgage loan on a property located in California serviced by Ocwen Servicing on or after August 10, 2009, and were assessed one or more of the Distressed Mortgage Fees (the "California Distressed Mortgage Fee Subclass").

106.    Excluded from each of the class and subclasses are: (i) Ocwen Financial Corporation, Ocwen Loan Servicing, LLC, Altisource Portfolio Solutions, S.A., and Altisource Solutions, Inc. and their employees, principals, affiliated entities, legal representatives, successors and assigns; (ii) William C. Erbey; (iii) the judges to whom this action is assigned and any members of their immediate families.

107.    There are thousands of members in each of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass, and California Distressed Mortgage Fee Subclass who are geographically dispersed throughout California and the United States. Therefore, individual joinder of the members of any of the classes defined above would be impracticable.

108.    Common questions of law or fact exist as to all members of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass and California Distressed Mortgage Fee Subclass. These common legal or factual questions include:

> a.   Whether Ocwen Servicing's Distressed Mortgage Fees as described herein were lawful.

> b.   Whether Ocwen Servicing's Distressed Mortgage Fees as described herein were unfair.

> c.   Whether Ocwen Servicing's effort to collect inflated or duplicative Distressed Mortgage Fees were unfair attempts to collect a debt.

> d.   Whether the Ocwen Entities, the Altisource Entities and Erbey were members of, or participants in, the conspiracy alleged herein.

> e.   Whether the Ocwen Entities, the Altisource Entities and Erbey engaged in a pattern or practice of racketeering, as alleged herein.

1        f.   Whether Ocwen Servicing charged excessive Distressed Mortgage Fees.

2        g.   Whether the Distressed Mortgage Fees Ocwen Servicing charged were excessive as a result of the Ocwen Enterprise.

3

4        h.   Whether Ocwen Servicing's Distressed Mortgage Fees were unconscionable;

5        i.   Whether Ocwen Servicing's use of Altisource Servicing and/or the Altisource Parent's software resulted in excessive Distressed Mortgage Fees.

6        j.   Whether Ocwen Servicing is a "debt collector" as defined by the FDCPA.

7        k.   Whether the Distressed Mortgage Fees added to Plaintiffs loan balances as described herein constitute "debt" within the meaning of the FDCPA.

8

9        l.   Whether Ocwen Servicing up-charged borrowers by charging them for Distressed Mortgage Services that duplicate services already provided and charged for.

10

11        m.  Whether Ocwen Servicing charged borrowers for Distressed Mortgage Services that were duplicative of other Distressed Mortgage Services Ocwen Servicing already charged for.

12

13        n.   Whether the Ocwen Entities, the Altisource Entities or Erbey aided or abetted any of the other Defendants in this misconduct alleged herein.

14      109.   Plaintiffs' claims are typical of the claims of the National Distressed Mortgage Fee

15 Class, National FDCPA Distressed Mortgage Fee Subclass and California Distressed Mortgage Fee

16 Subclass. Ocwen Servicing charged Plaintiffs excessive fees for property inspections, BPOs and other

17 Distressed Mortgage Services procured from Altisource Servicing or through the use of the Altisource

18 Parent's software than were unlawful, inflated, excessive and/or duplicative. Plaintiffs' loan was also

19 in default at the time Ocwen Servicing obtained its servicing rights. Plaintiffs are also California

20 residents. Therefore, Plaintiffs are no different in any material respect from any other members of the

21 National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass, or

22 California Distressed Mortgage Fee Subclass, and the relief sought by Plaintiffs is common to the

23 relief sought by the class and subclasses.

24      110.   Plaintiffs are adequate representatives of the National Distressed Mortgage Fee Class,

25 National FDCPA Distressed Mortgage Fee Subclass, and California Distressed Mortgage Fee Subclass

26 because their interests do not conflict with the interests of the class or subclasses members they seek

27 to represent, and they have retained counsel competent and experienced in conducting complex

28

lending and class action litigation.  Plaintiffs and their counsel will adequately protect the interests of the class and subclasses.

111.    A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual member of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass, and California Distressed Mortgage Fee Subclass are relatively small, while the burden and monetary expense needed to individually prosecute this case against Defendants is substantial.  Thus, it would be virtually impossible for class and subclass members individually to redress effectively the wrongs done to them.  Moreover, even if members of the class and subclasses defined herein could afford individual actions, a multitude of such individual actions still would not be preferable to class wide litigation. Individual actions also present the potential for inconsistent or contradictory judgments, which would be dispositive of at least some of the issues and hence interests of the other members not party to the individual actions, would substantially impair or impede their ability to protect their interests, and would establish incompatible standards of conduct for the party opposing the class.

112.    By contrast, a class action presents far fewer litigation management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Also, or in the alternative, the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass, and California Distressed Mortgage Fee Subclass may be certified because Defendants have acted or refused to act on grounds generally applicable to each of the respective class and subclasses, thereby making preliminary and final declaratory relief appropriate.

113.    Further, in the alternative, the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass and California Distressed Mortgage Fee Subclass may be maintained as class actions with respect to particular issues, pursuant to Fed.R.Civ.P. 23(c)(4).

114.    All records concerning each of the loans Ocwen Servicing services, including records showing Distressed Mortgage Fees charged to borrowers are in the possession and control of Defendants and their agents and are available through discovery.  For instance, Ocwen Financial "regularly undertakes its own internal analyses to benchmark its performance" which includes "accurate loan servicer information…which properly indicates the loans Ocwen does and does not

41

service, and which loans Ocwen serviced at what time."[57]  Ocwen Financial also possesses investor reports detailing recovery and remittance data sufficient to explain and justify expenses such as the Distressed Mortgage Fees at the individual loan level.  *Id*. pp. 17-18.

## VIII.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violations of RICO (18  U.S.C. §§ 1962(c) and (d)) (on Behalf of the National Distressed Mortgage Fees Class against All Defendants)

115.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

116.    Plaintiffs bring this cause of action on behalf of themselves and the members of the National Distressed Mortgage Fees Class.

117.    As described throughout this First Amended Complaint, Erbey and the Ocwen and Altisource Entities devised a scheme to defraud borrowers by charging them for Distressed Mortgage Fees that were inflated and/or duplicative by virtue of Defendants' undisclosed, unlawful and fraudulent self-dealing.   In furtherance of this scheme, Defendants used the mail and wires on numerous occasions to exchange fraudulent communications facilitating the ordering of, the charging and payment for, and the ultimate billing to borrowers for the Distressed Mortgage Fees that were inflated and/or duplicative by virtue of Defendants' undisclosed, unlawful and fraudulent self-dealing. Each such use of the mail or wires constituted mail or wire fraud, and together they constituted a pattern of racketeering activity.  The Ocwen Enterprise conducted its affairs through this pattern of racketeering activity.  As a result, Plaintiffs and members of the National Distressed Mortgage Fees Class paid for Distressed Mortgage Fees that were inflated and/or duplicative by virtue of Defendants' undisclosed, unlawful and fraudulent self-dealing and were thereby injured in their business or property.

118.    Each Defendant is a person within the meaning of 18 U.S.C. § 1961(3).

---

[57] Exhibit 15, March 22, 2015 Letter from Timothy M. Hays, Ocwen Financial's Executive Vice President and General Counsel, re Ocwen Response to January 23, 2015 Notice Pertaining to 119 Residential Mortgage Backed Securities Trusts, p. 8.

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

119.    The Ocwen Entities, through their directors, employees and agents, the Altisource Entities through their directors, employees and agents, and William C. Erbey conducted the affairs of an associated-in-fact enterprise as defined in 18 U.S.C. § 1961(4) (the "Enterprise").  The affairs of the Enterprise affected interstate commerce through a pattern of racketeering activity.

120.    The Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of charging, assessing, and collecting the Distressed Mortgage Fees.

121.    While the members of the Enterprise participate in and are part of the Enterprise, they also have an existence separate and distinct from the Enterprise.  The Enterprise has a systematic linkage due to contractual relationships, agreements, financial ties and coordinated activities between the Ocwen and Altisource Entities and Erbey.

122.    Ocwen Financial controls and directs the affairs of the Enterprise according to policies and procedures developed and established by Ocwen Financial's executives – formerly (and until January 16, 2015) including Mr. Erbey.

123.    As described throughout this Complaint, the policies and procedures established by Ocwen Servicing at the direction of Erbey through his control of Ocwen Financial and the Altisource Entities and in furtherance of the Enterprise include:  (i) procuring Distressed Mortgage Services through Altisource Servicing; (ii) leasing from the Altisource Parent software Ocwen Financial developed to program and which did program Ocwen Servicing's loan servicing systems to order, assess, charge and collect Inflated Distressed Mortgage Fees when borrowers are not current on their mortgage loan; (iii) charging borrowers more for Inflated Distressed Mortgage Services than what Ocwen Servicing or Altisource Servicing actually pays the service providers, and, at the very least, more than what is reasonable in the marketplace; (iv) charging borrowers for Distressed Mortgage Services that duplicate services already provided and charged for;  and (v) providing statements to borrowers that conceal the nature of the Inflated and Duplicative Distressed Mortgage Fees or the true cost thereof.

**A.    Violation of 18 U.S.C. § 1962(c)**

124.    Under the mortgage servicing rights that Ocwen Servicing acquires, Ocwen Servicing is authorized to assess reasonable and appropriate fees and charges as provided for in the mortgage agreement.  Whether or not they are contractually authorized to assess any or all of the fees at issue in this action, they cannot charge or collect fees that are unlawful, unfair or the product of a self-dealing fraudulent conspiracy under federal or state laws.

125.    The process of ordering, assessing and charging for Distressed Mortgage Fees is done automatically by Ocwen Servicing's loan servicing systems based on the programming and parameters established by Ocwen Servicing and other members of the Ocwen Enterprise.

126.    By developing and implementing policies and procedures leading to borrowers being charged for Distressed Mortgage Fees, the Ocwen and Altisource Entities and Erbey engaged in the conduct of the Enterprise distinct from any of their own affairs in their other business arrangements and inconsistent with their normal business or the guidelines under which each is obligated to operate.

127.    The Enterprise's systematic scheme of ordering, assessing and charging for Distressed Mortgage Fees, as described throughout this Complaint, was facilitated by the use of the United States Mail and wire.  The Ocwen Enterprise's scheme constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(l), as acts of mail and wire fraud, under 18 U.S.C. §§ 1341 and 1343.

128.    In violation of 18 U.S.C. §§ 1341 and 1343, the Ocwen Enterprise utilized the mail and wire in furtherance of their scheme to defraud borrowers whose loans are serviced by Ocwen Servicing by obtaining money from borrowers using false or fraudulent pretenses.

129.    Through the mail and wire, the Ocwen Enterprise provided invoices, statements, payoff demands, or proofs of claims to borrowers, and demanded that borrowers pay fees for Distressed Mortgage Fees.  Also through the mail and wire, the Enterprise communicated orders for Distressed Mortgage Services and exchanged money in the form of Distressed Mortgage Fees, including through the use of Altisource's mortgage servicing software.  The Ocwen Enterprise also used the mail and wire to accept payments and engage in other correspondence in furtherance of its scheme.

44

130.    The Ocwen Enterprise fraudulently and unlawfully assessed Distressed Mortgage Fees because the servicers were inflated and/or duplicative, and were contrary to the disclosures made to borrowers.

131.    The invoices, statements, or proofs of claims provided by Ocwen Servicing to borrowers disguised the fact that the Distressed Mortgage Fees – such as BPO fees, property inspection fees, auction fees and title fees assessed on borrowers' accounts – were up-charged, and misrepresented that the fees were charges for legitimate services, when in fact the borrower was being charged for servicers that provided no benefit to either the borrower or lender and were solely imposed to enrich the Ocwen Enterprise.  By disguising the true nature and basis of the Distressed Mortgage Fees purportedly owed in communications to borrowers, the Enterprise made false statements using the Internet, telephone, facsimile, United States Mail, and other interstate commercial carriers.  These false statements were uniform and consistent in that they failed to disclose the Ocwen Enterprise's unlawful conspiracy, or that the Distressed Mortgage Fees were inflated or duplicative of other services.

132.    These omissions were material to Plaintiffs and the members of the National Distressed Mortgage Fee Class.  Had the Enterprise accurately represented the nature of the fees being charged, or other unlawful activities described herein, Plaintiffs would have been aware and would have challenged Ocwen Servicing's unlawful practices or they would not have paid the Distressed Mortgage Fees.

133.    Each of these acts constituted an act of mail fraud for purposes of 18 U.S.C. § 1341.

134.    Additionally, using the Internet, telephone, and facsimile transmissions to fraudulently communicate false information to borrowers, to pursue and achieve their fraudulent scheme, the Enterprise engaged in repeated acts of wire fraud in violation of 18 U.S.C. § 1343.

135.    The Enterprise's knowledge that its activities were fraudulent and unlawful is evidenced by, among other things, the fact that they did not disclose the nature of the Distressed Mortgage Fees or their actions in their communications to borrowers.

136.    The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) in which the Ocwen Enterprise has engaged under 18 U.S.C. § 1962(c).

137.    All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the racketeering Enterprise. The racketeering acts committed by the Enterprise employed a similar method, were related, with a similar purpose, and involved similar participants, with a similar impact on the members of the National Distressed Mortgage Fees Class. Because this case is brought on behalf of a class of similarly situated borrowers described above, and there are numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiffs to plead all of the details of the scheme with particularity. Plaintiffs cannot plead the precise dates of all of the Enterprise's uses of the mail and wire because this information cannot be alleged without access to Defendants' records.

138.    The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

139.    Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

140.    As a direct and proximate result of these violations of 18 U.S.C. §§ 1962(c) and (d), Plaintiffs and members of the National Distressed Mortgage Fees Class have suffered substantial damages. Members of the Enterprise are liable to Plaintiffs and the Class for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under 18 U.S.C. § 1964(c).

**B.      Violation of 18 U.S.C. § 1962(d)**

141.    As set forth above in Subpart A to this First Cause of Action, in violation of 18 U.S.C. § 1962(d), Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c) by charging borrowers for Distressed Mortgage Fees.

142.    As set forth above in Subpart A to this First Cause of Action, Defendants were aware of the nature and scope of the Enterprise's unlawful scheme, and they agreed to participate in it.

143.    As a direct and proximate result, Plaintiffs and members of the National Distressed Mortgage Fees Class have been injured in their business or property by the predicate acts which make

46

1    up the Ocwen Enterprise's patterns of racketeering activity in that Distressed Mortgage Fees were

2    assessed on their mortgage accounts.

3         144.    As a direct and proximate result of these violations of 18 U.S.C. §§ 1962(c) and (d),

4    Plaintiffs and members of the National Distressed Mortgage Fees Class have suffered substantial

5    damages. Members of the Enterprise are liable to Plaintiffs and the Class for treble damages, together

6    with all costs of this action, plus reasonable attorney's fees, as provided under 18 U.S.C. § 1964(c).

7                          **SECOND CAUSE OF ACTION**
     **Violation of the FDCPA (15 U.S.C. §§ 1692, *et seq*) (on behalf of Plaintiffs and the FDCPA**
8    **Distressed Mortgage Fees Subclass against All Defendants)**

9         145.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate

10   them as if they were fully written herein.

11        146.    Plaintiffs bring this cause of action on behalf of themselves and the members of the

12   FDPCA Distressed Mortgage Fee Subclass.

13        147.    The FDCPA defines "debt" as "any obligation or alleged obligation of a consumer to

14   pay money arising out of a transaction in which the money, property, insurance or service which are

15   the subject of the transaction or primarily for personal, family, or household purposes, whether or not

16   such obligation has been reduced to judgment."

17        148.    The FDCPA defines "debt collector" as "any person who uses any instrumentality of

18   interstate commerce or the mails in any business the principal purpose of which is the collection of

19   any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or

20   asserted to be owed or due another." 15 U.S.C. § 1692a(6).

21        149.    Ocwen Servicing is a "debt collector" under the FDCPA for all loans it services for

22   which it obtained the servicing rights when the loan was in default, as it uses interstate commerce and

23   the mails to regularly collect debts owed or due or asserted to be owed or due by mortgage borrowers.

24        150.    Plaintiffs' mortgage loan was in default when Ocwen Servicing obtained the servicing

25   rights for Plaintiffs' loan.

26        151.    A borrower's obligation to pay the charges, fees, principal and interest on a mortgage

27   loan is a "debt" as defined by the FDCPA because it arises out of the agreement between homeowners

28

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

and their lenders and obliges the homeowners to pay money arising out of the loan given to purchase their home.

152.    The FDCPA prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt" (15 U.S.C. § 1692e).

153.    In violation of 15 U.S.C. § 1692e(10), Ocwen Servicing uses false misrepresentations and deceptive means to collect or attempt to collect a debt by charging borrowers for inflated (including duplicative) Distressed Mortgage Fees because Ocwen Servicing knowingly, affirmatively, and actively concealed and suppressed material facts, namely the fact that Ocwen Servicing inflated its Distressed Mortgage Fees and charged for duplicative Distressed Mortgage Services, in violation of the law and the servicing guidelines which Ocwen Servicing is obligated to follow.

154.    Contrary to Ocwen Servicing's communications, it was not legally authorized to asses, charge or collect inflated or duplicative Distressed Mortgage Fees.  Under the mortgage servicing rights that Ocwen Servicing acquires, Ocwen Servicing is authorized to assess reasonable and appropriate fees and charges as provided for in the mortgage agreement.  Whether or not they are contractually authorized to assess any or all of the fees at issue in this action, they cannot charge or collect fees that are unlawful, unfair or the product of a self-dealing fraudulent conspiracy under federal or state laws.

155.    As a result of Ocwen Servicing's violations of the FDCPA, Plaintiffs and the FDPCA Distressed Mortgage Fee Subclass members are entitled to their actual damages pursuant to 15 U.S.C. § 1692k(a)(1); statutory damages for Plaintiffs in an amount up to $1,000.00 pursuant to 15 U.S.C. § 1692k(a)(2)(A); class damages for FDPCA Distressed Mortgage Fee Subclass members that are not entitled to actual damages up to the lesser of $500,000 or 1 per centum of the net worth of Ocwen Servicing pursuant to 15 U.S.C. § 1692k(a)(2)(B)(ii); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. 1692k(a)(3) from Ocwen Servicing.

156.    Ocwen Financial, Altisource and Erbey willfully conspired with Ocwen Servicing to violate the FDCPA, and aided and abetted Ocwen Servicing in its violations of the FDCPA by providing agreeing to assist and assisting Ocwen Servicing in its conduct which violates the FDCPA,

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

1   and are jointly and severally liable to Plaintiffs and members of the FDPCA Distressed Mortgage Fee

2   Subclass for Ocwen Servicing's violations of the FDCPA.

3   <strong>THIRD CAUSE OF ACTION</strong>

**Violations of the Rosenthal Fair Debt Collection Practices Act (RFDCPA) (Cal. Civ. Code §§ 1788, *et seq* (on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against All Defendants)**

6   157.   Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate

7   them as if they were fully written herein.

8   158.   Plaintiffs bring this cause of action on behalf of themselves and the members of the

9   California Distressed Mortgage Fee Subclass.

10   159.   As alleged above, Ocwen Servicing committed violations of the Rosenthal Fair Debt

11   Collection Practices Act, California Civil Code §§ 1788, *et seq*. ("RFDCPA"), which incorporates by

12   reference, and requires compliance with, the provisions of the federal FDCPA, 15 U.S.C. § 1692.

13   160.   Ocwen Servicing is a "debt collector" within the meaning of California Civil Code §

14   1788.2(c) because Ocwen Servicing sent mortgage bills to Plaintiffs and members of the California

15   Distressed Mortgage Fee Subclass, and Plaintiffs and members of the California Distressed Mortgage

16   Fee Subclass made their mortgage payments to Ocwen Servicing, Ocwen Servicing accepted those

17   payments, and Ocwen Servicing made demands for payment which included payments for up-charged

18   Inflated Distressed Mortgage Fees.  Ocwen Servicing made demand for such payment by sending

19   letters, making telephone calls, and through other attempts to collect mortgage payments and fees.

20   161.   The FDCPA and RFDCPA prohibit a debt collector from using "any false, deceptive,

21   or misleading representation or means in connection with the collection of any debt."  15 U.S.C. §

22   1692e.

23   162.   The inflated and duplicative Distressed Mortgage Fees purportedly owed by Plaintiffs

24   and members of the California Distressed Mortgage Fee Subclass are a "debt" within the meaning of

25   California Civil Code § 1788.2(d), because they are "money, property or their equivalent which [are]

26   due or owing or alleged to be due or owing from a natural person to another person."

27   163.   Ocwen Servicing knowingly, affirmatively, and actively concealed and suppressed

28   material facts, namely the fact that the Distressed Mortgage Fees were inflated and/or duplicative as

49

alleged throughout this Complaint, in violation of the law and the servicing guidelines which Ocwen Servicing is obligated to follow.

164. Contrary to Ocwen Servicing's communications, it was not legally authorized to asses, charge or collect inflated or duplicative Distressed Mortgage Fees. Under the mortgage servicing rights that Ocwen Servicing acquires, Ocwen Servicing is authorized to assess reasonable and appropriate fees and charges as provided for in the mortgage agreement. Whether or not they are contractually authorized to assess any or all of the fees at issue in this action, they cannot charge or collect fees that are unlawful, unfair or the product of a self-dealing fraudulent conspiracy under federal or state laws.

165. Pursuant to California Civil Code §§ 1788.17 and 1788.30, Plaintiffs and members of the California Distressed Mortgage Fee Subclass are entitled to recover actual damages sustained as a result of Ocwen Servicing's violations of the RFDCPA. Such damages include, without limitation, monetary losses and damages. Additionally, because Ocwen Servicing's violations of the RFDCPA were committed willingly and knowingly, Plaintiffs and members of the California Distressed Mortgage Fee Subclass are entitled to recover penalties of up to $1,000 per violation as provided for in the RFDCPA, as well as attorneys' fees, costs, and expenses incurred in bringing this action.

166. Ocwen Financial, Altisource and Erbey willfully conspired with Ocwen Servicing to violate the FDCPA, and aided and abetted Ocwen Servicing in its violations of the RFDCPA by providing agreeing to assist and assisting Ocwen Servicing in its conduct which violates the RFDCPA, and are jointly and severally liable to Plaintiffs and members of the California Distressed Mortgage Fee Subclass for Ocwen Servicing's violations of the RFDCPA.

**FOURTH CAUSE OF ACTION**
**Violation of the "Unlawful" prong of the UCL (Bus. & Prof. Code §§ 17200, *et seq*.)(on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against All Defendants)**

167. Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

168. Plaintiffs bring this cause of action on behalf of themselves and the members of the California Distressed Mortgage Fee Subclass.

169.    The Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200, *et seq.*, defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice.

170.    A business act or practice is "unlawful" if it violates any established state or federal law.

171.    Defendants have and continue to violate the "unlawful" prong of the UCL by engaging in the conspiratorial conduct described above to charge borrowers for inflated and duplicative Distressed Mortgage Fees, and thereby attempting to collect a debt not owed, in violation of Title 18 U.S.C. §§ 1341, 1343, and 1962, 15 U.S.C. §§ 1601 *et seq.*, and California's Rosenthal Fair Debt Collection Practices Act.

172.    The Ocwen Entities are also subject to the laws and regulations established by the Consumer Financial Protection Board ("CFPB") pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. §§ 5301, *et seq.*

173.    Ocwen Financial and Ocwen Servicing are covered entities under the Dodd-Frank Act. 12 U.S.C. 5481(6)(A).   The Altisource Entities are service providers to the Ocwen Entities, and are therefore also covered entities under the Dodd-Frank Act.  12 U.S.C. 5481(6)(B).

174.    The Dodd-Frank Act prohibits any covered person or service provider, "from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service."  12 U.S.C. § 5531(a).

175.    Defendants have and continue to violate the "unlawful" prong of the UCL by, amongst other things, engaging in unfair, deceptive and abusive acts and practices declared unlawful by the Dodd-Frank Act by charging and collecting for inflated and duplicative Distressed Mortgage Fees.  12 U.S.C. § 5536(a)(1)(B).

176.    Ocwen Financial, Altisource and Erbey knowingly or recklessly provided substantial assistance to Ocwen Servicing by virtue of their action as part of the Ocwen Enterprise as described herein in charging and collecting for inflated and duplicative Distressed Mortgage Fees, and are

51

deemed in violation of the Dodd-Frank Act, and California's "unlawful" prong of the UCL, to the same extent as Ocwen Servicing to whom they provided assistance.  12 U.S.C. § 5536(a)(3).

177.    Under the mortgage servicing rights that Ocwen Servicing acquires, Ocwen Servicing is authorized to assess reasonable and appropriate fees and charges as provided for in the mortgage agreement.  Whether or not they are contractually authorized to assess any or all of the fees at issue in this action, they cannot charge or collect fees that are unlawful, unfair or the product of a self-dealing fraudulent conspiracy under federal or state laws.

178.    Ocwen Financial, Altisource and Erbey conspired with Ocwen Servicing to violate the UCL, and aided and abetted Ocwen Servicing in its violations of the UCL by providing agreeing to assist and assisting Ocwen Servicing in its conduct which violates the UCL, and are jointly and severally liable to Plaintiffs and members of the California Distressed Mortgage Fee Subclass for Ocwen Servicing's violations of the UCL.

179.    Through their unlawful acts and practices, Defendants have obtained, and continue to unfairly obtain, money from Plaintiffs and members of the California Distressed Mortgage Fee Subclass.  As such, Plaintiffs request on behalf of themselves and all California Distressed Mortgage Fee Subclass members the relief set forth in the Prayer, including that this Court enjoin Defendants from continuing to violate the Unfair Competition Law as discussed herein.  Otherwise, the California Distressed Mortgage Fee Subclass may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

**FIFTH CAUSE OF ACTION**
**Violation of the "Unfair" prong of the UCL (Bus. & Prof. Code §§ 17200,** *et seq.***) (on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against All Defendants)**

180.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

181.    Plaintiffs bring this cause of action on behalf of themselves and the members of the California Distressed Mortgage Fee Subclass.

182.    The Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200, *et seq.*, defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice.

52

183.   A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

184.   Defendants' acts and practices of assessing, charging and collecting inflated and duplicative Distressed Mortgage Fees was "unfair" under both the Dodd-Frank Act, 12 U.S.C. § 5531(c), and the UCL.  *See also* Paragraph 37, *supra*.

185.   The gravity of the harm to Plaintiffs and members of the California Distressed Mortgage Fee Subclass resulting from Defendants' unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of Defendants' conduct, and any countervailing benefits to consumers or to competition.  By committing the acts and practices alleged above, Defendants have engaged, and continue to be engaged, in unfair business practices within the meaning of Cal. Bus. & Prof. Code 17200, *et seq*. and the Dodd-Frank Act.

186.   As a result of the conduct described above, Defendants have been, and will continue to be, unjustly enriched at the expense of Plaintiffs and members of the proposed California Distressed Mortgage Fee Subclass.  Specifically, Defendants have been unjustly enriched by the revenue and profits they have obtained from Plaintiffs and members of the California Distressed Mortgage Fee Subclass for the Duplicative Distressed Mortgage Fees.

187.   Under the mortgage servicing rights that Ocwen Servicing acquires, Ocwen Servicing is authorized to assess reasonable and appropriate fees and charges as provided for in the mortgage agreement.  Whether or not they are contractually authorized to assess any or all of the fees at issue in this action, they cannot charge or collect fees that are unlawful, unfair or the product of a self-dealing fraudulent conspiracy under federal or state laws.

188.   Ocwen Financial, Altisource and Erbey conspired with Ocwen Servicing to violate the UCL, and aided and abetted Ocwen Servicing in its violations of the UCL by providing agreeing to assist and assisting Ocwen Servicing in its conduct which violates the UCL, and are jointly and severally liable to Plaintiffs and members of the California Distressed Mortgage Fee Subclass for Ocwen Servicing's violations of the UCL.

189.   Through their unfair acts and practices, Defendants have improperly obtained, and continue to improperly obtain, money from members of the California Distressed Mortgage Fee

53

Subclass.  As such, Plaintiffs request that this Court cause Defendants to restore this money to Plaintiffs and the California Distressed Mortgage Fee Subclass, to disgorge the profits Defendants have made on Inflated Distressed Mortgage Fees, and to enjoin Defendants from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future as discussed herein. Otherwise, members of the California Distressed Mortgage Fee Subclass may be irreparably harmed and/or denied an effective and complete remedy if such an Order is not granted.

**SIXTH CAUSE OF ACTION**
**Violation of the "Fraudulent" Prong of the UCL (Bus. & Prof. Code §§ 17200, *et seq.*) (on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against All Defendants)**

190.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

191.    Plaintiffs bring this cause of action on behalf of themselves and the members of the California Distressed Mortgage Fee Subclass.

192.    The Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200, *et seq.*, defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice.

193.    A business act or practice is "fraudulent" under the UCL if it actually deceives or is likely to deceive members of the consuming public.

194.    In the course and conduct of Ocwen Servicing's loan servicing and collection, Defendants fail to disclose the nature of the inflated or duplicative Distressed Mortgage Fees Ocwen Servicing assesses to and collects from borrowers.  Defendants also failed to disclose the nature of the relationship between and among the Ocwen Enterprise, and that all of the inflated (including duplicative) Distressed Mortgage Fees were inflated as a result of their relationships and the manner by which the up-charges were accomplished.

195.    In the course and conduct of Ocwen Servicing's loan servicing and collection, Defendants misrepresented that the services provided and charged to Plaintiffs and members of the Distressed Mortgage Fees class were provided by a dis-interested third-party, and that the charges for such services were negotiated at arms-length.

54

196.     Plaintiffs believed they were obligated to pay the amounts specified in Ocwen Servicing's communications, and they and members of the California Distressed Mortgage Fee Subclass were likely to be deceived by Ocwen Servicing's assertions that they were obligated to pay the amounts specified in Ocwen Servicing's communications, for the Distressed Mortgage Fees charged to Plaintiffs and California Distressed Mortgage Fee Subclass members, and that the services provide were provided by a dis-interested third-party and that the charges were negotiated at arms-length. Plaintiffs and members of the California Distressed Mortgage Fee Subclass relied on Defendants' omissions, misrepresentations and concealment in paying the Distressed Mortgage Fees as described herein that had the effect of misrepresenting and portraying the Distressed Mortgage Fees memorialized in Ocwen Servicing's uniform billing statements as lawful, reasonable and necessary, which they were not.  While proof of reliance for the members of the California Distressed Mortgage Fee Subclass is not necessary under the UCL, it may also be presumed or inferred from the very nature of the omissions, concealment, misrepresentations and conduct of the Defendants presented in this action.

197.     Borrowers, however, are not obligated to pay the amounts Ocwen Servicing specified in its communications concerning inflated and duplicative Distressed Mortgage Fees. Ocwen Servicing disguises the fact that the inflated (including duplicative) Distressed Mortgage Fees they represent as being owed were up-charged through the use of Altisource Servicing and the Altisource Parent's mortgage servicing technology software, and in violation of disclosures required by law and servicing guidelines Ocwen Servicing is required to follow.  Contrary to Ocwen Servicing's attempts to collect for the inflated and duplicative Distressed Mortgage Fees charged to borrowers, Ocwen Servicing is not legally authorized to indiscriminately assess and collect inflated or duplicative Distressed Mortgage Fees.

198.     Under the mortgage servicing rights that Ocwen Servicing acquires, Ocwen Servicing is authorized to assess reasonable and appropriate fees and charges as provided for in the mortgage agreement.  Whether or not they are contractually authorized to assess any or all of the fees at issue in this action, they cannot charge or collect fees that are unlawful, unfair or the product of a self-dealing fraudulent conspiracy under federal or state laws.

1    199.    Ocwen Servicing's misrepresentations and concealment of material facts, as set forth

2  above, was misleading or likely to deceive the general public within the meaning of the UCL.

3    200.    Ocwen Financial, Altisource and Erbey conspired with Ocwen Servicing to violate the

4  UCL, and aided and abetted Ocwen Servicing in its violations of the UCL by providing agreeing to

5  assist and assisting Ocwen Servicing in its conduct which violates the UCL, and are jointly and

6  severally liable to Plaintiffs and members of the California Distressed Mortgage Fee Subclass for

7  Ocwen Servicing's violations of the UCL.

8    201.    As a result of the conduct described above, Defendants have been, and will continue to

9  be, unjustly enriched at the expense of Plaintiffs and members of the California Distressed Mortgage

10  Fee Subclass.  Specifically, Defendants have been unjustly enriched by the revenue and profits they

11  have obtained from Plaintiffs and the California Distressed Mortgage Fee Subclass.

12    202.    Through their fraudulent acts and practices, Defendants have improperly obtained, and

13  continue to improperly obtain, money from members of the California Distressed Mortgage Fee

14  Subclass.  As such, Plaintiffs request that this Court cause Defendants to restore this money to

15  Plaintiffs and the California Distressed Mortgage Fee Subclass, to disgorge the profits Defendants

16  have made on Inflated Distressed Mortgage Fees, and to enjoin Defendants from continuing to violate

17  the Unfair Competition Law or violating it in the same fashion in the future as discussed herein.

18  Otherwise, members of the California Distressed Mortgage Fee Subclass may be irreparably harmed

19  and/or denied an effective and complete remedy if such an Order is not granted.

20                          **SEVENTH CAUSE OF ACTION**
   **Fraud (on behalf of Plaintiffs and the National Distressed Mortgage Fees Class and against All**
21                                    **Defendants)**

22    203.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate

23  them as if they were fully written herein.

24    204.    Plaintiffs bring this cause of action on behalf of themselves and the members of the

25  National Distressed Mortgage Fees Class.

26    205.    Plaintiffs and members of the National Distressed Mortgage Fee Class relied on Ocwen

27  Servicing's disclosures through its billing statements and other written communications that uniformly

28  and consistently failed to disclose the Ocwen Enterprise' conspiracy, or that the Ocwen Enterprise up-

56

charged for the inflated (including duplicative) Distressed Mortgage Fees, which Plaintiffs and the National Distressed Mortgage Fee Class reasonably believed were valid lawful charges.

206. Plaintiffs relied on Ocwen Servicing's disclosures through its billing statements and other written communications that uniformly and consistently misrepresented that the Distressed Mortgage Services were provided by a disinterested third-party, and that the charges for the Distressed Mortgage Services were negotiated at arms-length, and were not duplicative of other services.

207. Had the true nature of the inflated and duplicative Distressed Mortgage Fees been disclosed to Plaintiffs and members of the National Distressed Mortgage Fees Class, they would have been aware of the unfair, unlawful and fraudulent nature of the fees, and Plaintiffs would have disputed the charges and not paid them.

208. As a result of Ocwen Servicing's disclosures, misrepresentations, omissions and failures to disclose, Plaintiffs and National Distressed Mortgage Fee Class members have been injured and suffered a loss of money or property. Plaintiffs and members of the National Distressed Mortgage Fee Class would have challenged Ocwen Servicing's attempt to assess the inflated and duplicative Distressed Mortgage Fees on their accounts had it not been for Ocwen Servicing's concealment of material facts.

209. Ocwen Servicing omitted and concealed material facts, as discussed above, with knowledge of the effect of concealing of these material facts. Ocwen Servicing knew that by misleading consumers, the fees would generate higher revenue and profits for all members of the Ocwen Enterprise including itself, Ocwen Financial, Erbey and the Altisource Entities.

210. Plaintiffs and members of the National Distressed Mortgage Fee Class justifiably relied upon Ocwen Servicing's knowing, affirmative, and active concealment. Class Members' justifiable reliance may also be presumed or inferred from the very nature of the omissions, concealment, misrepresentations and conduct of the Defendants presented in this action. By concealing material information about their scheme to assess inflated and duplicative Distressed Mortgage Fees on borrowers' accounts, Ocwen Servicing intended to induce Plaintiffs and members of the National Distressed Mortgage Fee Class into believing that they owed Ocwen Servicing more money that it was entitled to.

57

211.    Ocwen Servicing acted with malice, oppression, or fraud.

212.    Ocwen Financial, Altisource and Erbey conspired with Ocwen Servicing to commit the frauds described herein, and aided and abetted Ocwen Servicing in its frauds by providing agreeing to assist and assisting Ocwen Servicing in its conduct which constitutes fraud, and are jointly and severally liable to Plaintiffs and members of the National Distressed Mortgage Fees Class for Ocwen Servicing's fraud.

213.    Under the mortgage servicing rights that Ocwen Servicing acquires, Ocwen Servicing is authorized to assess reasonable and appropriate fees and charges as provided for in the mortgage agreement.  Whether or not they are contractually authorized to assess any or all of the fees at issue in this action, they cannot charge or collect fees that are unlawful, unfair or the product of a self-dealing fraudulent conspiracy under federal or state laws.

214.    As a direct and proximate result of Ocwen Servicing's omissions and active concealment of material facts, Plaintiffs and each member of the National Distressed Mortgage Fee Class has been damaged in an amount to be proved at trial.

## IX.    PRAYER

WHEREFORE, Plaintiffs, on behalf of themselves and all class members and subclass members, request award and relief as follows:

A.    An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiffs Victor P. Giotta and Loralee Giotta be appointed a Class Representatives for the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass and California Distressed Mortgage Fee Subclass, and that Plaintiffs' counsel be appointed Counsel for the Class and Subclasses.

B.    Order that Defendants are financially responsible for notifying all members of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass and California Distressed Mortgage Fee Subclass of the alleged omissions, concealments, misrepresentations, conduct, inflation, duplicative or excessive Distressed Mortgage Services described herein, as well as any finding by the Court with respect thereto.

C.      Awarding compensatory damages in an amount determined at trial for each Cause of Action asserted herein for which these damages are available.

D.      Awarding restitution in such amount that were paid for inflated and duplicative Distressed Mortgage Fees, or restitutionary disgorgement of the profits Defendants obtained from those transactions for each Cause of Action asserted herein for which this relief is available.

E.      Awarding treble and punitive damages as provided by law in an amount determined at trial for each Cause of Action asserted herein for which these damages are available.

F.      Awarding statutory damages as provided by law for each Cause of Action asserted herein for which these damages are available.

G.      An order enjoining Defendants from continuing the unlawful, unfair and fraudulent practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of their conduct and pay them restitution and disgorgement of all moneys acquired by Defendants by means of any act or practice to be declared by this Court to be wrongful.

H.      An order awarding Plaintiffs their costs of suit, including reasonable attorneys' fees and pre and post-judgment interest.

I.      An order requiring an accounting for, and imposition of, a constructive trust upon, all monies received by Defendants as a result of the unlawful, unfair, and fraudulent conduct alleged herein.

J.      Such other and further relief as may be available as part of the statutory claims asserted herein, or otherwise as may be deemed necessary or appropriate for any of the claims asserted.

K.      An order directing Defendants to assign to Plaintiffs and Class Members the right to collect on indemnity agreements signed by any person who is obligated to indemnify Defendants for liability originating from the allegations of this First Amended Complaint.

## X.      DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims and/or issues so triable.

DATED:  June 12, 2015                          Respectfully Submitted,


                                                        /s/Joseph N. Kravec, Jr.
                                                        Joseph N. Kravec, Jr. (admitted *pro hac vice*)

Wyatt A. Lison (admitted *pro hac vice*)
McKean J. Evans (to be admitted *pro hac vice*)
**FEINSTEIN DOYLE**
   **PAYNE & KRAVEC, LLC**
Allegheny Building, 17th Floor
429 Forbes Avenue
Pittsburgh, PA  15219
Tel:    (412) 281-8400
Fax:    (412) 281-1007
Email:  jkravec@fdpklaw.com
Email:  wlison@fdpklaw.com
Email:  mevans@fdpklaw.com

Stephen F. Yunker (CSB 110159)
**YUNKER & SCHNEIDER**
655 West Broadway, Suite 1400
San Diego, California 92101
Tel:  (619) 233-5500
Fax:  (619) 233-5535
Email: sfy@yslaw.com

James M. Pietz
**PIETZ LAW OFFICE**
429 Forbes Avenue, Suite 1710
Allegheny Building
Pittsburgh, PA  15219
Tel:  (412) 288-4333
Fax  1-866-633-1820
Email:  jpietz@pietzlaw.com

Gretchen Freeman Cappio
(to be admitted *pro hac vice*)
Dean N. Kawamoto (CSB 232032)
Gretchen S. Obrist (to be admitted *pro hac vice*)
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax:  (206) 623-3384
E-mail:  gcappio@kellerrohrback.com
             dkawamoto@kellerrohrback.com
             gobrist@kellerrohrback.com

*ATTORNEYS FOR PLAINTIFFS AND THE
PROPOSED CLASS AND SUBCLASSES*

60