Stephen F. Yunker (CSB 110159)
**YUNKER & SCHNEIDER**
655 West Broadway, Suite 1400
San Diego, California 92101
Tel:  (619) 233-5500
Fax:  (619) 233-5535
Email: sfy@yslaw.com

Gretchen Freeman Cappio
(admitted *pro hac vice*)
Dean N. Kawamoto (CSB 232032)
Gretchen S. Obrist (admitted *pro hac vice*)
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax:  (206) 623-3384
E-mail: gcappio@kellerrohrback.com
        dkawamoto@kellerrohrback.com
        gobrist@kellerrohrback.com

Joseph N. Kravec, Jr.
(admitted *pro hac vice*)
James M. Pietz (admitted *pro hac vice*)
Wyatt A. Lison (admitted *pro hac vice*)
McKean J. Evans
(to be admitted *pro hac vice*)
**FEINSTEIN DOYLE
    PAYNE & KRAVEC, LLC**
Allegheny Building, 17th Floor
429 Forbes Avenue
Pittsburgh, PA  15219
Tel:    (412) 281-8400
Fax:    (412) 281-1007
Email:  jkravec@fdpklaw.com
Email:  jpietz@fdpklaw.com
Email:  wlison@fdpklaw.com
Email:  mevans@fdpklaw.com

***ATTORNEYS FOR PLAINTIFFS AND THE PROPOSED CLASS AND SUBCLASSES***

### IN THE UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| VICTOR P. GIOTTA and LORALEE GIOTTA, On Behalf Of Themselves And All Others Similarly Situated,<br><br>      Plaintiffs,<br><br>   vs.<br><br>OCWEN FINANCIAL CORPORATION, OCWEN LOAN SERVICING, LLC, ALTISOURCE SOLUTIONS, INC.; WILLIAM C. ERBEY; and DOEs 1-50.<br><br>      Defendants. | **Case No.: 5-15-cv-00620-BLF**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**<br>(1) Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962(c) and (d));<br>(2) Violations of the Fair Debt Collection Practices Act (15 U.S.C. §§ 1601, *et seq.*);<br>(3) Violations Of The Rosenthal Fair Debt Collection Practices Act (California Civil Code §§ 1788, *et seq.*);<br>(4) Violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*); and<br>(5) Fraud.<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   PARTIES ............................................................................................................8

III.  JURISDICTION AND VENUE ........................................................................16

IV.   INTRA-DISTRICT ASSIGNMENT .................................................................19

V.    FACTUAL ALLEGATIONS ............................................................................19

      A.    Home Mortgage Servicing Industry.......................................................19

      B.    Ocwen Servicing Operates its Subprime Mortgage Servicing Business
            to Generate Fees......................................................................................22

      C.    Ocwen Servicing is Part of Defendant Erbey's Larger Scheme to Overcharge
            Distressed Borrowers in Conjunction with the Other Defendants..............24

      D.    State and Federal Investigations of the Ocwen Enterprise .........................31

      E.    The Ocwen Enterprise Overcharges Plaintiffs and Other Borrowers for
            Distressed Mortgage Fees .......................................................................37

            1.    Ocwen Servicing Overcharges Borrowers for Property Inspections by
                  Charging Fees Despite Advising Borrowers that Property Inspections
                  Carried "No Charge".......................................................................37

            2.    Ocwen Servicing Overcharges Borrowers for Distressed Mortgage
                  Services That Are Significantly Above Cost and Above Market Rate
                  and Fails to Disclose the Up-charges in Violation of its Express
                  Duties .............................................................................................40

            3.    Ocwen Servicing Unfairly "Double-Dips" by Contemporaneously
                  Charging Borrowers for Multiple Services that Perform the Same
                  Property Inspection Function...........................................................51

            4.    The Ocwen Enterprise's Overcharges for Distressed Mortgage Services
                  Harmed Plaintiffs and Class Members in California and Nationwide by
                  Pushing Struggling Homeowners Deeper into Default................................54

      F.    The Ocwen Enterprise Concealed and Failed to Disclose Its Conduct .......56

      G.    Defendants' Omissions and Concealments Tolled the Applicable Statutes
            of Limitations.........................................................................................57

VI.   CIVIL CONSPIRACY AND AIDING AND ABETTING.................................58

VII.  CLASS ACTION ALLEGATIONS ..................................................................60

VIII. CLAIMS FOR RELIEF ...................................................................................63

FIRST CAUSE OF ACTION Violation of the "Unlawful" Prong of the UCL (Bus. & Prof. Code §§ 17200, *et seq.*)(on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against All Defendants as to All Overcharges) ................................................................................................64

SECOND CAUSE OF ACTION Violation of the "Fraudulent" Prong of the UCL (Bus. & Prof. Code §§ 17200, *et seq.*) (on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against All Defendants as to the "Property Inspection 'No Charge' Misrepresentation" and "Up-Charge, Above-Cost and Above-Market-Rate" Overcharges) ............................................................66

THIRD CAUSE OF ACTION Violation of the "Unfair" Prong of the UCL (Bus. & Prof. Code §§ 17200, *et seq.*) (on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against All Defendants as to All Overcharges) ................................................................................................68

FOURTH CAUSE OF ACTION Fraud (on behalf of Plaintiffs and the National Distressed Mortgage Fees Class and against All Defendants as to the "Property Inspection 'No Charge' Misrepresentation" and "Up-Charge, Above-Cost and Above-Market-Rate" Overcharges).............71

FIFTH CAUSE OF ACTION Violation of the FDCPA (15 U.S.C. §§ 1692, *et seq*) (on behalf of Plaintiffs and the FDCPA Distressed Mortgage Fees Subclass against All Defendants as to All Overcharges)...........................................................................................................................73

SIXTH CAUSE OF ACTION Violations of the Rosenthal Fair Debt Collection Practices Act (RFDCPA) (Cal. Civ. Code §§ 1788, *et seq* (on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against All Defendants as to All Overcharges) ...............................................75

SEVENTH CAUSE OF ACTION Violations of RICO (18 U.S.C. §§ 1962(c) and (d)) (on Behalf of the National Distressed Mortgage Fees Class against All Defendants as to the "Up-Charge, Above-Cost and Above-Market-Rate" Overcharge) ...............................................................................77

     A.     Violation of 18 U.S.C. § 1962(c).............................................................................79

     B.     Violation of 18 U.S.C. § 1962(d).............................................................................81

IX.     PRAYER ................................................................................................................82

X.     DEMAND FOR JURY TRIAL ................................................................................83

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

1       Plaintiffs Victor P. Giotta and Loralee Giotta (collectively "Plaintiffs" or the "Giottas") by

2  their attorneys, bring this class action on their own behalf and on behalf of all others similarly

3  situated against: Defendants Ocwen Financial Corporation ("Ocwen Financial") and Ocwen Loan

4  Servicing, LLC ("Ocwen Servicing") (collectively the "Ocwen Entities"); Defendant Altisource

5  Solutions, Inc. ("Altisource Servicing") (which, collectively with its parent Altisource Portfolio

6  Solutions, S.A. (the "Altisource Parent")[1] constitutes the "Altisource Entities"); and Defendant

7  William C. Erbey and other unknown DOEs defendants (collectively all defendants are referred to as

8  "Defendants").  Plaintiffs allege as follows based on the investigation of their counsel:

9  **I.    INTRODUCTION**

10       1.    This case is about the abusive, predatory and illegal home mortgage loan servicing

11  business Defendant Erbey orchestrated by means of an illegal scheme involving the Ocwen Entities

12  and the Altisource Entities that Erbey created to effectuate this scheme.  Until recently, Erbey

13  controlled each of the Ocwen Entities and the Altisource Entities either directly or functionally:

14  Erbey was the CEO of Ocwen Financial, the Executive Chairman of Ocwen Servicing and the

15  Chairman of the Board of Directors of the Altisource Parent and three Altisource subsidiaries.

16  Erbey's control over the Ocwen Entities and the Altisource Entities has been called a "complex

17  mortgage servicing empire."[2]

---

22  [1] Plaintiffs named the Altisource Parent as a defendant in their original Complaint (Dkt. No. 1) but
23  subsequently dismissed the Altisource Parent's without prejudice after entering into a tolling
   agreement with the company.  Dkt. No. 25.  Although Plaintiffs' Second Amended Complaint does
24  not name the Altisource Parent as a defendant, the Altisource Parent is a key entity in the Ocwen
   Enterprise described herein.

25  [2] *Altisource Portfolio – Fall of Erbey's Empire*, Seeking Alpha, March 23, 2015, available at
26  http://seekingalpha.com/article/3020316-altisource-portfolio-fall-of-erbeys-empire (last visited Jan.
   15, 2016).

First Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

2.     The Ocwen Enterprise[3] was set up in the following way:  Ocwen Financial purchased the servicing rights to subprime mortgages that were distressed or likely to become distressed, meaning the borrower fell behind in payments and entered default status. [4]  Ocwen Financial gives Ocwen Servicing the right to service the mortgages, who was and continues to be responsible for servicing Plaintiffs' and Class Members' mortgage loans on behalf of loan owners.  As the mortgage servicer, Ocwen Servicing acquires the right to collect and keep fees for certain services charged to borrowers with distressed loans referred to as Distressed Mortgage Services[5] throughout this Second Amended Complaint, which result in certain charges for the Distressed Mortgage Services (referred to herein as "Distressed Mortgage Fees") being assessed to and collected from borrowers.

3.     Under the direction of Erbey and other Ocwen executives, the Altisource Entities were spun off of Ocwen Financial in 2009, and became responsible for providing services to the Ocwen Entities for a fee.  The services the Altisource Entities provide to the Ocwen Entities include leasing mortgage servicing software to Ocwen Servicing that Ocwen Servicing needs to run its mortgage servicing business.  This same mortgage servicing software that Ocwen Servicing requires to operate was originally developed by the Ocwen Entities and given to the Altisource Parent when the company was spun off.  Altisource Servicing also provides Ocwen Servicing with Distressed

---

[3] The Ocwen Enterprise includes Erbey, the Ocwen Entities, the Altisource Entities and other Ocwen executives as more specifically described in the Seventh Cause of Action below.

[4] For instance, Ocwen Financial guaranteed Ocwen Servicing's performance and financed the transaction when Ocwen Financial acquired servicing rights from the lender on at least one occasion. *See* June 13, 2013 Ocwen Financial Corp SEC Form 8-K at p.3, item 1.01, attached hereto as Exhibit 1.  *See also id.* at Exhibit 10.1 ("Guarantee") (Ocwen Financial makes the guarantee to induce the bank to sell the servicing rights to Ocwen Servicing's subsidiary).

[5] As detailed herein, the Distressed Mortgage Services include the following: property inspections, broker price opinions ("BPOs"), property valuation expenses, foreclosure auctions, and title examinations.  Plaintiffs may learn of other Distressed Mortgage Services for which Ocwen Servicing charged borrowers fees as part of the Ocwen Enterprise, and reserve their right to amend their complaint to include additional fees for Distressed Mortgage Services so discovered.

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

Mortgage Services it orders for loans in default. The Distressed Mortgage Fees for the Distressed Mortgage Services Altisource provides to Ocwen Servicing for loans in default were assessed to and collected from struggling borrowers who had no ability to negotiate the rates being charged to them by Ocwen Servicing. In return for being "hired" by Ocwen Servicing to provide hundreds of millions of dollars in overcharged Distressed Mortgage Services paid for by borrowers, the Altisource Parent paid kickbacks to Ocwen Financial totaling $72.1 million from 2012 to 2014.

4.     Erbey and other Ocwen executives who directed the spin-off of the Altisource Entities placed themselves in control of the Altisource Entities and the Ocwen Entities by virtue of their stock ownership in the companies, their employment as officers in the companies, and their placement on the companies' boards of directors. This arrangement placed Erbey and other key Ocwen Executives on both ends of what should have been arms-length transactions, allowing them to self-deal and to financially benefit at the expense of borrowers forced to overpay for the costs of overcharged Distressed Mortgage Services. Erbey and other Ocwen Executives personally profited from the arrangement by virtue of their salaries, benefits and profits generated by the Ocwen Entities and the Altisource Entities.

5.     The Ocwen Enterprise's self-dealing scheme did not go entirely unnoticed by regulators. Effective January 16, 2015, Erbey was forced by the New York Department of Financial Services ("NYDFS") to resign from his positions with the Altisource and Ocwen Entities as part of a consent order entered following the NYDFS's investigation of the very same practices giving rise to the allegations in Plaintiffs' Second Amended Complaint. Despite being forced to step down, Erbey continues to exercise some control over these entities because he was and still remains the largest individual shareholder of both the Altisource Entities (which were subsidiaries of Ocwen Financial until, in 2009, it was spun off into an "independent" company under Erbey's direction), and has and still owns 16.9% (over 5 million shares) of stock in Ocwen Financial. Additionally, the Ocwen Enterprise simply replaced Mr. Erbey with his longtime business partner Barry Wish, with whom

Mr. Erbey founded Ocwen Financial. [6]   Moreover, the Ocwen Entities and the Altisource Entities continue to operate the scheme Erbey set in motion which continues to harm borrowers nationwide as described herein.  This illegal scheme is the "Ocwen Enterprise."

6.    The NYDFS investigation into the Ocwen Entities' conduct led to a Consent Order (hereinafter "NYFS Consent Order") in which the Ocwen Entities stipulated that they overcharged borrowers for Distressed Mortgage Services, and did so through their association with the Altisource Entities.

7.    Additionally, the Federal Consumer Finance Protection Bureau ("CFPB") and the attorneys general for 49 states filed a complaint against the Ocwen Entities for, amongst other things, unlawfully and unfairly overcharging borrowers for Distressed Mortgage Services.  As a result of the CFPB action, the Ocwen Entities entered into a Consent Judgment[7] requiring Ocwen to provide $2 billion in loan modifications to struggling borrowers, prohibiting Ocwen Entities from charging more than market rate for Distressed Mortgage Services, prohibiting Ocwen Entities from up-charging more than the actual cost of Distressed Mortgage Services, and requiring the Ocwen Entities to fully disclose the nature of their Distressed Mortgage Fees.  Contemporaneous with the CFPB Consent Judgement and the NYDFS Consent Order, the Altisource Entities announced they would no longer be paying Ocwen Financial the yearly, multi-million dollar kickback it termed a "Data Access and Services Agreement."

8.    Plaintiffs' Second Amended Complaint is based on Ocwen Servicing overcharging struggling borrowers in at least three ways described below and in more detail herein.  These three

---

[6] Sterngold, James and Zibel, Alan, *Erbey's Exit Ends Heady Era at Ocwen*, Wall Street Journal. December 22, 2014, available at http://www.wsj.com/articles/new-york-financial-regulator-announces-settlement-with-ocwen-1419257065 (last visited Jan. 15, 2016); Howley, Kathleen M. and Perlberg, Healther, *Billionaire Erbey Fails to Halt Ocwen Slide on Probe: Mortgages*, Bloomberg Business, Feb. 27, 2014, available at http://www.bloomberg.com/news/articles/2014-02-27/billionaire-erbey-fails-to-halt-ocwen-slide-on-probe-mortgages (last visited Jan. 15, 2016).

[7] Attached hereto as Exhibit 10.

1     overcharges are separate and independent violations of the law, and independently serve as the bases

2     for Plaintiffs' and the Classes' claims under state and federal laws.  Ocwen Financial, Erbey and

3     Altisource Servicing have been named for their active roles in this complex mortgage scheme,

4     including their actions in conspiring with and aiding and abetting Ocwen Servicing's conduct.

5         9.      First, the Ocwen Enterprise overcharged Plaintiffs and Class Members in California

6     and nationwide for the cost of property inspections which Erbey and Ocwen Servicing affirmatively

7     represented in form letters sent to borrowers would be provided at "no charge."  Erbey and Ocwen

8     Servicing cannot charge borrowers for property inspections they told them in form letters would be

9     at "no charge" without, at a minimum, advising borrowers that Ocwen Servicing would begin

10    charging them for the service.  By affirmatively representing to borrowers that property inspections

11    would be provided at "no charge," and then charging borrowers without first notifying them that

12    they would be charged, Ocwen Servicing and Erbey committed fraud and violated California's

13    Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code, §§ 17200, *et seq*.  Altisource Servicing

14    and Ocwen Financial aided and abetted and conspired with Ocwen Servicing and Erbey in violation

15    of these laws by providing material assistance to Ocwen Servicing in ordering, assessing and

16    collecting for property inspections knowing by virtue of their relationship that Erbey and Ocwen

17    Servicing represented would be at "no charge," including through the Altisource Entities' mortgage

18    servicing software system.   Ocwen Servicing and Erbey also violated the federal Fair Debt

19    Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, *et seq*., and California's Rosenthal Fair

20    Debt Collection Practices Act ("RFDCPA"), Cal. Civ. Code §§ 1788, et *seq*. as they attempted to

21    collect and collected amounts claimed to be owed for property inspections knowing that the property

22    inspections were to be provided at "no charge," and that the debt for the property inspections was

23    never owed.

24        10.     Second, the Ocwen Enterprise overcharged Plaintiffs and Class Members in

25    California and nationwide for Distressed Mortgage Services such as broker price opinions ("BPOs"),

26    auction fees and title examination fees that borrowers were forced to pay for at unlawful up-charged,

27    above-cost and above-market rates. Ocwen Servicing, by virtue of the CFPB Consent Judgment and

28    the Dodd Frank Act, could not up-charge borrowers more than the cost for Distressed Mortgage

Services, or charge them more than market rates for those services.  Yet, that is precisely what it did.  For example, Ocwen Servicing's BPOs were arranged for and charged by Altisource Servicing, which often paid nothing for the service because brokers are willing to provide BPOs for free in exchange for being assigned as the selling broker if the property goes into a foreclosure sale, or between $20 and $40 when brokers actually charged Altisource Servicing.  Even if Ocwen Servicing could charge borrowers more than the cost for Distressed Mortgage Services, Ocwen Servicing was prohibited from charging more than the market rate for such services which would be between $60 and $90.  Despite not being permitted to charge more than cost or, at the maximum market rate for BPOs, Ocwen Servicing charged Plaintiffs and Class Members $100 or more for BPOs.  The same is true for auction fees and title examination fees that Ocwen Servicing charged more than double market rate and significantly more than their actual cost.

11.    Moreover, Ocwen Servicing also could not up-charge more than the cost for Distressed Mortgage Services by forming a self-dealing Enterprise in order to charge more for services through one of its co-conspirators than it could charge itself.  As Erbey and other Ocwen executives were on both ends of what should have been arms-length transactions, the Altisource Entities were not acting as independent third-party companies in negotiating rates and fees with the Ocwen Entities; rather, they were part of the same Ocwen Enterprise set up for the purpose of evading the laws and regulatory oversight, and charging distressed borrowers more for Distressed Mortgage Services than Ocwen Servicing could charge itself.  Some of the money obtained from the unlawful up-charges was kicked back to Ocwen Financial under the guise of the so-called Data Access and Services Agreement that was abruptly discontinued right after the CFPB Consent Judgment and NYDFS Consent Order.  Erbey and other key executives reaped the benefits of the overcharges by virtue of increased value of stocks and other enhanced executive payments from extra and fraudulent revenue stream.  The Ocwen Enterprise's scheme to overcharge for BPOs and other Distressed Mortgage Services is a fraud and violates California's UCL, because Defendants had clear and express duties not to charge more than market rate for Distressed Mortgage Services, and to tell borrowers if any of their charges did, albeit impermissibly, exceed market rates for Distressed Mortgage Services.  Defendants failed to refrain from charging more than market rate for

6

Distressed Mortgage Services or to disclose their excessive rates to borrowers, so they could take some action to prevent paying the overcharge or to report the abuse the appropriate regulators. This same conduct by Ocwen Servicing also violates the FDCPA and California's Rosenthal Act, since these overcharges were not a proper and lawful debt.

12.    Additionally, the Ocwen Enterprise's self-dealing in conspiring to create a scheme that put them on both ends of what should have been an arms-length transaction, in charging more than the cost for Distressed Mortgage Services, and in failing to disclose to borrowers that it charged more than the cost for such Distressed Mortgage Services when it had a clear duty to disclose serves as a basis for a claim under RICO. In its Order dismissing Plaintiffs' RICO claim from the First Amended Complaint, the Court indicated Plaintiffs failed to sufficiently allege any duty the Ocwen Enterprise had to disclose information to borrowers, and what the precise alleged overcharge was. The duty the Ocwen Entities had and continue to have is a duty to notify borrowers that they are charging more than market rates and the actual costs for BPOs and other Distressed Mortgage Services stemming from the CFPB Consent Judgment, from common law under the Restatement of Torts §§ 550 and 551, from the legal duties imposed by the Dodd Frank Act, and other duties identified throughout this Second Amended Complaint. Despite their clear and express duties to disclose that they are charging more than their costs, or at maximum the market rate for BPOs and other Distressed Mortgage Services, the Ocwen Entities with the aid and assistance of their co-conspirators, Erbey and the Altisource Entities, were and continue to charge Plaintiffs and Class Members in California and nationwide more than market rate for BPOs and other services as described herein.

13.    Third, Ocwen Servicing unfairly overcharged Plaintiffs and Class Members in California and nationwide by duplicating property inspection services and charging Plaintiffs and Class Members in California and nationwide for redundant property inspection services, a practice known in the industry as "double-dipping." Specifically, Ocwen Servicing ordered both a property inspection and a BPO contemporaneously with one another despite the fact that a BPO includes a property inspection. This practice made the property inspection entirely duplicative and redundant because the broker performing the BPO performed a property inspection as part of the BPO. Even if

7

1   Ocwen Servicing wanted to order an entirely duplicative and redundant property inspection for itself,

2   it was patently unfair to pass along the charges for the duplicative and redundant service.   Ocwen

3   Servicing violated California's UCL by assessing and collecting for property inspections that were

4   duplicated by a contemporaneously provided BPO.   Altisource Servicing and Ocwen Financial aided

5   and abetted and conspired with Ocwen Servicing in violation of the UCL because they knew that

6   charging for a property inspection done contemporaneously with a BPO was double-dipping since

7   the service, and the resulting charge, were redundant and duplicative.   Ocwen Servicing and Erbey

8   also violated the FDCPA and California's Rosenthal Act because they attempted to collect and

9   collected amounts claimed to be owed for property inspections knowing that they were duplicative

10  and redundant of a contemporaneously provided BPO, and that the debt for them was never owed.

11          14.     Through these   schemes, the Ocwen Entities, the Altisource Entities, Erbey and the

12  rest of the self-dealing Ocwen Enterprise wrongfully reaped increased salary, benefits, revenue and

13  profits they did not earn at borrowers' expense by, amongst other things, being on both ends of what

14  should have been arms-length transactions.   Moreover, given that Altisource is not a mortgage

15  servicer, it operates outside of the purview of bank regulators such as the CFPB that was created to

16  rein-in mortgage servicing abuses.

17          15.     Plaintiffs bring this action seeking declaratory and injunctive relief and damages on

18  behalf of themselves and thousands of homeowners in California and throughout the United States

19  who have been and continue to be victims of Defendants' fraudulent, unfair and unlawful schemes.

20  **II.     PARTIES**

21          16.     Plaintiffs Victor P. Giotta and Loralee Giotta are married and citizens of the State of

22  California, residing in San Jose, Santa Clara County, California.   Plaintiffs have an outstanding

23  mortgage loan, on their San Jose house in which they have resided for over 50 years. [8]   On or about

24  _____

25

26  [8] *See* Deed of Trust for Victor P. Giotta and Loralee Giotta, dated January 9, 2007, attached hereto as
    Exhibit 2.

27

28

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

February 16, 2013 when Plaintiffs were already in default, the servicing rights to Plaintiffs' mortgage loan were transferred to Ocwen Servicing, and Ocwen Servicing continues to service the Giottas' mortgage loan to this date.[9]  Since filing this action, Plaintiffs have stopped receiving monthly billing statements from Ocwen Servicing despite federal law requiring mortgage servicers to send borrowers monthly statements.[10]  Plaintiffs have attempted to continue mailing payments to Ocwen Servicing's last known address in an effort to make timely payments under their mortgage, but in absence of monthly billing statements from Ocwen Servicing Plaintiffs are now left to guess at the amount that should be paid each month to make their loan current.

17.    Defendant William C. Erbey controlled the Ocwen Enterprise through either direct or effective control of its participants including the Ocwen and Altisource Entities.  Mr. Erbey is the former CEO of Ocwen Financial, the Executive Chairman of Ocwen Servicing and former Director and Chairman of the Board of four related Altisource companies, including Altisource Portfolio Solutions S.A., Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions, Ltd.  Mr. Erbey is the single largest shareholder of Ocwen Financial and the Altisource Parent.  On January 16, 2015, Mr. Erbey stepped down from his positions as Executive Chairman of Ocwen and Director and Chairman of the Board of Altisource as part of a consent order with the New York Department of Financial Services due to his involvement in a multitude of loan servicing violations, including those described herein.  Through his control of the Ocwen and Altisource Entities, Mr. Erbey orchestrated the Ocwen Enterprise.  Mr. Erbey's

---

[9] *See* February 7, 2013 Notice of Servicing Transfer and Welcome to Ocwen Loan Servicing, LLC, attached hereto as Exhibit 3.

[10] *See* 12 C.F.R. § 1026.41(a)(2) ("A servicer of a transaction subject to this section shall provide the consumer, for each billing cycle, a periodic statement…") and Consumer Financial Protection Bureau Consent Judgment (Exhibit 10 hereto) at p. 72, Ex. A, §I.B.5 (providing Ocwen Servicing "shall provide to borrowers…adequate information on monthly billing or other account statements…").

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

control over these entities has been called a "complex mortgage servicing empire."[11]  As of March 6, 2015, Erbey owned or controlled approximately 33.59% of the common stock of the Altisource Parent[12], and currently owns approximately 16.9% of the common stock of Ocwen Financial.[13] Erbey is an integral part of the Ocwen Enterprise, and a critical defendant given the questions surrounding Ocwen Financial's future in the mortgage servicing business after the fallout from the investigations of the NYDFS, CFPB, and the California Department of Business Oversight.

18.   Defendant Ocwen Financial Corporation is a publicly traded corporation organized under the laws of Florida, with its principal place of business in Atlanta, Georgia.  Ocwen Financial regularly conducts business in California, and regularly conducts business within this District. Ocwen Financial's main role in the Ocwen Enterprise is to help secure mortgage servicing rights for its subsidiary, Ocwen Servicing.  Ocwen Financial's close affiliation with the other members of the Ocwen Enterprise is reinforced by the following:

a.    Ocwen Financial admits its business is "dependent on many of the services and products provided by Altisource."[14]  These services include "various business process outsourcing services" (which includes the Distressed Mortgage Services) and technology products and support services (which includes the mortgage servicing software Ocwen Servicing developed then sold to the Altisource Parent). *Id.*

---

[11] *Altisource Portfolio – Fall of Erbey's Empire*, Seeking Alpha, March 23, 2015, available at http://seekingalpha.com/article/3020316-altisource-portfolio-fall-of-erbeys-empire (last visited Jan. 16, 2016).

[12] *See* Altisource Parent's March 6, 2015 SEC Schedule 13D/A at 2, available at http://www.sec.gov/Archives/edgar/data/1048105/000089183615000052/sc0048.htm.

[13] *See* Ocwen Financial's May 20, 2015 SEC Schedule 13D/A at 2, available at http://www.sec.gov/Archives/edgar/data/873860/000089183615000088/sc0077.htm.

[14] Ocwen Financial September 30, 2014 SEC Form 10-Q, p. 44-45, available at http://www.sec.gov/Archives/edgar/data/873860/000087386014000020/a2014093010q.htm (last visited Jan. 15, 2016).

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

b.    Ocwen Financial and the Altisource Parent also share administrative and corporate services as well as sharing access to borrower data.  *Id.*

c.    Although Ocwen Financial pays the Altisource Parent for the Distressed Mortgage Fees, Ocwen Financial does not report the Distressed Mortgage Fees as expenses because "[s]ervices provided by Altisource under the Services Agreements with Ocwen are generally charged to the borrower and/or loan investor."  *Id.*

d.    In 2013, Ocwen Financial purchased two competing home loan servicing entities, Homeward and ResCap, then promptly sold these entities' fee-based businesses to Altisource.  *Id.* at 42.  Ocwen Financial financed these transactions in part using a $75 million loan from the Altisource Parent.  *Id.* at 55.

e.    Ocwen Financial has automatically-renewing agreements with the Altisource Parent pursuant to which the Ocwen Entities and the Altisource Entities share services including human resources, vendor management, corporate services, six sigma, quality assurance, quantitative analytics, treasury, accounting, tax matters, risk management, strategic planning and compliance. *Id.* at F-59-60.

f.    Defendant Erbey was Ocwen Financial's Executive Chairman in addition to serving as the Chairman of Altisource, and many of Ocwen Financial's officers and directors own interests in the Altisource Parent and/or Altisource Servicing.[15]

g.    Its former Chairman, William Erbey, owns or controls more than 16% of Ocwen Financial's common stock and 33% of Altisource Portfolio Solutions S.A.'s common stock.

h.    In 2012, Ocwen Financial purchased Erbey's home for $6.5 million.  *Id.* at F-59.

---

[15] Ocwen Financial 2013 SEC Form 10-k, p. 18, available at http://www.sec.gov/Archives/edgar/data/873860/000144530514000799/a2013123110k.htm (last visited Jan. 15, 2016).

i.   Until recently, Ocwen Financial's Chief Risk Officer concurrently served as the Altisource Parent's Chief Risk Officer, while reporting directly to Erbey in both capacities.  Consent Order ¶ 23.  NYDFS observed "This individual seemed not to appreciate the potential conflicts of interest posed by this dual role, which was of particular concern given his role as Chief Risk Officer."  *Id*.

j.   According to the Altisource Parent's most recent SEC Annual Report, "Ocwen is our largest customer and the loss of Ocwen as a customer or a reduction in the size of Ocwen could adversely affect our business and results of operations."[16]  "The Service Agreements also prohibit Ocwen from establishing fee-based businesses that would directly or indirectly compete with Altisource's services with respect to the Homeward Residential, Inc. and Residential Capital, LLC portfolios."  April 23, 2015 SEC form 10-Q at 9.

k.   Unsurprisingly given its origin, the Altisource Parent provides mortgage services "primarily for loan portfolios serviced by Ocwen."[17]

l.   In 2014, 60% of the Altisource Parent's total revenue was derived from Ocwen Financial and its subsidiaries.[18]  No other client accounts for more than 10% of Altisource's revenue.

m.   As one investor report described, "[o]ne key aspect of the spinoff is that Ocwen has to use Altisource's services.  This means that whenever Ocwen sells shares or raises debt to buy mortgage servicing portfolios, it brings business to Altisource.  Altisource

---

[16] March 2, 2015 SEC Form 10-k, p. 9, available at
http://www.sec.gov/Archives/edgar/data/1462418/000162828015001367/asps-12312014x10k.htm.

[17] March 2, 2015 SEC Form 10-k, available at
http://www.sec.gov/Archives/edgar/data/1462418/000162828015001367/asps-12312014x10k.htm.

[18] March 2, 2015 SEC Form 10-k, p. 6, available at
http://www.sec.gov/Archives/edgar/data/1462418/000162828015001367/asps-12312014x10k.htm.

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

does not have to spend money on attracting this new business.  And of course it grows when Ocwen grows."[19]

n.   Since the Ocwen Enterprise has come under fire from regulators and consumer lawsuits, investors are seriously questioning the Altisource Parent's continued performance since it depends directly on the Ocwen Enterprise and is therefore directly threatened by the exposure of the Ocwen Enterprise's wrongdoing.[20] Reportedly, the Altisource Parent's "whole business model" "is now threatened" by the exposure of the Ocwen Enterprise's conduct.  *Id.*  "[A]s the bulk of Altisource's revenue is created in connection with [Ocwen Financial], a failure of [Ocwen Financial] to restore its operations in time would definitely endanger the whole core business of [the Altisource Parent]."  *Id.*

o.   The Altisource Parent's March 2, 2015 SEC filing reported a decline in earnings growth as a result of expenses incurred "for people and infrastructure to support a larger Ocwen[.]"[21]

19.   Defendant Ocwen Loan Servicing, LLC is a limited liability company organized under the laws of Delaware, and an indirect wholly-owned subsidiary of Ocwen Financial.[22]  Ocwen

---

[19] *Investment Thesis on Altisource Portfolio Solutions (ASPS)*, MarketFolly, July 8, 2013, available at http://www.marketfolly.com/2013/07/altisource-portfolio-solutions-asps.html (last visited Jan. 15, 2016).

[20] *Altisource Portfolio – Fall of Erbey's Empire*, Seeking Alpha, March 23, 2015, available at http://seekingalpha.com/article/3020316-altisource-portfolio-fall-of-erbeys-empire (last visited Jan. 15, 2016).

[21] See exhibit 99.1 to March 2, 2015 SEC Form 8-k, available at http://www.sec.gov/Archives/edgar/data/1462418/000110465915015799/a15-5701_1ex99d1.htm (last visited Jan. 15, 2016).

[22] Ocwen Financial September 30, 2014 SEC Form 10-Q, p. 8, available at http://www.sec.gov/Archives/edgar/data/873860/000087386014000020/a2014093010q.htm (last visited Jan. 15, 2016).

Servicing maintains operations in this District related to the activities at issue in this case, including operations involving the servicing of mortgage loans at issue in this action. Ocwen Servicing is headquartered in West Palm Beach, Florida, and is currently licensed to service mortgage loans in all fifty states, including California, the District of Columbia, and two U.S. territories.   Ocwen Servicing's main role in the Ocwen Enterprise is to service mortgages, contract with the Altisource Entities for Altisource and its affiliates to provide and charge for Distressed Mortgage Services, and to pass along Altisource's charges to borrowers.   As alleged herein, Ocwen Servicing was the primary actor in overcharging Plaintiffs, Class Members and other borrowers nationwide for Distressed Mortgage Services.   On January 23, 2015, the California Department of Business Oversight ("CADBO") announced a $2.5 million settlement with Ocwen Servicing for failing to provide the CADBO with reports on its compliance with California mortgage lending laws.[23]   The settlement provides Ocwen Servicing will pay $2.5 million in penalties to the CADBO, pay for an independent audit of its mortgage servicing practices and take on no new California customers pending the CADBO's approval, in exchange for the CADBO's agreement to drop its efforts to suspend Ocwen Servicing's license to operate in California.   *Id*.   On June 9, 2015, the CADBO named Fidelity Information Services as the independent, third-party auditor to review Ocwen Servicing's California mortgage servicing operations.   In naming Fidelity Information Services, the CADBO indicated that as of March 31, 2015, Ocwen serviced 366,955 California mortgages with a total unpaid principal balance of $92.4 billion, representing 24 percent of Ocwen's U.S. portfolio.[24]

---

[23] *Ocwen Agrees to $2.5 Million Settlement for Failing to Provide Loan Information*, California Department of Business Oversight, January 23, 2015, available at http://www.dbo.ca.gov/Press/press_releases/2015/Ocwen%20Settlement%20Announcement%2001-23-15.pdf (last visited April 1, 2015).

[24] *DBO Commissioner Owen Names FIS as Independent Auditor for Ocwen Loan* Servicing, available online at http://www.dbo.ca.gov/Press/press_releases/2015/Auditor_Selection_Announcement06-09-15.pdf (last visited Jan. 15, 2016).

14

20.     Altisource Portfolio Solutions S.A. is not a named defendant in this lawsuit, but is an integral element of the Ocwen Enterprise.  The Altisource Parent is a publicly traded company incorporated in Luxembourg, with a principal place of business in Atlanta, Georgia.  The Altisource Parent consists of Ocwen Financial's former "Ocwen Solutions" line of business that Ocwen Financial spun off in 2009.[25]  Ocwen Financial admits the Altisource Parent is really nothing more than "[Ocwen Financial's] former unsecured collections business, residential fee-based loan processing business and technology platforms" that continues to provide these services to the Ocwen Entities in furtherance of the Ocwen Enterprise. *Id*.  The Altisource Parent's main role in the Ocwen Enterprise is to lease back to Ocwen Financial the mortgage servicing software Ocwen Financial developed then sold to the Altisource Parent.  Ocwen Financial's 2013 Annual Report makes clear Ocwen Financial depends completely on this technology it used to own that it now leases back from the Altisource Parent.[26]

21.     Defendant Altisource Solutions, Inc. is a subsidiary of the Altisource Parent and is a closely affiliated company with the Ocwen Entities.  Altisource Servicing was incorporated in Delaware in 2009 after the Altisource Parent was spun off of the Ocwen Parent, and has its principal place of business in West Palm Beach, Florida.  Altisource Servicing is registered to conduct business in California, maintains offices and regularly conducts business in California and within this District.  Altisource Servicing's main role in the Ocwen Enterprise, as described in detail herein, is to provide and charge for Distressed Mortgage Services to Ocwen Servicing, that Ocwen Servicing passes along to borrowers nationwide which in turn generates higher revenue and profit

---

[25] Ocwen Financial 2013 SEC Form 10-k, p. 9, available at http://www.sec.gov/Archives/edgar/data/873860/000144530514000799/a2013123110k.htm (last visited Jan. 15, 2016).

[26] Ocwen Financial 2013 SEC Form 10-k, p. 18, available at http://www.sec.gov/Archives/edgar/data/873860/000144530514000799/a2013123110k.htm (last visited Jan. 15, 2016).

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

1  for the Ocwen Enterprise.  Altisource Servicing is an integral part of the Ocwen Enterprise, and a

2  critical defendant given the questions surrounding Ocwen Financial's future in the mortgage

3  servicing business after the fallout from the investigations of the NYDFS, CFPB, and CADBO.

4       22.    Defendants DOES 1-10 are individuals or entities who participated in the conduct

5  alleged in this Second Amended Complaint but whose identities are as yet unknown to Plaintiffs.

6  The DOE Defendants may include the officers or directors of the Ocwen and/or Altisource Entities,

7  who may be obligated to indemnify the Ocwen and/or Altisource Entities for liability stemming from

8  the allegations of this Second Amended Complaint.[27]   Plaintiffs reserve the right to amend this

9  Second Amended Complaint to identify these individuals or entities once their identities are

10  ascertained.

11  **III.     JURISDICTION AND VENUE**

12       23.    Jurisdiction is proper under 28 U.S.C. §§ 1331 for Plaintiffs' claims under RICO and

13  the FDCPA, and under 28 U.S.C. § 1367 the Court may exercise supplemental jurisdiction over the

14  state law claims because all of the claims are derived from a common nucleus of operative facts and

15  are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.  Jurisdiction

16  of this Court is also proper under 28 U.S.C. § 1332(d)(2).  The matter in controversy exceeds the

17  sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members

18  of the class of plaintiffs are citizens of states different from Defendants.

19       24.    Venue is proper within this judicial district pursuant to 28 U.S.C. §1391(b) and (c).

20  Defendants transact business and are found within this District, and a substantial portion of the

21  underlying transactions and events complained of by the enterprise occurred in this district, and

22

23

24  [27] For example, on March 21, 2015, Ocwen Financial began entering into undertakings with
25  directors and executive officers whereby the director or executive officer agreed to repay any
   amounts paid, advanced or reimbursed by Ocwen Financial in connection with a claim for which the
26  director or executive officer as adjudged to be liable.  *See* Ocwen Financial March 26, 2015 SEC
   Form 8-k exhibit 10.2.

27

28

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

affected persons, including Plaintiffs, who reside or resided in this judicial district at the material time. Defendants have received substantial compensation from such transactions and business activity in this District, including as the result of servicing mortgage loans for persons residing in this District. Finally, Defendants reside and/or may be found in this District and the interstate trade and commerce described herein is and has been carried out in part within this judicial District.

25.    The Court has general personal jurisdiction over the Ocwen Entities and the Altisource Entities because they have continuous and systemic business contacts within California by virtue of the conduct described throughout this Second Amended Complaint.  Alternatively, if the Ocwen Entities and the Altisource Entities' conduct described throughout this Second Amended Complaint does not rise to the level of "continuous and systemic" activity within California, the Court has specific personal jurisdiction over the Ocwen Entities and the Altisource Entities because the Ocwen Entities' and the Altisource Entities' conduct described throughout this Second Amended Complaint and out of which Plaintiffs' claims arise was purposefully directed at California residents, invoked the benefits and protections of California law, and causes jurisdiction over the Ocwen Entities and the Altisource Entities to be reasonable.

26.    The Court also has specific personal jurisdiction over Defendant Erbey by virtue of his role as the mastermind of the Ocwen Enterprise.  Erbey created, oversaw and implemented the Ocwen Enterprise's unlawful practices that were directed at and harmed California residents under the protection of California's laws and to the benefit of Erbey and the Ocwen Enterprise's other participants.   Erbey personally and directly controlled, directed, authorized, encouraged and participated in, and received a direct financial interest and benefit from, the Ocwen Enterprise as described throughout this Second Amended Complaint, including:

      a.   Erbey controlled the Ocwen Enterprise through direct and/or effective control of its participants, including the Ocwen and Altisource Entities, who constitute "Erbey's

Empire."[28]  Erbey is the former CEO of Ocwen Financial, the Executive Chairman of Ocwen Servicing and former Director and Chairman of the Board of four related Altisource companies, including Altisource Portfolio Solutions S.A., Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions, Ltd.  Erbey is the single largest shareholder of Ocwen Financial and the Altisource Parent.

b.   Under Erbey's direction, Ocwen Financial's former loan servicing arm, Ocwen Solutions, was spun off to create the Altisource Parent.  Erbey retained effective control over the Altisource Parent as part of the spin-off.  Ocwen Financial's SEC filings acknowledged the potential conflicts of interest created by the close relationship between Erbey and the Ocwen and Altisource Entities.[29]

c.   The Chief Risk Officer of both Ocwen Financial and the Altisource Parent reporting directly to Erbey.  Consent Order ¶ 23.

d.   In 2012, Ocwen purchased Erbey's personal residence for $6.5 million – 50% more than Erbey paid to purchase it in 2006.[30]

e.   The New York Department of Financial Services ordered Erbey to resign from his control positions within the Ocwen and Altisource Entities.  NYDFS specifically found (and the Ocwen Entities stipulated and agreed) that "Mr. Erbey…***has participated in*** the approval of a number of transactions between [Ocwen Financial and the Altisource Parent] or from which Altisource received some benefit[.]"  Consent Order ¶ 21 (emphasis added).  NYDFS' consent order also found extensive conflicts of interest among the Ocwen and Altisource Entities by virtue of Erbey's control positions within these entities.  NYDFS Consent Order ¶¶ 20-21.

f.   Despite this, Erbey continues to exercise some control over these entities because he remains largest individual shareholder of both the Altisource Parent and Altisource Servicing, and Ocwen Financial.

g.   Erbey corresponded directly with Plaintiffs at their San Jose residence.  Mr. Erbey signed the Notice of Servicing Transfer and Welcome to Ocwen Loan Servicing, LLC

---

[28] *Altisource Portfolio – Fall of Erbey's Empire*, Seeking Alpha, March 23, 2015, available at http://seekingalpha.com/article/3020316-altisource-portfolio-fall-of-erbeys-empire (last visited Jan. 15, 2016).

[29] Ocwen's SEC Form 8-K filed July 20, 2009 located at http://www.sec.gov/Archives/edgar/data/873860/000101905609000723/ocn_8k.htm.

[30] Ocwen Financial 2013 SEC Form 10-k, p. F-059, available at *http://www.sec.gov/Archives/edgar/data/873860/000144530514000799/a2013123110k.htm* (last visited Jan. 15, 2016*); Ocwen's Rapid Growth Puts Spotlight on Its Practices,* Wall Street Journal, Jan. 15, 2016, available at http://www.wsj.com/articles/SB10001424127887324640104578163461378035442.

letter provided to Plaintiffs when Ocwen Servicing began servicing Plaintiffs' mortgage.  Attached to the letter signed by Mr. Erbey was "Important Information" setting forth Ocwen Servicing's Schedule of Standard Servicing Fees, in which Ocwen Servicing and Mr. Erbey said inspections carry "NO CHARGE."  *See* Exhibit 3.

27.     Erbey also has extensive direct contact with California in an individual capacity.  In support of his motion to dismiss asserting the Court lacks personal jurisdiction over him, Erbey declared, "I have not been a partner, member, shareholder, director, or officer in a partnership, LLC, or corporation that was formed or had a principal place of business in California for over 25 years." Dkt. No. 39-01 at ¶ 3.  This statement is demonstrably false.  As of 2013, Erbey was a director of at least two active California corporations, including "NHPAHP Affordable Housing Corporation CA 14" and "NHPAHP Affordable Housing Corporation CA5."

## IV.     INTRA-DISTRICT ASSIGNMENT

28.     Consistent with Northern District of California Civil Local Rule 3-5(b), assignment to the San Jose Division is appropriate under Civil Local Rule 3-2(c) and 3-2(e), because acts giving rise to the claims at issue in this lawsuit occurred, among other places, in this District, in Santa Clara County, California.

## V.     FACTUAL ALLEGATIONS

### A.     Home Mortgage Servicing Industry

29.     The single family home mortgage servicing industry consists of three players: (1) borrowers who obtain mortgages for one- to four-family residential properties; (2) the trusts and investors who own borrowers' mortgages and derive income from borrowers' principal and interest payments; and (3) mortgage servicers that collect borrowers' mortgage payments, pass the principal and interest on to the owner and profit from the fees for ancillary services.

30.     For more than thirty years, mortgages typically have been "pooled" to create an investment vehicle, often denominated as a trust.  This practice exploded during the financial crisis along with a significant loosening of lending standards.  Interests in the trusts have been sold to investors that own interests in payment streams generated by principal and interest payments by the borrowers.  These interests are called mortgage backed securities.

19

31.     A mortgage servicer (such as Ocwen Servicing) is a company to which borrowers pay their mortgage loan payments and which performs other services in connection with mortgages and mortgage-backed securities.   Servicers perform services including: collecting payments from borrowers; applying the payments as provided by the mortgage agreement; forwarding principal and interest to the owner; assessing and collecting money for any distressed mortgage services as provided by the mortgage contract for such things as late payments, property inspection fees, appraisal fees, BPOs, foreclosure auctions and title examinations; managing any escrow created for the payment of taxes and/or insurance; and default and delinquency related activities such as pursuing collections or foreclosing on borrowers' homes.

32.     Often, as is the case with Ocwen Servicing, the servicer did not originate the loans it services but became the servicer by purchasing the "mortgage servicing rights" or by entering into a contract with a "master servicer" to act on its behalf as a "subservicer."  This occurs at various times throughout the life of the mortgage – including when the borrower is delinquent in payments and may need the servicer's assistance to avoid foreclosure.

33.     Under these servicing agreements, the servicer collects the borrower's payments for principal and interest and passes them along to the owner, and is paid a servicing fee based upon the value of the loan portfolio by the loan owners.  In addition to the money made based on the total amount of the loans being serviced, a mortgage servicer collects and keeps ancillary charges and fees assessed to borrowers (such as the Distressed Mortgage Fees).  Thus, every dollar a borrower pays in fees (as opposed to principal and interest) is a dollar of revenue for the servicer.

34.     A mortgage servicer that generates revenue from fees and charges imposed on loans being serviced, rather than from the principle and interest on the loans, creates a perverse incentive for servicers such as Ocwen Servicing to allow a loan to become distressed rather than keeping a loan performing.   The CFPB observed, "servicers have an incentive to look for opportunities to impose fees on borrowers to enhance revenues."   Mortgage Servicing Rules Under the Truth in Lending Act (Regulation Z), 78 FR 10902-01 at *10906.  "These attributes of the servicing market created problems for certain borrowers even prior to the financial crisis…There is evidence that borrowers were subjected to improper fees that servicers had no reasonable basis to impose…" *Id*.

20

at *10906.  As a Member of the Board of Governors of the Federal Reserve System explained, "[w]hile an investor's financial interests are tied more or less directly to the performance of a loan, the interest of a third-party servicer are tied to it only indirectly, at best.  The servicer makes money, to oversimplify it a bit, by maximizing fees earned and minimizing expenses while performing the actions spelled out in its contract with the investor….  The broad grant of delegated authority that servicers enjoy under pooling and servicing agreements (PSAs), combined with an effective lack of choice on the part of consumers, creates an environment ripe for abuse."[31]

35.     For loan servicers like Ocwen Servicing desiring to maximize revenue and profit from servicing loans, the right to charge servicing fees is "ripe for abuse."  Because the money Ocwen Servicing can generate from servicing fees is not linked to money generated from principal and interest, Ocwen Servicing makes more money on defaulting mortgages supposedly requiring many services than on performing loans requiring few services.  In short, Ocwen Servicing is incentivized to grow its revenue and profits by finding ways to charge borrowers additional fees, and distressed borrowers are ripe for exactly that.

36.     Mortgage contracts between borrowers and lenders, which provide for the terms under which mortgage servicers must perform their jobs, generally consist of two documents, a promissory note and mortgage or deed of trust.  These mortgage contracts, including both of their typical documents, are substantially similar for typical borrowers because they must conform to the standard Fannie Mae / Freddie Mac form contracts, and because they are most easily pooled for reinvestment when they are essentially fungible.

---

[31] Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference, November 12, 2010, available at  http://www.federalreserve.gov/newsevents/speech/raskin20101112a.htm  (last visited Jan. 15, 2016).

1

**B.      Ocwen Servicing Operates its Subprime Mortgage Servicing Business to Generate Fees**

2

3          37.      Ocwen Servicing is a mortgage servicer of single-family mortgages (*i.e.*, one to four-

4   family homes), including the mortgages of Plaintiffs and members of the putative class and

5   subclasses defined below.    Ocwen Financial touts Ocwen Servicing as being the fourth largest

6   mortgage servicer in the United States, and services over $400 billion of mortgage loans.  According

7   to the CADBO, as of March 31, 2015, California accounted for 24% of Ocwen's U.S. Portfolio.

8   Ocwen Servicing is one of the nation's largest "subprime" mortgage servicers, managing more than

9   1/4 of all outstanding subprime loans in the United States.  According to Ocwen Financial's October

10  31, 2014 Quarterly Report, Ocwen Servicing then serviced nearly 730,000 subprime loans with an

11  unpaid principal balance of over $123 billion.  Ocwen Servicing is also the largest nonbank servicer

12  in the United States. "Subprime" loans are those offered at a higher interest rate to individuals who

13  do not qualify for traditional "prime" loans.  Such subprime loans are often given by nontraditional

14  lenders to persons with lower credit ratings or fewer assets, who may have greater problems making

15  their mortgage payments.  These are also the borrowers that are the most likely be to be subject to

16  predatory lending practices.    Generally speaking, subprime borrowers are of modest economic

17  means, and are the most vulnerable to falling behind on their mortgage payments, and hence the

18  most likely to need help from their servicer.  From Ocwen Servicing's perspective, this translates to

19  greater opportunities to collect fees and increase revenue and profits from servicing subprime as

20  opposed to prime loans.

21          38.      Thus, the gist of Ocwen Servicing's business is to acquire the servicing rights for

22  mortgage loans that are in default already before Ocwen Servicing acquired them.    As recently

23  reported in the Atlanta Business Chronicle:

24

25

26

27

28

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

Ocwen (NYSE: OCN) runs call centers and other tools to rework or force repayment on mortgages that have gone sour. The idea, [Paul] Koches[32] said, is that it's better to keep a person in their house, paying something, than to kick them out and get nothing at all. Ocwen takes over the distressed loans of other banks and then calls the borrowers to renegotiate.[33]

39.     To put a good face on this, Ocwen Servicing presents itself as committed to helping borrowers whose mortgage loans it services, that it has technology allowing it to lower loan re-default rates, and that it has the ability to keep people from defaulting on loans.  Ocwen Servicing thus spins its business as goodwill using the slogan "Helping Homeowners is What We Do!" rather than what it truly is – selectively profiting directly from borrowers' financial distress.

40.     Under the mortgage servicing rights that Ocwen Servicing acquires, Ocwen Servicing is authorized to assess reasonable and appropriate fees and charges as provided for in the mortgage agreement.  Whether or not they are contractually authorized to assess any or all of the fees at issue in this action, they cannot charge or collect fees that are unlawful, unfair or the product of a self-dealing conspiracy under federal or state laws.

41.     Ocwen Servicing advances the money to pay fees, charges or premiums, and retains the right to recover the amounts advanced from borrowers.  When Ocwen Servicing performs a Distressed Mortgage Service such as a property inspection or BPO, Ocwen Servicing pays Altisource Servicing or another of the Altisource Parent's subsidiaries for the service then adds the cost on to the borrower's bill.  As reported by state and federal regulators and made the subject of consent decrees entered with the Ocwen Entities, described herein, Ocwen Servicing, contrary to its commitment to homeowners, routinely, amongst other things: (i) fails to timely and accurately apply payments made by borrowers; (ii) fails to maintain accurate account statements; (iii) charges

---

[32] Paul Koches is the Executive Vice President and General Counsel of Ocwen Financial Corp.

[33] "Ocwen Financial Spends $306M On Bad Loans", Atlanta Business Chronicle (Nov. 11, 2011) which can be found at:  http://www.bizjournals.com/atlanta/print-edition/2011/11/11/ocwen-financial-spends-306m-on-bad.html?page=all.

23

1  unauthorized inflated fees for Distressed Mortgage Services; (iv) charges fees for authorized but

2  unnecessary Distressed Mortgage Services, such as force-place insurance; (v) provides false and

3  misleading information to borrowers regarding their loans; and (vi) provides false or misleading

4  information to borrowers about their ability to modify their mortgages.[34]

5        42.    Using these unfair and fraudulent practices, Ocwen Servicing has made it its business

6  to maximize revenue by, among other things, assessing improper fees and charges to mortgage

7  loans, and making it difficult for borrowers to modify their existing mortgages to have more

8  favorable terms.  Ocwen Servicing charges borrowers for these needless, unfair, and unlawful

9  charges in order to maximize its revenue and profits from its servicing operations.  However, Ocwen

10  Servicing does not act or profit alone in these practices.

11       **C.    Ocwen Servicing is Part of Defendant Erbey's Larger Scheme to Overcharge**
              **Distressed Borrowers in Conjunction with the Other Defendants**

12

13        43.    Since the Ocwen Enterprise's inception in or about August of 2009 and continuing as

14  of the date of the filing of this Second Amended Complaint, Defendants Erbey, the Ocwen Entities

15  and the Altisource Entities conspired to increase their financial revenue and profits by overcharging

16  homeowners for services including services such as property inspections, broker price opinions

17  ("BPOs"), foreclosure auction services and title examinations.  Ocwen Servicing accomplishes this

18  by using Altisource Servicing and other subsidiaries of the Altisource Parent to procure and/or

19  provide these Distressed Mortgage Services, which is facilitated through the use of mortgage

20  servicing software leased by Ocwen Servicing from Altisource Servicing that Ocwen Financial

21  originally designed to manage homeowners' loan accounts and assess fees.  The undisclosed self-

22  dealing Ocwen Enterprise was formed and operated as described below.

23

24  ───────────────────

25  [34] *See* Complaint filed by the Consumer Finance Protection Bureau and 49 states attorneys general at

26  www.consumerfinance.gov/f/201312_cfpb_complaint_ocwen.pdf, pp. 12-13 (last visited Jan. 15,

27  2016).

28

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

44.     Prior to August 2009, the Altisource Parent was a subsidiary of Ocwen, then called Ocwen Solutions, that created and maintained Ocwen's mortgage servicing software.   Ocwen Solutions' mortgage servicing systems provided technological services throughout the lifecycle of the mortgages serviced by Ocwen Servicing – including triggering the Distressed Mortgage Services and the resulting Distressed Mortgage Fees at issue in this case – and also including collections and customer relationship management.  Ocwen Financial developed these mortgage servicing systems over a period of more than 20 years at a cost of more than $150 million.

45.     On August 10, 2009, Ocwen Financial, under the direction of Erbey and other officers of Ocwen Financial and its subsidiaries, spun off Ocwen Solutions to create a new, purportedly independent company called the Altisource Parent.  Erbey and other of Ocwen's officers took a large controlling share of the newly-formed Altisource Parent and the ability to financially profit from the revenues generated by both Ocwen Financial and its subsidiaries, and the Altisource Parent and its subsidiaries.

46.     When the companies split, Ocwen Financial gave the Altisource Parent control of the mortgage servicing software that, up to that point, was used by Owen Servicing to run its entire mortgage servicing operations.   Given that the software was essential to Ocwen Servicing's business, Ocwen Servicing "leases" the software from the Altisource Parent so that it can continue to service mortgages, essentially creating a cost to Ocwen Servicing that did not exist previously, and a revenue source to Altisource Servicing from which Erbey and other shareholders could financially benefit.   Moreover, Erbey and other officers holding shares in both Ocwen Financial and the Altisource Parent were then able to be paid salaries, bonuses, revenue and profits from both companies for the same mortgage services that had been provided exclusively from Ocwen Servicing and its affiliated companies prior to splitting off the Altisource Parent.  As part of the Altisource Parent's spin-off, Defendant Erbey, Ocwen Financial's Chairman of the Board and largest

25

individual shareholder owning of 13% of Ocwen Financial's common stock, also became the Chairman of the Board for Altisource.[35]

47.     At the time of the Altisource Parent's spin-off from Ocwen Financial, Ocwen Servicing immediately became Altisource Servicing's single largest customer. Ocwen Servicing was and remains contractually obligated to purchase mortgage servicing system services from Altisource Servicing through the year 2020.[36] Also at the time of the spin-off, Mr. Erbey became the largest shareholder of the Altisource Parent, holding 27.1% of common stock.[37]

48.     As the Altisource Parent explains its "Technology Services" mortgage servicing software is comprised of: (i) REALSuite software applications, including REALServicing that provides automated workflows and reporting through the entire life of a mortgage loan; (ii) REALTrans which automates the ordering, tracking and fulfilling of services related to mortgage servicing; (iii) REALRemit which allows service providers to submit invoices for payment

[35] The Altisource Parent was incorporated on November 4, 1999 in Luxembourg as Ocwen Luxembourg S.à r.l.  Altisource Portfolio Solutions S.A..  *See* SEC Form 10-K for the period ended Dec. 31, 2012, available at http://www.sec.gov/Archives/edgar/data/1462418/000110465913009969/a13-2839_110k.htm.  The company was renamed Altisource Portfolio Solutions S.à r.l. on May 12, 2009, and converted into the Altisource Parent on June 5, 2009. *Id.* Prior to August 10, 2009, the Altisource Parent was a wholly-owned subsidiary of Ocwen Financial. *Id.*

[36] The Altisource Parent SEC Form 10-K for the period ended Dec. 31, 2012, available at http://www.sec.gov/Archives/edgar/data/1462418/000110465913009969/a13-2839_110k.htm ("Ocwen, including its wholly owned subsidiary, Ocwen Mortgage Servicing Inc. ('OMS'), are contractually obligated to purchase certain mortgage servicing services and technology services from us under service agreements.  In October 2012, the Ocwen agreement was extended by three years through 2020.  Separately, we signed a similar agreement in October 2012 with OMS effective through 2020.)

[37] Mr. Erbey was the Chairman of the Altisource Parent and several other related companies, including Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd., and held more than $1 billion in stock in Ocwen and Altisource and their affiliated companies.  *See* Consent Order Pursuant to New York Banking Law § 44, at page 8, available at http://www.dfs.ny.gov/about/ea/ea141222.pdf (last visited Jan. 15, 2016).

1  electronically; and (iv) REALDoc that generates correspondence associated with mortgage loan

2  servicing.[38]

3      49.  The Altisource Parent's REALSuite platform manages Ocwen Servicing's mortgage

4  loan servicing automatically based on parameters determined by Ocwen Servicing.  This includes

5  ordering, managing and paying for Distressed Mortgage Services including property inspections,

6  BPOs and appraisals provided by local third-party vendors convenient to the home with a mortgage

7  in default.  Ocwen Servicing also assesses fees for these services through the REALSuite platform.

8      50.  This mortgage servicing software that that Ocwen Financial gave to the Altisource

9  Parent was used by the Ocwen Enterprise to automatically facilitate the ordering, charging, and

10  payment of the Distressed Mortgage Services described throughout this Second Amended

11  Complaint.  Those communications, which included overcharging for Distressed Mortgage Services,

12  were done electronically over the wires to borrowers nationwide.  The communications to borrowers

13  nationwide, such as billing statements, form letters about servicing fees, and the like, were also

14  created by the same mortgage servicing software, and communicated via the mail or wires.  These

15  communications were and are essential to the Ocwen Enterprise's operation because they facilitate

16  the very overcharges at issue in this Second Amended Complaint.  For the same reason, these

17  communications had/have similar purposes, results, victims and methods of commission, and each

18  is/was connected to the Ocwen Enterprise's operation.    These communications occurred

19  continuously since the Ocwen Enterprise's inception (and continue to occur as the Ocwen Enterprise

20  continues to operate) because the Ocwen Enterprise's goal was not to derive inflated revenue from

21  one transaction or several unrelated transactions, but rather to derive inflated revenue from the entire

22  class of Distressed Mortgage Fees alleged throughout this Complaint.  Because Ocwen Servicing

23

24

25  [38] SEC Form 10-for Altisource Portfolio Solutions S.A., for the period ended December 31, 2013,

26  available at http://www.sec.gov/Archives/edgar/data/1462418/000110465913009969/a13-2839_110k.htm (last visited Jan. 15, 2016).

27

28

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

1   services mortgages for millions of homeowners nationwide, these communications were transmitted

2   over the mail and/or wires at least twice and likely millions of times throughout the life of the

3   Ocwen Enterprise.

4       51.   The payments collected from borrowers nationwide for the Distressed Mortgage

5   Services ordered and facilitated by Altisource's Technology Services were passed from Ocwen

6   Servicing to Altisource Servicing, allowing Erbey and the Altisource Entities' other officers to profit

7   from services that had previously been provided by the Ocwen Parent's affiliated companies

8   internally.  Altisource Servicing charges additional fees for these Distressed Mortgage Services that

9   are passed along to borrowers by Ocwen Servicing.  Shifting the costs, revenue and profits from

10  Ocwen Servicing to Altisource for the Distressed Mortgage Services also allowed the Ocwen

11  Enterprise to evade regulatory scrutiny since they were being provided by what was held out, albeit

12  falsely, as an independent third-party company, with charges presumably negotiated at arms-length.

13      52.   In reality, Altisource was anything but an independent company.  Erbey and other

14  officers of the Ocwen Entities maintained a large controlling stake in both the Ocwen Entities and

15  the Altisource Entities by virtue of the amount of stock they owned in the companies, and by virtue

16  of their positions within the companies as directors and/or officers.  Further, to avoid any internal

17  criticism to the obvious undisclosed self-dealing and conflicts of interest between the Ocwen Entities

18  and the Altisource Entities, Erbey placed Ocwen Financial's chief risk officer in a duel role within

19  the Altisource Parent as its chief risk officer to ensure compliance with the Ocwen Enterprise, not

20  the law.

21      53.   By splitting off Ocwen Servicing's internal Distressed Mortgage Service function to

22  Altisource Servicing, the Ocwen Enterprise was able to hide high revenue and profits made from

23  inflated and duplicative Distressed Mortgage Fees.  The Ocwen Enterprise did this by, amongst other

24  things, having the Altisource Entities negotiate lower servicing charges from service providers such

25  as brokers and inspectors with a promise of higher work volume and under the guise of being a third-

26  party that had to charge the ultimate purchaser, Ocwen, a higher amount.  The Ocwen Enterprise

27  also overcharged borrowers for Distressed Mortgage Fees by virtue of its "leasing" the computer

28  software it created and gave to Altisource when it split Altisource into its own company, a cost of

28

1  which would have been added to Distressed Mortgage Fees.  Thus, the costs passed onto Ocwen's

2  borrowers included revenue and profits built in for the Ocwen Entities as well as the Altisource

3  Entities, and Erbey and other officers and directors of the Ocwen Entities earned a salary, bonuses,

4  benefits and increased stock options and value by being on both ends of the deal.  However, because

5  Altisource Servicing is not a mortgage servicer its operations were not subject to the same regulatory

6  oversight as Ocwen Servicing.

7      54.    SEC filings also illustrate a kickback the Altisource Parent provided to Ocwen

8  Financial pursuant to the Ocwen Enterprise.  The Altisource Parent paid Ocwen Financial $38.6

9  million in 2012, $20.0 million in 2013 and $13.5 million in 2014 pursuant to a "Data Access and

10  Services Agreement."[39]   On December 31, 2014, contemporaneous with the December 19, 2014

11  execution of the NYDFS Consent Order, the Altisource Parent notified Ocwen Financial it was

12  canceling the Data Access and Services Agreement effective March 31, 2015.  *Id.*  Altisource did not

13  report a reason for terminating this agreement, nor did it explain any adjustments to its operations

14  resulting from the agreement's termination.  That this payment was a kickback not a *bona fide*

15  payment for services can be reasonably inferred from the fact that the Altisource Parent does not

16  state its business will change as a result of losing access to data and services purportedly worth up to

17  $72.1 million.  This kickback is one manner in which the Ocwen Enterprise operated and shows that

18  both the Ocwen Entities and the Altisource Entities share revenue reaped from the Ocwen

19  Enterprise's conduct, while Mr. Erbey realized gains on both the Ocwen and Altisource ends of the

20  Ocwen Enterprise.

21

22

23

24  _____

25

26  [39] The Altisource Parent's March 2, 2015 SEC Form 10-k, p.61, available at

27  http://www.sec.gov/Archives/edgar/data/1462418/000162828015001367/asps-12312014x10k.htm.

28

29

55.     In its SEC filings, Ocwen Financial conceded the potential conflicts of interest created by the close relationship between Erbey, the Ocwen Entities and the Altisource Entities when it spun off the Altisource Parent in 2009 in its Form 8K filed on July 20, 2009.[40]

> Certain of our executive officers and directors may be subject to conflicts of interest with respect to such agreements and other matters due to their relationships with Altisource.
>
> ……..
>
> William C. Erbey, who will remain our Chief Executive Officer and Chairman of the Board, will become Altisource's non-executive Chairman of the Board as a result of the spin-off.  As a result, he has obligations to us as well as to Altisource and may potentially have conflicts of interest with respect to matters potentially or actually involving or affecting us and Altisource.
>
> ………
>
> Mr. Erbey will own substantial amounts of Altisource common stock and stock options because of his relationships with Altisource.  This ownership could create potential conflicts of interest when our Chairman of the Board is faced with decisions that involve Ocwen, Altisource or any of their respective subsidiaries.
>
> ………
>
> Matters that could give rise to conflicts between us and Altisource include, among other things: ... the quality and pricing of services that Altisource has agreed to provide to us or that we have agreed to provide to Altisource.

56.     The conflicts of interests due to the ongoing relationship between the Ocwen Entities and the Altisource Entities were called out by Benjamin Lawsky, Superintendent of the NYDFS in a public letter to Ocwen dated February 26, 2014.[41]  In that letter, Mr. Lawsky noted that Mr. Erbey was not only the Executive Chairman of Ocwen Financial, but was also the largest shareholder of each of several Altisource companies with business ties to the Ocwen Entities, including Altisource Portfolio Solutions, S.A., Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd.  Moreover, Mr. Lawsky noted that Altisource

---

[40] Exhibit 4, Ocwen Financial's SEC Form 8-K filed July 20, 2009.

[41] *See* February 26, 2014 letter from Benjamin M. Lawsky to Timothy Hayes, General Counsel for Ocwen Financial Corporation attached hereto as Exhibit 5.

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

1   Portfolio Solutions, S.A.'s Chief Risk Officer was also Ocwen Financial's Chief Risk Officer,

2   reported directly to Mr. Erbey in both capacities, and had his salary paid entirely by Ocwen.  The

3   result of the cozy relationship between Ocwen and Altisource, both being controlled by Erbey, was

4   that borrowers were overcharged for Distressed Mortgage Services, including by virtue of extra costs

5   built into all Distressed Mortgage Services charged through Altisource, and by the charging of

6   duplicative Distressed Mortgage Services.

7         57.    Indeed, after investigating the very conflicts of interest inherent in the Ocwen-

8   Altisource corporate relations complained about herein, Ocwen stipulated and agreed with the

9   NYFDS that Ocwen's conduct resulted in borrowers being overcharged for Distressed Mortgage

10  Services, and Erbey agreed to resign as an officer and director from all Ocwen and Altisource-

11  related companies as described below.  However, despite his removal as a director and officer in

12  Ocwen and Altisource companies, Erbey still maintains 16.9% of the common stock in Ocwen, and

13  more than 33% of Altisource's stock.

14        **D.     State and Federal Investigations of the Ocwen Enterprise**

15        58.    Ocwen stipulated with the NYDFS that the Ocwen Enterprise overcharged borrowers

16  for mortgage services.  As part of New York's continued investigation into the Ocwen Enterprise, it

17  was revealed that Ocwen Servicing used an Altisource Parent subsidiary, namely Hubzu, for online

18  auctions of homes of borrowers who were facing foreclosure.[42]  Hubzu charged Ocwen Servicing up

19  to three times the fees it charged non-Ocwen customers, which were passed along to the borrowers

20  facing foreclosure.  Mr. Lawsky noted his concerns about the Ocwen Enterprise's self-dealing, in

21  that it appeared the companies were overcharging struggling borrowers for inflated mortgage

22  servicing-related fees.

23

24  _____

25

26  [42] *See* April 21, 2014 letter from Benjamin M. Lawsky to Timothy Hayes, General Counsel for
    Ocwen Financial Corporation attached hereto as Exhibit 6.

27

28

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

59.     On August 4, 2014, Mr. Lawsky sent another letter raising further concerns about Ocwen Servicing's use of related companies to provide fee-based mortgage servicing, specifically Altisource Servicing.[43]   Mr. Lawsky stated that Ocwen Servicing had funneled as much as $65 million in fees from distressed homeowners to Altisource Servicing "for minimal work."  Ocwen Servicing's use of related companies to provide fee-based services also raised concerns regarding whether the services were priced fairly based on arms-length negotiations, or whether they were simply unlawful up-charges.

60.     On October 21, 2014, Mr. Lawsky sent yet another letter to Ocwen Servicing regarding its mortgage servicing practices related to the company's back-dating of critical letters sent to mortgage borrowers in default.[44]   Mr. Lawsky cited several examples of Ocwen Servicing telling mortgage borrowers that they were in danger of foreclosure if they did not respond by a date prior to the letter actually being sent to the borrower.  Other time-sensitive, backdated letters notified financially stressed borrowers that their request for loan modifications were denied, and that they had to appeal such denial by an imminent and unrealistic date or they would not be able to modify their mortgage loans.  Ocwen Financial's CEO, Ron Faris, wrote an open letter apologizing for the misdating of borrower letters, admitting that in some instances, "there was a significant gap between the date on the face of the letter and the date it was actually generated."[45]

61.     NYDFS and the Ocwen Entities entered into a Consent Order dated December 19, 2014.[46]   Pursuant to the Consent Order, the Ocwen Entities stipulated and agreed they engaged in

---

[43] *See* August 4, 2014 letter from Benjamin M. Lawsky to Timothy Hayes, General Counsel for Ocwen Financial Corporation attached hereto as Exhibit 7.

[44] *See* October 21, 2014 letter from Benjamin M. Lawsky to Timothy Hayes, General Counsel for Ocwen Financial Corporation attached hereto as Exhibit 8.

[45] See October 24, 2014 Open Letter to Homeowners Concerning Letter Dating Issues at http://shareholders.ocwen.com/releasedetail.cfm?ReleaseID=878151 (last visited Jan. 15, 2016).

[46] The Consent Order is attached hereto as Exhibit 9.

certain wrongdoing, including amongst other things the wrongdoing described above. Unlike many settlements of legal claims, the Ocwen Entities neither denied nor contested that they engaged in this wrongdoing described in the Consent Order.

62. The Ocwen Entities' stipulation to wrongdoing in the Consent Order supports Plaintiffs' allegations that Defendants engaged in the practices described herein. With respect to the inflated Distressed Mortgage Fees, the Ocwen Entities agreed that through Ocwen's relationship with the Altisource Parent, the Ocwen Entities overcharged borrowers for fee-based services. Consent Order ¶ 22. With respect to duplicative Distressed Mortgage Services, the Ocwen Entities agreed, amongst other things, that their computer systems contained duplicate process codes initiating the same servicing functions. Consent Order ¶ 17.

63. Pursuant to the Consent Order, the Ocwen Entities committed to report to NYDFS on a semi-annual basis all fees charged to New York borrowers by the Ocwen Enterprise. Consent Order ¶ 53. The purpose of these reports is to evaluate whether the fees "are commensurate with market rates" or "reasonably related to actual expenses incurred." *Id*. The Ocwen Entities also agreed that the "[m]aximum rates for services that are established by government-sponsored enterprises or other investors may not be presumed to be the market rate and may not substitute for actual assessment of market rates." *Id*.

64. While the Ocwen Entities also committed to provide some cash relief to New York borrowers exclusively as part of the Consent Order, the New York Consent Order did not provide any direct cash relief for the charges and fees assessed from the Ocwen Entities' specific wrongdoing alleged throughout this Complaint. Consent Order ¶¶ 24-25. Furthermore, the Consent Order expressly provides this relief does not limit borrowers' rights to hold the Ocwen Entities accountable for their unlawful conduct. *Id*. at ¶¶ 64-65.

65. It was not until Mr. Lawsky, Superintendent of the NYDFS, sent his letter dated February 26, 2014 that the Ocwen Enterprise's undisclosed self-dealing and conspiratorial conduct described herein was first (and only partially) revealed publicly.

66. The Consent Order also included Mr. Erbey's agreement that, by January 16, 2015, Mr. Erbey would resign and have no directorial, management, oversight, consulting, or any other

33

role at Ocwen Financial or any related party, or at any of Ocwen Financial's or the related parties' affiliates or subsidiaries, and to resign as Chairman of the Board of Directors of each of four related Altisource Parent companies: Altisource Portfolio Solutions S.A., Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions, Ltd. According to Ocwen's 8-K filed with the SEC on January 20, 2015, Erbey "retired" from Ocwen's Board and as an officer of the company on January 16, 2015.[47]

67.    Mr. Erbey's retirement as chairman of Ocwen Financial did not place Ocwen Financial in new hands or herald the end of the Ocwen Enterprise.  The Ocwen Enterprise simply replaced Mr. Erbey with his longtime business partner Barry Wish. [48]   Messrs. Wish and Erbey co-founded Ocwen Financial after working together at Mr. Wish's prior company Oxford Financial.[49]

68.    The NYDFS is not the only regulator who has taken notice of Ocwen Servicing's improper use of the affiliated Altisource Entities.  On December 19, 2013, the CFPB and the attorneys general for 49 states filed a complaint against the Ocwen Entities for their mortgage servicing practices.[50]   Among other things, the CFPB and attorneys general alleged that Ocwen Servicing unlawfully and unfairly charged unauthorized fees for Distressed Mortgage Services, failed to timely or accurately apply payments made by borrowers, and provided false and misleading

---

[47] *See* Ocwen Financial SEC Form 8-K filed January 16, 2015 available at http://google.brand.edgar-online.com/displayfilinginfo.aspx?FilingID=10415213-1084-12051&type=sect&TabIndex=2&companyid=10413&ppu=%252fdefault.aspx%253fsym%253docn

[48] Sterngold, James and Zibel, Alan, *Erbey's Exit Ends Heady Era at Ocwen*, Wall Street Journal. December 22, 2014, available at http://www.wsj.com/articles/new-york-financial-regulator-announces-settlement-with-ocwen-1419257065 (last visited Jan. 15, 2016).

[49] Howley, Kathleen M. and Perlberg, Healther, *Billionaire Erbey Fails to Halt Ocwen Slide on Probe: Mortgages*, Bloomberg Business, Feb. 27, 2014, available at http://www.bloomberg.com/news/articles/2014-02-27/billionaire-erbey-fails-to-halt-ocwen-slide-on-probe-mortgages (last visited Jan. 15, 2016).

[50] Available at www.consumerfinance.gov/f/201312_cfpb_complaint_ocwen.pdf (last visited Jan. 15, 2016).

34

1    information to borrowers concerning the status of loan modification requests and foreclosure efforts.

2    The Ocwen Enterprise's participants and their conspiratorial conduct described herein were not

3    mentioned or otherwise revealed in the CFPB's complaint.

4         69.    The result of the CFPB action was a federal Consent Judgment affecting 49 states

5    entered on February 26, 2014 which required Ocwen to provide $2 billion in loan modifications to

6    struggling borrowers, but which did not provide any direct cash relief to borrowers for the charges

7    and fees assessed from Ocwen's improper Distressed Mortgage Services.[51]   Additionally, the CFPB

8    Consent Judgment prohibited the Ocwen Entities from charging borrowers for duplicative services,

9    prohibited the Ocwen Entities from up-charging borrowers more than the cost for Distressed

10   Mortgage Services, prohibited charging more than market rate for Distressed Mortgage Services

11   procured from a third-party, and required the Ocwen Entities to fully disclose the nature of

12   Distressed Mortgage Fees.[52]   Again, Altisource, Erbey and their conspiratorial conduct described

13   herein were not mentioned or otherwise revealed in the Consent Judgment.

14        70.    The California Department of Business Oversight also investigated and pursued

15   Ocwen.   In early 2013, CADBO commenced a regulatory examination of Ocwen to evaluate its

16   compliance with California law, specifically the California Residential Mortgage Lending Act and

17   California's Homeowner Bill of Rights.   As part of this examination, CADBO made repeated

18   requests for information, including requests for loan files.   Despite multiple requests, an order from

19   the commissioner, and an order from an administrative law judge, Ocwen repeatedly refused to

20   provide the necessary information.   California thus had not choice put to commence a proceeding to

21   suspend Ocwen's business license, thereby prohibiting them from servicing mortgages in California.

22

23

24

25   [51] *See* Exhibit 10 attached hereto ("CFPB Consent Judgment").

26   [52] CFPB Consent Judgment at Exhibit A thereto, p. A-40 – 41.

27

28

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

71.     In January 2015, Ocwen and CADBO entered into a Consent Order.  Pursuant to this order, Ocwen agreed:  (1) not to acquire mortgage servicing rights for loans secured by properties in California without CADBO's approval; (2) to pay a $2.5 million civil penalty; and (3) to pay a third party auditor to conduct a compliance and servicing review of Ocwen.  As a department spokesman explained, "[O]cwen failed to comply with requests for information.  They failed to comply with a subpoena for information.  They violated a lawful order from the commissioner.  And they failed to comply with an order from an administrative judge.  We can't countenance that kind of behavior."[53]  On June 9, 2015, the CADBO announced that fidelity Information Services would act as an independent, third-party auditor to review the California mortgage servicing operations of Ocwen Servicing.

72.     As further fallout from the regulators' scrutiny over Ocwen Financial, Ocwen Financial's current CEO, Ronald Faris, announced the company would withdraw from the business of servicing mortgages backed by the U.S. government, and intended to sell such servicing rights for approximately $1.7 billion.  Ocwen Servicing intends to continue to service non-government backed mortgages going forward.

73.     Despite Erbey's involuntary "retirement" at the hands of the NYDFS the undisclosed self-dealing Ocwen Enterprise he set in motion continues to operate.  Moreover, Erbey still retains a degree of control over the Ocwen Enterprise, including by virtue of remaining the largest individual shareholder of both the Altisource Parent and Altisource Servicing.   Thus, despite Erbey's "retirement," the Ocwen Enterprise's conduct is ongoing and continues to harm borrowers.  As a result of the unlawful Ocwen Enterprise, many thousands of borrowers were cheated out of millions of dollars, none of which has yet been repaid or otherwise compensated.

---

[53]     *See* E. Scott Reckard, *California Seeking to Suspend Ocwen Financial's Mortgage License*, L.A. Times, January 12, 2015.

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

1

2

     **E.**     **The Ocwen Enterprise Overcharges Plaintiffs and Other Borrowers for Distressed Mortgage Fees**

3

4

5

6

7

8

9

10

     74.     When a borrower misses a payment and goes into "default," Ocwen Servicing assesses various fees for Distressed Mortgage Services, and charges them to the borrower.  These fees are the Distressed Mortgage Fees discussed throughout this Second Amended Complaint.  As detailed herein, the Distressed Mortgage Services for which Ocwen Servicing overcharges borrowers include: property inspections, broker price opinions ("BPOs;" sometimes identified by Ocwen Servicing as "property valuation expenses"), foreclosure auctions, and title examinations.  Plaintiffs may learn of other Distressed Mortgage Services for which Ocwen Servicing overcharged borrowers fees as part of the Ocwen Enterprise, and reserve their right to amend their complaint accordingly.

11

12

13

     75.     Ocwen Servicing charged Plaintiffs and other Class Members nationwide inflated and duplicative Distressed Mortgage Fees, thereby enriching the entire Ocwen Enterprise, in at least the three ways outlined below.

14

15

     **1.**     **Ocwen Servicing Overcharges Borrowers for Property Inspections by Charging Fees despite Advising Borrowers that Property Inspections Carried "No Charge"**

16

17

18

19

20

21

22

     76.     The first and most direct way in which Ocwen Servicing overcharged Plaintiffs and Class Members Distressed Mortgage Fees was by charging for property inspections after advising Plaintiffs and Class Members that Ocwen Servicing had "no charge" for property inspections. Upon acquiring the servicing rights to Plaintiffs' and other Class Members' loans, Ocwen Servicing sent them form letters signed by Mr. Erbey that included a standard form "Schedule of Standard Servicing Fees" identifying the charges for different Distressed Mortgage Services, including

23

24

25

26

27

28

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

property inspections.[54]   Ocwen Servicing's standard form "Schedule of Standard Servicing Fees" states that property inspections carry "no charge."

77.    Ocwen Servicing misrepresented to Plaintiffs and Class Members that property inspections carried "no charge," because soon after telling Plaintiffs and other Class Members in its form letters that they would not charge for property inspections, Ocwen Servicing imposed charges for property inspections on Plaintiffs and other Class Members.[55]   Plaintiffs and Class Members' property inspections were provided by Altisource Servicing, and the charges for property inspections paid for by Plaintiffs and Class Members were passed through Ocwen Servicing to Altisource Servicing.

78.    Despite informing Plaintiffs and Class members it would not charge for property inspections, Ocwen Servicing actually charged Plaintiffs and Class Members for property inspections done while Plaintiffs' and Class Members' loans were in default.   Ocwen Servicing never advised Plaintiffs or Class Members of any change to its "no charge" policy for property inspections as reflected in the "Schedule of Standard Servicing Fees" it sent them.   Rather, Ocwen Servicing just began sending Plaintiffs and Class Members monthly billing statements with charges for property inspections.   For example, like the other Class Members, after being sent the notice letter from Mr. Erbey on February 7, 2013 with the "Schedule of Standard Servicing Fees" stating

---

[54] *See* Plaintiffs' February 7, 2013 Notice of Servicing Transfer and Welcome to Ocwen Loan Servicing, LLC, attached hereto as Exhibit 3, at p. 4 ("Schedule of Standard Servicing Fees for California").

[55] Ocwen Servicing's decision to provide borrowers a statement it would not charge for property inspections is not a gratuity.   Ocwen Servicing likely realizes significant administrative cost savings from doing so, because certain mortgages are subject to specific Fannie Mae inspection guidelines pursuant to which Fannie Mae pays for the inspection.   *See* https://www.fanniemae.com/content/guide/servicing/d2/2/11.html (setting forth Fannie Mae inspection requirements and reimbursement procedure).   By representing it would not charge for inspections, Ocwen Servicing saves the administrative costs of identifying the non-Fannie-Mae loans and only charging those borrowers for property inspections.

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

property inspections we "no charge," Plaintiffs were sent a monthly billing statement showing that on August 26, 2013 Ocwen Servicing charged the Plaintiffs a $10.50 "Property Inspection Fee."[56] Another monthly billing statement Plaintiffs were sent showed that on June 27, 2014 Ocwen Servicing charged Plaintiffs for an additional eight separate property inspections procured through Altisource Servicing or through the Altisource Parent's software, six costing $10.50, and two costing $15.00.[57]   Plaintiffs were never informed that Ocwen Servicing (or anyone acting on its behalf) would be performing an inspection or any other valuation of their home, and nobody entered their home for the purpose of performing an inspection or another other valuation service on behalf of Ocwen Servicing. Ocwen Servicing charged Plaintiffs these numerous additional "Property Inspection Fees" without ever notifying Plaintiffs that it would begin charging for property inspections.

79.     Similarly, Ocwen Servicing charged other Class Members nationwide for property inspections after having told them that there were be no charge for property inspections.  At the minimum, Ocwen Servicing should have informed Plaintiffs and Class members that it would begin charging for property inspections before beginning to charge Plaintiffs and Class Members for said property inspection.  Yet, Ocwen Servicing never notified Plaintiffs or Class Members that Ocwen Servicing would begin charging for property inspections.

80.     The Property inspection fees charged to Plaintiffs and Class Members by Ocwen Financial were for services procured or performed by Altisource Servicing, and any property inspection fees collected from Plaintiffs and Class Members by Ocwen Servicing were paid to or split with Altisource Servicing.

---

[56] *See* Account Statement for Victor P. Giotta and Loralee Giotta dated September 5, 2013 attached hereto as Exhibit 11.

[57] *See* Mortgage Account Statement for Victor P. Giotta and Loralee Giotta dated June 30, 2014 attached hereto as Exhibit 12.

39

2.     **Ocwen Servicing Overcharges Borrowers for Distressed Mortgage Services That Are Significantly Above Cost and Above Market Rate and Fails to Disclose the Up-charges in Violation of its Express Duties**

81.     Ocwen Servicing is under express duties arising under the CFPB Consent Judgment and the Dodd-Frank Wall Street Reform and Consumer Protection Act ("DFA") (12 U.S.C. §§ 5301, *et seq*.), not to up-charge or to charge more than market rate for Distressed Mortgage Fees.  Despite these express duties, Ocwen Servicing charges borrowers, including Plaintiffs and Class Members in California and nationwide, fees for Distressed Mortgage Services that are significantly up-charged above cost and above the prevailing market rate for at least the following Distressed Mortgage Services: BPOs, foreclosure auctions, and title services in connection with short sales.

82.     The Ocwen Entities and Erbey, through the self-dealing conspiracy described herein, created the Ocwen Enterprise for the purpose of up-charging borrowers for Distressed Mortgage Services for their own financial gain.  In creating the Ocwen Enterprise, Erbey and other joint executives and directors of the Ocwen Entities and the Altisource Entities controlled both ends of ordering and procuring Distressed Mortgage Services which should have been negotiated in arms-length transactions.  The Enterprise's self-dealing enabled defendants to up-charge from the true costs of the Distressed Mortgage Services which was prohibited, and they up-charged so much that the costs to borrowers exceeded the market rate for Distressed Mortgage Services.

83.     On December 13, 2013, the CFPB, attorneys general for 49 states, Ocwen Financial and Ocwen Servicing executed the CFPB Consent Judgment attached hereto as Exhibit 10 which imposed certain duties upon the Ocwen Entities.  Amongst the Ocwen Entities' duties, the CFPB Consent Judgement specifically restricts the fees the Ocwen Entities ay charge borrowers.  CFPB Consent Judgment at Exhibit E, §VI[58].  In particular, the CFPB Consent Judgment requires: (1) the Ocwen Entities' Distressed Mortgage Fees "shall be bona fide, reasonable in amount and disclosed in detail to the borrower;" (2) the Ocwen Entities must maintain and make available to borrowers a

[58] Exhibit 10, CFPB Consent Judgment Exhibit A thereto, p. A-40 – 41.

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

plain language explanation of the Distressed Mortgage Fees and how they are calculated; (3) the Ocwen Entities may only collect Distressed Mortgage Fees if they are reasonable and only after clear and conspicuous disclosure of the fee is made available to the borrower; (4) the Ocwen Entities "shall not impose unnecessary or duplicative property inspection, property preservation or valuation fees on the borrower;" (5) *the Ocwen Entities may only charge market rate for Distressed Mortgage Services procured from third parties*; (6) *the Ocwen Entities may not up-charge for Distressed Mortgage Services.*

84.     In addition to the specific duties imposed by the CFPB Consent Judgment, the Ocwen Entities had a duty under the DFA not to charge more than its costs for Distressed Mortgage Services.  As a result of the financial crisis that resulted, in part, from subprime lending practices, Congress created the CFPB, authorized by DFA, for the purpose of, amongst other things, overseeing mortgage-servicing operations.  The CFPB is responsible for promoting fairness and transparency in mortgages and other financial products and services.

85.     As part of this mandate, the CFPB has authority to enforce the federal consumer protection laws, under which Defendants' conduct is prohibited, and may declare practices to be unlawful because it is "unfair" and "abusive" if certain circumstances are met. *See* 12 U.S.C. § 5531(c) (unfairness), (d) (abusive). *See also* 12 U.S.C. 5536 (prohibiting unfair and abusive acts). An "unfair" practice under the DFA is one where "the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers" and "such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c). An "abusive" practice is one where the conduct, among other things, "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service" or "takes unreasonable advantage of" of a consumer's "lack of understanding . . . of the material risks, costs, or conditions of the product or service" or "the inability of the consumer to protect" his or her interests "in selecting or using a consumer financial product or service." *Id.* § 5331(d).

86.     Similarly, the CFPB published regulatory guidance for the purpose of identifying and eliminating "risks to consumers," such as "potentially unfair, deceptive, or abusive acts or practices

41

(UDAAPs) with respect to servicers' interactions with consumers."[59] The CFPB's examination guidelines prohibit the following conduct:

- An act or practice is unfair when:

    (1) it causes or is likely to cause substantial injury to consumers;

    (2) the injury is not reasonably avoidable by consumers; and

    (3) the injury is not outweighed by countervailing benefits to consumers or to competition.

- An abusive act or practice:

    (1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service or

    (2) takes unreasonable advantage of –

    ▪ a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

    ▪ the inability of the consumer to protect its interests in selecting or using a consumer financial product or service; or

    ▪ the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.[60]

87.     These provisions of the DFA became effective July 21, 2011.  The practice of up-charging for Distressed Mortgage Services is unfair and abusive under the DFA because Plaintiffs and the Class have no choice in whether or who performs the Distressed Mortgage Services that Ocwen Servicing procures though the Altisource Entities, and the excessive charges are imposed upon them by Defendants without any disclosure of what the Distressed Mortgage Services actually cost.

---

[59] CFPB Examination Procedures—Mortgage Servicing (January 2014), at 3, *available at* http://files.consumerfinance.gov/f/201401_cfpb_mortgage-servicing-exam-procedures.pdf.

[60] *Id.* at 3-4.

1    88.    Moreover, Ocwen Servicing could not, through the guise of a self-dealing conspiracy,

2    get around the prohibition from charging more than costs by spinning off Altisource, a sham entity,

3    to effectuate the up-charge while concealing it from borrowers and regulators.  As Ocwen Servicing

4    cannot charge more than its costs directly, it cannot do so through the use of the Ocwen Enterprise.

5    89.    Even if Ocwen Servicing could charge more than its own costs for Distressed

6    Mortgage Service through the use of an actually independent third-party, it could not charge

7    borrowers more than the market rate for such services under the CFPB Consent Judgment, and under

8    the DFA.  The CFPB Consent Judgment specifically provided that the Ocwen Entities could only

9    charge market rate for Distressed Mortgage Services procured from third parties, and likewise the

10   DFA prohibits charges that are not *bona fide*, which would include any above-market rate charges.

11   90.    As the CFPB explained, "[t]he Bureau believes that it is a typical servicer duty, both

12   to the borrower and to the servicer's principal, to ensure that the servicer has a reasonable basis to

13   impose a charge on a borrower."  Mortgage Servicing Rules Under the Real Estate Settlement

14   Procedures Act (Regulation X), 78 FR 10696-01, at *10741.  Thus, "servicers should not impose

15   fees on borrowers that are not bona fide—that is, fees that a servicer does not have a reasonable

16   basis to impose upon a borrower."  *Id*.  "Servicers that operate in good faith in the normal course of

17   business refrain from imposing charges on borrowers that the servicer does not have a reasonable

18   basis to impose and correct errors relating to those fees when they arise."  *Id*.  Moreover, CFPB

19   regulations and policies require that borrowers be entitled to know whether their mortgage servicer

20   lacks a reasonable basis to impose the servicing fees for which they are charged (12 C.F.R. §

21   1024.35(b)(5)), that borrowers have an accounting of servicing fees imposed (*see* 78 FR 10902-01,

22   at 10967), and that mortgage statements identify fees and charges (12 C.F.R. § 1026.41(d)(2)(ii)).

23   91.    Despite these clear and express duties that Ocwen Servicing not up-charge borrowers

24   for Distressed Mortgage Services, or to charge more than market rate for services procured from an

25   independent third-party, Defendants self-dealing conspiracy allowed Ocwen Servicing to up-charge

26   more than the actual costs for Distressed Mortgage Services, and charging more than the prevailing

27   market rate for the same services.

28

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

92.    The costs for Distressed Mortgage Services is lower for a volume purchaser such as Ocwen Servicing than for an individual borrower.  For example, the cost of a BPO is normally between $40 and $50 as a one-time cost.  A mortgage servicer that orders more than 100,000 BPOs annually nationwide reduces BPO costs to between $20 and $30 given the high volume.  Critically, many brokers provide BPOs to mortgage servicers at no cost whatsoever in exchange for being the listing broker on the property if it is later listed for sale as part of a foreclosure.

93.    Given this type of volume discount, large national mortgage servicers the size of Ocwen Servicing routinely charge borrowers between $60 and $90 for BPOs, establishing the market rate, and Fannie Mae servicing guidelines caps the charge for BPOs provided for Fannie Mae at $80.

94.    Despite not being permitted to up-charge for BPOs, Plaintiffs and Class Members in California and nationwide were charged $100 or more for BPOs.  Not only is this an up-charge well above the $0 to $40 charge for such services it is significantly higher than the high-end of the market rate for BPOs for a mortgage servicer the size of Ocwen Servicing.

95.    Altisource Servicing, which charges Ocwen Servicing for BPOs provided to Plaintiffs and Class Members, could negotiate discounted rates for BPOs and other Distressed Mortgage Services.  According to Ocwen Financials 2014 SEC Form 10-k, Ocwen Servicing serviced 221,763 distressed loans in 2014, 308,468 distressed loans in 2013, and 204,325 distressed loans in 2012.[61] This is well over the 100,000 loans nationwide for which a distressed mortgage service provider would give a discounted rate if negotiated in an arms-length transaction.  Since Ocwen Servicing services hundreds of thousands of distressed loans, the market rate for an arms-length participant in Ocwen Servicing's position should be at the lower end of the market range.

---

[61] Ocwen Financial 2014 SEC Form 10-k at 52, available at
http://www.sec.gov/Archives/edgar/data/873860/000087386015000004/a2014123110k.htm.

96.     Additionally, Ocwen Servicing could negotiate an even greater discounted rate for Distressed Mortgage Services such as BPOs from Altisource Servicing.  Ocwen Servicing is far-and-away Altisource Servicing's single-largest customer, and represents the majority of the Altisource Parent's revenue due to the Ocwen Entities' and the Altisource Entities' relationship described in Paragraphs 2-4 herein.  Given its size and bargaining power, in addition to Altisource Servicing's reliance on Ocwen Servicing's business, Ocwen Servicing could negotiate an even larger volume discount for Distressed Mortgage Services from Altisource Servicing than it could from another service provider that was not dependent on Ocwen Servicing.

97.     However, none of the Ocwen Enterprise had the incentive to negotiate for low rates for Distressed Mortgage Services which, along with Defendants' up-charges, were being passed along to borrowers.  The Ocwen Enterprise's self-dealing, conspiratorial relationship allowed the Ocwen Entities on one end of the transactions to benefit from any money made by the Altisource Entities on the other end of the transactions.  The Altisource Parent paid a kickback to Ocwen Financial, while Erbey and other joint officers and directors of the Ocwen Entities and the Altisource Entities profited from both ends of what should have been arms-length transactions.

98.     Defendants' unlawful up-charges were not isolated to BPOs.  The Ocwen Entities stipulated in the NYDFS Consent Order that an Altisource Parent subsidiary charged the Ocwen Entities more for foreclosure auctions than it charged non-Ocwen customers, and that these charges were then passed on to borrowers.[62]   The NYDFS Consent Order also provides that the Ocwen Entities overpaid an Altisource Parent subsidiary for real estate agency services in connection with short sales, paying this subsidiary the normal rate despite the subsidiary failing to use local agents who could perform local work, and passed these charges on to borrowers.[63]  Also, Ocwen Servicing,

---

[62] NYDFS Consent Order, ¶ 22.

[63] *Id*.

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

but not the other Defendants here including Altisource Servicing and Erbey who received and retained much of Defendants' ill-gotten gains from overcharging borrowers for Distressed Mortgage Services, have been sued in another action alleging Ocwen Servicing charged several times market rate for BPOs and title examination fees. *See Weiner v. Ocwen Fin. Corp.*, No. 2:14-CV-02597-MCE, 2015 WL 4599427, at *1 (E.D. Cal. July 29, 2015) (alleging BPO charges of $109 and $110, and title examination fee of $829, all well in excess of the prevailing market rates for such services).

99.   In addition to the fees identified above, Plaintiffs and Class Members in California and nationwide were up-charged for Distressed Mortgage Fees for Distressed Mortgage Services procured by Ocwen Servicing through Altisource Servicing or through the use of the Altisource Parent's software as illustrated by Plaintiffs' and Class Members standard-form monthly billing statements.

100.   These up-charged fees for Distressed Mortgage Services, assessed and collected by Ocwen Servicing and passed along to Altisource Servicing, allowed the Altisource Entities to pay the Ocwen Entities a kickback pursuant to the "Data Access and Services Agreement," effectively reducing Ocwen Servicing's costs for the inflated, above-market rate Distressed Mortgage Services charged. *See supra*, ¶ 54 (describing kickback).

101.   Plaintiffs and Class Members are entitled to the return fees paid for Distressed Mortgage Services above the actual costs for said services because Ocwen Servicing was prohibited from up-charging for Distressed Mortgage Services. Even if the Distressed Mortgage Services were procured through a third party which, due to the Ocwen Enterprise and the self-dealing conspiracy does not include Altisource Servicing or other subsidiaries of the Altisource Parent, Plaintiffs and Class Members are at a minimum entitled to a return of any fees paid for Distressed Mortgage Services charged to them above the market rate for such services.

102.   Moreover, given that Ocwen Servicing breached its express duties by up-charging for Distressed Mortgage Services such as BPOs, auction fees and title examination fees, Ocwen Servicing had the express duty to disclose that its Distressed Mortgage Services were being charged above cost and at above-market rates stemming from the CFPB Consent Judgment and common law.

46

103.    The CFPB Consent Judgment required, amongst other things, that the Ocwen Entities make available to borrowers a plain language explanation of the Distressed Mortgage Fees and how they are calculated, and directed that the Ocwen Entities may only collect Distressed Mortgage Fees if they are not up-charged or more than market rate and only after clear and conspicuous disclosure of the fee is made available to the borrower.[64]

104.    The CFPB's regulations also impose a duty on mortgage servicers to provide borrowers with a billing statement that accurately identifies servicing charges.  *See* 12 C.F.R. § 1026.41(d)(2)(ii) (requiring that borrowers' monthly billing statement identify fees or charges imposed since the previous statement).  The CFPB noted that servicers must accurately identify fees on borrowers' statements because "it is essential for the consumer to have an accounting of any fee that is imposed."  Mortgage Servicing Rules Under the Truth in Lending Act (Regulation Z), 78 FR 10902-01, at *10967.

105.    Further, Sections 550 and 551 of the Restatement of Torts imposes a general duty on Ocwen to disclose the true nature of its costs for Distressed Mortgage Services, including the fact the fees are up-charged and above market rate.

106.    Restatement (Second) of Torts § 550 (1977) creates a duty to disclose that Ocwen Servicing's Distressed Mortgage Fees were up-charged and above market rate due to its concealment of this fact from Plaintiffs and Class Members in California and Nationwide.  Section 550 provides: One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering.

---

[64] Exhibit 10, CFPB Consent Judgment at p. 106, Exhibit E §§VI.A.1, VI.B.1, VI.B.2, and VI.C.

47

107.     Ocwen Servicing had an additional duty to disclose based upon the Restatement (Second) of Torts § 551 (1977), which has been cited with approval and relied upon by California courts.  Section 551 provides a duty to disclose arises as a matter of tort law based on a relationship such as a business transaction

> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
>
> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
>
>> (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
>> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
>> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
>> (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
>> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts § 551 (1977).

108.     Instead of disclosing that the Distressed Mortgage Fees were up-charged and above market rate, Ocwen Servicing simply identified the fees on borrowers' billing statements, suggesting the fees are legitimate, *bona fide* charges generated from arms-length transactions with the service providers in compliance with the law.  Ocwen breached its duty to disclose that its Distressed Mortgage Services were up-charged above the actual costs for the Distressed Mortgage Services and that the fees were charged to borrowers at above-market rate, concealing these facts by the way it routinely presented the fees on form billing statements.  Presenting the Distressed Mortgage Fees as *bona fide* charges amounts to concealment because, in the aggregate, they operated to prevent borrowers from acquiring material information about the true nature of the charges since its portrayal of the charges as *bona fide* gave no obvious reason for borrowers to suspect any impropriety in the charges.

48

1      109.    Additionally, Ocwen Servicing's letters, notices and statements to Plaintiffs and Class

2  Members with mortgages serviced by Ocwen Servicing portrayed that Ocwen Servicing is permitted

3  to charge fees for certain expenses, and that such charges are lawful.[65]  Neither Ocwen Servicing,

4  nor any other member of the Ocwen Enterprise, disclosed that the Altisource Entities were not

5  disinterested third-parties, or that the charges for Distressed Mortgage Services were not negotiated

6  at arms-length.  Nor did Plaintiffs or other Class Members have reason to suspect that they were

7  being up-charged and charged more than market rate for fees for services provided by a non-

8  disinterested third-party, and that the charges assessed were not negotiated at arms-length.

9      110.    When Ocwen Servicing first acquired the servicing right to Plaintiffs' and Class

10  Members' mortgages in California and nationwide, it provided them with a "Welcome to Ocwen

11  Loan Servicing, LLC" letter describing the legal basis for their acquisition of the servicing rights of

12  their loans, and a schedule of the types of fees (and their costs) for certain services, including some

13  Distressed Mortgage Services.[66]  This statement and others suggests to borrowers that the services

14  and any associated fees charged by Ocwen Servicing are and would be lawful.

15      111.    Had Ocwen Servicing disclosed to borrowers that its Distressed Mortgage Fees were

16  going to be more than the costs for such services, and even more than market rate for such services,

17  borrowers could have taken measures to avoid paying Ocwen Servicing the fees.  For instance,

18  borrowers cognizant they would pay inflated rates for Distressed Mortgage Services from Ocwen

19  Servicing might re-allocate their resources to avoid making a late payment and thereby avoid default

20  in the first instance.  Alternatively, borrowers already in default could emphasize becoming current

21  on their loans to avoid being charged these excessive fees.  Borrowers might also seek to refinance

22  their mortgage with a lender utilizing a non-Ocwen servicer that would not charge more than the

---

[65] *See, e.g.*, Exhibit 13, May 30, 2014 Ocwen Payment History and Fee Explanation.

[66] *See* Exhibit 3.

49

market rate for Distressed Mortgage Services, or, borrowers could avail themselves of recent CFPB mortgage servicing rules permitting borrowers to obtain documents supporting servicing fee charges if the borrower has reason to believe that "the servicer lacks a reasonable basis to impose [a fee or charge]." *See* 12 C.F.R. § 1024.35(b)(5).  Finally, borrowers could report Ocwen Servicing's unfair conduct to state and federal regulators such as the CFPB or contest the fees.

112.    To prevent such an inquiry, Ocwen Servicing did not disclose the true cost and nature of its Distressed Mortgage Fees in violation of its duties to disclose the information.

113.    On September 4, 2013, Ocwen Servicing charged Plaintiffs' loan account a $100.00 "Property Valuation Expense."[67]  Despite the fact that Plaintiffs made monthly loan payments following the imposition of this charge to their loan account, Ocwen Servicing did not take the $100 for this charge until June 27, 2014, when it applied $6.60 of Plaintiffs' payment to pay part of this charge, and on August 29, 2014, when it applied the balance of $93.40 to pay the remainder of this charge.[68]  Ocwen Servicing never defines what a "Property Valuation Expense" is.  However, this appears to be another name for a BPO since it is similarly priced and other statements identify a "Property Valuation Fee – BPO,"[69]  This Distressed Mortgage Service was procured through Altisource Servicing and/or through the use of the Altisource Parent's software.

114.    Subsequently, Ocwen Servicing charged Plaintiffs another BPO termed a "Property Valuation Expense" that was performed on December 4, 2014.[70]

---

[67] *See* Account Statement for Victor P. Giotta and Loralee Giotta dated September 5, 2013 attached hereto as Exhibit 11.

[68] *See* Exhibit 14, Giotta Consolidated Payment History, at 4.

[69] *See* Account Statement for Victor P. Giotta and Loralee Giotta dated August 30, 2014, attached hereto as Exhibit 15, at p. 8.

[70] *See* Mortgage Account Statement for Victor P. Giotta and Loralee Giotta dated December 16, 2014 attached hereto as Exhibit 16.

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

1

          3.       **Ocwen Servicing Unfairly "Double-Dips" by Contemporaneously Charging Borrowers for Multiple Services that Perform the Same Property Inspection Function**

2

3     115.   The Ocwen Enterprise also increases its revenue by unfairly contemporaneously

4   charging for duplicate Distressed Mortgage Services.

5     116.   For example, Ocwen Servicing, through Altisource Servicing or the Altisource

6   Parent's Technology Servicing software, routinely orders property inspections contemporaneously

7   with BPOs which, by fact and definition, entails the same service as a property inspection.

8     117.   Ocwen Servicing defines a "property inspection" which it charges borrowers for as

9   "an inspection of the property to make sure that it is still in good condition."[71]

10    118.   Ocwen Servicing defines a BPO charged to borrowers to be "determining the value

11  and condition of the property, using a certified Real Estate Agent."[72]  Performing a BPO entails the

12  same service as an inspection, because the service provider cannot perform a BPO without

13  "determining the…condition of the property" before coming to an opinion of value.

14    119.   In fact, brokers performing a BPO for Ocwen Servicing through Altisource Servicing

15  inspect the property subject to a BPO.

16    120.   Any property inspection performed contemporaneously with a BPO is duplicative

17  because any broker providing a BPO determines the condition of the property before providing their

18  valuation of the property.  Thus, because a property inspection is performed as part of a BPO, any

19  charge to a borrower for a property inspection performed contemporaneously with a BPO is

20  duplicative and redundant, and benefits neither the borrower nor the loan holder.[73]

21  _____

22

23  [71] *See* Ocwen Payment History and Fee Explanation, attached hereto as Exhibit 13, p. 5.

24  [72] *See* Exhibit 13, p. 5.

25  [73] In fact, the "lenders" (the investors in the securities backed by the pooled mortgages) for the loans

26  Ocwen services have themselves complained that Ocwen has improperly serviced the mortgages at
    issue in this lawsuit for many of the same reasons that form the basis for Plaintiffs' claims.  *See, e.*g.,

27  "Notice of Non-Performance to Ocwen Financial Corporation as servicer or master servicer...,"

28

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

121.   Indeed the guidelines of the federal government-sponsored enterprise Fannie Mae, which issues the standard form uniform security instruments used for residential mortgages in the United States including Plaintiffs and Class Members' mortgages, requires servicers, including Ocwen Servicing, to have clear written policies regarding fees that "will ensure that fees comply with applicable laws and regulations." Specifically, Fannie Mae requires servicers, including Ocwen Servicing, to have policies in place regarding property inspections, as follows:

> fees may be charged on a repetitive basis only when required or permitted by Fannie Mae's Guides or otherwise clearly supported by the circumstances relating to a particular loan (e.g., charging a delinquent borrower's account for monthly property inspections generally would not be a permissible practice unless the servicer determines that the circumstances *warrant multiple inspections.*[74]

122.   Despite not needing multiple inspections in a given month, which violates Fannie Mae servicing guidelines, Ocwen Servicing orders and charges borrowers for multiple inspections by virtue of ordering property inspections contemporaneous with BPOs which provide the same service.

123.   Plaintiffs, like other Class Members, were overcharged by being charged for duplicative Distressed Mortgage Services by Ocwen Servicing within the same 30 day period.  On August 26, 2013, Ocwen Servicing charged Plaintiffs a $10.50 "Property Inspection Fee," followed closely on September 4, 2013 by a $100.00 "Property Valuation Expense." (a/k/a BPO)[75]  Both the

---

located online at http://www.gibbsbruns.com/certificateholders-issue-notice-of-non-performance-identifying-alleged-failures-by-ocwen-financial-corporation-as-servicer-or-master-servicer-to-perform-covenants-and-servicing-agreements-in-119-residential-mortgage-backed-securities-trusts-01-23-2015/; and "Hedge fund claims Ocwen breached bond covenants," located online at http://www.housingwire.com/articles/32700-hedge-fund-claims-ocwen-breached-bond-covenants.

[74] Fannie Mae Single Family 2011 Servicing Guide, *available at* https://www.fanniemae.com/content/guide/svc061011.pdf.

[75] *See* Account Statement for Victor P. Giotta and Loralee Giotta dated September 5, 2013 attached hereto as Exhibit 11.

property inspection and BPO were procured through Altisource Servicing, or through the use of the Altisource Parent's software.

124.   Ocwen Servicing similarly charged Plaintiffs $13.25 for a "Property Inspection" on November 28, 2014, and six days later on December 4, 2014 charged Plaintiffs $100 for a "Property Valuation Expense."[76]   Both the property inspection and the BPO were procured by Altisource Servicing, or through the use of the Altisource Parent's software.

125.   Charging Plaintiffs and other Class Members for property inspections done contemporaneously with a BPO is unfairly "double-dipping," and another way Ocwen Servicing overcharges struggling borrowers.   This effectively means Ocwen Servicing charges twice for property inspections which it previously represented would come at "no charge" as explained in paragraphs 76-77 *supra*.

126.   Ocwen Servicing similarly charged Class Members nationwide for unnecessary and duplicative property inspections contemporaneously with BPOs, thereby "double-dipping" from Class Members in the materially same or similar fashion as Plaintiffs.

127.   Additionally, Ocwen Servicing conceals BPOs under the undefined moniker "property valuation expenses." Ocwen Servicing's concealment that "property valuation expenses" are just BPOs conceals that the company is assessing, charging and collecting fees from borrowers for a service that includes doing a property inspection, which it is also charging for contemporaneously.   Indeed, the definition of services provided to Plaintiffs and Class Members defines BPOs but does not identify them as a "Property Valuation" or even mention the term.

128.   By duplicating property inspections by virtue of ordering a BPO contemporaneously with a property inspection, Ocwen Servicing also violates Fannie Mae's servicing guidelines.

---

[76] *See* Mortgage Account Statement for Victor P. Giotta and Loralee Giotta dated December 16, 2014 attached hereto as Exhibit 16.

129.    "Double-dipping" in this manner only benefits the Ocwen Enterprise. Altisource Servicing profits from charging Ocwen Servicing twice for essentially the same service, once for the BPO and once for the redundant inspection.  Ocwen Servicing passes Altisource Servicing's charges to borrowers for both services, the charges are ultimately paid by borrowers, loan owners or the public.  Mr. Erbey and other of the Ocwen Entities and the Altisource Entities' joint executives and directors benefit from money made on both ends of these transactions.  Thus, even absent Ocwen Servicing's charging for property inspections after telling borrowers that property inspections came at "no charge," and up-charging above cost and above-market rate for BPOs, the Ocwen Enterprise still overcharges borrowers for duplicative Distressed Mortgage Services through this described "double-dipping."

130.    Ocwen's "double-dipping" is not limited to charging for a property inspection contemporaneously with a BPO.  Ocwen Servicing stipulated in the NYDFS Consent Order that the Technology Services Software it leases from the Altisource Entities duplicates other Distressed Mortgage Services charged to borrowers.  Consent Order ¶ 17.  Plaintiffs reserve the right to amend their Second Amended Complaint to the extent they identify additional Distressed Mortgage Services duplicated in these or another manner.

**4.    The Ocwen Enterprise's Overcharges for Distressed Mortgage Services Harmed Plaintiffs and Class Members in California and Nationwide by Pushing Struggling Homeowners Deeper into Default**

131.    The Ocwen Enterprise's conduct described herein overcharges borrowers in California and nationwide by charging for property inspections that were to be "no charge," up-charging more than cost and more than market rate for Distressed Mortgage Services, and charging for duplicative and redundant property inspection services, thereby directly harming Plaintiffs and Class Members.

132.    Borrowers cannot select their loan servicer and have no ability to simply "shop around" for a specific servicer for their loan in order to minimize servicing fees.  Additionally, mortgage servicers such as Ocwen Servicing do not negotiate with borrowers before ordering and charging for Distressed Mortgage Services, they are ordered by a mortgage servicer when a loan is

54

1    distressed and borrowers are charged for them after they have been provided to the mortgage

2    servicer.

3          133.    As the CFPB explained in regulatory findings underlying updated mortgage servicer

4    rules, "[s]ervicers are generally not subject to market discipline from consumers because consumers

5    have little opportunity to switch servicers."  Mortgage Servicing Rules Under the Truth in Lending

6    Act (Regulation Z), 78 FR 10902-01, at *10906.  The CFPB also found that, "[i]mproper fees harm

7    both mortgage loan borrowers and the investors that are mortgage servicers' principals.  Improper

8    and uncorrected fees harm borrowers by taking funds that may otherwise be used to keep a mortgage

9    loan current."  Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act

10   (Regulation X), 78 FR 10696-01, at *10741.

11         134.    This harm to borrowers is compounded by the fact that increased charges for

12   Distressed Mortgage Services leads directly to additional Distressed Mortgage Fees that push

13   borrowers deeper into default.  Ocwen Servicing applies mortgage payments first to outstanding

14   Distressed Mortgage fees before applying any money to the outstanding principal, interest or escrow

15   account.  Thus, if a person makes a normal mortgage payment amount following the imposition of a

16   Distressed Mortgage Fee, there will not be sufficient funds in the payment to cover the principal and

17   interest due after paying the Distressed Mortgage Fees.  This obvious and foreseeable shortfall leads

18   to another month of the loan in default, additional charges and fees being incurred, which will

19   continue to snowball each month as the payment to cover the principal and interest falls ever more

20   short.  This cascade of fees added monthly to a "default" loan consequently will often put borrowers

21   further and further behind in their payments, keeping them delinquent and unable to catch up on

22   their mortgage payments without going through a loan modification.  By inflating and duplicating

23   the Distressed Mortgage Fees through its conspiratorial self-dealing, the Ocwen Enterprise directly

24   pushes borrowers deeper into default with no countervailing legitimate benefit, and in violation of its

25   legal duties.

26         135.    Overcharging for Distressed Mortgage Fees not only harms borrowers by charging

27   them for fees they should not have to pay, but also further harms borrowers by making it difficult, if

28   not impossible, for mortgage borrowers to keep current on their loans after even one missed monthly

payment. Additionally, borrowers who fall further and further behind in their payments due to Ocwen Servicing's assessment of illegal and unfair Distressed Mortgage Fees have their credit scores damaged. Ocwen Servicing reports mortgage payment history, including delinquencies, to credit reporting companies. Borrowers kept in default by Ocwen Servicing's conduct therefore can lose their ability to get other loans – including loans to refinance their Ocwen Servicing-serviced loans – and can face higher rates on any loans they are able to obtain.

**F.    The Ocwen Enterprise Concealed and Failed to Disclose Its Conduct**

136.    Ocwen Servicing, as a servicer of Plaintiffs' and Class Members' loans, had a continuing duty to disclose to Plaintiffs and other borrowers the true costs and nature of the fees assessed for services provided for their mortgage loans, and of its cozy relationship with the Altisource Entities that provided Default Related Services for Ocwen Servicing. At minimum, Ocwen Servicing had a duty disclose to borrowers the same information it gave to its shareholders that conflicts could arise by virtue of the relationship between the Altisource Entities, the Ocwen Entities and Mr. Erbey. Ocwen Financial conceded, when it spun off the Altisource Parent in 2009, the following in its Form 8K filed on July 20, 2009:

> Certain of our executive officers and directors may be subject to conflicts of interest with respect to such agreements and other matters due to their relationships with Altisource.
>
> ……..
>
> William C. Erbey, who will remain our Chief Executive Officer and Chairman of the Board, will become Altisource's non-executive Chairman of the Board as a result of the spin-off. As a result, he has obligations to us as well as to Altisource and may potentially have conflicts of interest with respect to matters potentially or actually involving or affecting us and Altisource.
>
> ………
>
> Mr. Erbey will own substantial amounts of Altisource common stock and stock options because of his relationships with Altisource. This ownership could create potential conflicts of interest when our Chairman of the Board is faced with decisions that involve Ocwen, Altisource or any of their respective subsidiaries.

56

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

1

………

2

Matters that could give rise to conflicts between us and Altisource include, among other things: ... the quality and pricing of services that Altisource has agreed to provide to us or that we have agreed to provide to Altisource.[77]

3

4      137.   Ocwen Servicing also had a duty to disclose to Plaintiffs and the Class under

5   applicable law and the regulatory consent orders, cited herein, that it was its Distressed Mortgage

6   Services were upcharged and above market rate, and that those inflated charges resulted from its

7   conflicted relationship with the other Defendants.  Likewise, Ocwen Servicing is representing that

8   property inspections would be "no charge" gave it a duty to disclose that it would charge for

9   property inspection before imposing such charges.

10     **G.     Defendants' Omissions And Concealments Tolled The Applicable Statutes Of Limitations**

11

12     138.   Plaintiffs and members of the classes alleged herein did not know, had no reason to

13   suspect, and could not have known that the Ocwen Enterprise overcharged for Distressed Mortgage

14   Services until, at the very earliest, the New York State Department of Financial Services ("NYDFS")

15   published its letters regarding its investigation of the Ocwen Entities, the first of which is dated

16   February 26, 2014 as described in this Second Amended Complaint.  However, the publicity of the

17   NYSDF letters was limited, and therefore was unlikely to be known as a general matter to Class

18   Members, and was not known to Plaintiffs until shortly before filing this lawsuit.

19     139.   As explained above, Ocwen Servicing concealed that its Distressed Mortgage Fees

20   were inflated through the use of Altisource Servicing and the Altisource Parent's mortgage servicing

21   software.  Moreover, there was no public information disclosing Ocwen Servicing's up-charging of

22   or exceeding market rates for fees through the use of Altisource Servicing and the Altisource

23   Parent's mortgage servicing software prior to the New York State Department of Financial Services'

24   letters.

25   _____

26

27   [77]  Exhibit 4, Ocwen's SEC Form 8-K filed July 20, 2009.

28

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

140.     Plaintiffs and Class Members, like all other borrowers whose loans are being serviced by Ocwen Servicing, did not know, nor did they have reason to know, that Ocwen Servicing charged more than the cost for Distressed Mortgage Services, or that the charges were above-market rate for Distressed Mortgage Services as the result of Ocwen Servicing's relationship with Altisource. Neither Ocwen Servicing, any other member of the Ocwen Enterprise nor the holder of Plaintiffs' and other Class Members' loans disclosed to Plaintiffs, borrowers or the general public that Ocwen Servicing was overcharging for Distressed Mortgage Services.  Nor did Plaintiffs or other borrowers with loans being serviced by Ocwen Servicing have reason to suspect that they were being charged excessive Distressed Mortgage Fees.

141.     Plaintiffs and Class Members relied on Defendants' omissions and concealment in paying the Distressed Mortgage Fees as described herein that had the effect of improperly portraying the Default-Related Services Fees charges memorialized in Ocwen Servicing's uniform billing statements as lawful, and legitimate, which they were not.  Class Members' reliance may also be presumed or inferred from the very nature of the omissions, concealment, misrepresentations and conduct of the Defendants presented in this action, as specified herein.

142.     By virtue of Ocwen Servicing's misrepresentations and active concealment, as specified herein, any otherwise applicable statutes of limitations for Plaintiffs and class members are tolled by the discovery rule, concealment doctrine and/or other equitable tolling from the first unlawful charging of Distressed Mortgage Fees until – at the earliest – the publication of the New York State Department of Financial Services' letters concerning its investigation of the Ocwen Enterprise's practices described herein on February 26, 2014 and given the limited publicity of those letters, likely a later date.

## VI.    CIVIL CONSPIRACY AND AIDING AND ABETTING

143.     Members of the Ocwen Enterprise entered into a civil conspiracy, and each is jointly and severally liable for the actions of the other co-conspirators as if they committed the acts themselves as described in detail in paragraphs 43-57, *supra*.

144. As alleged herein and described above, members of the Ocwen Enterprise formed and operated a conspiracy to overcharge Plaintiffs and borrowers with mortgages serviced by Ocwen Servicing for Distressed Mortgage Services. *See* paragraphs 74-136, *supra*.

145. Plaintiffs and borrowers with loans serviced by Ocwen Servicing were overcharged for Distressed Mortgage Services. The Ocwen Enterprise's overcharging Plaintiffs and borrowers for Distressed Mortgage Services was intended to affect Plaintiffs and other borrowers whose loans were serviced by Ocwen Servicing.

146. Plaintiffs and borrowers with loans serviced by Ocwen Servicing were damaged by paying for overpaying for Distressed Mortgage Fees which were charged by the acts of the Ocwen Enterprise. Defendants could foresee that any harm caused by overcharging for Distressed Mortgage Services would harm Plaintiffs and borrowers with loans serviced by Ocwen Servicing, and they had a duty to disclose this information to Plaintiffs and other borrowers whose loans were serviced by Ocwen Servicing.

147. Plaintiffs' and other borrowers' damages from being overcharged and paying for Distressed Mortgage Services was proximately caused by each member of the undisclosed self-dealing Ocwen Enterprise, and their conduct in forming the conspiratorial enterprise alleged herein, misrepresenting, concealing and/or omitting the nature of the fees for Distressed Mortgage Services, as specified herein, and failing to disclose the overcharges for the Distressed Mortgage Services.

148. Members of the Ocwen Enterprise that did not charge Plaintiffs and Class Members for their Distressed Mortgage Fees aided and abetted Ocwen Servicing, the company that directly overcharged Distressed Mortgage Services, and that collected money from Plaintiffs and Class Members overcharged Distressed Mortgage Services by the collective conduct described herein.

149. Each member of the Ocwen Enterprise knew that Ocwen Servicing had a duty to Plaintiffs and Class Members not to overcharge for Distressed Mortgage Services.

150. Each member of the Ocwen Enterprise gave substantial assistance and encouragement to Ocwen Servicing to overcharge Plaintiffs and Class Members for Distressed Mortgage Services in their collective actions as described throughout this Second Amended Complaint.

151.    Each member of the Ocwen Enterprise assisted and encouraged Ocwen Servicing for their own financial advantage, and each member of the Ocwen Enterprise benefitted from borrowers overpaying for Distressed Mortgage Services.

## VII.    CLASS ACTION ALLEGATIONS

152.    This action asserts claims on behalf of a nationwide class, a nationwide subclass, and a California subclass pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and (c)(4), which class and subclasses consist of persons who paid for unlawfully overcharged Distressed Mortgage Services, as follows:

> All persons in the United States who had or have a mortgage loan serviced by Ocwen Servicing on or after August 10, 2009, and were assessed one or more of the Distressed Mortgage Fees by Ocwen Servicing (the "National Distressed Mortgage Fee Class").

> All persons in the United States who had or have a mortgage loan serviced by Ocwen Servicing on or after August 10, 2009, for which the servicing rights were transferred to Ocwen Servicing when the loan was already in default, and were assessed one or more of the Distressed Mortgage Fees (the "National FDCPA Distressed Mortgage Fee Subclass").

> All persons who have or had a mortgage loan on a property located in California serviced by Ocwen Servicing on or after August 10, 2009, and were assessed one or more of the Distressed Mortgage Fees (the "California Distressed Mortgage Fee Subclass").

153.    Excluded from each of the class and  subclasses are: (i) Ocwen Financial Corporation, Ocwen Loan Servicing, LLC, Altisource Portfolio Solutions, S.A., and Altisource Solutions, Inc. and their directors, officers, employees, principals, affiliated entities, legal representatives, successors and assigns; (ii) William C. Erbey; (iii) the judges to whom this action is assigned and any members of their immediate families.

154.    There are thousands of members in each of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass, and California Distressed Mortgage Fee Subclass who are geographically dispersed throughout California and the United States.  Therefore, individual joinder of the members of any of the classes defined above would be impracticable.

155.    Common questions of law or fact exist as to all members of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass and California Distressed Mortgage Fee Subclass.  These common legal or factual questions include:

> a.    Whether Ocwen Servicing's Distressed Mortgage Fees as described herein were lawful.

60

b.  Whether Ocwen Servicing's Distressed Mortgage Fees as described herein were unfair.

c.  Whether Ocwen Servicing's effort to collect for overcharged Distressed Mortgage Services were unfair attempts to collect a debt.

d.  Whether the Ocwen Entities, the Altisource Entities and Erbey were members of, or participants in, the conspiracy alleged herein.

e.  Whether the Ocwen Entities, the Altisource Entities and Erbey engaged in a pattern or practice of racketeering, as alleged herein.

f.  Whether Ocwen Servicing overcharged for Distressed Mortgage Services.

g.  Whether overcharged for Distressed Mortgage Services as a result of the Ocwen Enterprise.

h.  Whether Ocwen Servicing's Distressed Mortgage Fees were unconscionable;

i.  Whether Ocwen Servicing's use of Altisource Servicing and/or the Altisource Parent's software resulted in overcharges for Distressed Mortgage Services.

j.  Whether Ocwen Servicing is a "debt collector" as defined by the FDCPA.

k.  Whether the Distressed Mortgage Fees charged to Plaintiffs as described herein constitute "debt" within the meaning of the FDCPA.

l.  Whether Ocwen Servicing overcharged borrowers by charging them for property inspections that Ocwen Servicing indicated would carry "no charge."
m.  Whether Ocwen Servicing overcharged borrowers by up-charging more than the costs of Distressed Mortgage Services, or by charging more than the market rate for Distressed Mortgage Services.

n.  Whether Ocwen Servicing overcharged borrowers for Distressed Mortgage Services that were duplicative of other Distressed Mortgage Services Ocwen Servicing already charged for.

o.  Whether Defendants had a duty not to overcharge Plaintiffs and the Class as specified in this Complaint.

p.  Whether Defendants had a duty to and failed to disclose to Plaintiffs and the Class the overcharges and the underlying facts related thereto as set forth in this Complaint.

q.  Whether the Ocwen Entities, the Altisource Entities or Erbey aided or abetted any of the other Defendants in this misconduct alleged herein.

156.    Plaintiffs' claims are typical of the claims of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass and California Distressed Mortgage Fee Subclass.  Ocwen Servicing overcharged Plaintiffs for Distressed Mortgage Services by (1) charging Plaintiffs for property inspections after representing it would not charge for property inspections; (2) charging Plaintiffs fees for BPOs and other Distressed Mortgage Services that were above-cost and

61

above-market rate; and (3) "double-dipping" by charging Plaintiffs for duplicative BPOs and property inspections that were performed contemporaneously.  Plaintiffs' loan was also in default at the time Ocwen Servicing obtained the servicing rights to their loan, and Plaintiffs are California residents.  Therefore, Plaintiffs are no different in any material respect from any other members of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass, or California Distressed Mortgage Fee Subclass, and the relief sought by Plaintiffs is common to the relief sought by the class and subclasses.

157.    Plaintiffs are adequate representatives of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass, and California Distressed Mortgage Fee Subclass because their interests do not conflict with the interests of the class or subclasses members they seek to represent, and they have retained counsel competent and experienced in conducting complex lending and class action litigation.  Plaintiffs and their counsel will adequately protect the interests of the class and subclasses.

158.    A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual member of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass, and California Distressed Mortgage Fee Subclass are relatively small, while the burden and monetary expense needed to individually prosecute this case against Defendants is substantial.  Thus, it would be virtually impossible for class and subclass members individually to redress effectively the wrongs done to them. Moreover, even if members of the class and subclasses defined herein could afford individual actions, a multitude of such individual actions still would not be preferable to class wide litigation. Individual actions also present the potential for inconsistent or contradictory judgments, which would be dispositive of at least some of the issues and hence interests of the other members not party to the individual actions, would substantially impair or impede their ability to protect their interests, and would establish incompatible standards of conduct for the party opposing the class.

159.    By contrast, a class action presents far fewer litigation management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Also, or in the alternative, the National Distressed Mortgage Fee Class, National

62

FDCPA Distressed Mortgage Fee Subclass, and California Distressed Mortgage Fee Subclass may be certified because Defendants have acted or refused to act on grounds generally applicable to each of the respective class and subclasses, thereby making preliminary and final declaratory relief appropriate.

160.    Further, in the alternative, the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass and California Distressed Mortgage Fee Subclass may be maintained as class actions with respect to particular issues, pursuant to Fed.R.Civ.P. 23(c)(4).

161.    All records concerning each of the loans Ocwen Servicing services, including records showing Distressed Mortgage Fees charged to borrowers are in the possession and control of Defendants and their agents and are available through discovery.  For instance, Ocwen Financial "regularly undertakes its own internal analyses to benchmark its performance" which includes "accurate loan servicer information…which properly indicates the loans Ocwen does and does not service, and which loans Ocwen serviced at what time."[78]  Ocwen Financial also possesses investor reports detailing recovery and remittance data sufficient to explain and purportedly justify expenses such as the Distressed Mortgage Fees at the individual loan level. *Id*. pp. 17-18.

## VIII.    CLAIMS FOR RELIEF

162.    Plaintiffs are not asserting any breach of contract claims.  Plaintiffs are not required to allege a contractual breach in order to assert claims under RICO, California's UCL, for fraud, or for violation of federal and state debt collection acts.  In this Second Amended Complaint, Plaintiffs allege that Defendants breached various statutory and common law duties, and that these duties exist independently of Defendants' contractual obligations.   Whether or not Ocwen Servicing is contractually authorized to assess any or all of the fees at issue in this action, they cannot charge or

---

[78] Exhibit 17, March 22, 2015 Letter from Timothy M. Hays, Ocwen Financial's Executive Vice President and General Counsel, re Ocwen Response to January 23, 2015 Notice Pertaining to 119 Residential Mortgage Backed Securities Trusts, p. 8.

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

1  collect fees that are unlawful, unfair or the product of a self-dealing conspiracy under federal or state

2  laws.  All causes of action set forth below should be read consistent with this Paragraph.

3

**FIRST CAUSE OF ACTION**

4  **Violation of the "Unlawful" prong of the UCL (Bus. & Prof. Code §§ 17200, *et seq.*)(on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against All**

5  **Defendants as to All Overcharges)**

6      163.    Plaintiffs hereby incorporate the foregoing paragraphs of this Second Amended

7  Complaint and restate them as if they were fully written herein.

8      164.    Plaintiffs bring this cause of action on behalf of themselves and the members of the

9  California Distressed Mortgage Fee Subclass.

10     165.    The Unfair Competition Law ("UCL"), California Business and Professions Code §§

11  17200, *et seq.*, defines unfair business competition to include any "unlawful, unfair or fraudulent"

12  act or practice.

13     166.    A business act or practice is "unlawful" if it violates any established state or federal

14  law.

15     167.    Ocwen Servicing has and continues to violate the "unlawful" prong of the UCL by:

16          a.    representing to Plaintiffs and Class Members that property inspections carried

17  "no charge," then charging Plaintiffs and Class Members for property inspections without

18  first notifying Plaintiffs and Class Members that they would be charged for property

19  inspections, which violates the DFA, the CFPB Consent Judgment, the FDCPA and

20  RFDCPA, and constitutes fraud;

21          b.    overcharging Plaintiffs and Class Members for Distressed Mortgage Services

22  at up-charged, above-cost and above-market rates, which violates the DFA, the CFPB

23  Consent Judgment, the FDCPA and RFDCPA, the Fannie Mae servicing guidelines and

24  constitutes fraud; and/or

25          c.    "double-dipping" by duplicating property inspection services and charging

26  Plaintiffs and Class Members for redundant property inspection services, which violates the

27  DFA, the CFPB Consent Judgment, the FDCPA and RFDCPA, and the Fannie Mae servicing

28  guidelines.

1        168.    The Ocwen Entities are subject to the laws and regulations established by the CFPB

2   pursuant to the DFA.

3        169.    The Ocwen Entities are covered entities under the DFA.  12 U.S.C. 5481(6)(A).   The

4   Altisource Entities are service providers to the Ocwen Entities, and are therefore also covered

5   entities under the DFA.  12 U.S.C. 5481(6)(B).

6        170.    The DFA prohibits any covered person or service provider, "from committing or

7   engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any

8   transaction with a consumer for a consumer financial product or service."  12 U.S.C. §§ 5531(A) and

9   5536 (a)(1)(B).

10        171.    Ocwen Financial, the Altisource Entities and Erbey knowingly or recklessly provided

11   substantial assistance to Ocwen Servicing by virtue of their action as part of the Ocwen Enterprise as

12   described herein in charging and collecting for overcharged Distressed Mortgage Fees, and are

13   deemed in violation of the DFA, and California's "unlawful" prong of the UCL, to the same extent

14   as Ocwen Servicing to whom they provided assistance.  12 U.S.C. § 5536(a)(3).

15        172.    Ocwen Financial, the Altisource Entities and Erbey conspired with Ocwen Servicing

16   to violate the UCL, and aided and abetted Ocwen Servicing in its violations of the UCL by agreeing

17   to assist and assisting Ocwen Servicing in its conduct which violates the UCL, and are jointly and

18   severally liable to Plaintiffs and members of the California Distressed Mortgage Fee Subclass for

19   Ocwen Servicing's violations of the UCL.

20        173.    Through their unlawful acts and practices, Defendants have obtained, and continue to

21   unlawfully obtain, money from Plaintiffs and members of the California Distressed Mortgage Fee

22   Subclass.  As such, Plaintiffs request on behalf of themselves and all California Distressed Mortgage

23   Fee Subclass members the relief set forth in the Prayer, including that this Court enjoin Defendants

24   from continuing to violate the Unfair Competition Law as discussed herein.   Otherwise, the

25   California Distressed Mortgage Fee Subclass may be irreparably harmed and/or denied an effective

26   and complete remedy if such an order is not granted.

27

28

**SECOND CAUSE OF ACTION**
**Violation of the "Fraudulent" Prong of the UCL (Bus. & Prof. Code §§ 17200, *et seq*.)**
**(on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against All**
**Defendants as to the "Property Inspection 'No Charge' Misrepresentation" and "Up-Charge,**
**Above-Cost and Above-Market-Rate" Overcharges)**

174.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

175.    Plaintiffs bring this cause of action on behalf of themselves and the members of the California Distressed Mortgage Fee Subclass.

176.    The Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200, *et seq.*, defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice.

177.    A business act or practice is "fraudulent" under the UCL if it actually deceives or is likely to deceive members of the consuming public.

178.    Ocwen Servicing has and continues to violate the "fraudulent" prong of the UCL by representing to Plaintiffs and members of the California Distressed Mortgage Fee Subclass that property inspections carried "no charge," then charging Plaintiffs and members of the California Distressed Mortgage Fee Subclass for property inspections without first notifying Plaintiffs and members of the California Distressed Mortgage Fee Subclass that they would be charged for property inspections.

179.    Ocwen Servicing has and continues to violate the "fraudulent" prong of the UCL by charging Plaintiffs and members of the California Distressed Mortgage Fee Subclass Distressed Mortgage Fees that were up-charged, above-cost and above-market-rate, while concealing and/or failing to disclose to Plaintiffs and members of the California Distressed Mortgage Fee Subclass that the Distressed Mortgage Fees were up-charged, above-cost and above-market-rate and that such up-charged, above-cost and above-market-rate charges resulted from the Ocwen Enterprise's conspiratorial self-dealing, where Plaintiffs and members of the California Distressed Mortgage Fee Subclass reasonably believed that the Distressed Mortgage Fees identified on Ocwen Servicing's mortgage statements were *bona fide* fees for the services rendered in arms-length transactions. Ocwen Servicing disguises the fact that the overcharged Distressed Mortgage Fees were up-charged

66

by virtue of the Ocwen Enterprise's conspiratorial self-dealing.  Contrary to Ocwen Servicing's attempts to collect for the overcharged Distressed Mortgage Fees charged to borrowers, Ocwen Servicing cannot lawfully collect up-charged, above-cost and above-market-rate Distressed Mortgage Fees.

180.    Plaintiffs and members of the California Distressed Mortgage Fee Subclass relied on Defendants' omissions, misrepresentations and/or concealment in paying the Distressed Mortgage Fees as described herein that had the effect of improperly portraying the Distressed Mortgage Fees memorialized in Ocwen Servicing's uniform billing statements as lawful and legitimate, which they were not.  While proof of reliance for the members of the California Distressed Mortgage Fee Subclass is not necessary under the UCL, it may also be presumed or inferred from the very nature of the omissions, concealment, and/or conduct of the Defendants presented in this action.

181.    Ocwen Servicing's misrepresentations, omissions and concealment of material facts, as set forth above, was misleading or likely to deceive the general public within the meaning of the UCL.

182.    Under the mortgage servicing rights that Ocwen Servicing acquires, Ocwen Servicing is authorized to assess reasonable and appropriate fees and charges as provided for in the mortgage agreement.  Whether or not they are contractually authorized to assess any or all of the fees at issue in this action, they cannot charge or collect fees that are unlawful, unfair or the product of a self-dealing fraudulent conspiracy under federal or state laws.

183.    Ocwen Financial, the Altisource Entities and Erbey conspired with Ocwen Servicing to violate the UCL, and aided and abetted Ocwen Servicing in its violations of the UCL by agreeing to assist and assisting Ocwen Servicing in its conduct which violates the UCL, and are jointly and severally liable to Plaintiffs and members of the California Distressed Mortgage Fee Subclass for Ocwen Servicing's violations of the UCL.

184.    As a result of the conduct described above, Defendants have been, and will continue to be, unjustly enriched at the expense of Plaintiffs and members of the California Distressed Mortgage Fee Subclass.  Specifically, Defendants have been unjustly enriched by the revenue and profits they have obtained from Plaintiffs and the California Distressed Mortgage Fee Subclass.

67

185.    Through their fraudulent acts and practices, Defendants have improperly obtained, and continue to improperly obtain, money from members of the California Distressed Mortgage Fee Subclass.  As such, Plaintiffs request that this Court cause Defendants to restore this money to Plaintiffs and the California Distressed Mortgage Fee Subclass, to disgorge the profits Defendants have made on overcharged Distressed Mortgage Fees, and to enjoin Defendants from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future as discussed herein.  Otherwise, members of the California Distressed Mortgage Fee Subclass may be irreparably harmed and/or denied an effective and complete remedy if such an Order is not granted.

**THIRD CAUSE OF ACTION**
**Violation of the "Unfair" prong of the UCL (Bus. & Prof. Code §§ 17200, *et seq*.) (on behalf of Plaintiffs and the California Distressed Mortgage Fee Subclass against All Defendants as to All Overcharges)**

186.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

187.    Plaintiffs bring this cause of action on behalf of themselves and the members of the California Distressed Mortgage Fee Subclass.

188.    The Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200, *et seq*., defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice.

189.    Ocwen Servicing has and continues to violate the "unfair" prong of the UCL by:

a.    representing to Plaintiffs and members of the California Distressed Mortgage Fee Subclass that property inspections carried "no charge," then charging Plaintiffs and members of the California Distressed Mortgage Fee Subclass for property inspections without first notifying Plaintiffs and Class Members that they would be charged for property inspections;

b.    overcharging Plaintiffs and members of the California Distressed Mortgage Fee Subclass for Distressed Mortgage Services at up-charged, above-cost and above-market rates; and/or

1        c.       "double-dipping" by duplicating property inspection services and charging

2    Plaintiffs and members of the California Distressed Mortgage Fee Subclass for redundant

3    property inspection services.

4    190.    Defendants' unfair acts and practices are immoral, unethical, oppressive,

5    unscrupulous and/or substantially injure Plaintiffs and members of the California Distressed

6    Mortgage Fee Subclass, who generally cannot choose their loan servicer or choose whether to

7    purchase Distressed Mortgage Services, by causing them to pay additional and higher Distressed

8    Mortgage Fees for services that were not rendered through *bona fide* arms-length transactions.  Any

9    utility or benefit to Defendants' conduct does not outweigh the harm it causes to Plaintiffs and

10   members of the California Distressed Mortgage Fee Subclass because Defendants' conduct benefits

11   neither borrowers nor loan holders, but rather serves only to enrich the Ocwen Enterprise.

12   191.    Plaintiffs and members of the California Distressed Mortgage Fee Subclass could not

13   reasonably have avoided the harm they incurred resulting from Defendants' unfair acts and practices.

14   Plaintiffs and members of the California Distressed Mortgage Fee Subclass were misled by Ocwen

15   Servicing's statement that property inspections carried "no charge," and were unaware and had no

16   reason to suspect that the Distressed Mortgage Fees identified on Ocwen Servicing's Mortgage

17   Statements were not *bona fide* fees for services rendered through arms-length transactions but were

18   up-charged, above-cost and above-market-rate.    Furthermore, Plaintiffs and members of the

19   California Distressed Mortgage Fee Subclass cannot select their loan servicer and thus were forced

20   to pay the Distressed Mortgage Fees assessed by Ocwen Servicing regardless of whether they knew

21   that they would be overcharged for such fees.

22   192.    Defendants' conduct violates established statutory and regulatory public policies

23   including: (i) that Ocwen Servicing refrain from charging Distressed Mortgage Fees that are up-

24   charged, above-cost, above-market-rate or otherwise not *bona fide*, and disclose such fees in detail to

25   borrowers (CFPB Consent Judgment); (ii) that servicers refrain from imposing fees and charges

26   without a reasonable basis (Mortgage Servicing Rules Under the Real Estate Settlement Procedures

27   Act (Regulation X), 78 FR 10696-01, at *10741); (iii) that borrowers be entitled to know whether

28   their mortgage servicer lacks a reasonable basis to impose the servicing fees for which the borrowers

were charged (12 C.F.R. § 1024.35(b)(5)); (iv) that consumers have an accounting of servicing fees imposed (Mortgage Servicing Rules Under the Truth in Lending Act (Regulation Z), 78 FR 10902-01, at *10967); (v) that mortgage statements identify fees and charges (12 C.F.R. § 1026.41(d)(2)(ii)); and (vi) that mortgage servicers refrain from engaging in unfair, deceptive or abusive acts and practices (12 U.S.C. § 5536(a)(1)(B)).

193.    By committing the acts and practices alleged above, Defendants have engaged, and continue to be engaged, in unfair business practices within the meaning of the UCL and the DFA.

194.    As a result of the conduct described above, Defendants have been, and will continue to be, unjustly enriched at the expense of Plaintiffs and members of the proposed California Distressed Mortgage Fee Subclass.  Specifically, Defendants have been unjustly enriched by the revenue, profits and other benefits they have obtained from Plaintiffs and members of the California Distressed Mortgage Fee Subclass for the overcharged Distressed Mortgage Fees.

195.    Under the mortgage servicing rights that Ocwen Servicing acquires, Ocwen Servicing is authorized to assess reasonable and appropriate fees and charges as provided for in the mortgage agreement.  Whether or not they are contractually authorized to assess any or all of the fees at issue in this action, they cannot charge or collect fees that are unlawful, unfair or the product of a self-dealing fraudulent conspiracy under federal or state laws.

196.    Ocwen Financial, the Altisource Entities and Erbey conspired with Ocwen Servicing to violate the UCL, and aided and abetted Ocwen Servicing in its violations of the UCL by agreeing to assist and assisting Ocwen Servicing in its conduct which violates the UCL, and are jointly and severally liable to Plaintiffs and members of the California Distressed Mortgage Fee Subclass for Ocwen Servicing's violations of the UCL.

197.    Through their unfair acts and practices, Defendants have improperly obtained, and continue to improperly obtain, money from members of the California Distressed Mortgage Fee Subclass.  As such, Plaintiffs request that this Court cause Defendants to restore this money to Plaintiffs and the California Distressed Mortgage Fee Subclass, to disgorge the profits Defendants have made on overcharged Distressed Mortgage Fees, and to enjoin Defendants from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future as discussed

70

herein.  Otherwise, members of the California Distressed Mortgage Fee Subclass may be irreparably harmed and/or denied an effective and complete remedy if such an Order is not granted.

**FOURTH CAUSE OF ACTION**
**Fraud (on behalf of Plaintiffs and the National Distressed Mortgage Fees Class and against All Defendants as to the "Property Inspection 'No Charge' Misrepresentation" and "Up-Charge, Above-Cost and Above-Market-Rate" Overcharges)**

198.    Plaintiffs hereby incorporate the foregoing paragraphs of this Second Amended Complaint and restate them as if they were fully written herein.

199.    Plaintiffs bring this cause of action on behalf of themselves and the members of the National Distressed Mortgage Fees Class.

200.    Plaintiffs and members of the National Distressed Mortgage Fee Class relied on Ocwen Servicing's written disclosure that uniformly and consistently represented that property inspections carried "no charge."

201.    Plaintiffs and members of the National Distressed Mortgage Fee Class relied on Ocwen Servicing's disclosures through its billing statements and other standardized written communications that uniformly and consistently failed to disclose that the Distressed Mortgage Fees were up-charged, above-cost and above-market-rate while presenting the Distressed Mortgage Fees as *bona fide* fees for the services rendered in arms-length transactions provided by a disinterested third party.

202.    Had the true nature of the overcharged Distressed Mortgage Fees been disclosed to Plaintiffs and members of the National Distressed Mortgage Fees Class, they could have taken measures to avoid paying Ocwen Servicing the overcharged fees.  For instance, borrowers might re-allocate their resources to avoid making a late payment and thereby avoid default in the first instance; could emphasize becoming current on their loans to avoid being overcharged for future fees;  might seek to refinance their mortgage with a lender utilizing a non-Ocwen servicer that would not overcharge them for these fees; could avail themselves of recent CFPB mortgage servicing rules permitting borrowers to obtain documents supporting servicing fee charges if the borrower has reason to believe that "the servicer lacks a reasonable basis to impose [a fee or charge]" (12 C.F.R. §

71

1024.35(b)(5)); could report Ocwen Servicing's conduct to state and federal regulators such as the CFPB; or could contest the fees.

203.    As a result of Ocwen Servicing's misrepresentations, concealment and omissions, Plaintiffs and National Distressed Mortgage Fee Class members have been injured and suffered a loss of money or property.

204.    Ocwen Servicing misrepresented, omitted and concealed material facts, as discussed above, with knowledge of the effect of misrepresenting, omitting and concealing of these material facts.  Ocwen Servicing knew that by misleading consumers, the fees would generate higher revenue and profits for all members of the Ocwen Enterprise including itself, Ocwen Financial, Erbey and the Altisource Entities.

205.    Plaintiffs and members of the National Distressed Mortgage Fee Class justifiably relied upon Ocwen Servicing's knowing, affirmative, and active misrepresentations, concealment and omissions. Class Members' justifiable reliance may also be presumed or inferred from the very nature of the misrepresentations, omissions, concealment, and conduct of the Defendants presented in this action. By misrepresenting, concealing and omitting material information about their scheme to assess overcharged Distressed Mortgage Fees on borrowers' accounts, Ocwen Servicing intended to induce Plaintiffs and members of the National Distressed Mortgage Fee Class into believing that they owed Ocwen Servicing more money that it was entitled to.

206.    Ocwen Servicing acted with malice, oppression, and/or fraud.

207.    Ocwen Financial, the Altisource Entities and Erbey conspired with Ocwen Servicing to commit the frauds described herein, and aided and abetted Ocwen Servicing in its frauds by agreeing to assist and assisting Ocwen Servicing in its conduct which constitutes fraud, and are jointly and severally liable to Plaintiffs and members of the National Distressed Mortgage Fees Class for Ocwen Servicing's fraud.

208.    Under the mortgage servicing rights that Ocwen Servicing acquires, Ocwen Servicing is authorized to assess reasonable and appropriate fees and charges as provided for in the mortgage agreement.  Whether or not they are contractually authorized to assess any or all of the fees at issue

72

1   in this action, they cannot charge or collect fees that are unlawful, unfair or the product of a self-

2   dealing fraudulent conspiracy under federal or state laws.

3       209.    As a direct and proximate result of Ocwen Servicing's omissions and active

4   concealment of material facts, Plaintiffs and each member of the National Distressed Mortgage Fee

5   Class has been damaged in an amount to be proved at trial.

6                               **FIFTH CAUSE OF ACTION**

7   **Violation of the FDCPA (15 U.S.C. §§ 1692, *et seq*) (on behalf of Plaintiffs and the FDCPA Distressed Mortgage Fees Subclass against Ocwen Servicing and Mr. Erbey as to All Overcharges)**

8

9       210.    Plaintiffs hereby incorporate the foregoing paragraphs of this Second Amended

10  Complaint and restate them as if they were fully written herein.

11      211.    Plaintiffs bring this cause of action on behalf of themselves and the members of the

12  FDPCA Distressed Mortgage Fee Subclass against Ocwen Servicing and Mr. Erbey.

13      212.    The FDCPA defines "debt" as "any obligation or alleged obligation of a consumer to

14  pay money arising out of a transaction in which the money, property, insurance or service which are

15  the subject of the transaction or primarily for personal, family, or household purposes, whether or

16  not such obligation has been reduced to judgment."

17      213.    The FDCPA defines "debt collector" as "any person who uses any instrumentality of

18  interstate commerce or the mails in any business the principal purpose of which is the collection of

19  any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due

20  or asserted to be owed or due another." 15 U.S.C. § 1692a(6).

21      214.    Ocwen Servicing is a "debt collector" under the FDCPA for all loans it services for

22  which it obtained the servicing rights when the loan was in default, as it uses interstate commerce

23  and the mails to regularly collect debts owed or due or asserted to be owed or due by mortgage

24  borrowers.   Mr. Erbey controlled, knew of, ratified and participated (directly and indirectly), in

25  Ocwen Serving's debt collection activities by virtue of his role as a central figure in the Ocwen

26  Enterprise's operation as alleged throughout this Second Amended Complaint.  Mr. Erbey thereby

27  participated both in Ocwen Servicing's role as a debt collector and also in Ocwen Servicing's

28  violations of the FDCPA alleged herein.

215.    Plaintiffs' mortgage loan was in default when Ocwen Servicing obtained the servicing rights for Plaintiffs' loan.

216.    A borrower's obligation to pay the charges, fees, principal and interest on a mortgage loan is a "debt" as defined by the FDCPA because it arises out of the agreement between homeowners and their lenders and obliges the homeowners to pay money arising out of the loan given to purchase their home.

217.    The FDCPA prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt," including "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt" and "[t]he false representation of…the character, amount, or legal status or any debt."  (15 U.S.C. §§ 1692e, 1692e(2)(A) and 1692(10))

218.    In violation of 15 U.S.C. § 1692e, Ocwen Servicing and Mr. Erbey use false representations and deceptive means, concealment and/or omissions to collect or attempt to collect a debt by overcharging borrowers for Distressed Mortgage Fees by:

      a.    representing to Plaintiffs and members of the FDPCA Distressed Mortgage Fee Subclass that property inspections carried "no charge," then charging Plaintiffs and members of the FDPCA Distressed Mortgage Fee Subclass for property inspections without first notifying Plaintiffs and members of the FDPCA Distressed Mortgage Fee Subclass that they would be charged for property inspections;

      b.    overcharging Plaintiffs and members of the FDPCA Distressed Mortgage Fee Subclass for Distressed Mortgage Services at up-charged, above-cost and above-market rates; and/or

      c.    "double-dipping" by duplicating property inspection services and charging Plaintiffs and members of the FDPCA Distressed Mortgage Fee Subclass for redundant property inspection services.

219.    Contrary to Ocwen Servicing's communications, it was not legally authorized to asses, charge or collect the overcharged Distressed Mortgage Fees described above.  Under the mortgage servicing rights that Ocwen Servicing acquires, Ocwen Servicing is authorized to assess

1    reasonable and appropriate fees and charges as provided for in the mortgage agreement.  Whether or

2    not they are contractually authorized to assess or collect any fees for Distressed Mortgage Services

3    generally, they cannot charge or collect fees that are unlawful, unfair or the product of a self-dealing

4    fraudulent conspiracy under federal or state laws.

5        220.    As a result of Ocwen Servicing's violations of the FDCPA, Plaintiffs and the FDPCA

6    Distressed Mortgage Fee Subclass members are entitled to their actual damages pursuant to 15

7    U.S.C. § 1692k(a)(1); statutory damages for Plaintiffs in an amount up to $1,000.00 pursuant to 15

8    U.S.C. § 1692k(a)(2)(A); class damages for FDPCA Distressed Mortgage Fee Subclass members

9    that are not entitled to actual damages up to the lesser of $500,000 or 1 per centum of the net worth

10   of Ocwen Servicing pursuant to 15 U.S.C. § 1692k(a)(2)(B)(ii); and reasonable attorneys' fees and

11   costs pursuant to 15 U.S.C. 1692k(a)(3) from Ocwen Servicing.

12                              **SIXTH CAUSE OF ACTION**
     **Violations of the Rosenthal Fair Debt Collection Practices Act (RFDCPA) (Cal. Civ.**
13   **Code §§ 1788, *et seq* (on behalf of Plaintiffs and the California Distressed Mortgage Fee**
     **Subclass against Ocwen Servicing and Mr. Erbey as to All Overcharges)**
14

15       221.    Plaintiffs hereby incorporate the foregoing paragraphs of this Second Amended

16   Complaint and restate them as if they were fully written herein.

17       222.    Plaintiffs bring this cause of action on behalf of themselves and the members of the

18   California Distressed Mortgage Fee Subclass.

19       223.    As alleged above, Ocwen Servicing committed violations of the Rosenthal Fair Debt

20   Collection Practices Act, California Civil Code §§ 1788, *et seq*. ("RFDCPA"), which incorporates

21   by reference, and requires compliance with, the provisions of the federal FDCPA, 15 U.S.C. § 1692.

22       224.    Ocwen Servicing is a "debt collector" within the meaning of California Civil Code §

23   1788.2(c) because Ocwen Servicing sent mortgage bills to Plaintiffs and members of the California

24   Distressed Mortgage Fee Subclass, and Plaintiffs and members of the California Distressed

25   Mortgage Fee Subclass made their mortgage payments to Ocwen Servicing, Ocwen Servicing

26   accepted those payments, and Ocwen Servicing made demands for payment which included

27   payments for overcharged Distressed Mortgage Fees.  Ocwen Servicing made demand for such

28

Second Amended Class Action Complaint;
Case No.: 5-15-cv-00620-BLF

1  payment by sending letters, making telephone calls, and through other attempts to collect mortgage

2  payments and fees.

3      225.    Mr. Erbey controlled, knew of, ratified and participated (directly and indirectly), in

4  Ocwen Serving's debt collection activities by virtue of his role as a central figure in the Ocwen

5  Enterprise's operation as alleged throughout this Second Amended Complaint.  Mr. Erbey thereby

6  participated both in Ocwen Servicing's role as a debt collector and also in Ocwen Servicing's

7  violations of the FDCPA and RFDCPA alleged herein.

8      226.    The FDCPA and RFDCPA prohibit a debt collector from using "any false, deceptive,

9  or misleading representation or means in connection with the collection of any debt."  15 U.S.C. §

10  1692e.

11      227.    The overcharged Distressed Mortgage Fees purportedly owed by Plaintiffs and

12  members of the California Distressed Mortgage Fee Subclass are a "debt" within the meaning of

13  California Civil Code § 1788.2(d), because they are "money, property or their equivalent which [are]

14  due or owing or alleged to be due or owing from a natural person to another person."

15      228.    Ocwen Servicing knowingly, affirmatively, and actively misrepresented, concealed

16  and omitted material facts by:

17          a.    representing to Plaintiffs and Class Members that property inspections carried

18      "no charge," then charging Plaintiffs and Class Members for property inspections without

19      first notifying Plaintiffs and Class Members that they would be charged for property

20      inspections;

21          b.    overcharging Plaintiffs and Class Members for Distressed Mortgage Services

22      at up-charged, above-cost and above-market rates; and/or

23          c.    "double-dipping" by duplicating property inspection services and charging

24      Plaintiffs and Class Members for redundant property inspection services.

25      229.    Contrary to Ocwen Servicing's communications, it was not legally authorized to

26  asses, charge or collect overcharged Distressed Mortgage Fees.  Under the mortgage servicing rights

27  that Ocwen Servicing acquires, Ocwen Servicing is authorized to assess reasonable and appropriate

28  fees and charges as provided for in the mortgage agreement.  Whether or not they are contractually

1   authorized to assess any or all of the fees at issue in this action, they cannot charge or collect fees

2   that are unlawful, unfair or the product of a self-dealing fraudulent conspiracy under federal or state

3   laws.

4        230.   Pursuant to California Civil Code §§ 1788.17 and 1788.30, Plaintiffs and members of

5   the California Distressed Mortgage Fee Subclass are entitled to recover actual damages sustained as

6   a result of Ocwen Servicing's violations of the RFDCPA. Such damages include, without limitation,

7   monetary losses and damages. Additionally, because Ocwen Servicing's violations of the RFDCPA

8   were committed willingly and knowingly, Plaintiffs and members of the California Distressed

9   Mortgage Fee Subclass are entitled to recover penalties of up to $1,000 per violation as provided for

10  in the RFDCPA, as well as attorneys' fees, costs, and expenses incurred in bringing this action.

11                         **SEVENTH CAUSE OF ACTION**
    **Violations of RICO (18 U.S.C. §§ 1962(c) and (d)) (on Behalf of the National Distressed**
12  **Mortgage Fees Class against All Defendants as to the "Up-Charge, Above-Cost and Above-**
                         **Market-Rate" Overcharge)**
13

14       231.   Plaintiffs hereby incorporate the foregoing paragraphs of this Second Amended

15  Complaint and restate them as if they were fully written herein.

16       232.   Plaintiffs bring this cause of action on behalf of themselves and the members of the

17  National Distressed Mortgage Fees Class.

18       233.   As described throughout this Second Amended Complaint, Erbey, the Ocwen Entities

19  and the Altisource Entities devised a scheme to defraud borrowers by charging up-charged, above-

20  cost and above-market-rate Distressed Mortgage Fees by virtue of Defendants' undisclosed,

21  unlawful and fraudulent self-dealing.  In furtherance of this scheme, Defendants used the mail and

22  wires on numerous occasions to exchange fraudulent communications facilitating the ordering of,

23  the charging and payment for, and the ultimate billing to borrowers for the Distressed Mortgage Fees

24  that were up-charged, above-cost and above-market-rate by virtue of Defendants' undisclosed,

25  unlawful and fraudulent self-dealing.  Each such use of the mail or wires constituted mail or wire

26  fraud, and together they constituted a pattern of racketeering activity.  The Ocwen Enterprise

27  conducted its affairs through this pattern of racketeering activity.  As a result, Plaintiffs and

28  members of the National Distressed Mortgage Fees Class paid for Distressed Mortgage Fees that

1   were up-charged, above-cost and above-market-rate by virtue of Defendants' undisclosed, unlawful

2   and fraudulent self-dealing and were thereby injured in their business or property.

3          234.   Each Defendant is a person within the meaning of 18 U.S.C. § 1961(3).

4          235.   The Ocwen Entities, through their directors, employees and agents, the Altisource

5   Entities through their directors, employees and agents, and William C. Erbey conducted the affairs

6   of an associated-in-fact enterprise as defined in 18 U.S.C. § 1961(4) (the "Enterprise").  The affairs

7   of the Enterprise affected interstate commerce through a pattern of racketeering activity.

8          236.   The Enterprise is an ongoing, continuing group or unit of persons and entities

9   associated together for the common purpose of charging, assessing, and collecting the Distressed

10  Mortgage Fees.

11         237.   While the members of the Enterprise participate in and are part of the Enterprise, they

12  also have an existence separate and distinct from the Enterprise.  The Enterprise has a systematic

13  linkage due to contractual relationships, agreements, financial ties and coordinated activities

14  between the Ocwen and Altisource Entities and Erbey.

15         238.   Ocwen Financial controls and directs the affairs of the Enterprise according to

16  policies and procedures developed and established by Ocwen Financial's executives – formerly (and

17  until January 16, 2015) including Mr. Erbey.

18         239.   As described throughout this Second Amended Complaint, the policies and

19  procedures established by Ocwen Servicing at the direction of Erbey through his control of the

20  Ocwen Entities and the Altisource Entities and in furtherance of the Enterprise include:   (i)

21  procuring Distressed Mortgage Services through Altisource Servicing; (ii) leasing from the

22  Altisource Parent software Ocwen Financial developed to program and which did program Ocwen

23  Servicing's loan servicing systems to order, assess, charge and collect Distressed Mortgage Fees

24  when borrowers are not current on their mortgage loan; (iii) charging borrowers more for Distressed

25  Mortgage Services than what Ocwen Servicing or Altisource Servicing actually pays the service

26  providers, and, at the very least, more than what is reasonable in the marketplace; (iv) providing

27  statements to borrowers that conceal the nature of the Distressed Mortgage Fees or the true cost

28  thereof; and (v) spinning-off the Altisource Entities for the purpose and to facilitate the conduct of

78

this overcharge scheme, while Erbey and other Ocwen Entities officers held key director and executive positions in Altisource Entities to maintain control of the Enterprise.

## A.      Violation of 18 U.S.C. § 1962(c)

240.     Under the mortgage servicing rights that Ocwen Servicing acquires, Ocwen Servicing is authorized to assess reasonable and appropriate fees and charges as provided for in the mortgage agreement.  Whether or not they are contractually authorized to assess any or all of the fees at issue in this action, they cannot charge or collect fees that are unlawful, unfair or the product of a self-dealing fraudulent conspiracy under federal or state laws.

241.     The process of ordering, assessing and charging Distressed Mortgage Fees is done automatically by Ocwen Servicing's loan servicing systems based on the programming and parameters established by Ocwen Servicing and other members of the Ocwen Enterprise.

242.     By developing and implementing policies and procedures leading to borrowers being charged Distressed Mortgage Fees, the Ocwen Entities, the Altisource Entities and Erbey engaged in the conduct of the Enterprise distinct from any of their own affairs in their other business arrangements and inconsistent with their normal business or the guidelines under which each is obligated to operate.

243.     The Enterprise's systematic scheme of ordering, assessing and charging Distressed Mortgage Fees, as described throughout this Complaint, was facilitated by the use of the United States Mail and wire.  The Ocwen Enterprise's scheme constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(l), as acts of mail and wire fraud, under 18 U.S.C. §§ 1341 and 1343.

244.     In violation of 18 U.S.C. §§ 1341 and 1343, the Ocwen Enterprise utilized the mail and wire in furtherance of their scheme to defraud borrowers whose loans are serviced by Ocwen Servicing by obtaining money from borrowers using false or fraudulent pretenses.

245.     Through the mail and wire, the Ocwen Enterprise provided invoices, statements, payoff demands, or proofs of claims to borrowers, and demanded that borrowers pay Distressed Mortgage Fees.  Also through the mail and wire, the Enterprise communicated orders for Distressed Mortgage Services and exchanged money in the form of Distressed Mortgage Fees, including through the use of Altisource Servicing's mortgage servicing software.  The Ocwen Enterprise also

79

1  used the mail and wire to accept payments and engage in other correspondence in furtherance of its

2  scheme.

3      246.    The Ocwen Enterprise fraudulently and unlawfully assessed Distressed Mortgage

4  Fees because the servicers were unlawfully up-charged, above-cost and above-market rates.

5      247.    The invoices, statements, schedules of charges or proofs of claims provided by

6  Ocwen Servicing to borrowers omitted and/or concealed the fact that the Distressed Mortgage Fees –

7  such as BPO fees, property inspection fees, auction fees and title fees assessed on borrowers'

8  accounts – were up-charged, above-cost and above-market rates.   The Enterprise omitted and

9  concealed that the Distressed Mortgage Fees were unlawful and for an illegitimate purpose.

10      248.    The Enterprise's omissions were material to Plaintiffs and the members of the

11  National Distressed Mortgage Fee Class.  Had the Enterprise accurately represented the true costs

12  and nature of the fees being charged, or the other unlawful activities described herein, Plaintiffs and

13  other members of the class would have been aware and would have challenged Ocwen Servicing's

14  unlawful practices or they would not have paid the above-market rate Distressed Mortgage Fees or

15  otherwise taken action.

16      249.    Each of these acts constituted an act of mail fraud for purposes of 18 U.S.C. § 1341.

17      250.    Additionally, using the Internet, telephone, and facsimile transmissions to

18  communicate false information to borrowers, to pursue and achieve their fraudulent scheme, the

19  Enterprise engaged in repeated acts of wire fraud in violation of 18 U.S.C. § 1343.

20      251.    The Enterprise's knowledge that its activities were fraudulent and unlawful is

21  evidenced by, among other things, the fact that they did not disclose the true cost or nature of the

22  Distressed Mortgage Fees or their actions in their communications to borrowers.

23      252.    The predicate acts specified above constitute a "pattern of racketeering activity"

24  within the meaning of 18 U.S.C. § 1961(5) in which the Ocwen Enterprise has engaged under 18

25  U.S.C. § 1962(c).

26      253.    All of the predicate acts of racketeering activity described herein are part of the nexus

27  of the affairs and functions of the racketeering Enterprise. The racketeering acts committed by the

28  Enterprise employed a similar method, were related, with a similar purpose, and involved similar

80

participants, with a similar impact on the members of the National Distressed Mortgage Fees Class. Because this case is brought on behalf of a class of similarly situated borrowers described above, and there are numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiffs to plead all of the details of the scheme with particularity. Plaintiffs cannot plead the precise dates of all of the Enterprise's uses of the mail and wire because this information cannot be alleged without access to Defendants' records.

254. The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

255. Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

256. As a direct and proximate result of these violations of 18 U.S.C. §§ 1962(c) and (d), Plaintiffs and members of the National Distressed Mortgage Fees Class have suffered substantial damages. Members of the Enterprise are liable to Plaintiffs and the Class for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under 18 U.S.C. § 1964(c).

### B.    Violation of 18 U.S.C. § 1962(d)

257. As set forth above in Subpart A to this First Cause of Action, in violation of 18 U.S.C. § 1962(d), Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c) by charging borrowers for Distressed Mortgage Fees.

258. As set forth above in Subpart A to this First Cause of Action, Defendants were aware of the nature and scope of the Enterprise's unlawful scheme, and they agreed to participate in it.

259. As a direct and proximate result, Plaintiffs and members of the National Distressed Mortgage Fees Class have been injured in their business or property by the predicate acts which make up the Ocwen Enterprise's patterns of racketeering activity in that Distressed Mortgage Fees were assessed on their mortgage accounts.

260. As a direct and proximate result of these violations of 18 U.S.C. §§ 1962(c) and (d), Plaintiffs and members of the National Distressed Mortgage Fees Class have suffered substantial damages. Members of the Enterprise are liable to Plaintiffs and the Class for treble damages,

81

together with all costs of this action, plus reasonable attorney's fees, as provided under 18 U.S.C. § 1964(c).

**IX.   PRAYER**

WHEREFORE, Plaintiffs, on behalf of themselves and all class members and subclass members, request award and relief as follows:

A.     An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiffs Victor P. Giotta and Loralee Giotta be appointed a Class Representatives for the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass and California Distressed Mortgage Fee Subclass, and that Plaintiffs' counsel be appointed Counsel for the Class and Subclasses.

B.     Order that Defendants are financially responsible for notifying all members of the National Distressed Mortgage Fee Class, National FDCPA Distressed Mortgage Fee Subclass and California Distressed Mortgage Fee Subclass of the alleged omissions, concealments, misrepresentations, conduct, inflation, duplicative or excessive Distressed Mortgage Services described herein, as well as any finding by the Court with respect thereto.

C.     Awarding compensatory damages in an amount determined at trial for each Cause of Action asserted herein for which these damages are available.

D.     Awarding restitution in such amount that were paid for inflated and duplicative Distressed Mortgage Fees, or restitutionary disgorgement of the profits Defendants obtained from those transactions for each Cause of Action asserted herein for which this relief is available.

E.     Awarding treble and punitive damages as provided by law in an amount determined at trial for each Cause of Action asserted herein for which these damages are available.

F.     Awarding statutory damages as provided by law for each Cause of Action asserted herein for which these damages are available.

G.     An order enjoining Defendants from continuing the unlawful, unfair and fraudulent practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of their conduct and pay them restitution and disgorgement of all moneys acquired by Defendants by means of any act or practice to be declared by this Court to be wrongful.

1      H.      An order awarding Plaintiffs their costs of suit, including reasonable attorneys' fees

2 and pre and post-judgment interest.

3      I.      An order requiring an accounting for, and imposition of, a constructive trust upon, all

4 monies received by Defendants as a result of the unlawful, unfair, and fraudulent conduct alleged

5 herein.

6      J.      Such other and further relief as may be available as part of the statutory claims

7 asserted herein, or otherwise as may be deemed necessary or appropriate for any of the claims

8 asserted.

9      K.      An order directing Defendants to assign to Plaintiffs and Class Members the right to

10 collect on indemnity agreements signed by any person who is obligated to indemnify Defendants for

11 liability originating from the allegations of this Second Amended Complaint.

12 **X.      DEMAND FOR JURY TRIAL**

13      Plaintiffs hereby demand a trial by jury on all claims and/or issues so triable.

14 DATED:  January 15, 2016                     Respectfully Submitted,

15

16                              /s/Joseph N. Kravec, Jr.

17                           Joseph N. Kravec, Jr. (admitted *pro hac vice*)

18                           James M. Pietz (admitted *pro hac vice*)
                          Wyatt A. Lison (admitted *pro hac vice*)

19                           McKean J. Evans (admitted *pro hac vice*)
                          **FEINSTEIN DOYLE**

20                             **PAYNE & KRAVEC, LLC**
                          Allegheny Building, 17th Floor

21                           429 Forbes Avenue
                          Pittsburgh, PA  15219

22                           Tel:  (412) 281-8400
                          Fax:  (412) 281-1007

23                           Email: jkravec@fdpklaw.com
                          Email: jpietz@fdpklaw.com

24                           Email:  wlison@fdpklaw.com
                          Email:  mevans@fdpklaw.com

25                           Stephen F. Yunker (CSB 110159)

26                           **YUNKER & SCHNEIDER**
                          655 West Broadway, Suite 1400

27                           San Diego, California 92101
                          Tel:  (619) 233-5500

28                           Fax:  (619) 233-5535
                          Email: sfy@yslaw.com

                                     83

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gretchen Freeman Cappio
(admitted *pro hac vice*)
Dean N. Kawamoto (CSB 232032)
Gretchen S. Obrist (admitted *pro hac vice*)
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax:  (206) 623-3384
E-mail:  gcappio@kellerrohrback.com
            dkawamoto@kellerrohrback.com
            gobrist@kellerrohrback.com

***ATTORNEYS FOR PLAINTIFFS AND THE
PROPOSED CLASS AND SUBCLASSES***

84