**LOCKE LORD LLP**
Thomas J. Cunningham (Bar No. 263729)
tcunningham@lockelord.com
300 South Grand Avenue, Suite 2600
Los Angeles, California 90071
Phone:  213-687-6738

P. Russell Perdew (admitted *pro hac vice*)
rperdew@lockelord.com
111 South Wacker Drive
Chicago, Illinois 60606
Phone:  312-443-1712

James C. Magid (Bar No. 233043)
james.magid@lockelord.com
44 Montgomery Street, Suite 4100
San Francisco, California  94104
Phone:  415-318-8810

Attorneys for Defendants
OCWEN FINANCIAL CORPORATION,
OCWEN LOAN SERVICING, LLC, and
WILLIAM C. ERBEY

**DENTONS US LLP**
Andrew S. Azarmi (State Bar No. 241407)
andrew.azarmi@dentons.com
Spear Tower, One Market Plaza, 24th Floor
San Francisco, California 94105
Telephone:     415.267.4000
Facsimile:      415.267.4198

Nathan L. Garroway (admitted *pro hac vice*)
nathan.garroway@dentons.com
303 Peachtree Street NE, Suite 5300
Atlanta, Georgia 30308
Telephone:     404.527.4000
Facsimile:      404.527.4198

Attorneys for Defendant ALTISOURCE
SOLUTIONS, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| VICTOR P. GIOTTA and LORALEE GIOTTA, On Behalf Of Themselves And All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>OCWEN FINANCIAL CORPORATION, OCWEN LOAN SERVICING, LLC, ALTISOURCE PORTFOLIO SOLUTIONS S.A., ALTISOURCE SOLUTIONS, INC., WILLIAM C. ERBEY, and DOES 1-50,<br><br>Defendants. | Case No. 5:15-CV-00620-BLF<br><br>**DEFENDANTS' *JOINT* NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:      June 9, 2016<br>Time:      9:00 a.m.<br>Dept:      Courtroom 3, 5th Floor<br><br>The Hon. Beth Labson Freeman |

1

**NOTICE OF MOTION**

2
TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

3
NOTICE IS HEREBY GIVEN that on June 9, 2016, at 9:00 a.m. in Courtroom 3 of the

4
United States District Court, Northern District of California, San Jose Division, located at 280

5
South First Street, San Jose, California, Defendants Ocwen Financial Corporation ("OFC"),

6
Ocwen Loan Servicing, LLC ("OLS"), William C. Erbey, and Altisource Solutions, Inc.

7
("Altisource") (collectively, "Defendants"), will and hereby do jointly[1] move the Honorable Beth

8
Labson Freeman, United States District Judge, for dismissal of the Second Amended Complaint

9
(Dkt. 78, hereafter "SAC") filed by Plaintiffs Victor P. Giotta and Loralee Giotta (collectively,

10
"Plaintiffs") because the SAC fails to state a claim under Federal Rule of Civil Procedure 12(b)(6).

11
The SAC should be dismissed without leave to amend because Plaintiffs have already had

12
two opportunities to amend their original Complaint but remain unable to cure any of the defects,

13
and because any further amendment would be futile.

14
This motion is based on this Notice of Motion and Motion, the Memorandum of Points and

15
Authorities, the pleadings, papers and records on file in this case, and such oral argument as may

16
be presented at any hearing.

17

18

19

20

---

21
[1] Defendants file this motion jointly in response to the Court's request at the hearing on

22
Defendants' separate motions to dismiss Plaintiffs' First Amended Complaint. Hrg. Tr., p. 38:5-

23
21; Dkt. 71. Defendants are separate parties with separate interests. While Plaintiffs improperly

24
lump all Defendants together, their allegations concede that Ocwen Financial Corporation and

25
Altisource Solutions, Inc. are separate companies with separate headquarters, separate businesses,

26
separate management, and separate principal places of business. *See* SAC, ¶¶ 18, 21.

27

28

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION .................................................................................................. 1

II.  FACTUAL BACKGROUND ............................................................................... 3

    A.   Plaintiffs Defaulted on Their Mortgage Loan. ......................................... 3

    B.   The Fees at Issue Were Authorized by Plaintiffs' Contract. .................... 3

    C.   This Court Previously Rejected Plaintiffs' Theory That the Contractually-
          Authorized Fees Are Unfair or Unlawful. ............................................... 4

    D.   The SAC Does Not Cure the Defects of the Prior Complaint. .................. 5

III. LEGAL STANDARD ......................................................................................... 6

IV.  ARGUMENT ....................................................................................................... 7

    A.   The Fraud-Based Claims—RICO, Fraud, and UCL-Fraud—All Fail. ..... 7

        1.   Plaintiffs' Fraud-Based Claims Are Mostly Based on Non-
            Disclosures And Thus Fail Because No Duty to Disclose Exists. ............... 7

            a.   No Duty to Disclose Exists Under California Law. .......................... 8

            b.   No Duty To Disclose Is Created by the CFPB Consent
                Order. ............................................................................................... 9

            c.   No Duty to Disclose Is Created by Servicing Regulations. ............ 10

            d.   Altisource is Even Further Removed. ............................................. 10

        2.   The Fee Schedule Does Not Support a Fraud Claim Because
            Plaintiffs Could Not Have Reasonably or Justifiably Relied Upon a
            Schedule that Was Subject to Change At Any Time Without Notice ......... 11

        3.   Plaintiffs' Fraud and RICO Claims Fail Because They Are Not
            Conceptually Distinct From Plaintiffs' Contract With OLS. ..................... 12

    B.   The UCL Unfairness-Prong Claim Must Be Dismissed Because Plaintiffs
          Do Not Allege Facts Showing That the Challenged Fees Are Unfair. ................... 15

        1.   Fees for Property Inspections and Property Valuations Are
            Expressly Permitted by the Deed of Trust. .................................................. 17

        2.   The Schedule of Fees Does Not Show the Challenged Fees Are
            Unfair. ......................................................................................................... 17

        3.   Plaintiffs' New Conclusory Allegations Regarding the Market Rate

for BPOs Also Do Not Show That the Charges Are Unfair........................ 18

        a.    Plaintiffs Lack Standing to Enforce a Consent Order. .................... 19

        b.    Plaintiffs do not Adequately Allege a Violation of the Consent Order. ................................................................................. 21

        c.    Plaintiffs Cannot Base Their Claim on Fannie Mae Guidelines.................................................................................... 22

    4.    Plaintiffs' Legal Citations do not Support the UCL Unfairness Claim. ...................................................................................... 24

    5.    Altisource is Even Further Removed. ......................................... 25

C.    Plaintiffs' Statutory Debt-Collection Claims Against OFC, OLS, and Erbey Fail Because the Fees at Issue Were Authorized. .................................. 26

    1.    Collection of Contractually-Authorized Property-Inspection and BPO Fees Cannot Support FDCPA or RFDCPA Claims. .......................... 26

    2.    Erbey Cannot Be Liable Under the FDCPA or RFDCPA Because He Is Not a Debt Collector. .......................................................... 27

D.    Plaintiffs' UCL-Unlawful Claim Fails Because No Statutory Violations Are Alleged. ...................................................................................... 28

E.    Plaintiffs' Claims Fail Under the Deed of Trust's Notice-and-Cure Provision.................................................................................... 28

    1.    The Notice-and-Cure Provision Applies to Claims Against OLS, OFC, Erbey, and Altisource. ...................................................... 29

    2.    The Notice-and-Cure Provision Applies to the Non-Contract Claims that Plaintiffs Assert Here. ......................................................... 31

F.    OFC Had No Connection with Plaintiffs' Loan and Cannot Be Held Liable for the Servicing of that Loan................................................................. 31

G.    Altisource Cannot be Held Liable as a Common Law Co-Conspirator or Aider-Abettor. ............................................................................ 34

V.    CONCLUSION ............................................................................... 35

# INDEX OF AUTHORITIES

CASES                                                                                          Page(s)

*Allen v. Greatbanc Trust Co.*,
    No. 15 C 3053, 2015 WL 5821772 (N.D. Ill. Oct. 1, 2015) ................................................. 22

*Altman v. PNC Mortg.*,
    850 F. Supp. 2d 1057 (E.D. Cal. 2012) ................................................................................. 15

*Annulli v. Panikkar*,
    200 F.3d 189 (3d Cir. 1999) .................................................................................................. 13

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
    7 Cal. 4th 503 (1994) ............................................................................................................. 34

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................................... 6, 22

*Astra Media Grp., LLC v. Clear Channel Taxi Media, LLC*,
    414 F. App'x 334 (2d Cir. 2011) .......................................................................................... 22

*Austin B. v. Escondido Union School Dist.*,
    149 Cal. App. 4th 860 (2007) ............................................................................................... 34

*Balistreri v. Pacifica Police Dep't*,
    901 F.2d 696 (9th Cir. 1990) .................................................................................................. 6

*Bardin v. Daimlerchrysler Corp.*,
    136 Cal. App. 4th 1255 (Cal. Ct. App. 2006) ...................................................................... 16

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................................ 6

*Benner v. Bank of Am.*,
    917 F. Supp. 2d 338 (E.D. Penn. 2013) ............................................................................... 26

*Berryman v. Merit Prop. Mgmt., Inc.*,
    152 Cal. App. 4th 1544 (2007) ............................................................................................... 8

*Bojorquez v. Gutierrez*,
    No. C 09-03684, 2010 WL 1223144 (N.D. Cal. Mar. 25, 2010) ........................................... 9

*Forbes v. Eagleson*,
    228 F.3d 471 (3d Cir. 2000) ................................................................................................. 13

*Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
    637 F.3d 1047 (9th Cir. 2011) ................................................................................................ 6

*Cal. Grocers Ass'n v. Bank of Am.*,
 22 Cal. App. 4th 205 (Cal. Ct. App. 1994) ........................................................................ 16

*Casey v. U.S. Bank Nat'l Ass'n*,
 127 Cal. App. 4th 1138 (2005)............................................................................................ 32

*Chabner v. United of Omaha Life Ins. Co.*,
 225 F.3d 1042 (9th Cir. 2000)............................................................................................. 28

*Christie v. Bank of N.Y. Mellon, N.A.*,
 617 F. App'x 680 (9th Cir. 2015)........................................................................................... 9

*Cirino v. Bank of America, N.A.*,
 No. CV-13-8829, 2014 WL 9894432 (C.D. Cal. Oct. 1, 2014) ........................................... 31

*Cmty. Assisting Recovery, Inc. v. Aegis Sec. Ins. Co.*,
 92 Cal. App. 4th 886 (Cal. Ct. App. 2001) ........................................................................ 16

*Cty. of Santa Clara v. Astra USA, Inc.*,
 588 F.3d 1237 (9th Cir. 2009)............................................................................................. 19

*Deschaine v. IndyMac Mortg. Servs.*,
 No. 2:13-1991, 2014 WL 281112 (E.D. Cal. Jan. 23, 2014) ............................................. 24

*Dey v. Cont'l Cent. Credit*,
 170 Cal. App. 4th 721 (2008)........................................................................................ 26, 28

*Doctors' Co. v. Super. Ct.*,
 49 Cal. 3d 39 (1989) .......................................................................................................... 34

*Doe v. Unocal Corp.*,
 248 F.3d 915 (9th Cir. 2001)............................................................................................... 33

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
 751 F.3d 990 (9th Cir. 2014)............................................................................................... 22

*Eller v. EquiTrust Life Ins. Co.*,
 778 F.3d 1089 (2015) ........................................................................................................... 8

*Facebook, Inc. v. MaxBounty, Inc.*,
 274 F.R.D. 279 (N.D. Cal. 2011) ................................................................................... 32, 33

*Fontaine v. Bank of Am., N.A.*,
 2015 WL 128067 (S.D. Cal. Jan. 7, 2015) ......................................................................... 20

*Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*,
 209 Cal. App. 4th 1118 (2012)............................................................................................ 12

*Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*,
 868 F. Supp. 2d 983 (E.D. Cal. 2012)................................................................................. 13

*Gold v. Midland Credit Management*,
  82 F. Supp. 3d 1064, 1072–73 (N.D. Cal. 2015) ................................................................... 28

*Graham v. Bank of Am., N.A.*,
  226 Cal. App. 4th 594 (2014)............................................................................................... 20

*Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*,
  896 F.2d 1542 (9th Cir. 1989)................................................................................................. 7

*Harrison Ventures, LLC v. Alta Mira Treatment Ctr., LLC*,
  No. C 10-00188 RS, 2010 WL 1929566 (N.D. Cal. May 12, 2010)...................................... 30

*Hollowell v. Alliance Bancorp, Inc.*,
  No. C–10–1658 MMC, 2011 WL 2884801 (N.D. Cal. July 19, 2011)................................... 29

*Howard v. Am. Online, Inc.*,
  208 F.3d 741 (9th Cir. 2000)................................................................................................. 15

*Jackson v. Atl. Sav. of Am.*,
  No. C 13–05755 CW, 2014 WL 4802879 (N.D. Cal. Sept. 26, 2014)................................... 29

*James v. Litton Loan Serv., LP*,
  No. C 10–05407 CRB, 2011 WL 724969 (N.D. Cal. Feb. 22, 2011) ...................................... 8

*JMP Sec. LLP v. Altair Nanotechs. Inc.*,
  880 F. Supp. 2d 1029 (N.D. Cal. 2012) ................................................................................ 13

*Jurewitz v. Bank of Am., N.A.*,
  938 F. Supp. 2d 994 (S.D. Cal. 2013) ................................................................................... 20

*Kariguddaiah v. Wells Fargo Bank, N.A.*,
  No. C 09–5716 MHP, 2010 WL 2650492 (N.D. Cal. July 1, 2010)...................................... 23

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005)............................................................................................... 29

*Kowal v. Day*,
  20 Cal. App. 3d 720 (1971).................................................................................................. 18

*Lawrence v. Wells Fargo Bank, N.A.*,
  2014 WL 2705425 (N.D. Cal. June 13, 2014) ...................................................................... 20

*Lazar v. Superior Court*,
  12 Cal. 4th 631 (1996)..................................................................................................... 11, 12

*In re LinkedIn User Privacy Litig.*,
  No. 5:12-CV-03088-EJD, 2014 WL 1323713 (N.D. Cal. Mar. 28, 2014)........................... 4, 5

*Lyons v. Bank of Am., NA*,
  No. 11-01232, 2011 WL 3607608 (N.D. Cal. Aug. 15, 2011)................................................. 9

*Marchante v. Sony Corp. of Am., Inc.*,
   801 F. Supp. 2d 1013 (S.D. Cal. 2011) ................................................................. 16

*Masuda v. Citibank, N.A.*,
   38 F. Supp. 3d 1130, 1134 (N.D. Cal. 2014)) ...................................................... 26

*McKenzie v. Wells Fargo Bank, N.A.*,
   931 F. Supp. 2d 1028 (N.D. Cal. 2013) ................................................................. 23

*Multifamily Captive Grp., LLC v. Assurance Risk Managers, Inc.*,
   629 F. Supp. 2d 1135 (E.D. Cal. 2009) ................................................................. 13

*N. Star Int'l v. Ariz. Corp. Comm'n*,
   720 F.2d 578 (9th Cir. 1983) .................................................................................... 6

*Oaks Mgmt. Corp. v. Superior Ct.*,
   145 Cal. App. 4th 453 (2006) ................................................................................ 8, 9

*OCM Principal Opportunities Fund v. CIBC World Markets Corp.*,
   157 Cal. App. 4th 835 (2007) .................................................................................... 8

*Pantoja v. Countrywide Home Loans, Inc.*,
   640 F. Supp. 2d 1177 (N.D. Cal. 2009) ................................................................. 28

*Paskenta Band of Nomlaki Indians v. Crosby*,
   No. 2:15-CV-00538-GEB, 2015 WL 4879650 (E.D. Cal. Aug. 14, 2015) ............ 32

*Perlman v. Zell*,
   185 F.3d 850 (7th Cir. 1999) .................................................................................. 13

*Rafferty v. NYNEX Corp.*,
   60 F.3d 844 (D.C. Cir. 1995) ................................................................................. 19

*Reyes v. Atlantic Richfield Co.*,
   12 F.3d 1464 (9th Cir. 1993) .................................................................................... 8

*Richard B. LeVine, Inc. v. Higashi*,
   131 Cal. App. 4th 566 (2005) ................................................................................ 30

*Royce Int'l Broad. Corp. v. Field*,
   No. C-99-4169-SI, 2000 WL 236434 (N.D. Cal. Feb. 23, 2000) .......................... 13

*Samura v. Kaiser Foundation Health Plan, Inc.*,
   17 Cal. App. 4th 1284 (Cal. Ct. App. 1993) ................................................... 15, 17

*Sanchez v. Triple-S Mgmt. Corp.*,
   492 F.3d 1 (1st Cir. 2007) ...................................................................................... 13

*Shadoan v. World Savings & Loan Ass'n*,
   219 Cal. App. 3d 97 (Cal. Ct. App. 1990) ............................................................. 16

*Shaw v. Regents of Univ. of Cal.*,
  58 Cal. App. 4th 44, 67 Cal. Rptr. 2d 850 (1997) ................................ 17, 18

*Shepherd v. Am. Home Mortg. Servs. Inc.*,
  No. 2:09-1916, 2009 WL 4505925 (E.D. Cal. Nov. 20, 2009) ................................ 8

*Skarbrevik v. Cohen, England & Whitfield*,
  231 Cal. App. 3d 692 (1991) ................................ 34

*Skilstaf, Inc. v. CVS Caremark Corp*,
  669 F.3d 1005 (9th Cir. 2012) ................................ 7

*So. v. Bay Area Rapid Transit*,
  No. C-12-05671 DMR, 2013 WL 5663207 (N.D. Cal. Oct. 17, 2013) ................................ 32

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001) ................................ 24

*Standfacts Credit Servs., Inc. v. Experian Info. Solutions, Inc.*,
  405 F. Supp. 2d 1141 (C.D. Cal. 2005), *aff'd in part*, 294 F. App'x 271 (9th Cir. 2008) ...... 34

*Stanley v. Bobo Const., Inc.*,
  No. 14-CV-00035 JAM-EFB, 2014 WL 3837366 (E.D. Cal. July 30, 2014) .............. 32

*Thompson v. Ill. Dep't of Prof'l Reg.*,
  300 F.3d 750 (7th Cir. 2002) ................................ 7

*Travelers Indem. Co. of Connecticut v. Centex Homes*,
  2014 WL 8864520 (C.D. Cal. Oct. 2, 2014) ................................ 29

*United Guar. Mortg. Indemnity Co. v. Countrywide Fin. Corp.*,
  660 F. Supp. 2d 1163 (C.D. Cal. 2009) ................................ 12

*United States v. Asarco Inc.*,
  430 F.3d 972 (9th Cir. 2005) ................................ 19

*United States v. FMC Corp.*,
  531 F.3d 813 (9th Cir. 2008) ................................ 9, 19

*Vega v. Ocwen Fin. Corp.*,
  No. 2:14–cv–04408–ODW, 2015 WL 3441930 (C.D. Cal. May 28, 2015) ........................ 23

*Vega v. Ocwen Financial Corp.*,
  2015 WL 1383241 (C.D. Cal. Mar. 24, 2015) ("*Vega I*") ................................ 14, 15

*Wahl v. Am. Sec. Ins. Co.*,
  No. 5:08-CV-0555, 2009 WL 1766620 (N.D. Cal. June 18, 2009) ........................ 16

*Walker v. Countrywide Home Loans, Inc.*,
  98 Cal. App. 4th 1158 (Cal. Ct. App. 2002) ................................ 16

*Weiner v. Ocwen Financial*,
    No. 2:14-cv-02597-MCE-DAD, 2015 WL 4599427 (E.D. Cal. July 29, 2015) .............. 14, 15

*Yang v. Dar Al-Handash Consultants*,
    250 Fed. Appx. 771 (9th Cir. 2007) ........................................................................ 23

**FEDERAL AND STATE STATUTES**

 12 U.S.C. § 5301, *et seq.* (the Dodd-Frank Act) .................................................. 18, 24

Fair Debt Collection Practices Act ("FDCPA") .......................................... 2, 26, 27, 28

Rackateer Influenced and Corrupt Organizations Act ("RICO") ........................ passim

Rosenthal Fair Debt Collection Practices Act ("RFDCPA") ................... 2, 3, 26, 27, 28

**OTHER AUTHORITIES**

12 C.F.R. § 1024.35(b)(5) ...................................................................................... 25

12 C.F.R. § 1026.41(d)(2)(ii) ............................................................................ 25, 10

Fed. R. Civ. Proc. 12(b)(6) ................................................................................. 6, 7

Restatement (Second) of Torts § 551(2)(a) ........................................................... 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

**I.     INTRODUCTION**

3      Plaintiffs' SAC is their third attempt to state a claim, and they still fail. The SAC reasserts

4   the same claims that this Court previously dismissed, and suffers from the same incurable legal

5   defects. Plaintiffs' failure to cure these defects on their third try shows that any future amendments

6   would be futile, so the Court should dismiss the SAC in its entirety and with prejudice.

7      Plaintiffs are borrowers who defaulted on their mortgage, leading their loan servicer (OLS)

8   to assess contractually-authorized fees for property inspections and property valuations. Plaintiffs

9   admit the controlling loan contract explicitly permits the exact fees at issue if the borrower

10   defaults. Plaintiffs do not claim the fees breached their contract, but they nonetheless allege the

11   contractually-authorized fees are improper under a variety of non-contractual legal theories.

12      The SAC suffers from the same two problems that led the Court to dismiss the prior

13   complaint. First, the Court dismissed the prior complaint because "Plaintiffs have not alleged facts

14   showing that they were charged fees that were unlawful or unfair." Dkt. 74, p. 14:7–8. Second, the

15   Court found that all of the fraud-based claims were premised on alleged non-disclosures and that

16   the facts alleged did not show the existence of a duty to disclose, which provided an independent

17   basis for dismissing the fraud, RICO and UCL-fraud claims. *Id.*, pp. 13:17–14:5. As discussed

18   below, those rulings require dismissal of the SAC as well.

19      The SAC provides few new factual allegations—it mostly adds citations to legal

20   authorities—and still fails to show that the contractually-authorized fees were improper or that any

21   duty to disclose exists. Plaintiffs add an allegation that property-inspection fees were improper

22   because (months before the inspections occurred) they received a fee schedule from OLS stating

23   that inspections would be performed at "no charge." But the fee schedule explicitly states that "all

24   fees and amounts are subject to change without prior notice," establishing that the servicer

25   retained discretion to impose property-inspection fees in the future. OLS's subsequent assessment

26   of property-inspection fees was thus authorized by the plain language of the contract and

27   consistent with the fee schedule. Plaintiffs also add an allegation that the $100 fee for property

28

1   valuations (known as BPOs) was above an alleged "market rate" of $60 to $90. But Plaintiffs lack

2   standing to enforce a "market rate" requirement against any Defendants, and Plaintiffs allege no

3   facts supporting their conclusory assertion of what the "market rate" was for BPOs. Just as the

4   Court found in dismissing the prior complaint, Plaintiffs still fail to explain "why it is unlawful or

5   unfair for [OLS] and/or Altisource to realize a profit on the subject transactions." Dkt. 74, p.

6   14:14-16.

7          The three fraud-based claims (fraud, RICO, and UCL-fraud) must also be dismissed for

8   two additional and independent reasons. First, all three claims are primarily based on non-

9   disclosures (with one exception discussed below), and Plaintiffs have failed to adequately allege

10  facts imposing a duty to disclose on any Defendant. As this Court already determined, OLS's role

11  as Plaintiffs' loan servicer does not create a duty to disclose as a matter of law. And Altisource,

12  which never had any relationship or communications with Plaintiffs and never received any

13  money from Plaintiffs, is even further removed. Further, the single affirmative statement Plaintiffs

14  rely on (the fee schedule that was subject to change at any time) was not false, and Plaintiffs do

15  not allege that they relied on (or could have reasonably relied on) the schedule. Finally, the fraud

16  and RICO claims must also be dismissed because they are not legally or conceptually distinct from

17  the contract at issue in this case.

18         Beyond the problems discussed above, the SAC must also be dismissed because Plaintiffs

19  have not alleged compliance with their contract's notice-and-cure provision. While the Court

20  previously declined to adopt Defendants' notice-and-cure argument based on uncertainty about

21  whether the term "Lender" included a loan servicer such as OLS, a loan modification agreement

22  that Plaintiffs did not previously attach to their complaint shows that the parties all understood that

23  servicers were included in that contractual term. Thus, OLS can rely on the notice-and-cure

24  provision, and Plaintiffs' failure to comply with that provision is fatal to the SAC.

25         Additionally, Erbey is improperly named as a defendant in claims arising under the federal

26  Fair Debt Collection Practices Act ("FDCPA") and California's Rosenthal Fair Debt Collection

27  Practices Act ("RFDCPA"). Erbey is not a debt collector, and he cannot be liable under those

28

statutes simply because he is a former director and officer of OLS. Similarly, all the claims against OFC must be dismissed because Plaintiffs do not allege that OFC engaged in any conduct regarding their loan.

Finally, Plaintiffs provide no basis for including Altisource as a defendant. Altisource is merely a third-party vendor that performed the inspections and BPOs at issue. Altisource never had any relationship with Plaintiffs, and the services were performed at OLS's request and charged to OLS. While Plaintiffs try to paint Altisource with the same brush as the other Defendants, they ultimately concede (as they must) that Altisource is a separate company with separate management, separate headquarters, and even separate principal places of business located in different states. The Court previously dismissed all claims against Altisource, and the SAC adds no new facts specific to Altisource. The fact remains that a third-party vendor does not act unlawfully by performing and then charging a loan servicer for contractually-authorized default-related services simply because the vendor make a profit. This defect was at the core of the Court's prior order, and Plaintiffs have been unable to cure it despite ample opportunity to do so.

## II.   FACTUAL BACKGROUND

### A.   Plaintiffs Defaulted on Their Mortgage Loan.

Plaintiffs defaulted on their loan prior to February 2013. SAC, ¶ 16. As their loan servicer, OLS collects monthly payments and imposes certain fees if the loan goes into default. *Id.*, ¶ 31. OLS's responsibilities as servicer are governed by two loan contracts: a note and deed of trust. *Id.*, ¶ 36. The deed of trust is Exhibit 2 to the SAC.

### B.   The Fees at Issue Were Authorized by Plaintiffs' Contract.

Plaintiffs' claims are based on fees that OLS charged for property inspections and BPOs. SAC, ¶¶ 78, 113–114. The SAC describes other so-called "Distressed Mortgage Services," but other services are not at issue because Plaintiffs never allege that they were charged for them.

Plaintiffs acknowledge that servicers like OLS are contractually authorized to collect fees for property inspections and BPOs. SAC, ¶ 31 ("Servicers perform services including: . . . assessing and collecting money for any distressed mortgage services as provided by the mortgage

1   contract for such things as . . . property inspection fees, appraisal fees, BPOs  . . . .”). Plaintiffs’

2   deed of trust expressly authorized OLS to charge fees for property inspections and BPOs if

3   Plaintiffs defaulted. SAC, Ex. 2 at ¶ 14 (“Lender may charge Borrower fees for services

4   performed in connection with Borrower’s default, for the purpose of protecting Lender’s interest

5   in the Property and rights under this Security Instrument, including, but not limited to, attorneys’

6   fees, property inspection and valuation fees.”); *see also* SAC, Ex. 2 at ¶ 9 (“If (a) Borrower fails to

7   perform the covenants and agreements contained in this Security Instrument . . ., then Lender may

8   do and pay for whatever is reasonable or appropriate to protect Lender’s interest in the Property

9   and rights under this Security Instrument, including protecting and/or assessing the value of the

10  Property, and securing and/or repairing the Property. . . . Any amounts disbursed by Lender under

11  this Section 9 shall become additional debt of Borrower secured by this Security Instrument.”).

12      Plaintiffs are ***not*** alleging that any fees they were charged violated their contract. SAC,

13  ¶ 162. Thus, for purposes of this motion to dismiss, the Court should assume that the fees were

14  authorized under the governing contract. *In re LinkedIn User Privacy Litig.*, No. 5:12-CV-03088-

15  EJD, 2014 WL 1323713, at *2 (N.D. Cal. Mar. 28, 2014) (“[I]t is not proper for the court to

16  assume that ‘the [plaintiff] can prove facts that [he or she] has not alleged or that defendants have

17  violated the . . . laws in ways that have not been alleged.’” (citing *Associated Gen. Contractors of*

18  *Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983))).

19      **C.      This Court Previously Rejected Plaintiffs’ Theory That the Contractually-**

20              **Authorized Fees Are Unfair or Unlawful.**

21      All claims in the SAC are based on the allegation that the contractually-authorized fees at

22  issue were somehow unlawful or unfair. SAC, ¶¶ 163–260. But the Court previously dismissed the

23  First Amended Complaint in its entirety because Plaintiffs had “not alleged facts showing that

24  they were charged fees that were unlawful or unfair.” Dkt. 74, p. 14:7–8, 17:1–5, 17:8–9, 18:23,

25  18:26–28, 19:10–11, 19:17–19. The Court specifically rejected Plaintiffs’ argument that OLS’s

26  use of Altisource to perform property inspections or BPOs was unlawful or unfair. *Id.*, p. 14:22–24

27  (“Counsel argued that the same practice was unlawful or unfair in this case because Altisource is a

28

spin-off company. . . . Plaintiffs have not cited, and the Court has not discovered, any case supporting that position."). The Court also rejected the argument that it is unfair or unlawful for OLS and Altisource, which are for-profit businesses, to make a profit on their services. *Id.*, p. 14:14–16 ("Plaintiffs have not explained why it is unlawful or unfair for Ocwen Servicing and/or Altisource to realize a profit on the subject transactions."). Finally, the Court rejected Plaintiffs' argument that the fees charged for property inspections and BPOs were duplicative. *Id.*, p. 18:26–28 ("Plaintiffs have not alleged facts or presented legal authority showing that . . . Defendants were not entitled to obtain both property inspections and BPOs within a short period of time.").

The Court also dismissed the three fraud-based claims (fraud, RICO, and UCL-fraud) on the independent basis that Defendants owed Plaintiffs no duty to disclose. The Court concluded that Plaintiffs' allegations amounted to purported non-disclosures rather than affirmative misrepresentations, relying in part on Plaintiffs' own admission at the hearing that "this is really a concealment case." *Id.*, p. 13:17–19 ("The alleged acts of mail and wire fraud in this case are premised upon non-disclosure."). The Court then found that Plaintiffs "have not identified a fiduciary duty or any other duty that would give rise to a disclosure obligation on the part of Defendants," which was also fatal to the fraud-based claims. *Id.*, pp. 14:2–4, 16:27–17:1, p. 19:8–11, p. 19:17–18.

**D.      The SAC Does Not Cure the Defects of the Prior Complaint.**

The SAC asserts the exact same legal claims, based on the exact same fees, as the defective First Amended Complaint, and relies on many of the same arguments this Court previously rejected. SAC, ¶ 11 (fees are improper because OLS used Altisource to perform property inspections and BPOs); *id.*, ¶ 12 (OLS or Altisource act unfairly and unlawfully by earning any profit on property inspections or BPOs); *id.*, ¶ 13 (OLS acted unfairly and unlawfully by having both property inspections and BPOs conducted in the same time frame).

The SAC's few new allegations do not save it. First, Plaintiffs allege they received a fee schedule from OLS reflecting "no charge" for property inspections. *Id.*, ¶ 76; SAC, Ex. 3. But

Plaintiffs received the schedule in February 2013 and do not allege they were charged for property inspections until August 2013, six months after receiving the schedule. SAC, ¶ 78. And the schedule states "[a]ll fees and amounts are subject to change without prior notice." *Id.*, Ex. 3 at p. 4. Further, Altisource was not a party to this letter, and the SAC does not allege that Altisource participated in preparing the letter or even knew about it.

The SAC also adds an allegation that the $100 BPO fee Plaintiffs were charged exceeds a supposed $60 to $90 "market rate" for BPOs. SAC, ¶ 10. But Plaintiffs' contract does not limit BPO fees to the $60 to $90 market rate claimed by Plaintiffs. And Plaintiffs' reliance on a consent order with the Consumer Financial Protection Bureau does not support their claim because Plaintiffs lack standing to enforce an order entered by agreement of OLS and the CFPB. Plaintiffs also allege no factual support for their conclusion that $60 to $90 was the "market rate" for BPOs.

The SAC includes no new factual allegations specific to Altisource. And, nothing in the SAC disputes that: (1) Altisource had no relationship, transaction or communication with Plaintiffs; (2) Altisource is a separate company with separate headquarters, management, and principal places of business than OLS and OFC (SAC, ¶¶ 18, 21); and (3) Altisource is not a party to the consent order between OLS and the CFPB.

## III.    LEGAL STANDARD

"The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Dismissal may be based on the lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To withstand a motion to dismiss, a complaint must plausibly allege facts supporting a claim for which relief may be granted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. A court's discretion to dismiss the complaint with prejudice "is particularly broad where plaintiff has previously amended the complaint." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011).

1    Documents attached to a complaint may be considered part of the complaint for purposes

2  of a Rule 12(b)(6) motion. *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542,

3  1555 (9th Cir. 1989). "[W]hen a written instrument contradicts allegations in a complaint to which

4  it is attached, the exhibit trumps the allegations." *Thompson v. Ill. Dep't of Prof'l Reg.*, 300 F.3d

5  750, 754 (7th Cir. 2002). The Court may disregard allegations that contradict facts in referenced

6  documents. *See Skilstaf, Inc. v. CVS Caremark Corp*, 669 F.3d 1005, 1016 n. 9 (9th Cir. 2012).

7  **IV.    ARGUMENT**[2]

8       **A.    The Fraud-Based Claims—RICO, Fraud, and UCL-Fraud—All Fail.**

9            **1.    Plaintiffs' Fraud-Based Claims Are Mostly Based on Non-Disclosures**

10            **And Thus Fail Because No Duty to Disclose Exists.**

11    As the Court found in its prior order and as Plaintiffs conceded at the last hearing, the

12  fraud-based claims in Plaintiffs' prior complaint were entirely based on alleged concealment, not

13  affirmative misrepresentations. Dkt. 74, p. 13:6-20; Dkt. 71 (Hrg. Tr.), p. 66:18-24 ("This is really

14  a concealment case . . . ."). With one exception discussed below, this has not changed in the SAC,

15  which is based on Defendants' alleged failure to disclose that: (1) OLS would assess fees after

16  property inspections after it sent a fee schedule allegedly showing "no charge" for such

17  inspections; and, (2) OLS's fees for property inspections and BPOs allegedly included an element

18  of profit or were above Plaintiffs' claimed "market rate" for such services. *See*, SAC, ¶ 178 (UCL-

19  fraud claim alleging OLS charged for property inspections after sending fee schedule "without

20  first notifying Plaintiffs . . . that they would be charged for property inspection"); ¶ 179 (UCL-

21  fraud claim alleging "Ocwen Servicing has and continues to violate the 'fraudulent' prong of the

22  UCL by . . . concealing and/or failing to disclose to Plaintiffs . . . that the Distressed Mortgage

23  Fees were up-charged, above-cost and above-market rate . . . ."); ¶ 201 (common-law fraud claim

24  _____

[2] The Court previously denied in part the motion to dismiss the First Amended Complaint filed by

25  Erbey based on lack of personal jurisdiction and Plaintiffs' failure to state a claim against Erbey.

26  Dkt. 74. Erbey hereby incorporates and preserves his prior arguments from earlier briefing in full.

27

28

1  alleging "Ocwen Servicing's disclosures through its billing statements . . . failed to disclose that

2  the Distressed Mortgage Fees were up-charged, above-cost and above-market rate . . . ."); ¶ 247

3  (RICO wire-fraud claim alleging "invoices . . . provided by Ocwen Servicing to borrowers omitted

4  and/or concealed the fact that the Distressed Mortgage Fees . . . were up-charged, above-cost and

5  above-market rates."); ¶ 251 (RICO claim alleging Defendants "did not disclose the true cost or

6  nature of the Distressed Mortgage Fees . . . .").

7       But fraud-based claims founded on non-disclosure can survive a motion to dismiss only if

8  there is a duty to disclose. *OCM Principal Opportunities Fund v. CIBC World Markets Corp.*, 157

9  Cal. App. 4th 835, 845 (2007) ("[T]o establish fraud through nondisclosure or concealment of

10  facts, it is necessary to show the defendant 'was under a legal duty to disclose them.'"); *Berryman*

11  *v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1557, (2007) ("Absent a duty to disclose, the

12  failure to do so does not support a claim under the fraudulent prong of the UCL."); *Eller v.*

13  *EquiTrust Life Ins. Co.*, 778 F.3d 1089 (2015) ("Absent an independent duty, such as a fiduciary

14  duty or an explicit statutory duty, failure to disclose cannot be the basis of a [RICO] fraudulent

15  scheme."). Because no such duty exists here, the three fraud-based claims must be dismissed.

16             **a.      No Duty to Disclose Exists Under California Law.**

17       California law is clear that a duty to disclose only exists where there is a fiduciary or other

18  special relationship between the parties. *Reyes v. Atlantic Richfield Co.*, 12 F.3d 1464, 1472 (9th

19  Cir. 1993) ("Parties engaged in an arm's length business transaction do not have a duty to disclose

20  absent a 'fiduciary or other similar relationship of trust and confidence.'"). California courts have

21  repeatedly held that the relationship between a borrower and lender (or loan servicer) is not the

22  kind of fiduciary or special relationship that creates a duty to disclose. *See Oaks Mgmt. Corp. v.*

23  *Superior Ct.*, 145 Cal. App. 4th 453, 466 (2006) ("[A]bsent special circumstances, . . . a loan

24  transaction is at arms-length and there is no fiduciary relationship between the borrower and

25  lender."); *James v. Litton Loan Serv., LP*, No. C 10–05407 CRB, 2011 WL 724969, at *3 (N.D.

26  Cal. Feb. 22, 2011) (no fiduciary relationship between borrower and loan servicer); *Shepherd v.*

27  *Am. Home Mortg. Servs. Inc.*, No. 2:09-1916, 2009 WL 4505925, at *2 (E.D. Cal. Nov. 20, 2009)

28

1   (same); *Bojorquez v. Gutierrez*, No. C 09-03684, 2010 WL 1223144, at *7 (N.D. Cal. Mar. 25,

2   2010) ("[P]laintiff fails to allege how defendants Ocwen and Specialized exceeded the scope of

3   their conventional role as loan servicers such that they assumed a fiduciary duty."); *Lyons v. Bank*

4   *of Am., NA*, No. 11-01232, 2011 WL 3607608, at *7 (N.D. Cal. Aug. 15, 2011) (dismissing

5   constructive fraud claim without leave to amend for failure to allege that defendants owed

6   plaintiffs a duty of care or the existence of a fiduciary relationship).[3]

7        Here, the only relationship Plaintiffs identify with any Defendant is OLS's role as

8   Plaintiffs' loan servicer, which is insufficient as a matter of law to create a duty to disclose. *E.g.*,

9   *Oaks Mgmt.*, 145 Cal. App. 4th at 466. And Plaintiffs allege no relationship at all between them

10  and OFC, Erbey, or Altisource. If the relationship between a borrower and lender (or loan

11  servicer) is not enough to create a duty to disclose, then there is plainly no basis for finding a duty

12  to disclose as to OFC, Erbey, or Altisource.

13                 **b.**     **No Duty To Disclose Is Created by the CFPB Consent Order.**

14       Plaintiffs also claim Defendants owed them a duty to disclose by virtue of the December

15  2013 consent order entered into by OLS, OFC, the CFPB, and the attorneys general of several

16  states. SAC, ¶ 69, Ex. 10. This argument fails for two reasons.

17       First, and as discussed more fully below in Section V.B.3.a, Plaintiffs are not parties to the

18  CFPB consent order and thus have no right to enforce its terms. The Ninth Circuit has consistently

19  held that incidental third-party beneficiaries to a consent order, like Plaintiffs, have no standing to

20  enforce its provisions. *See, e.g.*, *United States v. FMC Corp.*, 531 F.3d 813, 820 (9th Cir. 2008);

21

22  _____

    [3] The sections of the Restatement (Second) of Torts cited by the SAC do not help Plaintiffs

23  because they merely reiterate the uncontroversial legal principles that a duty to disclose cannot

24  exist in the absence of a fiduciary or other special relationship between the parties. For example,

25  section 551 states that a concealment claim requires "a fiduciary or other similar relation of trust

26  and confidence." Restatement (Second) of Torts § 551(2)(a).

27

28

*Christie v. Bank of N.Y. Mellon, N.A.*, 617 F. App'x 680, 682 (9th Cir. 2015) ("Christie cannot enforce the consent order because she is only an incidental third-party beneficiary of that order."). Thus, Plaintiffs cannot use the consent order with the CFPB to support any of their claims.

Second, even if Plaintiffs could enforce the terms of the CFPB consent order, those terms do not create any disclosure duties that would support any of Plaintiffs' claims. While the consent order requires default fees to be "disclosed in detail to the borrower" (SAC, Ex. 10, p. 106 of 174, ¶ VI.A.1), Plaintiffs concede that the property-inspection and BPO fees *were* disclosed to them. SAC, ¶ 108 (OLS "identified the fees on borrowers' billing statements" and "routinely presented the fees on form billing statements."). In fact, Plaintiffs even attach multiple statements from OLS describing the fees at issue. SAC, Exs. 11–16.

### c.    No Duty to Disclose Is Created by Servicing Regulations.

Plaintiffs also try to establish a duty to disclose by citing to two sections in the Code of Federal Regulations (SAC, ¶ 90)—12 C.F.R. § 1024.35(b)(5) and 12 C.F.R. § 1026.41(d)(2)(ii)—but those allegations fare no better. Neither regulation creates a general duty to disclose, and neither imposes the specific duty to disclose Plaintiffs allege here, *i.e.*, a duty to disclose "that the Distressed Mortgage Fees were up-charged, above-cost and above-market rate." SAC, ¶ 179. Rather, the first regulation only requires servicers to respond to certain communications from borrowers that provide notice of servicing errors, and the second regulation only requires servicers to provide regular monthly statements that list any fees charged. Neither requirement has any bearing on Plaintiffs' fraud-based claims against OLS and, as further discussed below in Section V.B.4, there is no allegation that OLS or any other Defendant violated either of these regulations in any event. Thus, the regulations provide no support for Plaintiffs' attempt to create a duty to disclose against OLS or any other Defendant.

### d.    Altisource is Even Further Removed.

Finally, all of the arguments discussed above apply even more strongly to Altisource. The Court already found that Altisource did not owe Plaintiffs any duty of disclosure (Dkt. 74, p. 14:2-5), and the SAC adds no new factual allegations that could impose such a duty on Altisource.

1   Plaintiffs still do not allege Altisource had any relationship or communication with Plaintiffs, let

2   alone the kind of confidential relationship that could give rise to a disclosure duty. At most,

3   Plaintiffs allege that Altisource was a third-party vendor hired by OLS to perform services on the

4   Plaintiffs' property, that Altisource charged OLS for the services it performed, and that OLS then

5   passed some amount for those services onto Plaintiffs. That does not come close to alleging a

6   fiduciary relationship between Altisource and Plaintiffs. Altisource is also not a party to the

7   consent order with the CFPB, so that order is irrelevant to imposing any disclosure duty on

8   Altisource. And the servicing regulations discussed above apply only to loan servicers and not

9   third-party vendors like Altisource. There is simply no authority for the proposition that a loan

10  servicer's third-party vendor, which has no direct contractual relationship or even any

11  communication with the borrower, could owe disclosure obligations.

12          **2.      The Fee Schedule Does Not Support a Fraud Claim Because Plaintiffs**

13          **Could Not Have Reasonably or Justifiably Relied Upon a Schedule that**

14          **Was Subject to Change At Any Time Without Notice.**

15          Although Plaintiffs' fraud claim is based predominantly on pure non-disclosures, they cite

16  to one affirmative statement by OLS in an attempt to save that claim: the fee schedule stating that

17  property inspections would be conducted at "no charge." SAC, ¶ 200 ("Plaintiffs . . . relied on

18  Ocwen Servicing's written disclosure that uniformly and consistently represented that property

19  inspections carried 'no charge.'"). This fee schedule cannot support a fraud claim because the fee

20  schedule was not false and because Plaintiffs have not alleged (and could not allege) that they

21  reasonably relied on the schedule. *See Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996)

22  (elements of common-law fraud include false statement and reasonable reliance).

23          First, the fee schedule contains no false statements. Plaintiffs complain that they received a

24  fee schedule in February 2013 stating that property inspections would be performed at "no

25  charge," and that Plaintiffs were charged between $10.50 and $15 for property inspections

26  beginning six months later in August 2013. SAC, ¶ 78. But Plaintiffs ignore that the fee schedule

27  also stated that "[a]ll fees and amounts are subject to change without prior notice." SAC, Ex. 3,

28

p. 4. Because the schedule was explicitly subject to change without notice, the fact that the fees changed six months later, and Plaintiffs were charged a $10.50 fee for a property inspection, does not render the information in the schedule false. Thus, Plaintiffs' reliance on the fee schedule cannot support their fraud claim for this reason alone.

Second, Plaintiffs could not have reasonably relied on the amounts quoted in the schedule given that the fees were explicitly subject to change without prior notice. The schedule did not warrant that the fees would remain the same for any period of time, or that Plaintiffs would receive any notice before the fees changed, so Plaintiffs could not have reasonably assumed that the fee amounts would stay the same. And in any event, Plaintiffs do not allege that they took any action in reliance on the fee schedule. In particular, they do not claim to have defaulted (thus triggering the deed of trust provision authorizing property-inspection fees) because they received the fee schedule. In fact, they acknowledge they were already in default when they received the fee schedule. SAC, ¶ 16. Thus, Plaintiffs have not alleged reasonable reliance, and the fee schedule cannot rescue their fraud claim for this additional reason. *Lazar*, 12 Cal. 4th at 638.

Finally, Altisource had nothing to do with the fee schedule. There is no allegation that Altisource sent or received the schedule, that Altisource assisted in preparing the schedule, or that Altisource even knew of the schedule's existence. *See, e.g.*, SAC, ¶¶ 76-77. Thus, Plaintiffs' claims as to the fee schedule obviously fail as to Altisource.

### 3.    Plaintiffs' Fraud and RICO Claims Fail Because They Are Not Conceptually Distinct From Plaintiffs' Contract With OLS.

Plaintiffs' fraud and RICO claims also fail because they are based entirely on fees imposed under Plaintiffs' contract with OLS. *See Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1130-32 (2012) (fraud claims not "conceptually distinct from the contract" are barred by California law). Both state and federal case law construing fraud claims under California's economic-loss rule, as well as federal cases construing RICO claims, require dismissal of such contract-based claims disguised as fraud claims.

California's economic-loss rule prevents Plaintiffs from basing common-law fraud claims on conduct that is governed by a contract. *United Guar. Mortg. Indemnity Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1180 (C.D. Cal. 2009) ("The economic loss rule generally bars tort claims for contract breaches, thereby limiting contracting parties to contract damages." (citations omitted)); *Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*, 868 F. Supp. 2d 983, 991-92 (E.D. Cal. 2012) ("Under California law, the economic loss doctrine 'requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise.'" (quoting *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004)) (plaintiff failed to state a claim for promissory fraud where "the misrepresentation that forms the basis of the fraud claim is the contract itself")); *JMP Sec. LLP v. Altair Nanotechs. Inc.*, 880 F. Supp. 2d 1029, 1043-45 (N.D. Cal. 2012) (dismissing fraud claims that took "allegations underpinning a straightforward claim for breach of a commercial contract and recast them as torts"). Dismissal of a fraud-based claim is also appropriate where "the damages plaintiffs seek are the same economic losses arising from the alleged breach of contract." *See Multifamily Captive Grp., LLC v. Assurance Risk Managers, Inc.*, 629 F. Supp. 2d 1135, 1146 (E.D. Cal. 2009).

Similarly, courts are also wary of RICO claims predicated on contractual disputes couched as mail or wire fraud because a breach of contract is not a cognizable RICO "predicate act." *See, e.g.*, *Perlman v. Zell*, 185 F.3d 850, 853 (7th Cir. 1999) ("Breach of contract is not fraud, and a series of broken promises therefore is not a pattern of fraud. It is correspondingly difficult to recast a dispute about broken promises into a claim of racketeering under RICO."); *Sanchez v. Triple-S Mgmt. Corp.*, 492 F.3d 1, 12 (1st Cir. 2007) ("[B]reach of contract itself [does not] constitute a scheme to defraud."); *Annulli v. Panikkar*, 200 F.3d 189, 200 (3d Cir. 1999) ("[I]f garden-variety state law crimes, torts, and contract breaches were to constitute predicate acts of racketeering (along with mail and wire fraud), civil RICO law, which is already a behemoth, would swallow state civil and criminal law whole. Virtually every litigant would have the incentive to file their breach of contract and tort claims under the federal civil RICO Act."), *abrogated on other grounds*

1   by *Forbes v. Eagleson*, 228 F.3d 471 (3d Cir. 2000); *Royce Int'l Broad. Corp. v. Field*, No. C-99-

2   4169-SI, 2000 WL 236434, at *6 (N.D. Cal. Feb. 23, 2000) ("To the extent that plaintiff's

3   allegations of mail or wire fraud are little more than allegations of a state breach of contract claim,

4   a RICO claim is not cognizable.").

5         Here, Plaintiffs' fraud-based claims are no more than disguised contract claims. All of

6   Plaintiffs' fraud-based claims are based on the allegation that OLS's "billing statements and other

7   standardized written communications . . . failed to disclose that the Distressed Mortgage Fees were

8   up-charged, above-cost and above-market-rate." *E.g.*, SAC, ¶ 201. But this simply alleges a

9   contractual breach, *i.e.* that the contractually authorized fees were inappropriate due to their price,

10  apparently reading some price limitation into the contract.

11        Plaintiffs' purported fraud claims are exactly the kind of claims courts dismiss as being

12  indistinguishable from contract claims. For example, the Central District of California recently

13  dismissed similar claims for this very reason in *Vega v. Ocwen Financial Corp.*, 2015 WL

14  1383241 (C.D. Cal. Mar. 24, 2015) ("*Vega I*"). The plaintiff there asserted fraud, RICO, UCL-

15  fraud, and other supposedly non-contract claims, alleging that OLS and OFC "continually and

16  indiscriminately assessed fees for unnecessary property inspections on the mortgage account of

17  Plaintiff Vega, thereby subjecting her to an invalid debt," and that defendants "fail[ed] to disclose

18  the nature of the charges and fees assessed." *Id.* at *1. Specifically, the plaintiff complained that

19  OLS and OFC committed fraud by failing to disclose that the fees were improper because the

20  inspections were unnecessary. *Id.* at *6. The court found that the plaintiff could not state a fraud

21  claim based on a dispute over contractually-authorized fees:

22            According to Vega, this case is about the "manner" property inspections are
              ordered. If that is true, Vega has alleged nothing more than a breach of contract
23            claim. Yet Vega is bringing a host of fraud and deception claims. The Court will
              not allow Vega to spin a simple contract dispute into something more.
24
    *Id.* at *5. As to the claim that OLS and OFC committed mail and wire fraud by failing to disclose

25  that the property inspections were "unnecessary," the court held that "it would be absurd for

26  Ocwen to print 'unnecessary property inspection' on each billing statement." *Id.* at *6. Like *Vega*,

27  this case is a contract dispute that Plaintiffs are attempting to pass off as fraud.

28

1    As this Court previously recognized, the language of Plaintiffs' deed of trust also

2    distinguishes this case from *Weiner v. Ocwen Financial*, No. 2:14-cv-02597-MCE-DAD, 2015

3    WL 4599427 (E.D. Cal. July 29, 2015). The deed of trust in *Weiner* "permit[ted] Ocwen to be

4    reimbursed for reasonable and appropriate fees but not marked up fees designed to make a profit."

5    Dkt. 74, p. 15:9–19 (citing *Weiner*, 2015 WL 4599427, at *7). The deed of trust here is

6    distinguishable from that in *Weiner* and is instead identically worded to the deed of trust in *Vega*.

7    Dismissal of Plaintiffs' fraud-based claims, as in *Vega*, is therefore warranted.[4]

8    Simply put, because this is a "dispute over the contractual language in the mortgage

9    agreement and [can be] fully resolved by the agreed-upon contract between the parties," it "is not

10   a fraud case." *Vega I*, 2015 WL 1383241, at *5. Thus, the fraud-based claims should be dismissed

11   for this additional reason.[5]

12   **B.     The UCL Unfairness-Prong Claim Must Be Dismissed Because Plaintiffs Do**

13   **Not Allege Facts Showing That the Challenged Fees Are Unfair.**

14   The UCL unfairness-prong claim should be dismissed because Plaintiffs are still unable to

15   allege facts or law "showing that they were charged fees that were unlawful or unfair." Dkt. 74, p.

16   14:7–8. The Court dismissed Plaintiffs' First Amended Complaint based on this fatal flaw and

17   nothing in the SAC remedies it.

18   California courts have been reluctant to find contractually-authorized conduct to be unfair

19   under the UCL. *See Samura v. Kaiser Foundation Health Plan, Inc.*, 17 Cal. App. 4th 1284, 1299,

20

21   [4] The dismissal in *Vega* is currently on appeal to the Ninth Circuit. A motion to stay pending the

22   outcome in *Vega* was filed in *Weiner* in August 2015 and the court has yet to rule on that motion,

23   or take any other action in that case after its order denying Defendants' motion to dismiss. *Weiner*,

24   No. 2:14-cv-02597-MCE-DAD (E.D. Cal.).

25   [5] Plaintiffs' RICO conspiracy claim fails as a matter of law because Plaintiffs have failed to plead

26   a substantive RICO violation. *Howard v. Am. Online, Inc.*, 208 F.3d 741, 751 (9th Cir. 2000).

27

28

15

n. 6 (Cal. Ct. App. 1993) (reversing injunction entered under UCL-unfairness prong; "[t]he [UCL] does not give the courts a general license to review the fairness of contracts . . . ."); *Altman v. PNC Mortg.*, 850 F. Supp. 2d 1057, 1077 (E.D. Cal. 2012) (dismissing UCL-unfairness claim for same reason); *Cmty. Assisting Recovery, Inc. v. Aegis Sec. Ins. Co.*, 92 Cal. App. 4th 886, 894 (Cal. Ct. App. 2001) (affirming dismissal of UCL-unfairness claim where insurer's method of adjusting loss did not violate statute, involve fraud, or involve "a breach of the standard form policy."); *Marchante v. Sony Corp. of Am., Inc.*, 801 F. Supp. 2d 1013, 1017–1018 (S.D. Cal. 2011) (dismissing UCL-unfairness claim based on TV defects after warranty period expired); *Bardin v. Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1270 (Cal. Ct. App. 2006) (affirming dismissal of UCL-unfairness claim arising from use of less expensive and less durable material to "earn excessive profits" because "use of tubular steel exhaust manifolds [did not] violate any warranty or other agreement").

Indeed, California courts have found contractually authorized fees are not unfair under the UCL unless they are unconscionable or violate some independent statutory prohibition. *See Walker v. Countrywide Home Loans, Inc.*, 98 Cal. App. 4th 1158, 1178 (Cal. Ct. App. 2002) (rejecting UCL unfairness claim for property-inspection fees imposed by loan servicer; "Countrywide's imposition of the inspection fee upon the defaulting borrower is not unfair."); *Cal. Grocers Ass'n v. Bank of Am.*, 22 Cal. App. 4th 205, 218 (Cal. Ct. App. 1994) (reversing injunction under UCL unfairness claim for contractually-authorized fee; "Judicial review of one service fee charged by one bank is an entirely inappropriate method of overseeing bank service fees."); *Shadoan v. World Savings & Loan Ass'n*, 219 Cal. App. 3d 97, 106 (Cal. Ct. App. 1990) (affirming dismissal of UCL-unfairness claim regarding prepayment fee and "unilateral call" provision allowing lender to demand repayment; "the mere combination of the two provisions is not unconscionable, and thus not an unfair business practice . . ."); *cf. Wahl v. Am. Sec. Ins. Co.*, No. 5:08-CV-0555, 2009 WL 1766620, at *6–7 (N.D. Cal. June 18, 2009) (denying summary judgment on UCL claim where defendant failed to comply with the California Insurance Code's disclosure requirements).

Case No. 5:15-CV-00620-BLF
*JOINT* MOTION TO DISMISS; MEMORANDUM
OF POINTS AND AUTHORITIES

1     Here, Plaintiffs do not dispute that the challenged fees were allowed under the contract

2 with OLS, and Plaintiffs allege no independent legal basis to conclude that the fees are unlawful or

3 unfair. Furthermore, Altisource was entirely removed from the contractual relationship and was

4 simply a third-party retained by OLS to provide certain services. Plaintiffs have still failed to

5 articulate any legal authority which would make any of the Defendants liable under the UCL for

6 the conduct alleged. Thus, the UCL-unfairness claim must be dismissed.

7          **1.       Fees for Property Inspections and Property Valuations Are Expressly**

8                 **Permitted by the Deed of Trust.**

9     As Plaintiffs concede, the property-inspection and BPO fees at issue here are expressly

10 authorized by the deed of trust. SAC, Ex. 2 at ¶¶ 9, 14 ("Lender may charge Borrower fees for

11 services performed in connection with Borrower's default . . . including, but not limited to . . .

12 property inspection and valuation fees."). And Plaintiffs admittedly do not claim that the fees

13 violate the deed of trust. SAC, ¶ 162. Thus, Plaintiffs must point to some independent legal

14 authority to support their claim that the fees are unfair, and their failure to do so requires dismissal

15 of the claim.

16         **2.       The Schedule of Fees Does Not Show the Challenged Fees Are Unfair.**

17     Plaintiffs allege that the property-inspection fees they were charged are unfair because they

18 previously received a schedule from OLS indicating that property inspections would be performed

19 at "no charge." SAC, ¶¶ 76–78, 189(a); SAC, Ex. 3 at p. 4. Plaintiffs therefore claim that, once the

20 letter was sent, OLS was thereafter prohibited from charging them ***any*** property-inspection fees

21 under ***any*** circumstances. These allegations fail to support a claim for at least two independent

22 reasons.

23     First, Plaintiffs' position that OLS could not charge ***any*** amount for property inspections is

24 contrary to the plain language of the contract. *See* SAC, Ex. 2 at ¶¶ 9, 14 ("Lender may charge

25 Borrower fees for services performed in connection with Borrower's default . . . including, but not

26 limited to . . . property inspection and valuation fees."). Nothing in the contract requires advance

27 disclosure of fees or limits the fees to the amount disclosed in a schedule. This Court should

28

1   therefore reject Plaintiffs' attempt to enforce (via a UCL-unfairness claim) a duty that the

2   governing contract does not create. *Samura*, 17 Cal. App. 4th at 1299 n.6 ("The [UCL] does not

3   give the courts a general license to review the fairness of contracts . . . ."); *Shaw v. Regents of*

4   *Univ. of Cal.*, 58 Cal. App. 4th 44, 53, 67 Cal. Rptr. 2d 850, 855 (1997) ("Where contract

5   language is clear and explicit and does not lead to absurd results, we ascertain intent from the

6   written terms and go no further." (internal citation omitted)).

7        Second, nothing in the schedule of fees Plaintiffs received even purports to amend the

8   plain language of the contract that authorizes property-inspection fees. The schedule plainly says

9   that any amounts described in the letter "are subject to change without prior notice." SAC, Ex. 3 at

10  p. 4. In other words, nothing in the schedule is binding or permanent but is instead subject to

11  unilateral revision at any time. Given the absence of any binding obligation, the schedule cannot

12  create any contractual duties or alter pre-existing contractual duties owed by OLS. *Kowal v. Day*,

13  20 Cal. App. 3d 720, 724 (1971) ("Where a contract imposes no definite obligation on one party to

14  perform, it lacks mutuality of obligation. It is elementary that where performance is optional with

15  one of the parties no enforceable obligation exists." (internal citations omitted)). Even apart from

16  the lack of mutuality, the schedule cannot be plausibly read to impose a duty on OLS to notify

17  Plaintiffs of any change in the amount of property-inspection fees given the clear statement that

18  fees are "subject to change without prior notice." Thus, the schedule of fees does nothing to

19  change the contractual language authorizing property-inspection fees and cannot support

20  Plaintiffs' UCL-unfairness claim for this reason as well.

21            **3.    Plaintiffs' New Conclusory Allegations Regarding the Market Rate for**

22                **BPOs Also Do Not Show That the Charges Are Unfair.**

23       Plaintiffs also allege that their BPO fees ($100 for each of two BPOs charged in September

24  2013 and December 2014) were unfair because $100 exceeded an alleged "market rate" of $60 to

25  $90. SAC, ¶¶ 93, 94, 113, 114. Plaintiffs claim that OLS was required to charge this alleged

26  "market rate" for BPOs by virtue of a consent order with the CFPB, the Dodd-Frank Act (12

27

28

1   U.S.C. § 5301, *et seq.*), and Fannie Mae servicing guidelines. *Id.*, ¶¶ 81, 93. These allegations

2   likewise fail to support a UCL unfairness claim for several reasons.

3               **a.      Plaintiffs Lack Standing to Enforce a Consent Order.**

4         First, Plaintiffs have no standing to enforce a consent order with the CFPB. The consent

5   order (Ex. 10 to the SAC) was an agreed order entered in litigation, reflecting a settlement

6   between OLS and OFC on the one hand, and the CFPB and state attorneys general on the other.

7   SAC, Ex. 10 at pp. 8–9 of 174. The Ninth Circuit has repeatedly held that such consent orders are

8   treated like contracts and enforceable only by the parties or intended third-party beneficiaries.

9   *FMC Corp.*, 531 F.3d at 819–820 ("[C]onsent decrees are construed as contracts for purposes of

10  enforcement. . . . [I]ncidental third-party beneficiaries may not enforce consent decrees, but

11  intended third-party beneficiaries may."); *United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir.

12  2005) ("Without question courts treat consent decrees as contracts for enforcement purposes.").

13  Where the government is a party to the consent order, courts presume that non-parties are only

14  incidental beneficiaries and thus unable to enforce the order unless the order clearly states

15  otherwise. *FMC Corp.*, 531 F.3d at 821 ("[W]hen the government is the plaintiff, third-party

16  beneficiaries are presumed to be incidental in the absence of a clear expression of a different intent

17  in the consent decree."). A non-party seeking to enforce a governmental consent order must meet a

18  high burden to show they are an intended beneficiary with standing to enforce the consent order:

19          [P]arties that benefit from a government contract are generally
            assumed to be incidental beneficiaries, rather than intended ones,

20          and so may not enforce the contract *absent a clear intent to the*
            *contrary.* This clear intent hurdle is not satisfied by a contract's

21          recitation of interested constituencies, vague, hortatory
            pronouncements, statements of purpose, explicit reference to a third

22          party, or even a showing that the contract operates to the third
            parties' benefit and was entered into with them in mind. Rather, we

23          examine the precise language of the contract for a clear intent to
            rebut the presumption that the third parties are merely incidental

24          beneficiaries.

25  *Cty. of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237, 1244 (9th Cir. 2009), *rev'd on other*

26  *grounds by Astra USA, Inc. v. Santa Clara Cty.*, 563 U.S. 110, 131 S. Ct. 1342 (2011); *see also*

27  *Rafferty v. NYNEX Corp.*, 60 F.3d 844, 849 (D.C. Cir. 1995) ("Unless a government consent

28

1    [order] stipulates that it may be enforced by a third party beneficiary, only the parties to the [order]

2    can seek enforcement of it.").

3            Multiple courts (including this one) have already found that borrowers are no more than

4    incidental beneficiaries to the consent order with the CFPB (also known as the National Mortgage

5    Settlement)[6] and thus cannot enforce the order. *See, e.g.*, *Fontaine v. Bank of Am., N.A.*, 2015 WL

6    128067, at *8 (S.D. Cal. Jan. 7, 2015) ("The precise language of the Consent Judgment does not

7    establish a clear intent to rebut the presumption that the third parties to the Consent Judgment are

8    merely incidental beneficiaries."); *Lawrence v. Wells Fargo Bank, N.A.*, 2014 WL 2705425, at *6

9    (N.D. Cal. June 13, 2014) (dismissing claims, including UCL claim, for alleged violation of

10   National Mortgage Settlement; "[t]he court agrees with Wells Fargo that plaintiff has no standing

11   to enforce the National Mortgage Settlement consent judgment. Numerous courts have held that

12   individual borrowers are merely incidental beneficiaries of the National Mortgage Settlement, and

13   so have no right to bring third-party suits to enforce the consent judgment."); *Graham v. Bank of

14   Am., N.A.*, 226 Cal. App. 4th 594, 615-16 (2014) (affirming demurrer; "Graham is not entitled to

15   declaratory relief regarding the National Mortgage Settlement because he has no standing to

16   enforce the consent judgment."); *Jurewitz v. Bank of Am., N.A.*, 938 F. Supp. 2d 994, 997-98 (S.D.

17   Cal. 2013) ("Plaintiff has failed to allege sufficient facts indicating that she has standing to enforce

18   the Consent Judgment.").

19           Here, nothing in the CFPB consent order provides individual borrowers with any

20   enforcement rights against OLS or OFC. Rather, enforcement authority is vested in governmental

21   entities and a specific group charged with oversight responsibility. SAC, Ex. 10 at p. 134 of 174

22   ("An enforcement action under this Consent Judgment may be brought by any Party to this

23   Consent Judgment or the Monitoring Committee."). Thus, Plaintiffs have no standing to enforce

24   alleged requirements of the consent order and cannot base their claims against OLS and OFC on

25   alleged violations of the consent order.

26   _____

27   [6] *See* http://www.nationalmortgagesettlement.com/ and https://nationalocwensettlement.com/.

28

1

                 **b.**       **Plaintiffs do not Adequately Allege a Violation of the Consent**

2

                                 **Order.**

3        Even if Plaintiffs had standing to enforce the consent order (they do not), they have alleged

4  no facts showing that OLS violated it. As an initial matter, the consent order was entered on

5  February 26, 2014, and its servicing requirements became effective 60 days later, or on April 27,

6  2014. Ex. 1, Entered Consent Order, p. 12 of 173, ¶ 14; p. 121 of 173, ¶ A (stating that "the period

7  for implementation will be within 60 days of entry of this Consent Judgment").[7] Thus, the consent

8  order did not apply to the first BPO for which Plaintiffs were charged in September 2013.

9        Further, the terms of the consent order do not support Plaintiffs' theories of unfairness. For

10  example, although the order addresses both property-inspection fees and BPO fees, (Ex. 1, p. 106

11  of 173, ¶¶ VI.C.1.b, c), it imposes no restriction on conducting those two services within close

12  proximity of each other. Thus, the consent order provides no support for Plaintiffs' claim that

13  performing both property-inspection and BPOs constitutes improper "double dipping." The

14  consent order also contemplates that a servicer may use other companies to perform default

15  services, ***even if*** they are related to or affiliated with the servicer. *Id.*, p. 108 of 173, ¶ VI.C.3.

16  Thus, the consent order provides no support for Plaintiffs' claim that OLS's use of Altisource (an

17  independent company with separate headquarters, management, and principal place of business)

18  was somehow improper.

19        While the consent order does require that vendors charge affiliated servicers a "market

20  rate" for services (*id.*), Plaintiffs allege no facts to show that the $100 they were charged for a

21  BPO in December 2014 exceeded a reasonable market rate. Rather, Plaintiffs make only generic

22  claims about what BPOs typically cost and then make the conclusory assertion that the market rate

23  for BPOs is "between $60 and $90." SAC, ¶¶ 92, 93. Plaintiffs allege no facts to support a

24  plausible conclusion that $60 to $90 was the prevailing market rate in any market at any time, and

25

---

26  [7] Exhibit 1 is simply a file-stamped copy of the consent order that Plaintiffs attach as Exhibit 10 to

27  the SAC, and is attached hereto to show the entry date of the order.

28

Case No. 5:15-CV-00620-BLF
*JOINT* MOTION TO DISMISS; MEMORANDUM
OF POINTS AND AUTHORITIES

1   certainly include no allegations showing that $60 to $90 was the market rate for BPOs conducted

2   by a large national servicer (such as OLS) in San Jose, California in late 2014.

3        Courts have repeatedly rejected similarly conclusory and unsupported allegations of a

4   market rate as insufficient to state a claim. *Eclectic Props. E., LLC v. Marcus & Millichap Co.*,

5   751 F.3d 990, 999 (9th Cir. 2014) (affirming dismissal of RICO claim based on purchase of real

6   estate at allegedly inflated price; "the complaint alleges no specific facts supporting its conclusion

7   that the properties' 'true fair market valu[e]' was just $11.1 million. The complaint does not cite

8   any documents or sources for this value, nor does it explain the methodology by which this value

9   was derived."); *Astra Media Grp., LLC v. Clear Channel Taxi Media, LLC*, 414 F. App'x 334, 336

10  (2d Cir. 2011) (affirming dismissal of predatory pricing claim because "Astra Media provides no

11  facts to support its contention that $170 is actually close to the standard industry cost. It is unclear

12  from the complaint whether the industry standard is higher or lower than $170 or by how

13  much. . . . Astra Media, therefore, failed properly to plead that Clear Channel's prices were below

14  an appropriate measure of its costs."); *Allen v. Greatbanc Trust Co.*, No. 15 C 3053, 2015 WL

15  5821772, at *3 (N.D. Ill. Oct. 1, 2015) (dismissing ERISA claim based on loan at allegedly

16  inflated interest rate because "Plaintiffs have nothing to bolster their claim that the market rate

17  was, in fact, 4.25%").

18       In short, Plaintiffs do not plead sufficient facts to show that the $100 they were charged for

19  a BPO exceeded the market rate. Thus, even if Plaintiffs had standing to enforce the consent order

20  (they do not), they have alleged no facts supporting a plausible conclusion that the consent order

21  was violated. Plaintiffs have thus failed to show that the fees were unfair for this additional reason.

22  *Iqbal*, 129 S.Ct. at 1950 ("Where the well-pleaded facts do not permit the court to infer more than

23  the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the

24  pleader is entitled to relief." (*citing* Fed R. Civ. Proc. 8(a)(2))).

25               c.       **Plaintiffs Cannot Base Their Claim on Fannie Mae Guidelines.**

26       Plaintiffs also claim that the fees are unfair because they exceed an amount permitted by

27  Fannie Mae servicing guidelines. SAC, ¶ 93. This allegation cannot support Plaintiffs' UCL-

28

1    unfairness claim for several reasons. First, Plaintiffs do not allege that their loan was owned by

2    Fannie Mae such that those servicing guidelines would apply. The Fannie Mae guidelines cannot

3    support Plaintiffs' claim for this simple reason alone.

4        Second, borrowers lack standing to enforce Fannie Mae servicing guidelines. *McKenzie v.*

5    *Wells Fargo Bank, N.A.*, 931 F. Supp. 2d 1028, 1044 (N.D. Cal. 2013) (dismissing borrower's

6    claim against servicer based on alleged violation of servicing guidelines; "the federal courts have

7    uniformly concluded, to the extent that the [Fannie Mae and Freddie Mac] servicing guidelines

8    can be read as creating enforceable contractual duties, that borrowers are neither parties nor third-

9    party beneficiaries entitled to enforce the [Fannie Mae and Freddie Mac] servicing guidelines.");

10   *Kariguddaiah v. Wells Fargo Bank, N.A.*, No. C 09–5716 MHP, 2010 WL 2650492, at *4 n.4

11   (N.D. Cal. July 1, 2010) (dismissing borrower claim against servicer based on alleged violation of

12   servicing guideline because borrower "has not alleged that he was an intended beneficiary of any

13   putative contract between Fannie Mae and Freddie Mac," and even if he had, "he would be

14   mistaken as a matter of law."); *Vega v. Ocwen Fin. Corp.*, No. 2:14–cv–04408–ODW, 2015 WL

15   3441930, at *4 (C.D. Cal. May 28, 2015) ("The law is clear—an alleged violation or breach of the

16   Fannie Mae Servicing Guide does not give rise to any cause of action." (citations omitted)). Thus,

17   Plaintiffs' cannot use Fannie Mae servicing guidelines to support their claims.

18       Finally, Plaintiffs incorrectly describe the guidelines. While Fannie Mae servicing

19   guidelines capped BPO fees at $80 in 2010, that cap was replaced in 2012 by a guideline

20   providing, "Fannie Mae will reimburse the servicer for any of the following out-of-pocket costs

21   that it pays to third-party vendors or the courts, as long as the costs are actual, reasonable, and

22   necessary . . . charges for brokers' price opinions." Ex. 2, Servicing Guideline 110.03, p. 1.[8]

---

23   [8] A court need not "blindly accept the allegations in the pleadings as true if these allegations are

24   contradicted by uncontested facts set forth in (1) exhibits to the non-moving party's pleading, (2)

25   documents that are referred to in the non-moving party's pleading, or (3) facts that are included in

26   materials that can be judicially noticed." *Yang v. Dar Al-Handash Consultants*, 250 Fed. Appx.

28

1    Plaintiffs are therefore flat wrong in alleging that the $100 fee they were charged in 2013 and

2    2014 exceeded the amount permitted by Fannie Mae servicing guidelines.

3          In sum, there is no basis for claiming the $100 fee for a contractually-authorized BPO was

4    unfair based on Plaintiffs' incorrect allegation regarding an inapplicable and unenforceable

5    servicing guideline.

6                      **4.     Plaintiffs' Legal Citations do not Support the UCL Unfairness Claim.**

7          Plaintiffs also use legal citations to support their UCL-unfairness claim, but none save the

8    claim from dismissal. Although the Court previously rejected the argument, Plaintiffs again allege

9    that the fees violated the Dodd-Frank Act. SAC, ¶¶ 81, 192(vi). But "courts have uniformly

10   held . . . that the provisions of Dodd-Frank are not retroactive" and do not apply to mortgages

11   originating before July 21, 2010, or July 21, 2011. *See, e.g.*, *Deschaine v. IndyMac Mortg. Servs.*,

12   No. 2:13-1991, 2014 WL 281112, at *8 (E.D. Cal. Jan. 23, 2014). Because Plaintiff's deed of trust

13   originated in 2007, the Dodd-Frank Act is irrelevant to this case. And even if the Dodd-Frank Act

14   applied, it does not contain specific restrictions on property-inspection or BPO fees. The statute

15   merely prohibits "any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B).

16   Thus, Plaintiffs' reliance on it is circular—they claim the fees at issue are unfair under the UCL

17   because they are unfair under the Dodd-Frank Act. But this does not address the fatal flaw in

18   Plaintiffs' claim: they have alleged no facts showing the fees are unfair under *either* statute. The

19   Court already rejected Plaintiffs' prior use of the Dodd-Frank Act for this precise reason and

20   should do so here as well. Dkt. 74, p. 18:16-23.

21   _____

     *{continued from previous page}*

22   771, 772 (9th Cir. 2007).  Here,  Plaintiffs have mischaracterized the contents of the Fannie Mae

23   Guidelines; thus, a true and correct copy of the relevant (and publically available) 2012 Fannie

24   Mae Guideline 110.03  is attached hereto as Exhibit 2.   *See, e.g., Sprewell v. Golden State*

25   *Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("The court need not … accept as true allegations that

26   contradict matters properly subject to judicial notice or by exhibit.")

27

28

Plaintiffs also cite two Code of Federal Regulations sections (SAC, ¶ 192(iii), (v)), but they do not allege facts showing that either section was violated. The first regulation, 12 C.F.R. § 1024.35(b)(5), requires servicers to respond to certain communications from borrowers that provide notices of servicing errors. This provision is irrelevant because Plaintiffs do not allege that they provided OLS with a notice of error. The second regulation, 12 C.F.R. § 1026.41(d)(2)(ii), requires that any fees be disclosed to borrowers in monthly statements. But Plaintiffs do not allege that they were assessed any fees that had not been disclosed to them in monthly statements. On the contrary, Plaintiffs acknowledge that the fees at issue were regularly disclosed in OLS's billing statements, and even attach those statements to the SAC. SAC, ¶ 108 (OLS "identified the fees on borrowers' billing statements" and "routinely presented the fees on form billing statements."); SAC, Exs. 11-16. Thus, Plaintiffs have failed to allege any violation of either regulation that could support a UCL unfairness claim.[9]

### 5. Altisource is Even Further Removed.

Plaintiffs' allegations about the fee schedule, the consent order with the CFPB, Fannie Mae servicing guidelines, and federal regulations applicable to loan servicers are even more deficient when it comes to Altisource. Altisource is not alleged to have had anything to do with the fee schedule or to have known about it. Altisource was also not a party to the consent order with the CFPB. And, Altisource is not alleged to be subject to any Fannie Mae servicing guidelines, or to the federal regulations cited in the SAC that apply only to loan servicers.

---

[9] Plaintiffs also cite to non-binding CFPB commentary regarding these two regulations published in the Federal Register. SAC, ¶ 192(ii), (iv). But this commentary is irrelevant because no violation of these regulations has been alleged.

**C.**     **Plaintiffs' Statutory Debt-Collection Claims Against OFC, OLS, and Erbey Fail Because the Fees at Issue Were Authorized.**

**1.**     **Collection of Contractually-Authorized Property-Inspection and BPO Fees Cannot Support FDCPA or RFDCPA Claims.**

Plaintiffs assert claims under the FDCPA (Fifth Claim) and the RFDCPA (Sixth Claim), alleging that OLS and Erbey violated these statutes by collecting property-inspection and BPO fees that OLS "was not legally authorized to asses, charge or collect . . . ." SAC, ¶¶ 219, 229.[10] These claims fail for the simple reason that the deed of trust explicitly authorized OLS to collect property-inspection and BPO fees, and Plaintiffs are not alleging that the fees violate the contract. Courts regularly dismiss FDCPA claims based on contractually-authorized fees. *See Benner v. Bank of Am.*, 917 F. Supp. 2d 338, 354 (E.D. Penn. 2013) (dismissing FDCPA claim; "Plaintiff's mortgage specifically allows for property inspections"; "[n]otifying a defaulted debtor that a property inspection fee is due is not a false statement under . . . the FDCPA."); *Dey v. Cont'l Cent. Credit*, 170 Cal. App. 4th 721, 727 (2008) (affirming dismissal of FDCPA claim; "[Plaintiff] does not meet his burden of showing a contract or statute prohibits defendants' collection fee"). These holdings apply equally to the RFDCPA, which only prohibits collecting fees and charges "if, in fact, such fees or charges may not legally be added to the existing obligation." Cal. Civ. Code § 1788.13(e); *see also Masuda v. Citibank, N.A.*, 38 F. Supp. 3d 1130, 1134 (N.D. Cal. 2014) ("Federal judicial interpretations of the FDCPA are incorporated into the Rosenthal Act . . . ."). This Court should follow suit and once again dismiss Plaintiffs' FDCPA and RFDCPA claims.

Plaintiffs try to salvage their FDCPA and RFDCPA claims with the same allegations made in support of their UCL-unfairness claim, *i.e.*, that the fees were improper because of: (1) the fee schedule they received; (2) the alleged $60 to $90 market rate for BPOs; and (3) the alleged impropriety of charging for both property inspections and BPOs. SAC, ¶¶ 218, 228. Defendants

---

[10] The Court dismissed Plaintiffs' prior FDCPA and RFDCPA claims against Altisource. Dkt. 74, p. 17:10-18:4. Plaintiffs no longer assert these claims against Altisource in the SAC.

1  addressed these allegations above in Section V.B, and those arguments apply equally here. There

2  is no basis for claiming the contractually-authorized property-inspection and BPO fees were unfair

3  or illegal, so Plaintiffs' FDCPA and RFDCPA claims must be dismissed.

### 2.  Erbey Cannot Be Liable Under the FDCPA or RFDCPA Because He Is Not a Debt Collector.

6  In dismissing the FDCPA and RFDCPA claims in Plaintiffs' First Amended Complaint,

7  this Court recognized that claims under either statute require a showing that "the defendant was a

8  debt collector or engaged in debt collection activity." Dkt. 74, p. 17:14–15 (*citing Hunt v. Wells*

9  *Fargo Bank, N.A.*, No. 2:13–cv–02435–MCE–KJN, 2014 WL 1028391, at *5 (E.D. Cal. Mar. 17,

10  2014) ("As with the RFDCPA, to establish a violation of the FDCPA, a plaintiff must show that

11  the defendant was a debt collector engaged in debt collection activity.")). This Court also

12  concluded that aiding and abetting liability was unavailable under the FDCPA and RFDCPA. Dkt.

13  74, p. 17:21–25 (*citing Rich v. BAC Home Loans Servicing LP*, 2013 WL 10104612, at *5 ("There

14  is no support in the FDCPA for extending its coverage to secondary liability for aiding and

15  abetting.")).

16  Here, Erbey does not meet the statutory definition of "debt collector" under either statute

17  because he is not alleged to have taken any actions individually to collect the fees at issue, as

18  required under both statutes. *See* 15 U.S.C. § 1692a(6) ("The term 'debt collector' means any

19  person who uses any instrumentality of interstate commerce or the mails in any business the

20  principal purpose of which is the collection of any debts, or who regularly collects or attempts to

21  collect, directly or indirectly, debts owed or due or asserted to be owed or due another."); Cal. Civ.

22  Code § 1788.2(c) ("The term 'debt collector' means any person who, in the ordinary course of

23  business, regularly, on behalf of himself or herself or others, engages in debt collection.");

24  § 1788.2(b) ("The term 'debt collection' means any act or practice in connection with the

25  collection of consumer debts.").

26  Plaintiffs' alternative claim that Erbey should be held vicariously liable for the debt-

27  collection activity of OLS should also be rejected for two reasons. First, entities that are not debt

1 collectors cannot be held vicariously liable under either statute. *Gold v. Midland Credit*

2 *Management*, 82 F. Supp. 3d 1064, 1072–73 (N.D. Cal. 2015) ("[T]he majority of courts to have

3 considered the issue have determined that a principal must be a debt collector in order to be held

4 vicariously liable for the debt collection activities of another."). Second, even if Erbey could be

5 held vicariously liable under the FDCPA or the RFDCPA, Plaintiffs do not allege any facts

6 showing that Erbey in any way participated in the collection of the property-inspection or BPO

7 fees. Thus, there is no basis for holding Erbey liable under the FDCPA or RFDCPA.

8     **D.**    **Plaintiffs' UCL-Unlawful Claim Fails Because No Statutory Violations Are**

9            **Alleged.**

10     "By proscribing any unlawful business practice, section 17200 borrows violations of other

11 laws and treats them as unlawful practices that the unfair competition law makes independently

12 actionable." *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000)

13 (internal quotation marks and citation omitted).

14     Here, Plaintiffs attempt to base their UCL-unlawful claim on the various grounds discussed

15 above, *i.e.*, the Dodd-Frank Act, the consent order with the CFPB, the FDCPA, the RFDCPA, and

16 Fannie Mae servicing guidelines. SAC, ¶ 167. But as explained above, Plaintiffs lack standing to

17 enforce both the CFPB consent order and the Fannie Mae servicing guidelines, and Plaintiffs have

18 not adequately alleged a violation of any of the legal authorities they rely upon. Because all of

19 Plaintiffs' predicate claims fail, their derivative UCL-unlawful claim must be dismissed as well.

20 *Dey v. Cont'l Cent. Credit*, 170 Cal. App. 4th 721, 730 (2008) (affirming dismissal of UCL-

21 unlawful claim where no FDCPA claim was stated); *Pantoja v. Countrywide Home Loans, Inc.*,

22 640 F. Supp. 2d 1177, 1190-91 (N.D. Cal. 2009) (same).

23     **E.**    **Plaintiffs' Claims Fail Under the Deed of Trust's Notice-and-Cure Provision.**

24     OLS, OFC, and Erbey previously moved to dismiss all of Plaintiffs' claims under the

25 following notice-and-cure provision of Plaintiffs' deed of trust:

26         Neither Borrower nor Lender may commence, join, or be joined to any judicial
        action (as either an individual litigant or the member of a class) that arises from the

27         other party's actions pursuant to this Security Instrument or that alleges that the
        other party has breached any provision of, or any duty owed by reason of, this

28

Case No. 5:15-CV-00620-BLF
*JOINT* MOTION TO DISMISS; MEMORANDUM
OF POINTS AND AUTHORITIES

1

2

> Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.

3  SAC, Ex. 2, ¶ 20. Courts in this district have repeatedly dismissed claims by borrowers who fail to

4  allege compliance with the notice-and-cure provision. *See, e.g.*, *Hollowell v. Alliance Bancorp,*

5  *Inc.*, No. C–10–1658 MMC, 2011 WL 2884801, at *1 (N.D. Cal. July 19, 2011); *Jackson v. Atl.*

6  *Sav. of Am.*, No. C 13–05755 CW, 2014 WL 4802879, at *6 (N.D. Cal. Sept. 26, 2014).

7

8

### 1.    The Notice-and-Cure Provision Applies to Claims Against OLS, OFC, Erbey, and Altisource.

9          The Court previously concluded the notice-and-cure provision was inapplicable because of

10  uncertainty about whether OLS was a "Lender" as referenced in the provision. Dkt. 74, p. 10:17–

11  18 ("Here, Plaintiffs—the borrowers—sue the loan *servicer* and related entities, none of which is

12  the lender."). But a loan modification agreement executed by Plaintiffs, which is attached hereto

13  as Exhibit 3,[11] shows the parties clearly understood that loan servicers and their successors were

14  ─────────────────

15  [11] The Court may consider the subsequent loan modification agreement because it modifies the

16  terms of the contract that Plaintiff has put at issue by attaching the Deed of Trust to the

17  SAC.  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (extending the "incorporation by

18  reference" doctrine "to situations in which the plaintiff's claim depends on the contents of a

19  document, the defendant attaches the document to its motion to dismiss, and the parties do not

20  dispute the authenticity of the document . . . .").  In addition, the loan modification was recorded

21  on April 4, 2012 in the Santa Clara County Recorder's Office, so its authenticity is not in

22  question.  *Travelers Indem. Co. of Connecticut v. Centex Homes,* 2014 WL 8864520, at *10 (C.D.

23  Cal. Oct. 2, 2014) (letter attached to a motion to dismiss considered where the contents of the

24  letter were alleged in the claim, Plaintiff's claim depended on the contents of the letter, and the

25  authenticity of the letter not questioned).

26

27

28

1   among those considered the "Lender" under the contract. The modification specifically defines the

2   servicer as the "Lender." Ex. 3, p. 1 (stating that the modification was between Plaintiffs and

3   "GMAC Mortgage, LLC the Lender\Servicer or agent for Lender\Servicer ('Lender')"). Further,

4   Plaintiffs acknowledged in the loan modification that "'Lender' is the legal holder and the owner,

5   *or agent/servicer* for the legal holder and owner, of the Note and Security Instrument." *Id.*

6   (emphasis added). Finally, the modification agreement was signed by the prior loan servicer,

7   GMAC Mortgage, LLC,[12] demonstrating the servicer's authority to negotiate changes to the

8   payment terms of Plaintiffs' loan. *Id.*, p. 6. Thus, the loan modification shows that the parties

9   understood both that the term "Lender" included the loan servicer and that the servicer had

10  authority over the terms of the loan just as a lender would. As a result, the notice-and-cure

11  provision extends to servicers such as OLS.

12          Although OFC, Erbey, and Altisource are not "Lenders" under the notice-and-cure

13  provision, their liability as alleged co-conspirators is purely derivative of OLS's liability. *See*

14  SAC, ¶ 8 ("Ocwen Financial, Erbey and Altisource Servicing have been named for their active

15  roles in this complex mortgage scheme, including their actions in conspiring with and aiding and

16  abetting Ocwen Servicing's conduct."). Thus, if Plaintiffs' claims against OLS fail, their

17  derivative claims against OFC, Erbey, and Altisource must also fail. *Richard B. LeVine, Inc. v.*

18  *Higashi*, 131 Cal. App. 4th 566, 574 (2005) ("We begin by recognizing the well-worn principle

19  applicable to the civil conspiracy theory: '[T]here is no separate tort of civil conspiracy, and there

20  is no civil action for conspiracy to commit a recognized tort unless the wrongful act itself is

21  committed and damage results therefrom.'" (citing 5 Witkin, Summary of Cal. Law (9th ed. 1988)

22  Torts, § 44, p. 107)); *see also id.* at 250 ("The unifying principle under either theory of recovery,

23  civil conspiracy or aiding and abetting, is that [defendant's] liability depends upon *the actual*

24  *commission of a tort*." (emphasis added)); *Harrison Ventures, LLC v. Alta Mira Treatment Ctr.,*

25

26  [12] GMAC Mortgage's role as prior servicer is reflected in the servicing transfer notice attached to the SAC as Exhibit 3.

27

28

*LLC*, No. C 10-00188 RS, 2010 WL 1929566, at *5 (N.D. Cal. May 12, 2010) ("Moreover, aider and abettor liability requires actual commission of the underlying tort. Thus, the absence of a breach in the instant case also precludes liability on the aiding and abetting claim." (internal citation omitted)).

> **2.      The Notice-and-Cure Provision Applies to the Non-Contract Claims that Plaintiffs Assert Here.**

The notice-and-cure provision applies to Plaintiffs' claims even though Plaintiffs have not asserted an action for breach-of-contract because the notice-and-cure provision applies to "***any*** judicial action . . . that arises from the other party's actions pursuant to this Security Instrument." SAC, Ex. 2, ¶ 20 (emphasis added). All of Plaintiffs' claims arise from contractually-authorized property-inspection and BPO fees, and thus arise from actions taken under the contract.

California courts consistently find non-contract claims arise from a contract where, as in this case, the claims are based on a fee imposed under the contract. For example, in *Cirino v. Bank of America, N.A.*, No. CV-13-8829, 2014 WL 9894432, at *2 (C.D. Cal. Oct. 1, 2014), the plaintiff brought RICO, UCL, and fraud claims, but no contract claim, based on property-inspection fees. The court found the deed of trust's choice-of-law provision applied: "[a]ll of Plaintiff's claims are inextricably intertwined with the terms of his Deed of Trust. To the extent Plaintiff's claims arise out of Defendants' levy of property inspection fees, his claims depend on the proposition that those fees are impermissible under his Deed of Trust because they are not reasonable or necessary." *Id* at *11.

Thus, the notice-and-cure provision applies to the claims raised by Plaintiffs here and can be relied upon by OLS, OFC, Erbey and Altisource. As a result, all of Plaintiffs' claims must be dismissed because Plaintiffs have not alleged compliance with the notice-and-cure provision.

> **F.      OFC Had No Connection with Plaintiffs' Loan and Cannot Be Held Liable for the Servicing of that Loan.**

Plaintiffs' claims against OFC also fail for the separate and independent reason that Plaintiffs do not allege that OFC had any role in imposing the allegedly improper fees. Plaintiffs

1   acknowledge that OLS was their loan servicer (SAC, ¶ 16) and that OLS was the only entity that

2   imposed the allegedly improper fees. SAC, ¶ 8 ("Plaintiffs' Second Amended Complaint is based

3   on Ocwen Servicing overcharging struggling borrowers in at least three ways described below and

4   in more detail herein."). Plaintiffs do not allege that OFC is a party to their loan, serviced their

5   loan, or charged or received any of the fees at issue. Instead, they only allege mundane corporate

6   details, such as that OFC purchased mortgage servicing rights that are provided to OLS (*Id.*, ¶ 2),

7   that OFC spun off Altisource's parent company in 2009 (*Id.*, ¶ 20), and that OFC has engaged in

8   transactions with Altisource or Altisource's parent, including leasing software that is used in

9   servicing mortgages. *Id.*, ¶¶ 18, 20. Plaintiffs also allege that OLS is OFC's "indirect wholly-

10   owned subsidiary." *Id.*, ¶ 19. Based solely on those allegations, Plaintiffs attempt to hold OFC

11   liable for "conspiring with and aiding and abetting" OLS's conduct. *Id.*, ¶ 8.

12          Plaintiffs have not come close to sufficiently pleading conspiracy or aiding and abetting

13   liability against OFC. Conspiracy liability requires factual allegations showing an agreement to

14   commit a tortious act and some overt act in support of the conspiracy. *Stanley v. Bobo Const., Inc.*,

15   No. 14-CV-00035 JAM-EFB, 2014 WL 3837366, at *3 (E.D. Cal. July 30, 2014) ("To establish a

16   conspiracy, 'a plaintiff must allege (1) that the defendant had knowledge of and agreed to both the

17   objective and the course of action that resulted in the injury, (2) that there was a wrongful act

18   committed pursuant to that agreement, and (3) that there was resulting damage.'" (citing *Berg &

19   Berg Enters., LLC v. Sherwood Partners, Inc.*, 131 Cal. App. 4th 802, 833 (2005)); *Facebook, Inc.

20   v. MaxBounty, Inc.*, 274 F.R.D. 279, 285–286 (N.D. Cal. 2011). And aiding-and-abetting liability

21   requires factual allegations showing the defendant provided substantial assistance to a tortfeasor

22   with "knowledge by the alleged aider and abettor of the wrong and his or her role in furthering it."

23   *Id.* at 285; *see also Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1153 (2005)

24   ("California courts have long held that liability for aiding and abetting depends on proof the

25   defendant had actual knowledge of the specific primary wrong the defendant substantially

26   assisted."); *Paskenta Band of Nomlaki Indians v. Crosby*, No. 2:15-CV-00538-GEB, 2015 WL

27   4879650, at *4 (E.D. Cal. Aug. 14, 2015) (dismissing aiding and abetting claims where no

28

Case No. 5:15-CV-00620-BLF
*JOINT* MOTION TO DISMISS; MEMORANDUM
OF POINTS AND AUTHORITIES

1   allegation of "actual knowledge"); *So. v. Bay Area Rapid Transit*, No. C-12-05671 DMR, 2013

2   WL 5663207, at *12 (N.D. Cal. Oct. 17, 2013) (dismissing aiding and abetting claim; "Plaintiffs

3   have not alleged that any Defendants had actual knowledge of the assault and battery allegedly

4   committed"). In other words, both theories require facts showing the defendant was aware of, and

5   agreed to assist, ongoing tortious activity.

6   　　　　Here, Plaintiffs allege no facts showing that OFC knew of any alleged improprieties with

7   the property-inspection and BPO fees, and bare allegations that a defendant knew of the allegedly

8   wrongful conduct are not enough to avoid dismissal. *See Facebook*, 274 F.R.D. at 285 (alleging

9   defendant "knows its affiliates" engaged in tortious conduct insufficient to state claim). Further,

10  the fact that OFC allegedly engaged in routine corporate conduct (such as financing the acquisition

11  of servicing rights, leasing computer systems, or creating new corporate entities) does not support

12  liability without factual allegations showing that those actions were taken with knowledge of

13  wrongdoing. *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) ("A parent corporation may

14  be directly involved in financing and macro-management of its subsidiaries . . . without exposing

15  itself to a charge that each subsidiary is merely its alter ego." (citing *Fletcher v. Atex, Inc.*, 68 F.3d

16  1451, 1459-60 (2d Cir. 1995) (no alter ego liability where parental approval required for leases,

17  major capital expenditures and the sale of its subsidiary's assets))). No such facts are alleged here.

18  Nor do OFC's references to OLS's or Altisource's activities in annual reports support liability. *See*

19  *Doe*, 248 F.3d at 928 ("[R]eferences in the parent's annual report to subsidiaries or chains of

20  subsidiaries as divisions of the parent company do not establish the existence of an alter ego

21  relationship.").

22  　　　　Plaintiffs' claims are all based on fees imposed by their loan servicer OLS. While those

23  claims are all flawed for the multiple reasons discussed above, Plaintiffs have alleged no facts

24  showing that OFC could also be liable for any alleged torts committed by OLS. Thus, all claims

25  against OFC must be dismissed for this separate and additional reason.

26

27

28

1    **G.      Altisource Cannot be Held Liable as a Common Law Co-Conspirator or**

2    **Aider-Abettor.**

3         Like OFC, Altisource similarly cannot be held liable as a common law co-conspirator or

4    aider-abettor. In addition to their lengthy RICO conspiracy allegations, Plaintiffs also assert

5    boilerplate common law conspiracy and aider-abettor allegations against Altisource as a last-ditch

6    effort to keep Altisource in this case. SAC, ¶¶ 143-151. While co-conspirators may be liable for an

7    underlying tort, this "presupposes that the coconspirator is legally capable of committing the tort,

8    *i.e.*, that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability

9    for breach of that duty." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511

10   (1994); *see also Doctors' Co. v. Super. Ct.*, 49 Cal. 3d 39, 44 (1989) (holding that civil conspiracy

11   may not arise "if the alleged conspirator, though a participant in the agreement underlying the

12   injury, was not personally bound by the duty violated by the wrongdoing"); *Skarbrevik v. Cohen,*

13   *England & Whitfield*, 231 Cal. App. 3d 692, 710-11 (1991) (holding that, absent a preexisting duty

14   to disclose, defendant could not "be held accountable on a theory of conspiracy to conceal . . ."); 

15   *Standfacts Credit Servs., Inc. v. Experian Info. Solutions, Inc.*, 405 F. Supp. 2d 1141, 1148 (C.D.

16   Cal. 2005), *aff'd in part*, 294 F. App'x 271 (9th Cir. 2008) (dismissing claims under California's

17   UCL because defendants, even if they were co-conspirators, did not owe the plaintiffs any duty).

18   As has been explained at length, Altisource did not owe Plaintiffs any duty of disclosure under

19   California law.

20        Likewise, Altisource is not liable as an aider and abettor. An aider and abettor may be

21   liable for the commission of an intentional tort only if the aider and abettor either (a) knows that

22   the other's conduct constitutes a breach of duty and gives *substantial assistance* to the other to so

23   act, or (b) gives substantial assistance to the other in accomplishing a tortious result and his or her

24   own conduct, separately considered, constitutes a breach of duty to the person acted upon. *Austin*

25   *B. v. Escondido Union School Dist.*, 149 Cal. App. 4th 860, 879 (2007). Mere knowledge that a

26   tort is being committed and the failure to prevent it cannot create liability. *Id.* And as a general

27   rule, one owes no duty to control the conduct of another. *Id.* Plaintiffs have not alleged any facts

28

1  demonstrating that Altisource substantially assisted OLS in committing fraud. For example,

2  Plaintiffs do not allege that Altisource sent the purportedly fraudulent loan invoices to Plaintiffs,

3  communicated with Plaintiffs in any way or made any representations at all to Plaintiffs that were

4  false or otherwise. Nor do Plaintiffs allege any relationship, transaction or charges with Altisource.

5  Indeed, Plaintiffs cannot even coherently allege how it is that Altisource's conduct in this case—

6  the provision of contractually-authorized default-related services at the request of a loan servicer

7  and charged to the loan servicer—is unlawful or wrongful in the first place.

8  **V.     CONCLUSION**

9          For the foregoing reasons, the SAC should be dismissed in its entirety. Because Plaintiffs

10 have now had three chances to explain why Defendants' conduct was unlawful, but have been

11 unable to do so, their SAC should be dismissed with prejudice.

12 DATED:  February 29, 2016              DENTONS US LLP

13

14
                                        By:  _____/s/ Andrew S. Azarmi_____
15                                           Andrew S. Azarmi
16                                           Attorneys for Defendant Altisource Solutions, Inc.

17                                      LOCKE LORD LLP

18

19
                                        By:  _____/s/ P. Russell Perdew_____
20                                           P. Russell Perdew
21                                           Attorneys for Defendants Ocwen Financial
                                             Corporation, Ocwen Loan Servicing LLC and
22                                           William C. Erbey

23                                      <u>**CERTIFICATION**</u>

24          Pursuant to Local Rule 5-1(i)(3), the filing attorney attests that he has obtained
   concurrence regarding the filing of this document from the indicated signatories to the document.
25

26

27

28